**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

IN THE MATTER OF                                      Misc. No. 3:21-mc-01260

THE EXTRADITION OF                                   18 U.S.C. § 3184
RUSALIN SORIN MĂRGINEAN

                                                     **UNDER SEAL**

**COMPLAINT**
**(Fugitive from Foreign Country to United States)**
**(18 U.S.C. § 3184)**

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter I represent the United States in fulfilling its treaty obligations to the Government of Romania;

2.      There is an extradition treaty in force between the United States and Romania, to wit the Extradition Treaty between the United States of America and Romania and the Protocol to the Treaty between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters, U.S. - Rom., September 10, 2007, S. TREATY DOC. NO. 110-11 (2008) (collectively referenced hereafter as "the Treaty").

3.      Pursuant to the Treaty, the Government of Romania has submitted a formal request through diplomatic channels for the extradition of RUSALIN SORIN MĂRGINEAN,

**Complaint**                                                          **Page 1**

also known as Nik Lion ("MĂRGINEAN"), who is wanted to serve a sentence of imprisonment for three years and six months upon his conviction of four counts of instigation to misrepresentation and one count of use of false deed under private signature.

4.     According to information provided by the Government of Romania, MĂRGINEAN was convicted of instigation to misrepresentation, in violation of Article 47 of the Romanian Criminal Code, and use of false deed under private signature, in violation of Article 322 of the Romanian Criminal Code. A warrant for the enforcement of a custodial sentence was issued on March 19, 2015, by the Alba District Court in Alba County, Romania. MĂRGINEAN is sought by the Alba District Court to serve the above-described sentence.

5.     The conviction was based on the following facts, as set forth in the October 13, 2014, Criminal Sentence issued by the Alba District Court:

     a.     At all relevant times, MĂRGINEAN was the administrator and sole owner of the transportation company S.C. Sory Express S.R.L. Tartaria ("Sory Express" or the "Company"). In or around 2007, Sory Express fell into financial trouble. MĂRGINEAN established a scheme whereby he encouraged his employees and a relative to obtain loans in their names using forged documents that exaggerated their monthly income and employment. The money from the loans went directly to MĂRGINEAN and, in return, MĂRGINEAN promised that he would draft all necessary documentation and, implicitly, that he would repay the loans.

     b.     In or around November 2007, MĂRGINEAN asked new employee Chiriluț Cristian Sabin ("Sabin") to take out a loan for EUR 15,000 to help MĂRGINEAN pay off his Company's debts. Sabin agreed with the understanding that he would keep EUR 4,000 for himself and MĂRGINEAN would pay off the loan. In fact, Sabin requested a separate

**Complaint**                              **Page 2**

document memorializing this agreement, which both Sabin and MĂRGINEAN signed. MĂRGINEAN accompanied Sabin to the bank and personally presented false documents that inflated Sabin's salary and income to the loan officer.   A handwriting analysis confirmed that MĂRGINEAN signed the income statement.  The handwriting analysis concluded that MĂRGINEAN likely signed the employee contract, which exaggerated Sabin's term of employment and income.  The loan was approved, and Sabin handed EUR 11,000 to MĂRGINEAN.  Only three loan payments were made on this loan.

c.    In early January 2008, MĂRGINEAN offered Mărginean Nicolaie ("Nicolaie") a job.  A few days later, MĂRGINEAN told him about the Company's financial problems and asked him to help by taking out a loan.  MĂRGINEAN promised to repay the loan. MĂRGINEAN accompanied Nicolaie when he sought the loan, and MĂRGINEAN personally provided fraudulent documents to the loan officer.  The fraudulent documents verified Nicolaie's employment and inflated his income.  Nicolaie was not employed by the Company.  A EUR 15,000 loan was approved by the same loan officer, who handed over the money to MĂRGINEAN, not Nicolaie.  The first installment on the loan was paid, but no other installments were paid.  A handwriting analysis confirmed that MĂRGINEAN signed the false income statement and likely signed the false employee contract.

d.    A few months later, in May 2008, MĂRGINEAN asked a dayworker named Trifan Florin ("Florin") to take out a loan because MĂRGINEAN needed additional money.  MĂRGINEAN promised to repay the loan, and Florin agreed.  On MĂRGINEAN's instructions, Florin provided false documents to a loan officer to obtain a EUR 15,000 loan.  The documents exaggerated Florin's income and falsely stated that he was a driver at Sory Express,

**Complaint**                                                                                   **Page 3**

when in truth Florin did not even have a driver's license and was not employed by the Company. A handwriting analysis found that MĂRGINEAN signed the false income statement and likely signed the false employment contract. The loan was approved and Florin turned over the money to MĂRGINEAN. No installments on this loan were ever paid.

       e.     A few days later, Florin went to a different bank with similar fraudulent documents and obtained another personal loan for EUR 4,900. The money from this loan was also given to MĂRGINEAN, as was the loan repayment schedule. MĂRGINEAN failed to make a single installment payment towards this loan.

       f.     In June 2008, MĂRGINEAN asked his cousin Grozav Eugen Tiberiu ("Tiberiu") to work for his Company as a driver. MĂRGINEAN explained that Tiberiu would need to take out a loan, which would be used to cover any car accidents. MĂRGINEAN promised that he would make all the installment payments on the loan. Tiberiu noted that he did not have a driver's license, but MĂRGINEAN said this would not be a problem. MĂRGINEAN asked Tiberiu to sign several blank pages that bore the Company's stamp at the bottom of each page.

       g.     On June 4, 2008, Tiberiu used fraudulent documents created with the help of MĂRGINEAN to obtain loans from two separate banks. Tiberiu contracted a loan for EUR 10,000 from one bank and a loan for RON 10,000 from another bank. The money from both loans was given to MĂRGINEAN. A few weeks later, on the urging of MĂRGINEAN, Tiberiu obtained a "roll over" loan, which covered the two prior loans and provided an additional loan amount. Tiberiu used the same fraudulent employment contract and new income statements, and

the surplus money not used to pay off the prior loans was given to MĂRGINEAN.  Only a few partial payments were made on this roll over loan.

h.      A handwriting analysis found that MĂRGINEAN signed the income statements and likely signed the false employment contract for Tiberiu.  Tiberiu was not employed by the Company.

i.      An investigation by Romanian authorities found that MĂRGINEAN was assisted in obtaining these loans by his sister-in-law (who also worked at the Company) and complicit loan officers.

j.      MĂRGINEAN maintained his innocence, but the trial court noted that MĂRGINEAN was unable to explain the discrepancies between the documents he issued on behalf of Sory Express for the purpose of obtaining these loans and the internal bookkeeping maintained by his Company.

k.      MĂRGINEAN was present for his trial and was represented by counsel throughout the proceedings.  On October 13, 2014, MĂRGINEAN was found guilty of four counts of inciting fraud and one count of forgery of documents under a private signature.  He was sentenced to three years and six months imprisonment.  MĂRGINEAN appealed his conviction and sentence, but the appeal was dismissed "as devoid of merit."

6.      The offense with which MĂRGINEAN is charged is covered by Article 2(1) of the Treaty.

7.      According to the investigation to date, MĂRGINEAN may be found within the jurisdiction of this court at 628 NE 155th Ave, Portland, Oregon.

**Complaint**                                                                                    **Page 5**

8.      Michael N. Jacobsohn, an attorney adviser in the Office of the Legal Adviser of the United States Department of State, has provided the Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the offenses for which extradition is demanded are covered by the Treaty, and confirming that the documents supporting the request for extradition bear the certificate or seal of the Romanian Ministry of Justice, so as to enable them to be received in evidence in accordance with Article 10 of the Treaty.

9.      The declaration from the Department of State with its attachments, including a copy of the diplomatic note from Romania, a copy of the Treaty, and the certified documents submitted in support of the request (marked collectively as Government's Exhibit #1), are filed with this Complaint and incorporated by reference herein.

10.      A complaint and arrest warrant arising from this request were previously issued by the United States District Court for the Western District of Washington on October 1, 2021, because MĂRGINEAN was then believed to reside in Vancouver.  It has been determined he is currently a resident of Portland and is expected to be arrested in this district, so this Court is the proper venue for the Complaint and extradition proceedings. *See* 18 U.S.C. § 3184.

11.      Although MĂRGINEAN is a naturalized U.S. citizen, there is a likely possibility that he will flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with the Extradition Treaty between the United States and Romania and 18 U.S.C. § 3184, so that the fugitive may be arrested and brought before this

///

**Complaint**                                                                                          **Page 6**

Court and evidence of his criminality may be heard and considered, and that this Complaint and

the warrant be placed under seal until such time as the warrant is executed.

/s/ *Ryan Wesley Bounds*

RYAN W. BOUNDS, OSB #00012
Assistant United States Attorney


Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at

8:07   a.m/p.m. on November   19  , 2021.

*Jolie A. Russo*

HONORABLE JOLIE A. RUSSO
United States Magistrate Judge


**Complaint**                                                                                    **Page 7**

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF MICHAEL N. JACOBSOHN

I, Michael N. Jacobsohn, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests, and I am charged with the extradition case of Rusalin Sorin Mărginean. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Romania are found in the Extradition Treaty between the United States of America and Romania, signed on September 10, 2007 (the "Extradition Treaty"). A copy of the Extradition Treaty is attached to this declaration.

3. In accordance with the provisions of the Extradition Treaty, the Embassy of Romania has submitted Diplomatic Note 2450, dated November 13, 2017, formally requesting the extradition of Rusalin Sorin Mărginean. The Ministry of Justice of Romania submitted additional information relating to this request to the United States Department of Justice by letter dated May 7, 2018. Copies of the diplomatic note and letter are attached to this declaration.

4. In accordance with Article 20 of the Extradition Treaty, the United States represents the interests of Romania in proceedings in U.S. courts arising out of extradition requests made by Romania, and Romania provides similar representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article 2(1) of the Extradition Treaty.

20017785-1

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

I Certify That Michael N. Jacobsohn, whose name is subscribed to the document hereunto annexed, was at the time of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of State, United States of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*



In testimony whereof, I, Michael R. Pompeo, Secretary of State , have hereunto caused the seal of the Department of State to be affixed and my name subscribed by the Assistant Authentication Officer, of the said Department, at the city of Washington, in the District of Columbia, this twenty-first day of January, 2020.

*Issued pursuant to CHXIV, ___ of
Ser___ 5, 1789, 1 Stat. 68___ ___
___ ___657; 22USC 2651a; ___
___ 28 USC 1733 et. seq.;
___ 3(f); RULE 44 Federal R___
___ivil Procedure.*

Secretary of State

By _____

Assistant Authentication Officer,
Department of State

**Government Exhibit 1
Page 2 of 266**

6.   In accordance with Article 10 of the Extradition Treaty, documents that bear the certificate or seal of the Ministry or Department of Justice, or the Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization.  Romania, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Extradition Treaty requirements with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January ___6___, 2020.


_____
MICHAEL N. JACOBSOHN

Attachments:
1.  Copies of Note and Letter
2.  Copy of Extradition Treaty



**AMBASADA ROMÂNIEI**
**în Statele Unite ale Americii**

1607 23rd Street NW
Washington, DC 20008

Phone: +1 (202) 986 6973
Fax:    +1 (202) 232 4748
E-mail: washington@mae.ro
http://washington.mae.ro
facebook.com/romanian.embassy.us

L/LEI

2017 NOV 15 P 1: 21

DEPARTMENT OF STATE

Nr. *2450*

The Embassy of Romania to the United States of America presents its compliments to the United States Department of State and, according to the provisions of the Extradition Treaty between Romania and the United States of America, signed in Bucharest on the 10th of September 2007 and entered into force on the 8th of May 2009, and the letter of the Ministry of Justice of Romania, dated September 20, 2017, has the honor to submit, hereby enclosed, the request for extradition to Romania of the Romanian national **MĂRGINEAN Rusalin Sorin**, located by the U.S. authorities on the territory of the United States of America.

The Embassy of Romania to the United States of America avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington D.C., November __, 2017

*Enclosure:*

*Letter of the Ministry of Justice of Romania and the supporting documents.*

**UNITED STATES DEPARTMENT OF STATE**

**Office of the Legal Adviser**

cc/
United States Department of Justice
Criminal Division
Office of International Affairs

**Government Exhibit 1**
**Page 4 of 266**

 MINISTERUL JUSTIȚIEI

 ROMÂNIA
1918 2018 | SĂRBĂTORIM ÎMPREUNĂ

44260/2017 /07.05.2018

**U.S. DEPARTMENT OF JUSTICE**
**Criminal Division**
**Office of International Affairs**
**1301 New York Avenue, N.W.**
**Suite 800**
**Washington DC 20005**

In attention to : Deborah GAYNUS,
Senior Trial Attorney

In reference to your ellectronic message dated 3 May 2018, concerning the additional information needed in regard to the extradition request against MĂRGINEAN RUSALIN SORIN, we communicate you, bellow, as requested, the text of articles 320 and 321 from our Criminal Code:

**ART. 320**
**Tampering with official documents**
(1) The act of tampering with an official document by counterfeiting the writing or the signatures or by altering it in any manner, likely to have legal consequences, shall be punishable by no less than 6 months and no more than 3 years of imprisonment.
(2) The action described in par. (1), committed by a public servant during the exercise of their office duties, shall be punishable by no less than 1 and no more than 5 years of imprisonment and a ban on the exercise of certain rights.
(3) Tickets or any other printed documents producing legal consequences are assimilated to official documents.
(4) The attempt shall be also punishable.

**ART. 321**
**Creating false documents**
(1) The act of tampering with an official document when it is drawn up, committed by a public servant during the exercise of office duties, by certifying untrue facts or circumstances or by knowingly omitting to insert certain data or circumstances, shall be punishable by no less than 1 and no more than 5 years of imprisonment.
(2) The attempt shall be also punishable.

Respectfully yours,

Viviana Onaca,
Director

Directorate for International Law and Judicial Cooperation



Str. Apolodor nr. 17, sector 5, 050741 București, România
Tel. +4 037 204 1082
www.just.ro

Pagina 1 din 1

COD: FS-01-03-ver.3

Government Exhibit 1
Page 5 of 266



| 110TH CONGRESS 2d Session | SENATE | TREATY DOC. 110–11 |
|---|---|---|

# EXTRADITION TREATY WITH ROMANIA AND PROTOCOL TO THE TREATY ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS WITH ROMANIA

---

## MESSAGE

### FROM

# THE PRESIDENT OF THE UNITED STATES

#### TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND ROMANIA (THE "EXTRADITION TREATY" OR THE "TREATY") AND THE PROTOCOL TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND ROMANIA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS (THE "PROTOCOL"), BOTH SIGNED AT BUCHAREST ON SEPTEMBER 10, 2007



JANUARY 22, 2008.—Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2008

69–118

EXT-MARGINEAN-DECL-006

Government Exhibit 1
Page 6 of 266

EXT-MARGINEAN-DECL-007

Government Exhibit 1
Page 7 of 266

# LETTER OF TRANSMITTAL

———

THE WHITE HOUSE, *January 22, 2008.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty between the United States of America and Romania (the "Extradition Treaty" or the "Treaty") and the Protocol to the Treaty between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters (the "Protocol"), both signed at Bucharest on September 10, 2007. I also transmit, for the information of the Senate, the reports of the Department of State with respect to the Extradition Treaty and Protocol.

The Extradition Treaty would replace the outdated Extradition Treaty between the United States and Romania, signed in Bucharest on July 23, 1924, and the Supplementary Extradition Treaty, signed in Bucharest on November 10, 1936. The Protocol amends the Treaty Between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters, signed in Washington on May 26, 1999 (the "1999 Mutual Legal Assistance Treaty"). Both the Extradition Treaty and the Protocol also fulfill the requirements for bilateral instruments (between the United States and each European Union (EU) Member State) that are contained in the Extradition and Mutual Legal Assistance Agreements between the United States and the EU currently before the Senate.

The Extradition Treaty follows generally the form and content of other extradition treaties recently concluded by the United States. It would replace an outmoded list of extraditable offenses with a modern "dual criminality" approach, which would enable extradition for such offenses as money laundering and other newer offenses not appearing on the list. The Treaty also contains a modernized "political offense" clause, and it provides that neither Party shall refuse extradition based on the citizenship of the person sought. Finally, the new Treaty incorporates a series of procedural improvements to streamline and speed the extradition process. The Protocol primarily serves to amend the 1999 Mutual Legal Assistance Treaty in areas required pursuant to the U.S.-EU Mutual Legal Assistance Agreement, specifically: mutual legal assistance to administrative authorities; expedited transmission of requests; use limitations; identification of bank information; joint investigative teams; and video conferencing.

I recommend that the Senate give early and favorable consideration to the Extradition Treaty and the Protocol, along with the U.S.-EU Extradition and Mutual Legal Assistance Agreements and

EXT-MARGINEAN-DECL-008

Government Exhibit 1
Page 8 of 266

IV

the other related bilateral instruments between the United States and European Union Member States.

GEORGE W. BUSH.

# LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, November 1, 2007.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty between the United States of America and Romania (the "Extradition Treaty") and the Protocol to the Treaty between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters (the "Protocol"), both signed at Bucharest on September 10, 2007. Upon its entry into force, the Extradition Treaty would replace the Extradition Treaty between the United States of America and Romania, signed at Bucharest on July 23, 1924, and the Supplementary Extradition Treaty, signed at Bucharest on November 10, 1936. The Extradition Treaty and the Protocol fulfill the requirements of the Agreements on Extradition and Mutual Legal Assistance between the United States of America and the European Union, both signed on June 25, 2003, which were transmitted to the Senate on September 28, 2006, for implementing bilateral instruments between the United States and each member state of the European Union. The article-by-article analyses of the two instruments are enclosed with this report. I recommend that the Extradition Treaty and the Protocol be transmitted to the Senate for its advice and consent to ratification. Both instruments are self-executing and will not require implementing legislation.

Respectfully submitted.

CONDOLEEZZA RICE.

Enclosures: Overviews and analyses of the provisions of the Extradition Treaty and Protocol.

PROTOCOL TO THE TREATY BETWEEN ROMANIA AND THE UNITED STATES OF AMERICA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

## OVERVIEW

The Protocol to the Treaty between Romania and the United States of America on Mutual Legal Assistance in Criminal Matters (the "Protocol") serves to implement, as between the United States and Romania, the provisions of the 2003 Agreement on Mutual Legal Assistance between the United States of America and the European Union (the "U.S.-EU Mutual Legal Assistance Agreement"). It does this through amendment of the Treaty between Romania and the United States of America on Mutual Legal Assist-

(V)

EXT-MARGINEAN-DECL-010

VI

ance in Criminal Matters, signed at Washington on May 26, 1999 (the "1999 Mutual Legal Assistance Treaty").

The following is an article-by-article description of the provisions of the Protocol.

Article 1 of the Protocol incorporates Article 8 of the U.S.-EU Mutual Legal Assistance Agreement ("Mutual legal assistance to administrative authorities"), thereby providing an express legal basis for the provision of assistance to an administrative authority investigating conduct with a view to criminal prosecution or referral to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. If the administrative authority anticipates that no prosecution or referral will take place, assistance is not available. This provision is added as Article 1 bis of the 1999 Mutual Legal Assistance Treaty.

Article 2 of the Protocol replaces Article 2 of the 1999 Mutual Legal Assistance Treaty. The only change is that the amended treaty will reflect that, for Romania, the Central Authority is the Ministry of Justice.

Article 3 of the Protocol replaces Article 4(1) of the 1999 Mutual Legal Assistance Treaty and provides that requests transmitted by fax or email shall be considered to be in writing. It also adds Article 4(1) bis to the 1999 Mutual Legal Assistance Treaty to incorporate Article 7 of the U.S.EU Mutual Legal Assistance Agreement ("Expedited transmission of requests"), which provides that requests for mutual legal assistance, and communications related thereto, may be made by expedited means of communications, including fax or email, with formal confirmation to follow where required by the requested State. The requested State may respond to the request by any such expedited means of communication.

Article 4 of the Protocol incorporates Article 6(2) of the U.S.-EU Mutual Legal Assistance Agreement, providing that the costs associated with establishing and servicing a video-conference for mutual legal assistance purposes, as well as the allowances and expenses related to travel of persons in relation to such video-conferences, will be borne by the Requesting State unless otherwise agreed. This provision replaces Article 6(1) of the 1999 Mutual Legal Assistance Treaty.

Article 5 of the Protocol incorporates Article 9 of the U.S.-EU Mutual Legal Assistance Agreement ("Limitations on use to protect personal and other data") by replacing Article 7 of the 1999 Mutual Legal Assistance Treaty. Paragraph 1 of the new Article 7 permits the Requesting State to use evidence or information it has obtained from the requested State for its criminal investigations and proceedings, for preventing an immediate and serious threat to its public security, for non-criminal judicial or administrative proceedings directly related to its criminal investigations or proceedings, for non-criminal judicial or administrative proceedings for which assistance was provided under Article 1 of the Protocol, and for any other purpose if the information or evidence was made public within the framework of the proceedings for which it was transmitted or pursuant to the above permissible uses. Other uses of the evidence or information require the prior consent of the requested State.

Government Exhibit 1
Page 11 of 266

VII

Paragraph 2(a) specifies that the article does not preclude the requested State from imposing additional conditions where the particular request for assistance could not be granted in the absence of such conditions. Where such additional conditions are imposed, the requested State may require the requesting State to give information on the use made of the evidence or information.

Paragraph 2(b) provides that generic restrictions with respect to the legal standards of the requesting State for processing personal data may not be imposed by the requested State as a condition under paragraph 2(a) to providing evidence or information. This provision is further elaborated upon in the explanatory note to the U.S.-EU Mutual Legal Assistance Agreement (regarding Article 9(2)(b) of that Agreement), which specifies that the fact that the requesting and requested States have different systems of protecting the privacy of data does not give rise to a ground for refusal of assistance and may not as such give rise to additional conditions under paragraph 2(a). Such refusal of assistance could only arise in exceptional cases in which, upon balancing the important interests involved in the particular case, furnishing the specific data sought by the requesting State would raise difficulties so fundamental as to be considered by the requested State to fall within the essential interests grounds for refusal.

Paragraph 3 provides that where, following disclosure to the requesting State, the requested State becomes aware of circumstances that may cause it to seek additional conditions in a particular case, it may consult with the requesting State to determine the extent to which the evidence or information can be protected.

Article 6 of the Protocol incorporates Article 4 of the U.S.-EU Agreement ("Identification of Bank Information") as Article 17 bis of the 1999 Mutual Legal Assistance Treaty.

Paragraph 1(a) requires the requested State to promptly ascertain if banks located in its territory possess information on whether a natural or legal person suspected of or charged with a criminal offense as designated pursuant to paragraph 4, holds a bank account or accounts. Paragraph 1(b) permits, but does not obligate, the requested State to ascertain whether bank information exists pertaining to convicted persons, or whether there is information in the possession of non-bank financial institutions, or financial transactions other than those related to accounts.

Paragraph 2 requires a request for this form of cooperation to include, first, the identity of the natural or legal person relevant to locating such accounts or transactions; second, sufficient information to enable the competent authority of the requested State to reasonably suspect that such person engaged in a criminal offense and that banks or non-bank financial institutions in the requested State may have the information requested and to conclude that the information sought relates to the criminal investigation or proceeding for which assistance is sought; and, third, as much information as possible concerning which banks or other institutions may have the information, in order to reduce the breadth of the inquiry.

Paragraph 3 designates the U.S. channel of communication for requests for assistance under this article as the U.S. legal attaché

Government Exhibit 1
Page 12 of 266

VIII

to Romania representing the Drug Enforcement Administration, the Bureau of Immigration and Customs Enforcement, and the Federal Bureau of Investigation (depending on the nature of the investigation or proceeding giving rise to the request). For Romania, the designated channel is the Prosecutor's Office of the High Court of Cassation and Justice. Paragraph 3 also allows the United States and the European Union to modify these designations by exchange of diplomatic notes after the entry into force of the Protocol.

Paragraph 4 provides that the United States and Romania will provide assistance under this article with respect to money laundering and terrorist activity punishable under the laws of both states, and with respect to such other criminal activity as to which may subsequently be agreed by the Parties. U.S. negotiators verified that under Romanian law assistance will be available for a wide range of conduct associated with terrorism (which includes the conduct criminalized in international counterterrorism conventions to which they are party) and money laundering with respect to an extremely broad range of predicate offenses.

Paragraph 5 indicates that the Requested State shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this article in accordance with the other provisions of the 1999 Mutual Legal Assistance Treaty, as amended by the Protocol.

Article 7 of the Protocol incorporates Article 5 of the U.S.-EU Mutual Legal Assistance Agreement ("Joint Investigative Teams"), and is added as Article 17 ter of the 1999 Mutual Legal Assistance Treaty.

Paragraph 1 of the new Article 17 ter provides that joint investigative teams may be established and operated in the respective territories of the United States and Romania, where the Parties agree to do so.

Under paragraph 2, the manner of the team's operation shall be agreed between the competent authorities, as determined by the respective States concerned.

Paragraph 3 describes channels of communication so as to facilitate direct communication between law enforcement authorities with respect to cases arising under the Treaty. The paragraph provides that the competent authorities determined by the respective States concerned shall communicate directly for purposes of establishing and operating such teams, except where the complexity, scope, or other circumstances involved are deemed to require more central coordination, in which case the States concerned may agree upon other channels of communication. This approach facilitates speed, efficiency, and clarity by providing for direct communications in most cases among the affected law enforcement components, rather than through a mutual legal assistance request transmitted through the Central Authority, as would otherwise take place pursuant to a bilateral Mutual Legal Assistance Treaty.

Paragraph 4 states that, where the joint investigative team needs investigative measures to be taken in one of the States involved in the team, a member of the team of that State may request its own competent authorities to take those measures without the other State having to submit a mutual legal assistance request. The legal standard for obtaining the measure is the applica-

IX

ble domestic standard. Thus, where an investigative measure is to be carried out in the United States, for example, a U.S. team member could do so by invoking existing domestic investigative authority, and would share resulting information or evidence seized pursuant to such an action with the foreign authorities. A formal mutual legal assistance request would not be required. In a case in which there is no domestic U.S. jurisdiction and consequently a compulsory measure cannot be carried out based on domestic authority, the other provisions of the 1999 Mutual Legal Assistance Treaty, as amended by the Protocol, may furnish a separate legal basis for carrying out such a measure.

Article 8 of the Protocol incorporates Article 6 of the U.S.-EU Mutual Legal Assistance Agreement ("Video Conferencing"), except that Article 6 (2), relating to the costs of video conferencing is addressed, as noted above, in Article 4 of the Protocol. Article 8 is applied as Article 17 quater of the 1999 Mutual Legal Assistance Treaty.

Paragraph 1 of the new Article 17 quater provides that the use of video transmission technology shall be available between the United States of America and Romania for taking testimony in a proceeding for which mutual legal assistance is available. The procedures to be applied in taking such testimony are as otherwise set forth in the 1999 Mutual Legal Assistance Treaty, as amended by the Protocol.

Paragraph 2 provides for a consultation mechanism in order to facilitate legal, technical or logistical issues that may arise in the execution of a particular request.

Paragraph 3 provides that the making of intentionally false statements or other witness or expert misconduct shall be punishable in the requested State in the same manner as if such conduct had been committed in the course of a domestic proceeding. This is already the case where the United States has been requested to facilitate the taking of video testimony from a witness or expert located in the United States on behalf of a foreign State, since the proceeding to execute the request is a U.S. proceeding and therefore penalties under U.S. law for perjury, obstruction of justice, or contempt of court are applicable.

Paragraph 4 specifies that the availability of video transmission technology for purposes of facilitating the taking of testimony does not mean that other means of obtaining testimony are no longer available.

Paragraph 5 makes clear that the requested State may also permit the use of video conferencing technology for purposes other than providing testimony, including for purposes of identification of persons or objects, and taking of investigative statements (to the extent these are not considered to be testimony under the law of the requesting State).

Article 9 of the Protocol sets out the temporal application of the Protocol in accordance with Article 12 of the U.S.-EU Mutual Legal Assistance Agreement. Paragraph 1 provides that the Protocol will apply to offenses committed before as well as after it enters into force. Paragraph 2 provides that the Protocol shall apply to requests for assistance made after its entry into force; however, Articles 3 ("Expedited transmission of requests"), 4 ("Cost of video con-

Government Exhibit 1
Page 14 of 266

x

ferencing"), and 8 ("Video conferencing") shall apply to requests pending in the Requested State at the time the Protocol enters into force.

Article 10 of the Protocol provides for entry into force and termination of the Protocol. Entry into force of the Protocol occurs, following an exchange of notifications regarding the completion of applicable internal procedures, on the date of entry into force of the U.S.-EU Mutual Legal Assistance Agreement. In the event of termination of the U.S.-EU Mutual Legal Assistance Agreement, the Protocol also will terminate. Thereupon the 1999 Mutual Legal Assistance Treaty will apply along with any provisions of the Protocol for which the United States and Romania agree to continue application.

The Department of Justice joins the Department of State in urging approval of this Protocol by the Senate at the earliest possible date.

## U.S.-ROMANIA EXTRADITION TREATY

### OVERVIEW

The U.S.-Romania Extradition Treaty (the "Extradition Treaty" or the "Treaty") replaces an outdated 1924 extradition treaty, as amended by a 1936 supplementary treaty. This new Extradition Treaty also serves to implement, as between the United States and Romania, the provisions of the Agreement on Extradition between the United States of America and the European Union ("the U.S.-EU Extradition Agreement"), currently before the Senate.

The following is an Article-by-Article description of the provisions of the Treaty.

Article 1 obligates each Party to extradite to the other, pursuant to the provisions of the Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or convicted of an extraditable offense.

Article 2, which is taken from Article 4 of the U.S.-EU Extradition Agreement, defines extraditable offenses. Article 2(1) defines an offense as extraditable if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty. The approach taken in the Treaty with respect to extraditable offenses is consistent with the modern "dual criminality" approach, rather than the old "list" approach, and is one of the key benefits of the new Treaty. Use of a "dual criminality" clause, rather than the categories of offenses listed in the 1924 Treaty, obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws in both States and ensures a comprehensive coverage of criminal conduct for which extradition might be sought.

Article 2(2) further defines an extraditable offense to include an attempt or a conspiracy to commit, or participation in the commission of, an extraditable offense. The Parties intended to include, under the broad description of "participation," the offenses of aiding, abetting, counseling, or procuring the commission of an offense, as well as being an accessory to an offense.

Government Exhibit 1
Page 15 of 266

EXT-MARGINEAN-DECL-015

XI

Additional direction is provided by Article 2(3), which provides that an offense shall be an extraditable offense: (a) whether or not the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology; (b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only; or (c) whether or not, in criminal cases relating to taxes, customs duties, currency control, or commodities, the laws of the Requesting and Requested States provide for the same kinds of taxes, customs duties or controls on currency, or on the import or export of the same kinds of commodities.

With regard to offenses committed outside the territory of the Requesting State, Article 2(4) provides that extradition shall be granted in accordance with the provisions of the Treaty if the laws of the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws of the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may proceed with extradition provided that all other requirements of the Treaty are met.

Article 2(5) provides that, if extradition is granted for an extraditable offense, it shall also be granted for any other offense specified in the request if the latter offense is punishable by one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

Article 3 provides that extradition shall not be refused based on the citizenship of the person sought. This provision reflects a significant development in the U.S.-Romania extradition relationship. The 1924 Treaty does not require that the Parties extradite their citizens, and this provision required an amendment both to the Romanian Constitution and Romania's domestic law on international extradition.

Article 4 governs political and military offenses as a basis for the denial of extradition. As is customary in extradition treaties, paragraph 1 provides that extradition shall not be granted if the offense for which extradition is requested constitutes a political offense. Article 4(2) specifies six categories of offenses that shall not be considered to be political offenses:

(a) a murder or other violent crime against a Head of State of one of the Parties, or of a member of the Head of State's family;

(b) an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(c) murder, manslaughter, malicious wounding, inflicting grievous bodily harm, assault with intent to cause serious physical injury, or serious sexual assault;

(d) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

Government Exhibit 1
Page 16 of 266

EXT-MARGINEAN-DECL-016

XII

(e) placing, using, threatening to use or possessing an explosive, incendiary, or destructive device capable of endangering life, causing substantial bodily harm, or causing substantial property damage; and

(f) a conspiracy or attempt to commit, or participation in the commission of any of the offenses set forth in (a)–(e).

Article 4(3) provides that, notwithstanding Article 4(2), extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

Article 4(4) provides that the competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law. Desertion would be an example of such an offense.

Article 4(5) provides that the Executive Branch is the "competent authority" for the United States for purposes of Article 4.

Article 5 governs those circumstances in which the person whose extradition is sought has been the subject of a prior prosecution. Article 5(1) provides that extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

Article 5(2) provides that extradition shall not be precluded by the fact that the competent authorities of the Requested State have decided:

(a) not to prosecute the person sought for the acts for which extradition is requested;

(b) to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c) to investigate the person sought for the same acts.

Article 6 provides that extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the law of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

Article 7, which is taken from Article 13 of the U.S.-EU Extradition Agreement, concerns capital punishment. It provides that, when an offense for which extradition is sought is punishable by death under the laws in the Requesting State but not under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty, if imposed, shall not be carried out. If the Requesting State accepts extradition subject to such a condition, it must comply with the condition.

Article 8 establishes extradition procedures and describes the documents required to support a request for extradition. Article 8(1), which is taken from Article 5(1) of the U.S.-EU Extradition Agreement, provides that all requests for extradition must be submitted through the diplomatic channel, which shall include transmission through the channel specified in Article 12(4) of the Treaty.

Article 8(2) specifies the documents, information, and legal texts that shall support all extradition requests. Article 8(3) provides

XIII

that a request for the extradition of a person who is charged with an offense must also be supported by: a) a copy of the warrant or order of arrest issued by a judge, court, or other competent authority; b)a copy of the charging document; and c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

Article 8(4) sets forth the items, in addition to those set forth in Article 8(2), that must accompany a request for the extradition relating to a person who has been found guilty or been convicted of the offense for which extradition is sought.

Pursuant to Article 8(4)(d), a request for extradition of a person who has been convicted in absentia must also be supported by those documents required for a request for a person who has been charged with an offense, as well as information regarding the circumstances under which the person was absent from the proceedings.

Article 9, which is taken from Article 8 of the U.S.-EU Extradition Agreement, authorizes the Requested State to require the Requesting State to furnish additional information to support an extradition request, if the Requested State deems it necessary to fulfill the requirements of the Treaty. It specifies that such information may be requested and supplied directly between the United States Department of Justice and the Ministry of Justice of Romania.

Article 10, which is taken from Article 5(2) of the U.S.-EU Extradition Agreement, concerns admissibility of documents. It provides that documents bearing the certificate or seal of either the Ministry or Department of Justice or the foreign affairs Ministry or Department of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification.

Article 11 provides that all documents submitted under the Treaty by the Requesting State shall be translated into the language of the Requested State.

Article 12 sets forth procedures and describes the information that is required for the provisional arrest and detention of the person sought pending presentation of the formal extradition request and supporting documents. Article 12( 1) provides for provisional arrest and sets forth procedures for transmission of a request for provisional arrest. Article 12(2) specifies the information that must accompany an application for provisional arrest. Article 12(3) requires the Requested State to notify the Requesting State of the disposition of the provisional arrest request and the reasons for any inability to proceed with the request.

Article 12(4) provides that, if the Requested State has not received the request for extradition and supporting documents within sixty days of the date of provisional arrest, the person shall be discharged, unless good cause is shown to maintain custody. Consistent with Article 7 of the U.S.-EU Extradition Agreement, Article 12(4) provides an alternative channel for receipt of extradition requests applicable with respect to persons who have been provisionally arrested, namely, through transmission of the request to the Embassy of the Requested State in the Requesting State. Article 12(5) provides that the discharge of a person from custody pursuant to Article 12(4) does not prejudice the person's subsequent

EXT-MARGINEAN-DECL-018

XIV

rearrest and extradition if the extradition request and supporting documents are delivered at a later date.

Article 13 specifies the procedures governing a decision on the extradition request and the surrender of the person sought. It requires the Requested State to promptly notify the Requesting State of its decision regarding a request. If the request is denied in whole or in part, the Requested State must provide an explanation of the reasons for the denial and, upon request, copies of pertinent judicial decisions. If extradition is granted, the States shall agree on the time and place for the surrender of the person sought. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, the person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 14 addresses temporary and deferred surrender. Article 14(1), on temporary surrender, is taken from Article 9 of the U.S.-EU Extradition Agreement. It provides that, if a person whose extradition is sought is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person to the Requesting State for the purpose of prosecution. The Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States. Time spent in custody in the Requesting State pending prosecution there may be deducted from the time to be served in the Requested State.

Article 14(2), on deferred surrender, provides that the Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in the Requested State until that prosecution has concluded or sentence has been served.

Article 15, which is taken from Article 10 of the U.S.-EU Extradition Agreement, governs the situation in which the Requested State receives requests for the extradition or surrender of the same person from more than one State, either for the same offense or for different offenses. In the event of requests by more than one State for the same person, the executive authority of the Requested State shall determine to which State, if any, it will surrender that person. In the event that Romania receives requests both from the United States and pursuant to a European arrest warrant for the same person, Romania's judicial authority, or such other authority as Romania may designate, shall determine to which State, if any, it will surrender the person. Article 15(3) provides a non-exclusive list of factors to be considered by the Requested State in determining to which State to surrender a person who is sought by more than one State.

Article 16 provides that the Requested State may, to the extent permitted under its law, seize and surrender to the Requesting State all items, including articles, documents, evidence, and proceeds, that are connected with the offense in respect of which extradition is granted. Such items may be surrendered even if the extradition cannot be carried out due to the death, disappearance, or

EXT-MARGINEAN-DECL-019

xv

escape of the person sought. The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State. The rights of third parties in such items are to be respected in accordance with the laws of the Requested State.

Article 17 sets forth the Rule of Specialty, which, subject to specific exceptions set forth in paragraph 3, prohibits a person extradited under the Treaty from being detained, tried, or punished in the Requesting State except for:

    (a) any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

    (b) any offense committed after the extradition of the person; or

    (c) any offense for which the competent authority of the Requested State consents to the person's detention, trial, or punishment.

Article 17(2) provides that a person extradited under the Treaty may not be the subject of onward extradition or surrender for any offense committed prior to the extradition to the Requesting State unless the Requested State consents. This provision would preclude Romania from transferring a fugitive surrendered to it by the United States to a third country or international tribunal without the consent of the United States.

Article 17(3) sets forth exceptions to the rule of specialty. It provides that the restrictions set forth under Article 17 shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of a person to a third State, if the extradited person either leaves the territory of the Requesting State after extradition and voluntarily returns to it or fails to leave the territory of the Requesting State within twenty days of being free to do so.

Article 17(4) provides that the Executive Branch is the "competent authority" for the United States for purposes of Article 17.

Article 18, which is taken from Article 11 of the U.S.-EU Extradition Agreement, permits surrender without further proceedings if the person sought consents to being surrendered to the Requesting State. The consent of the person sought may include agreement to waiver of protection of the rule of specialty.

Article 19, which is taken from Article 12 of the U.S.-EU Extradition Agreement, governs the transit through the territory of one State of a person surrendered to the other State by a third country, or to a third country by the other State.

Article 20 contains provisions regarding representation and the expenses associated with extradition. Specifically, the Requested State is required to advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition. Article 20(2) establishes that the Requested State bears all expenses incurred in that State in connection with the extradition proceedings, except that the Requesting State pays expenses related to the translation of extra-

EXT-MARGINEAN-DECL-020

XVI

dition documents and the transportation of the person surrendered. Article 20(3) specifies that neither State shall make any pecuniary claim against the other arising out of the arrest, detention, examination, or surrender of persons under the Treaty.

Article 21(1) provides that the parties may consult in connection with the processing of individual cases and in furtherance of efficient implementation of the Treaty. Article 21(2), which is taken from Article 14 of the U.S.-EU Extradition Agreement, provides for consultation between the parties when the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition, in order to determine the extent to which the information can be protected by the Requested State in the event of submission.

Article 22 makes the Treaty applicable to offenses committed both before and after the date it enters into force.

Article 23 contains final clauses addressing the Treaty's ratification, entry into force, and termination. It provides that the Treaty is subject to ratification and that the Treaty shall enter into force upon the exchange of the instruments of ratification. Article 23(3) provides that, upon entry into force of the Treaty, the Treaty of Extradition between the United States of America and Romania, signed at Bucharest on July 23, 1924, as well as the Supplementary Extradition Treaty, signed at Bucharest on November 10, 1936, shall cease to have any effect except that they shall apply in extradition proceedings in which extradition documents have already been submitted to the courts of the Requested State at the time the Treaty enters into force. In such cases, only Articles 2, 14(1), and 18 of this Treaty will apply, and Article 17 of the Treaty, regarding the rule of specialty, will apply to persons found extraditable under the earlier treaties. Under Article 23(4), where a request for extradition was received by the Requested State but not submitted to its courts before the entry into force of this Treaty, the Requesting State, after entry into force of this treaty, may amend or supplement the request for extradition as necessary in order for it to be submitted to the courts of the Requested State under this Treaty.

Under Article 23(5), either State may terminate the Treaty with six months' written notice to the other State through the diplomatic channel.

The Department of Justice joins the Department of State in urging approval of this Treaty by the Senate at the earliest possible date.

# EXTRADITION TREATY

## BETWEEN

## THE UNITED STATES OF AMERICA

## AND

## ROMANIA

(1)

EXT-MARGINEAN-DECL-022

2

## TABLE OF CONTENTS

Article 1 ................................................................ Obligation to Extradite

Article 2 ................................................................ Extraditable Offenses

Article 3 ................................................................ Citizenship

Article 4 ................................................................ Political and Military Offenses

Article 5 ................................................................ Prior Prosecution (*Non Bis in Idet*)

Article 6 ................................................................ Lapse of Time

Article 7 ................................................................ Capital Punishment

Article 8 ................................................................ Extradition Procedures and
Required Documents

Article 9 ................................................................ Supplemental Information

Article 10 .............................................................. Admissibility of Documents

Article 11 .............................................................. Translation

Article 12 .............................................................. Provisional Arrest

Article 13 .............................................................. Decision and Surrender

Article 14 .............................................................. Temporary Surrender and Deferred
Surrender

Article 15 .............................................................. Requests for Extradition or
Surrender Made by Several States

Article 16 .............................................................. Seizure and Surrender of Property

Article 17 .............................................................. Rule of Specialty

Government Exhibit 1
Page 23 of 266

3

Article 18 ................................................. Simplified Procedures

Article 19 ................................................. Transit

Article 20 ................................................. Representation and Expenses

Article 21 ................................................. Consultation

Article 22 ................................................. Application

Article 23 ................................................. Ratification, Entry into Force, and Termination

EXT-MARGINEAN-DECL-024

Government Exhibit 1
Page 24 of 266

4

The United States of America and Romania (hereinafter referred to as "the Parties");

Recalling the Treaty of Extradition between the United States of America and Romania, signed at Bucharest on July 23, 1924, and the Supplementary Extradition Treaty, signed at Bucharest on November 10, 1936;

Noting that both the United States of America and Romania currently apply the terms of these Treaties;

Mindful of obligations set forth in the Agreement on Extradition between the United States of America and the European Union, signed at Washington, D.C. on June 25, 2003;

Having due regard for rights of individuals and the rule of law; and

Desiring to provide for more effective cooperation between the Parties in the fight against crime, and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

EXT-MARGINEAN-DECL-025

5

## Article 1
### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or convicted of an extraditable offense.

## Article 2
### Extraditable Offenses

1.    An offense shall be an extraditable offense if it is punishable under the laws in both Parties by deprivation of liberty for a period of more than one year or by a more severe penalty.  Where the request is for enforcement of the sentence of a person convicted of an extraditable offense, the deprivation of liberty remaining to be served must be at least four months.

2.    An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of any offense described in paragraph 1 of this Article.

3.    For the purposes of this Article, an offense shall be an extraditable offense:

(a)    whether or not the laws in the Requesting and Requested States place the acts or omissions constituting the offense within the same category of offenses or describe the offense by the same terminology;

(b)    whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court; and

(c)    whether or not, in criminal cases relating to taxes, customs duties, currency control and the import or export of commodities, the laws of the Requesting and Requested States provide for the same kinds of taxes, customs duties, or controls on currency or on the import or export of the same kinds of commodities.

4.    If the offense has been committed outside of the territory of the Requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the Requested State provide for the punishment of an offense committed outside its territory in similar circumstances.  If the laws of the Requested State do not provide for the punishment of an offense committed outside its territory in similar circumstances, the executive authority of the Requested State, at its discretion, may proceed with extradition provided that all other applicable requirements for extradition are met.

5.    If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by

Government Exhibit 1
Page 26 of 266

6

one year's deprivation of liberty or less, provided that all other requirements for extradition are met.

## Article 3
### Citizenship

Extradition shall not be refused based on the citizenship of the person sought.

## Article 4
### Political and Military Offenses

1.    Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.    For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)    a murder or other violent crime against a Head of State of one of the Parties, or of a member of the Head of State's family;

(b)    an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(c)    murder, manslaughter, malicious wounding, inflicting grievous bodily harm, assault with intent to cause serious physical injury, or serious sexual assault;

(d)    an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)    placing, using, threatening the use of, or possessing an explosive, incendiary or destructive device capable of endangering life, of causing substantial bodily harm, or of causing substantial property damage; and

(f)    a conspiracy or attempt to commit any of the foregoing offenses, or participation in the commission of such offenses.

3.    Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated.

4.    The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law.

5.    For the United States of America, the Executive Branch is the competent authority for purposes of this Article.

**Government Exhibit 1**
**Page 27 of 266**

EXT-MARGINEAN-DECL-027

7

### Article 5
### Prior Prosecution
### (Non Bis in Idem)

1.      Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. .    Extradition shall not be precluded by the fact that the authorities of the Requested State have decided:

   (a)      not to prosecute the person sought for the acts for which extradition is requested;

   (b)      to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

   (c)      to investigate the person sought for the same acts for which extradition is sought.

### Article 6
### Lapse of Time

Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State.

### Article 7
### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or, if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty, if imposed, shall not be carried out.    If the Requesting State accepts extradition subject to the condition attached pursuant to this Article, it shall comply with the condition.

### Article 8
### Extradition Procedure and Required Documents

1.      Requests for extradition and supporting documents shall be submitted through the diplomatic channel, which shall include transmission as provided for in Article 12(4).

EXT-MARGINEAN-DECL-028

8

2.    Requests for extradition shall be supported by:

(a)    documents, statements, or other types of information that describe the identity and probable location of the person sought;

(b)    information describing the facts of the offense and a brief procedural history of the case;

(c)    the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

(d)    the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested;

(e)    the relevant text of the law(s) describing any time limit on the prosecution or enforcement of the penalty and information describing the application of the law(s) to the offense for which extradition is sought; and

(f)    the documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3.    In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is charged with an offense shall also be supported by:

(a)    a copy of the warrant or order of arrest or detention issued by a judge, court, or other competent authority;

(b)    a copy of the charging document; and

(c)    such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought.

4.    In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been found guilty or convicted of the offense for which extradition is sought shall also be supported by:

(a)    a copy of the conviction and sentence, or, if the person sought has been found guilty but not sentenced, a statement by a judicial authority as to the finding of guilt;

(b)    information establishing that the person sought is the person to whom the finding of guilt refers;

(c)    if the person sought has been sentenced, a statement establishing to what extent the sentence has been carried out; and

EXT-MARGINEAN-DECL-029

9

(d)    in the case of a person who has been found guilty or convicted in absentia, the documents required by paragraph 3 of this Article and information regarding the circumstances under which the person was absent from the proceedings.

## Article 9
## Supplemental Information

The Requested State may require the Requesting State to furnish additional information within such reasonable length of time as it specifies, if it considers that the information furnished in support of the request for extradition is not sufficient to fulfill the requirements of this Treaty. Such supplementary information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of Romania.

## Article 10
## Admissibility of Documents

Documents that bear the certificate or seal of the Ministry or Department of Justice, or the Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization.

## Article 11
## Translation

All documents submitted by the Requesting State shall be translated into the language of the Requested State, unless otherwise agreed.

## Article 12
## Provisional Arrest

1.    In case of urgency, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition and supporting documentation. A request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of Romania. The facilities of the International Criminal Police Organization (Interpol) also may be used to transmit such a request.

2.    The application for provisional arrest shall contain:

(a)    a description of the person sought;

EXT-MARGINEAN-DECL-030

10

(b)     the location of the person sought, if known;

(c)     a brief statement of the facts of the case, including, if possible, the date and location of the offense(s);

(d)     a description of the law(s) violated;

(e)     a statement of the existence of a warrant or order of arrest or detention or a finding of guilt or judgment of conviction against the person sought; and

(f)     a statement that the request for extradition for the person sought and supporting documentation will follow within the time specified in this Treaty.

3.     The Requesting State shall be notified without delay of the disposition of its request for provisional arrest including the reasons for any inability to proceed with the request.

4.     Unless good cause is shown to maintain custody, a person who is provisionally arrested shall be discharged upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State, by the date specified in this paragraph, shall constitute receipt by the Requested State.

5.     The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

## Article 13
## Decision and Surrender

1.     The Requested State shall promptly notify the Requesting State of its decision on the request for extradition.

2.     If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3.     If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4.     If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Government Exhibit 1
Page 31 of 266

11

## Article 14
### Temporary Surrender and Deferred Surrender

1.      If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.   The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Parties.  The time spent in custody in the territory of the Requesting State pending prosecution in that State may be deducted from the time remaining to be served in the Requested State.

2.      The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

## Article 15
### Requests for Extradition or Surrender Made by Several States

1.      If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2.      If Romania receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its judicial authority, or such other authority as it may subsequently designate, shall determine to which State, if any, it will surrender the person.

3.      In making its decision under paragraphs 1 and 2, the Requested State shall consider all relevant factors, including, but not limited to:

(a)     whether the requests were made pursuant to a treaty;

(b)     the place where each offense was committed;

(c)     the respective interests of the Requesting States;

(d)     the gravity of the offenses;

(e)     the nationality or citizenship of the victim;

(f)     the possibility of any subsequent extradition between the Requesting States; and

EXT-MARGINEAN-DECL-032

12

(g)    the chronological order in which the requests were received from the respective Requesting States.

### Article 16
### Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items, including articles, documents, evidence, and proceeds that are connected with the offense in respect of which extradition is granted. The items mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought and may be surrendered prior to the extradition.

2.    The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

3.    The rights of third parties in such items shall be duly respected in accordance with the laws of the Requested State.

### Article 17
### Rule of Specialty

1.    A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)    any offense committed after the extradition of the person; or

(c)    any offense for which the competent authority of the Requested State consents to the person's detention, trial, or punishment. For the purpose of this subparagraph:

(i)    the Requested State may require the submission of the documentation called for in Article 8; and

(ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

Government Exhibit 1
Page 33 of 266

13

2.    A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition or surrender of that person to a third State, if:

(a)    that person leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b)    that person does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4.    For the United States of America, the Executive Branch is the competent authority for purposes of this Article.

### Article 18
### Simplified Procedures

If the person sought consents to be surrendered to the Requesting State, the Requested State may, in accordance with the principles and procedures provided for under its legal system, surrender the person as expeditiously as possible without further proceedings. The consent of the person sought may include agreement to waiver of the protection of the rule of specialty.

### Article 19
### Transit

1.    The United States may authorize transportation through its territory of a person surrendered to Romania by a third State, or by Romania to a third State. Romania may authorize transportation through its territory of a person surrendered to the United States by a third State, or by the United States to a third State.

2.    A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of Romania. The facilities of the International Criminal Police Organization (Interpol) may also be used to transmit such a request to the above-mentioned authorities. The request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

3.    Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the transit State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to

Government Exhibit 1
Page 34 of 266

14

paragraph 2 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

### Article 20
### Representation and Expenses

1. The Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition.

2. The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

### Article 21
### Consultation

1. The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

2. Where the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

### Article 22
### Application

This Treaty shall apply to offenses committed before as well as after the date it enters into force.

### Article 23
### Ratification, Entry into Force, and Termination

1. This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged as soon as possible.

15

2.    This Treaty shall enter into force upon the exchange of the instruments of ratification.

3.    Upon the entry into force of this Treaty, the Treaty of Extradition between the United States of America and Romania, signed at Bucharest July 23, 1924, and the Supplementary Extradition Treaty, signed at Bucharest November 10, 1936 (together, the "prior Treaties"), shall cease to have any effect. Nevertheless, the prior Treaties shall apply to any extradition proceedings in which the extradition documents have already been submitted to the courts of the Requested State at the time this Treaty enters into force, except that Articles 2, 14(1), and 18 of this Treaty shall be applicable to such proceedings, and Article 17 of this Treaty shall apply to persons found extraditable under the prior Treaties.

4.    With respect to any extradition proceedings in which the request for extradition was received by the Requested State but not submitted to its courts before the entry into force of this Treaty, the Requesting State, after entry into force of this Treaty, may amend or supplement the request for extradition as necessary in order for it to be submitted to the courts of the Requested State under this Treaty.

5.    Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized, have signed this Treaty.

DONE at Bucharest, in duplicate, this tenth day of September, 2007, in the English and Romanian languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:
Nicholas F. TAUBMAN
Ambassador Extraordinary and Plenipotentiary
of the United States of America to Romania

FOR ROMANIA:
Tudor-Alexandru CHIUARIU
Minister of Justice

EXT-MARGINEAN-DECL-036

16

**Protocol to the Treaty between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters signed in Washington on 26 May 1999**

As contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Mutual Legal Assistance Agreement"), the United States of America and Romania agree as follows, and acknowledge that, in accordance with the provisions of this Protocol, the U.S.-EU Mutual Legal Assistance Agreement is applied in relation to the bilateral Treaty Between the United States of America and Romania on Mutual Legal Assistance in Criminal Matters signed 26 May 1999 (hereafter, "the 1999 Mutual Legal Assistance Treaty"), under the following terms:

### Article 1: Mutual legal assistance to administrative authorities

Pursuant to Article 8 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied as Article 1 *bis* of the 1999 Mutual Legal Assistance Treaty:

"Article 1 *bis*:

Mutual Legal Assistance to Administrative Authorities

1. Mutual legal assistance shall also be afforded to a national administrative authority, investigating conduct with a view to a criminal prosecution of the conduct, or referral of the conduct to criminal investigation or prosecution authorities, pursuant to its specific administrative or regulatory authority to undertake such investigation. Mutual legal assistance may also be afforded to other administrative authorities under such circumstances. Assistance shall not be available for matters in which the administrative authority anticipates that no prosecution or referral, as applicable, will take place.

b. Requests for assistance under this Article shall be transmitted between the Central Authorities designated pursuant to Article 2 of this Treaty, or between such other authorities as may be agreed by the Central Authorities."

Government Exhibit 1
Page 37 of 266

EXT-MARGINEAN-DECL-037

17

### Article 2: Central authorities

This article shall be applied in place of Article 2 of the 1999 Mutual Legal Assistance Treaty:

### "Article 2:

### Central Authorities

1.    Each Contracting Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2.    For the United States of America, the Central Authority shall be the Attorney General or a person designated by the Attorney General.  For Romania, the Central Authority shall be the Ministry of Justice.

3.    The Central Authorities shall communicate directly with one another for the purposes of this Treaty."

### Article 3: Expedited transmission of requests

Pursuant to Article 7 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied in place of Article 4(1) of the 1999 Mutual Legal Assistance Treaty:

"1: A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations.  If the request is not in writing, it shall be confirmed in writing within ten days unless the Central Authority of the Requested State agrees otherwise.  For purposes of this paragraph, requests transmitted by fax or e-mail shall be considered to be in writing.

1 bis.  Requests for mutual legal assistance, and communications related thereto, may be made by expedited means of communications, including fax or e-mail, with formal confirmation to follow where required by the Requested State.  The Requested State may respond to the request by any such expedited means of communication."

### Article 4: Cost of video conferencing

Pursuant to Article 6 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied in place of Article 6(1) of the 1999 Mutual Legal Assistance Treaty:

EXT-MARGINEAN-DECL-038

18

"1. The Requested State shall pay all costs relating to the execution of a request, including the costs of representation, except for the following, which shall be paid by the Requesting State:

    (a)   the fees of experts;

    (b)   the costs of translation, interpretation, and transcription;

    (c)   the allowances and expenses related to travel of persons pursuant to Articles 10, 11, 12, and 17 *quater*; and

    (d)   the costs associated with establishing and servicing a video transmission pursuant to Article 17 *quater*, unless otherwise agreed by the Requesting and Requested States. Other costs arising in the course of providing such assistance (including costs associated with travel of participants in the Requested State) shall be borne in accordance with the other provisions of this Article."

### Article 5: Limitations on use to protect personal and other data

Pursuant to Article 9 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied in place of Article 7 of the 1999 Mutual Legal Assistance Treaty:

"Article 7:
Limitations on Use to Protect Personal and Other Data

1.   The Requested State may require that the Requesting State limit the use of any evidence or information obtained from the Requested State to the following purposes:

    (a)   for the purpose of its criminal investigations and proceedings;

    (b)   for preventing an immediate and serious threat to its public security;

    (c)   in its non-criminal judicial or administrative proceedings directly related to investigations or proceedings:

        (i)   set forth in subparagraph (a); or
        (ii)  for which mutual legal assistance was rendered under Article 1 *bis* of this Treaty;

    (d)   for any other purpose, if the information or evidence has been made public within the framework of proceedings for which they were transmitted, or in any of the situations described in subparagraphs (a), (b) and (c); and

    (e)   for any other purpose, only with the prior consent of the Requested State.

2.   (a)   This Article shall not prejudice the ability of the Requested State to impose additional conditions in a particular case where the particular request for

EXT-MARGINEAN-DECL-039

19

assistance could not be complied with in the absence of such conditions. Where additional conditions have been imposed in accordance with this subparagraph, the Requested State may require the Requesting State to give information on the use made of the evidence or information;

(b)   Generic restrictions with respect to the legal standards of the Requesting State for processing personal data may not be imposed by the Requested State as a condition under subparagraph (a) to providing evidence or information.

3. Where, following disclosure to the Requesting State, the Requested State becomes aware of circumstances that may cause it to seek an additional condition in a particular case, the Requested State may consult with the Requesting State to determine the extent to which the evidence and information can be protected."

### Article 6: Identification of bank information

Pursuant to Article 4 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied as Article 17 *bis* of the 1999 Mutual Legal Assistance Treaty:

"Article 17 *bis*:

### Identification of Bank Information

1.   (a)   Upon request of the Requesting State, the Requested State shall, in accordance with the terms of this Article, promptly ascertain if the banks located in its territory possess information on whether an identified natural or legal person suspected of or charged with a criminal offence is the holder of a bank account or accounts. The Requested State shall promptly communicate the results of its enquiries to the Requesting State;

(b)   The actions described in subparagraph (a) may also be taken for the purpose of identifying:

(i)   information regarding natural or legal persons convicted of or otherwise involved in a criminal offence;

(ii)   information in the possession of non-bank financial institutions; or

(iii)   financial transactions unrelated to accounts.

2.   In addition to the requirements of Article 4(3) of this Treaty, a request for information described in paragraph 1 shall include:

(a)   the identity of the natural or legal person relevant to locating such accounts or transactions; and

(b)   sufficient information to enable the competent authority of the Requested State to:

EXT-MARGINEAN-DECL-040

20

(ii)    reasonably suspect that the natural or legal person concerned has engaged in a criminal offence and that banks or non-bank financial institutions in the territory of the Requested State may have the information requested; and

(iii)    conclude that the information sought relates to the criminal investigation or proceeding; and

(c)    to the extent possible, information concerning which bank or non-bank financial institution may be involved, and other information the availability of which may aid in reducing the breadth of the enquiry.

3.    Unless subsequently modified by exchange of diplomatic notes between the United States of America and the European Union, requests for assistance under this Article shall be transmitted between:

(a)    for Romania, in lieu of the channel described in Article 2(2) of this Treaty, the Prosecutor's Office of the High Court of Cassation and Justice, and

(b)    for the United States of America, in lieu of the channel described in Article 2(2) of this Treaty, the attaché responsible for Romania of the:

(i)    U.S. Department of Justice, Drug Enforcement Administration, with respect to matters within its jurisdiction;

(ii)    U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement, with respect to matters within its jurisdiction; and

(iii)    U.S. Department of Justice, Federal Bureau of Investigation, with respect to all other matters.

4.    The United States of America and Romania shall provide assistance under this Article with respect to money laundering and terrorist activity punishable under the laws of both States, and with respect to such other criminal activity as subsequently may be agreed to by the Parties.

5.    The Requested State shall respond to a request for production of the records concerning the accounts or transactions identified pursuant to this Article in accordance with the other provisions of this Treaty."

### Article 7: Joint investigative teams

Pursuant to Article 5 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied as Article 17 *ter* of the 1999 Mutual Legal Assistance Treaty:

Government Exhibit 1
Page 41 of 266

21

"Article 17 *ter*:

Joint Investigative Teams

1.    Joint investigative teams may be established and operated in the respective territories of the United States of America and Romania for the purpose of facilitating criminal investigations or prosecutions involving the United States of America and one or more Member States of the European Union where deemed appropriate by the United States of America and Romania.

2.    The procedures under which the team is to operate, such as its composition, duration, location, organization, functions, purpose, and terms of participation of team members of a State in investigative activities taking place in another State's territory shall be as agreed between the competent authorities responsible for the investigation or prosecution of criminal offences, as determined by the respective States concerned.

3.    The competent authorities determined by the respective States concerned shall communicate directly for the purposes of the establishment and operation of such team except that where the exceptional complexity, broad scope, or other circumstances involved are deemed to require more central coordination as to some or all aspects, the States may agree upon other appropriate channels of communications to that end.

4.    Where the joint investigative team needs investigative measures to be taken in one of the States setting up the team, a member of the team of that State may request its own competent authorities to take those measures without the other States having to submit a request for mutual legal assistance. The required legal standard for obtaining the measure in that State shall be the standard applicable to its domestic investigative activities."

## Article 8: Video conferencing

Pursuant to Article 6 of the U.S.-EU Mutual Legal Assistance Agreement, the following shall be applied as Article 17 *quater* of the 1999 Mutual Legal Assistance Treaty:

"Article 17 *quater*:

Video Conferencing

1.    The use of video transmission technology shall be available between the United States of America and Romania for taking testimony in a proceeding for which mutual legal assistance is available of a witness or expert located in the Requested State. To the

Government Exhibit 1
Page 42 of 266

22

extent not specifically set forth in this Article, the modalities governing such procedure shall be as otherwise provided under this Treaty.

2.      The Requesting and Requested States may consult in order to facilitate resolution of legal, technical or logistical issues that may arise in the execution of the request.

3.      Without prejudice to any jurisdiction under the law of the Requesting State, making an intentionally false statement or other misconduct of the witness or expert during the course of the video conference shall be punishable in the Requested State in the same manner as if it had been committed in the course of its domestic proceedings.

4.      This Article is without prejudice to the use of other means for obtaining of testimony in the Requested State available under applicable treaty or law.

5.      The Requested State may permit the use of video conferencing technology for purposes other than those described in paragraph 1 of this Article, including for purposes of identification of persons or objects, or taking of investigative statements.

### Article 9: Temporal application

1.      In accordance with Article 12 of the U.S.-EU Mutual Legal Assistance Agreement, this Protocol shall apply to offenses committed before as well as after it enters into force.

2.      This Protocol shall apply to requests made after its entry into force. Nevertheless, in accordance with Article 12(2) of the U.S.-EU Mutual Legal Assistance Agreement, Articles 3, 4, and 8 of this Protocol shall apply to requests pending in the Requested State at the time this Protocol enters into force.

### Article 10: Entry into force and termination

1.      This Protocol shall be subject to the completion by the United States of America and Romania of their respective applicable internal procedures for entry into force. The United States of America and Romania shall thereupon exchange instruments indicating that such measures have been completed. This Protocol shall enter into force on the date of entry into force of the U.S.-EU Mutual Legal Assistance Agreement.

2.      In the event of termination of the U.S.-EU Mutual Legal Assistance Agreement, this Protocol shall be terminated and the 1999 Mutual Legal Assistance Treaty shall be applied. The United States of America and Romania nevertheless may agree to continue to apply some or all of the provisions of this Protocol.

23

IN WITNESS WHEREOF, the undersigned, being duly authorized, have signed this Protocol.

DONE at Bucharest, in duplicate this tenth day of September 2007, in the English and Romanian languages, both texts being equally authentic.

FOR THE UNITED STATES OF AMERICA:            FOR ROMANIA:

Nicholas F. TAUBMAN                          Tudor-Alexandru CHIUARIU
Ambassador Extraordinary and Plenipotentiary  Minister of Justice
of the United States of America to Romania

EXT-MARGINEAN-DECL-045



in Statele Unite ale Americii

1607 23rd Street NW

Phone: +1 (202) 986 6973
Fax:   +1 (202) 232 4748
E-mail: washington@mae.ro
http://washington.mae.ro
facebook.com/romanian.embassy.us

L/LEI

2017 NOV 15 P 1: 21

DEPARTMENT OF STATE

Nr. *2450*

The Embassy of Romania to the United States of America presents its compliments to the United States Department of State and, according to the provisions of the Extradition Treaty between Romania and the United States of America, signed in Bucharest on the 10th of September 2007 and entered into force on the 8th of May 2009, and the letter of the Ministry of Justice of Romania, dated September 20, 2017, has the honor to submit, hereby enclosed, the request for extradition to Romania of the Romanian national **MĂRGINEAN Rusalin Sorin**, located by the U.S. authorities on the territory of the United States of America.

The Embassy of Romania to the United States of America avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington D.C., November 13, 2017

*Enclosure:*
*Letter of the Ministry of Justice of Romania and the supporting documents.*

**UNITED STATES DEPARTMENT OF STATE**

**Office of the Legal Adviser**

cc/
United States Department of Justice
Criminal Division
Office of International Affairs

**Government Exhibit 1**
**Page 46 of 266**

EXT-MARGINEAN-00001

*Translation from Romanian:*

ROMANIAN GOVERNMENT
MINISTRY OF JUSTICE (coat of arms)

Bucharest, 20.09.2017
Our ref. 44260/2017

**U.S. DEPARTMENT OF JUSTICE**
**Office of International Affairs**
**Criminal Division**
**1301 New York Avenue, N.Y.**
**Suite 800**
**Washington DC 20005**

The Romanian Ministry of Justice sends its greetings to the US Department of Justice and, in accordance with the provisions of the Extradition Treaty between Romania and the United States of America, signed in Bucharest, on 10 September 2007, is honoured to kindly request to submit to the competent US authorities this

**EXTRADITION REQUEST**

Concerning the Romanian citizen MĂRGINEAN RUSALIN SORIN, Romanian citizen, born on 16th of February 1972, in Cugir, Alba County, residing in Săliștea Township, Tărtăria Village, 54 Florilor Street, Alba County, located on the U.S. territory.

The extradition of the individual Mărginean Rusalin Sorin is requested in order to serve the custodial sentence of 3 years and 6 months imprisonment, imposed against him by criminal court sentence no. 577/2014 of the 13th of October 2014, delivered by Alba District Court, and final by the criminal court decision no. 314/A/2015 of 19th March 2015 delivered by the Alba Court of Appeal.

Pursuant to the criminal court sentence no. 577/2014 of the 13th of October 2014, the Alba District Court convicted the defendant Mărginean Rusalin Sorin to serve the following sentences:

- 1 year and 8 months imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with application of article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts – passive subject Grozav Eugen);
- 1 year and 6 months imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with application of article 5 of the Criminal Code (passive subject Chiriluț Cristian);
- 1 year and 6 months imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with application of article 35 paragraph 1 and article 5 of the Criminal Code (passive subject Mărginean Nicolae);
- 1 year and 6 months imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to Article 244 of the Criminal Code with application of Article 35 paragraph 1 and article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin);
- 1 year imprisonment for the offence of use of false deed under private signature referred to in article 322 related to article 35 paragraph 1 of the Criminal Code with the application of article 5 of the Criminal Code.

1

Government Exhibit 1
Page 47 of 266

Under article 39 paragraph 1 letter b of the Criminal Code, the Alba District Court merged the aforementioned penalties into the greatest penalty of 1 year and 8 months of imprisonment to which the increase of 1 year and 10 months imprisonment has been added, the defendant finally having to execute the sentence of **3 years and 6 months imprisonment**.

The Warrant for Enforcement of a Custodial Sentence no. 720/2014 issued on the 19th of March 2015 by the Alba District Court, could not be executed, as the sentenced person Mărginean Rusalin Sorin evaded the execution of his sentence, leaving the country and thus was searched on international level, being located on the territory of the United States of America.

According to Article 8 of the Extradition Treaty signed in Bucharest on September 10, 2007 by Romania and the United States of America, we hereby enclose the following documents to this request:

**Attachment A, containing the following:**
- Case summary drawn up by the Alba District Court, containing the description of the facts for which extradition is requested and a short procedural history of the case;
- Legislation certificate drawn up by the Alba District Court containing the relevant legal provisions, including the provisions referring to the statutes of limitations applied to the execution of sentences;
- Certified copies of the statements made by the defendant Mărginean Rusalin Sorin during the criminal prosecution;
- Copy of the ID card and of the passport held by the extraditable person;
- Certified copy of the letter sent by the Local Court of Târgu Mureș, having attached an excerpt from the DRPAD database (Directorate for the Records of Persons and Administration of Databases under the authority of the Ministry of the Interior)

**Attachment B, containing the following:**
- Certified copy of the Court Minutes for the adjournment of the ruling issued on 22.09.2014 and 06.10.2014 by the Alba District Court;
- Certified copy of the criminal court sentence no. 577/2014 of the 13th of October 2014, delivered by Alba District Court;
- Certified copy of the Court Minutes for the adjournment of the ruling issued on 04.03.2015 by the Alba District Court;
- Certified copy of the criminal court decision no. 314/A/2015 of 19th March 2015 delivered by the Alba Court of Appeal.

**Attachment C:** Certified copy of the Warrant for Enforcement of a Custodial Sentence no. 720/2014 issued on the 19th of March 2015 by the Alba District Court.

The documents are accompanied by certified English translations.

According to Article 10 of the Extradition Treaty signed in Bucharest on September 10, 2007 by Romania and the United States of America, the Extradition Request and the enclosed documents have been certified by applying the stamp of the Romanian Ministry of Justice.

In the event other additional information and data are necessary in order to execute this request, these shall be sent by emergency to the U.S. authorities.

2

The Romanian Ministry of Justice is thanking the U.S. Department of Justice in advance for its amiable cooperation and uses this opportunity to renew the assurance of its highest consideration.

**Viviana ONACA** [Signature: illegible]
**Director**
**Directorate for International Law and Judicial Cooperation**

17 Apolodor St., 5th District, 050741, Bucharest; Romania, www.just.ro

3

EXT-MARGINEAN-00004

Government Exhibit 1
Page 49 of 266

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

 MINISTERUL JUSTIŢIEI

Bucureşti, 20.09.2017
Ref ns. 44260/2017

**DEPARTAMENTUL DE JUSTIŢIE AL STATELOR UNITE ALE AMERICII**
**U.S. Department of Justice**
**Office of International Affairs**
**Criminal Division**
**1301 New York Avenue, N.W.**
**Suite 800**
**Washington DC 20005**

Ministerul Justiţiei al României prezintă salutul său Departamentului de Justiţie al Statelor Unite ale Americii şi, în conformitate cu dispoziţiile Tratatului de extrădare dintre România şi Statele Unite ale Americii, semnat la Bucureşti, la 10 septembrie 2007, are onoarea de a-i transmite rugămintea amabilă de a supune autorităţilor americane competente prezenta

**CERERE DE EXTRĂDARE**

a condamnatului MĂRGINEAN RUSALIN SORIN, de cetăţenie română, născut la data de 16 februarie 1972 în Cugir, judeţul Alba, cu domiciliul în comuna Săliştea, sat Tărtăria, strada Florilor nr. 54, judeţul Alba, localizat pe teritoriul Statelor Unite ale Americii.

Extrădarea numitului Mărginean Rusalin Sorin se solicită în vederea executării pedepsei de 3 ani şi 6 luni închisoare, aplicată prin sentinţa penală nr. 577/2014 din 13 octombrie 2014 a Tribunalului Alba, definitivă prin decizia penală nr. 314/A/2015 din 19 martie 2015 a Curţii de Apel Alba.

Prin sentinţa penală nr. 577/2014 din 13 octombrie 2014 Tribunalul Alba l-a condamnat pe inculpatul Mărginean Rusalin Sorin la următoarele pedepse:
- 1 an şi 8 luni închisoare pentru săvârşirea infracţiunii de instigare la infracţiunea de înşelăciune, faptă prevăzută de art. 47 din Codul penal raportat la art. 244 din Codul penal, cu aplicarea art. 35 alin. 1 şi art. 5 din Cod penal (3 acte materiale – subiect pasiv Grozav Eugen);
- 1 an şi 6 luni închisoare pentru săvârşirea infracţiunii de instigare la infracţiunea de înşelăciune, faptă prevăzută de art. 47 din Codul penal raportat la art. 244 din Codul penal, cu aplicarea art. 5 din Codul penal (subiect pasiv Chiriluţ Cristian);
- 1 an şi 6 luni închisoare pentru săvârşirea infracţiunii de instigare la infracţiunea de înşelăciune, faptă prevăzută de art. 47 din Codul penal raportat la art. 244 din Codul penal, cu aplicarea art. 35 alin. 1 şi art. 5 din Cod penal (subiect pasiv Mărginean Nicolaie);



Str. Apolodor nr. 17, sector 5, 050741 Bucureşti, România
Tel. +4 037 204 1082
www.just.ro

Pagina 1 din 3

COD: FS-01-03-ver.2

Government Exhibit 1
Page 51 of 266

EXT-MARGINEAN-00006

MINISTERUL JUSTIŢIEI

- 1 an şi 6 luni închisoare pentru săvârşirea infracţiunii de instigare la infracţiunea de înşelăciune, faptă prevăzută de art.47 din Codul penal raportat la art. 244 din Codul penal, cu aplicarea art. 35 alin. 1 şi art. 5 din Cod penal (2 acte materiale -subiect pasiv Trifan Florin);
- 1 an închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată, prevăzută de art. 322 raportat la art. 35 alin. 1 din Codul penal, cu aplicarea art. 5 din Codul penal.

În baza art. 39 alin.1 lit. b) din Codul penal Tribunalul Alba a contopit pedepsele menţionate în pedeapsa cea mai grea, de 1 an şi 8 luni închisoare, la care a adăugat sporul de 1 an şi 10 luni închisoare, urmând ca în final inculpatul să execute pedeapsa de 3 ani şi 6 luni închisoare.

Mandatul de executare a pedepsei închisorii nr. 720/2014 din 19 martie 2015, emis de Tribunalul Alba, nu a putut fi adus la îndeplinire, întrucât condamnatul Mărginean Rusalin Sorin s-a sustras de la executarea pedepsei, părăsind ţara, astfel încât a fost dat în urmărire internaţională, fiind localizat pe teritoriul SUA.

În conformitate cu dispoziţiile art. 8 din Tratatul de extrădare între România şi Statele Unite ale Americii, semnat la Bucureşti, la 10 septembrie 2007, la prezenta cerere se anexează următoarele:

**Ataşamentul A, care conţine următoarele:**
- Referat întocmit de Tribunalul Alba, conţinând expunerea faptelor pentru care se solicită extrădarea şi un scurt istoric procedural al cazului;
- certificat legislativ întocmit de Tribunalul Alba, conţinând dispoziţiile legale aplicabile, inclusiv textele privind prescripţia executării pedepsei;
- copii certificate de pe declaraţiile date de inculpatul Mărginean Rusalin Sorin în cursul urmăririi penale;
- copia cărţii de identitate şi a paşaportului persoanei extrădabile;
- copia certificată a adresei Judecătoriei Tîrgu Mureş, având ataşată fişa extrasă din DEPABD (Direcţia pentru Evidenţa Persoanelor şi Administrarea Bazelor de Date din cadrul Ministerului Afacerilor Interne).

**Ataşamentul B, care conţine următoarele:**
- copia certificată a încheierilor de amânare a pronunţării din 22.09.2014 şi 06.10.2014 a Tribunalului Alba;
- copia certificată a sentinţei penale nr. 577/2014 din 13.10.2014 a Tribunalului Alba;
- copia certificată a încheierii de amânare a pronunţării din 04.03.2015 a Curţii de Apel Alba Iulia;
- copia certificată a deciziei penale nr. 314/A/2015 din 19.03.2015 a Curţii de Apel Alba Iulia.

**Ataşamentul C:** copia certificată a mandatului de executare a pedepsei închisorii nr. 720/2014 din 19.03.2015 emis de Tribunalul Alba.

Actele sunt însoţite de traduceri certificate în limba engleză.



Str. Apolodor nr. 17, sector 5, 050741 Bucureşti, România
Tel. +4 037 204 1082
www.just.ro

Pagina 2 din 3

COD: FS-01-03-ver.2

Government Exhibit 1
Page 52 of 266

EXT-MARGINEAN-00007

MINISTERUL JUSTIȚIEI

În conformitate cu dispozițiile art. 10 din Tratatul de extrădare între România și Statele Unite ale Americii, semnat la București, la 10 septembrie 2007, cererea de extrădare și documentele anexate au fost certificate prin aplicarea ștampilei Ministerului Justiției al României.

În cazul în care, pentru soluționarea prezentei cereri, sunt necesare informații și date suplimentare, acestea vor fi transmise, de urgență, autorităților americane.

Ministerul Justiției al României mulțumește anticipat Departamentului de Justiție al Statelor Unite ale Americii pentru amabila cooperare și folosește această ocazie pentru a-i reînnoi asigurarea înaltei sale considerații.

Director

Viviana ONACA

Direcția Drept Internațional și Cooperare Judiciară



Str. Apolodor nr. 17, sector 5, 050741 București, România
Tel. +4 037 204 1082
www.just.ro

Pagina 3 din 3

COD: FS-01-03-ver.2

EXT-MARGINEAN-00008

Government Exhibit 1
Page 53 of 266

# Ataşament A

EXT-MARGINEAN-00009

ROMÂNIA
TRIBUNALUL ALBA
SECȚIA PENALĂ
DOSAR NR. 3420/107/2017



*14*

### Expunerea faptelor în raport de care considerăm îndeplinite condițiile pentru a se solicita extrădarea și un scurt istoric al cazului din punct de vedere procedural :

Prin sentința penală nr. 577/2014 pronunțată la data de 13.10.2014 de Tribunalul Alba în dosarul nr. 15829/107/2012, rămasă definitivă la data de 19.05.2015 prin respingerea apelului prin decizia penală nr. 314/A/2015 a Curți de Apel Alba Iulia,  persoana căutată Mărginean Rusalin Sorin (CNP 1720216013541), cetățean român,  fiul lui Rusalin și Olimpia, născut la data de 16.02.1972 în Cugir, Jud. alba, cu domiciliul în com. Săliștea, sat Săliștea deal nr. 39A, jud. Alba, a fost condamnată la pedeapsa rezultantă de 3 ani și 6 luni închisoare.

În sarcina condamnatului s-a reținută că în perioada decembrie   2007 – iunie 2008 a determinat un număr de patru persoane să contracteze în mod fraudulos credite bancare, sens în care le-a pus la dispoziție documente pe care le-a falsificat împreună cu inculpata Poienar Ana, cuantumul total al creditelor contractate fiind   59.900 EUR și 68.800 lei. Pentru comiterea acestor fapte a fost condamnat după cum urmează:

-    1 an și 8 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen);

-    1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluț Cristian)

-    1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune infracțiunii prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Mărginean Nicolaie)

-    1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic.art.35 alin.1 și art.5 C.penal (2 acte materiale- subiect pasiv Trifan Florin)

Faptele aceleiași persoane care, acționând în baza aceleiași rezoluții infracționale, în scopul obținerii unor credite în mod fraudulos, a întocmit în fals un nr. de 14 acte ce au fost prezentate băncilor constituie infracțiunea de fals în înscrisuri sub semnătură privată în formă continuată, prev. de art. prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal, pentru care a fost condamnat la pedeapsa de 1an închisoare.

În baza art. 39 alin.1 lit. b) C.penal instanța a aplicat condamnatului pedeapsa cea mai  grea, de 1 an și 8 luni închisoare, la a adăugat un  spor de 1 an și 10 luni închisoare, rezultând pedeapsa finală de 3 ani și 6 luni închisoare.

Pe parcursul procesului penal, persoana condamnată Mărginean Rusalin Sorin a fost asistată de un apărător ales, respectiv de domnul avocat Gheorghe Marin. Totodată, persoana condamnată a fost prezentă personal la procesul în urma căruia a fost pronunțată hotărârea.

În baza hotărârii definitive de condamnare, Tribunalul Alba a fost emis mandatul de executare a pedepsei închisorii nr. 420/2014 din data de 19.03.2015, care nu a fost pus în executare deoarece persoana condamnată nu a fost găsită. Din acest motiv, Mărginean Rusalin Sorin a fost dat în urmărire internațională, fiind emis și un mandat european de arestare.

Judecător,
**OVIDIU TOTH**

20

EXT-MARGINEAN-00010

*46*

ROMÂNIA
TRIBUNALUL ALBA
SECŢIA PENALĂ
DOSAR NR. 3420/107/2017

- **Textele legale relevante care reglementează următoarele:**
**\* elementele constitutive ale infracţiunii pentru care se solicită extrădarea;**
**\* pedepsele pentru infracţiunile pentru care se solicită extrădarea;**

**I. Instigare la infracţiunea de înşelăciune prevăzută de art. 47 Cod penal raportat la art. 244 C.pen. cu aplicarea art.35 alin.1 şi art.5 Cod penal**

**\* Articolul 47 Cod penal : Instigatorul**
      " Instigator este persoana care, cu intenţie, determină o altă persoană să săvârşească o faptă prevăzută de legea penală."

**\* Articolul 244 Cod penal referitor la infracţiunea de „Înşelăciune"**
      "(1) Inducerea în eroare a unei persoane prin prezentarea ca adevărată a unei fapte mincinoase sau ca mincinoasă a unei fapte adevărate, în scopul de a obţine pentru sine sau pentru altul un folos patrimonial injust şi dacă s-a pricinuit o pagubă, se pedepseşte cu închisoarea de la 6 luni la 3 ani.
      (2) Înşelăciunea săvârşită prin folosirea de nume sau calităţi mincinoase ori de alte mijloace frauduloase se pedepseşte cu închisoarea de la unu la 5 ani. Dacă mijlocul fraudulos constituie prin el însuşi o infracţiune, se aplică regulile privind concursul de infracţiuni.
      (3) Împăcarea înlătură răspunderea penală."

**\* Articolul 35 alin. 1 Cod penal referitor la** "Unitatea infracţiunii continuate şi a celei complexe"
      "(1) Infracţiunea este continuată când o persoană săvârşeşte la diferite intervale de timp, dar în realizarea aceleiaşi rezoluţii şi împotriva aceluiaşi subiect pasiv, acţiuni sau inacţiuni care prezintă, fiecare în parte, conţinutul aceleiaşi infracţiuni."

**\* Art. 5 Cod penal referitor la** "Aplicarea legii penale mai favorabile până la judecarea definitivă a cauzei"
      "(1) În cazul în care de la săvârşirea infracţiunii până la judecarea definitivă a cauzei au intervenit una sau mai multe legi penale, se aplică legea mai favorabilă.
      (2) Dispoziţiile alin. (1) se aplică şi actelor normative ori prevederilor din acestea declarate neconstituţionale, precum şi ordonanţelor de urgenţă aprobate de Parlament cu modificări sau completări ori respinse, dacă în timpul când acestea s-au aflat în vigoare au cuprins dispoziţii penale mai favorabile."

**II. Fals în înscrisuri sub semnătură privată în formă continuată, prevăzut de art. art.322 C.penal**
      "(1) Falsificarea unui înscris sub semnătură privată prin vreunul dintre modurile prevăzute în art. 320 sau art. 321, dacă făptuitorul foloseşte înscrisul falsificat ori îl încredinţează altei persoane spre folosire, în vederea producerii unei consecinţe juridice, se pedepseşte cu închisoare de la 6 luni la 3 ani sau cu amendă.
      (2) Tentativa se pedepseşte."

*50*

## III. Prescripția executării pedepsei

ART. 161

(1) Prescripția înlătură executarea pedepsei principale.

(2) Prescripția nu înlătură executarea pedepselor principale în cazul:

a) infracțiunilor de genocid, contra umanității și de război, indiferent de data la care au fost comise;

b) infracțiunilor prevăzute la art. 188 și 189 și al infracțiunilor intenționate urmate de moartea victimei.

--------

(3) Prescripția nu înlătură executarea pedepselor principale nici în cazul infracțiunilor prevăzute la alin. (2) lit. b) pentru care, la data intrării în vigoare a acestei dispoziții, nu s-a împlinit termenul de prescripție a executării.

ART. 162

**Termenele de prescripție a executării pedepsei**

(1) Termenele de prescripție a executării pedepsei pentru persoana fizică sunt:

a) 20 de ani, când pedeapsa care urmează a fi executată este detențiunea pe viață sau închisoarea mai mare de 15 ani;

b) 5 ani, plus durata pedepsei ce urmează a fi executată, dar nu mai mult de 15 ani, în cazul celorlalte pedepse cu închisoarea;

c) 3 ani, în cazul când pedeapsa este amenda.

(2) Termenele prevăzute în alin. (1) se socotesc de la data când hotărârea de condamnare a rămas definitivă.

(3) În cazul revocării sau anulării amânării aplicării pedepsei, suspendării executării pedepsei sub supraveghere ori liberării condiționate, termenul de prescripție începe să curgă de la data când hotărârea de revocare sau anulare a rămas definitivă.

(4) În cazul revocării liberării condiționate, în condițiile art. 104 alin. (1), termenul de prescripție începe să curgă de la data când hotărârea de revocare a rămas definitivă și se calculează în raport cu restul de pedeapsă neexecutat.

(5) În cazul înlocuirii pedepsei amenzii cu pedeapsa închisorii, termenul de prescripție curge de la data când hotărârea de înlocuire a rămas definitivă și se calculează în raport cu durata pedepsei închisorii.

(6) Pedepsele complementare aplicate persoanei fizice și măsurile de siguranță nu se prescriu.

(7) Prin pedeapsa ce se execută se înțelege pedeapsa stabilită de instanță, ținându-se cont de cauzele ulterioare de modificare a acesteia.

ART. 163

**Întreruperea cursului prescripției executării pedepsei**

(1) Cursul termenului de prescripție a executării pedepsei se întrerupe prin începerea executării pedepsei. Sustragerea de la executare, după începerea executării pedepsei, face să curgă un nou termen de prescripție de la data sustragerii.

(2) Cursul termenului de prescripție a executării se întrerupe și prin săvârșirea din nou a unei infracțiuni.

(3) Cursul termenului de prescripție a executării pedepsei amenzii se întrerupe și prin înlocuirea obligației de plată a amenzii cu obligația de a presta o muncă neremunerată în folosul comunității.

ART. 164

Suspendarea cursului prescripției executării pedepsei

(1) Cursul termenului prescripției executării pedepsei este suspendat în cazurile și condițiile prevăzute în Codul de procedură penală.

Government Exhibit 1
Page 57 of 266

47

(2) Prescripția își reia cursul din ziua în care a încetat cauza de suspendare.

**Precizăm că în speță termenul de prescripție a executării pedepsei este de 8 ani și 6 luni și nu s-a împlinit întrucât condamnarea a rămas definitivă la data de 19.05.2015.**



51

EXT-MARGINEAN-00013

INTERNELOR ŞI REFORMEI ADMINISTRATIVE          Regim special

*BA - SIT.*

*nr. 279 /P 1 2008.*                              Seria **B** Nr. *0468090*

*66*

# DECLARAŢIE  învinuit/inculpat

Din ziua *17* luna *08* anul *2008*

*MARGINEAN* prenumele *ANSALIN SORIN.*

actului de identitate *CI* seria *AX* nr. *251039* eliberat

*EP CUGIR* CNP *1720216013541*

prenumele purtat anterior

terii (anul, luna ziua) şi locul naşterii *16.02.1972, CUGIR.*

prenumele tatălui *MARGINEAN ANSALIN.*

prenumele mamei *MARGINEAN OLIMPIA.*

*ROMANA.*

*SCOALA PROFESIONALA.*

militară *HESATISFACUT.*

*CONDUCATOR AUTO.*

muncă *SC LEO TRANS SRL*

vilă *CASATORIT.*

ul/reşedinţă *SALISTEA SAT SALISTEA SCAL, NR. 3PA 749 ALBA*

la care locuieşte efectiv

dente penale *FARA.*

e mi s-a adus la cunoştinţă că sunt învinuit/inculpat de săvârşirea infracţiunii/lor de

*FALS INTELECTUAL, UZ DE FALS SI INSTIGARE LA*

*INSELACIUNE.*

e prev. de art. *288 din C.P., 289 din C.P. si 25 din C.P.*

*la art.* *din* *215 al. 1-3 din C.P.*

AN DE CERCETARE          APĂRĂTOR          ÎNVINUIT/INCULPAT
OLIŢIEI JUDICIARE

*8*

Government Exhibit 1
Page 59 of 266

Cd. 2095 - 2007

constând în aceea că *[handwritten text]*

*[handwritten lines]*

și că potrivit art. 70 alin. 2  și 4 C.pr.pen. am dreptul la un apărător și dreptul de a n

nicio declarație, atrăgându-mi-se atenția că tot ce declar poate fi folosit și împotriv

precum și obligația de a anunța în scris, în termen de 3 zile, orice schimbare a locui

parcursul procesului penal,  declar următoarele: ...............................................

    Audierea a inceput la ora 10.31.

    Mi s-a adus la cunostinta ca sunt invinuit de savarsirea infractiunilor

prev. si ped. de art. 289 din C.pen.; 291 din C.pen. si art. 25 din C.pen.; rap

la art. 215 al. 1-3 din C.pen.; ca am dreptul la un aparator ales si dreptul de a

nu face nici o declaratie, tot ceea ce declar putand fi folosit impotriva mea.

    Mi s-a adus la cunostinta ca in cazul in care imi voi schimba locuinta,

pe parcursul procesului penal, inainte cu trei zile, sunt obligat sa anunt in

scris organele judiciare.

    In aceasta faza a cercetarilor sunt de acord sa fiu asistat de aparatorul

ales, av. Moise Petru, in prezenta caruia sunt de acord sa fac aceasta

declaratie.

    In perioada 2006-august 2008 am fost administrator in cadrul SC Sory

Expres SRL Salistea. Din august 2008 societatea nu mai are activitate, fiind

initiata procedura de lichidare. Eu am fost singurul administrator si asociat al

acestei societati. Societatea a avut ca si principal obiect de activitate

„transporturi".In perioada 2007-2008, nu mai retin data exact, la societatea

administrata de mine au fost angajati numitii Chirilut Cristian, Trifan Florin

si Marginean Nicolaie. Ii cunosteam pe toti trei inainte de a se angaja la

societatea mea. Toti trei mi-au solicitat sa ii angajez la societatea mea, lucru

pe care l-am si facut.

    Toti trei au fost angajati ai societatii in aceeasi perioada de timp.

    Imi amintesc ca numitul Chirilut a fost angajat la inceputul anului

2007 si pana in toamna anului 2007. A detinut calitatea de conducator auto,

iar la sfarsitul anului 2007 am decis sa il disponibilizez din cauza faptului ca

l-am surprins furand motorina si din cauza indisciplinei.

| ORGAN DE CERCETARE | APĂRĂTOR | ÎNVINUIT/INCULPAT |
|---|---|---|
| AL POLITIEI JUDICIARE | APARATOR | INVINUIT |

Government Exhibit 1
Page 60 of 266

continuare decl. invinuit Marginean Rusalin Sorin

Chirilut a semnat personal un contract de munca. Din partea societatii contractul de munca a fost semnat de catre subsemnatul. Pe contractul de munca era mentionat calitatea de conducator auto al acestuia si ca si salariu lunar, suma de 1.700 lei sau 1.800 lei, nu mai retin exact. Revin si asupra faptul ca, efectiv, contractul de munca a fost scris de catre contabila societatii de la acea vreme, respectiv numita Sima Crina, insa nu mai retin exact ce suma a fost inscrisa pe contract, insa cred ca suma aratata anterior. Precizez ca eu am negociat cu Chirilut ce suma va fi inscrisa pe contractul de munca.

In fapt, numitul Chirilut, pe langa salariul de baza mentionat in contractul de munca, beneficia lunar de diurna si alte bonusuri, in functie de cursele efectuate. Chirilut isi desfasura activitatea pe un autotractor, achizitionat in sistem leasing de catre societatea mea.

Contractul de munca a numitului Chirilut a fost inregistrat la ITM.

In vara anului 2007, nu mai retin exact data, Chirilut mi-a spus ca are nevoie de o adeverinta de salariu, pentru a contracta un credit de la banca. Mi-a spus ca luase anterior o suma de bani imprumut si dorea sa o restituie. Nu stiu de la cine a luat bani imprumut. Nu i-am cerut detalii in legatura cu acest credit. Nu stiam de la ce banca urma sa contracteze creditul.

In acest context i-am eliberat o adeverinta de venit. Acest document a fost completat de catre contabila societatii, numita Sima Crina, care nu stiu unde locuieste. Aceasta nu a fost angajata la societate, doar avea incheiata o conventie civila si nu am nici o data despre ea. Nu stiu unde locuieste.

Am verificat adeverinta de venit, in sensul ca sumele inscrise ca si salariu corespundeau cu realitatea, iar apoi am semnat acea adeverinta. Adeverinta a fost semnata doar de catre mine. Adeverinta de venit cuprindea castigurile realizate de catre Chirilut, adica salariul de baza, cat si bonusurile amintite anterior. De asemenea, i-am mai dat lui Chirilut si o copie dupa contractul de munca. Nu i-am mai dat alte documente.

Nu stiam ce credit urma sa contracteze. Nu m-a interesat acest lucru. Nu a mai fost nici o persoana de fata in momentul in care Chirilut mi-a spus ca va contracta un credit pentru a-si achita o datorie.

Nu am avut nici o intelegere cu numitul Chirilut in legatura cu creditul contractat sau cu suma de bani. Nu i-am cerut parte din suma de bani contractata. Nu stiu cand a ridicat banii de la banca, cati bani a ridicat sau ce a facut cu acestia. Eu nu l-am insotit la banca niciodata pe Chirilut.

Nu stiu daca a acvhitat ratele aferente acestui credit.

In toamna anului 2007, acesta a fost dat afara de la societate, din motivele aratate anterior. Din aceasta cauza cred ca numitul Chirult sustine

ORGAN CP       APARATOR       INVINUIT

Government Exhibit 1
Page 61 of 266

ca as fi avut o intelegere cu el in privinta creditului, insa nu este adevarat acest lucru.

Numitul Marginean Nicolaie a fost angajat la inceputul anului 2007, cred ca luna februarie sau martie si pana in toamna anului 2008. A detinut calitatea de conducator auto, iar in toamna anului 2008 am decis sa il disponibilizez din cauza faptului ca l-am surprins furand motorina si din cauza indisciplinei. De asemenea mi-a mai furat si alte bunuri care apartineau societatii.

Marginean Nicolaie a semnat personal un contract de munca. Din partea societatii mele contractul de munca a fost semnat de catre subsemnatul. Pe contractul de munca era mentionat calitatea de conducator auto al acestuia si ca si salariu lunar, suma de 1.600 lei sau 1.800 lei, nu mai retin exact. Revin si arat faptul ca, efectiv, contractul de munca a fost scris de catre contabila societatii de la acea vreme, respectiv numita Sima Crina, insa nu mai retin exact ce suma a fost inscrisa pe contract, insa cred ca suma aratata anterior. Precizez ca eu am negociat cu Marginean Nicolaie ce suma va fi inscrisa pe contractul sau de munca.

In fapt, numitul Marginean Nicolaie, pe langa salariul de baza mentionat in contractul de munca, beneficia lunar de diurna si alte bonusuri, in functie de cursele efectuate. Susnumitul isi desfasura activitatea pe un autotractor, achizitionat in sistem leasing de catre societatea mea, precum si pe o combina de recoltat cereale, care apartinea tot societatii.

Contractul de munca a numitului Marginean a fost inregistrat la ITM. Stiu sigur acest lucru, deoarece am verificat viza de pe contractul care a ramas la societate.

In vara anului 2007, nu mai retin exact data, Marginean Nicolaie mi-a spus ca are nevoie de o adeverinta de salariu, pentru a contracta un credit de la banca. Stiam ca anterior achizitionase un autoturism si trebuia sa il achite. Nu stiu de la cine cumparase autoturismul sau cu ce suma. Nu i-am cerut detalii in legatura cu acest credit. Nu stiam de la ce banca urma sa contracteze creditul.

In acest context i-am eliberat o adeverinta de venit. Acest document a fost completat de catre contabila societatii, numita Sima Crina.

Am verificat adeverinta de venit, in sensul ca sumele inscrise ca si salariu corespundeau cu realitatea, iar apoi am semnat acea adeverinta. Adeverinta a fost semnata doar de catre mine. Adeverinta de venit cuprindea castigurile realizate de catre Marginean Nicolaie, adica salariul de baza, cat si bonusurile amintite anterior. De asemenea, i-am mai dat lui Marginean Nicolaie si o copie dupa contractul de munca. Nu i-am mai dat alte documente.

Nu stiam ce credit urma sa contracteze. Nu m-a interesat acest lucru.

ORGAN CP          APARATOR          INVINUIT

EXT-MARGINEAN-00017

//

continuare decl. invinuit Marginean Rusalin Sorin

Nu am avut nici o intelegere cu numitul Marginean Nicolaie in
legatura cu creditul contractat sau cu suma de bani. Nu i-am cerut parte din
suma de bani contractata. Nu stiu cand a ridicat banii de la banca, cati bani a
ridicat sau ce a facut cu acestia. Eu nu l-am insotit la banca niciodata pe
numit.

Nu stiu daca a achitat ratele aferente acestui credit.

In toamna anului 2008, dupa intrarea societatii in faliment acesta a
fost dat afara de la societate, din motivele aratate anterior. Din aceasta cauza
cred ca numitul Marginean Nicolaie sustine ca as fi avut o intelegere cu el in
privinta creditului, insa nu este adevarat acest lucru.

Numitul Trifan Florin a fost angajat la inceputul anului 2008, cred ca
prin februarie sau martie si pana in toamna anului 2008, pana la intrarea
societatii in lichidare. A detinut calitatea de conducator auto, iar in toamna
anului 2008 am decis sa il disponibilizez din cauza faptului ca l-am surprins
l-am surprins in repetate randuri in stare de ebrietate, in timpul serviciului si
nu isi indeplinea indatoririle de serviciu.

Trifan Florin a semnat personal un contract de munca. Din partea
societatii mele contractul de munca a fost semnat de catre subsemnatul. Pe
contractul de munca era mentionata calitatea de conducator auto al acestuia
precum si salariu lunar, suma de 1.600 lei sau 1.800 lei, nu mai retin exact.
Revin si arat faptul ca, efectiv, contractul de munca a fost scris de catre
contabila societatii de la acea vreme, respectiv numita Sima Crina, insa nu
mai retin exact ce suma a fost inscrisa pe contract, insa cred ca suma aratata
anterior. Precizez ca eu am negociat cu Trifan ce suma va fi inscrisa pe
contractul sau de munca.

In fapt, numitul Trifan, pe langa salariul de baza mentionat in
contractul de munca, beneficia lunar de diurna si alte bonusuri, in functie de
cursele efectuate. Susnumitul isi desfasura activitatea pe un autotractor,
achizitionat in sistem leasing de catre societatea mea.

Mentionez ca eu am vazut permisele de conducere a numitilor
Chirilut, Marginean Nicolaie si Trifan Florin si toti trei au condus pe
drumurile publice autovehiculele societatii mele.

Contractul de munca a numitului Trifan a fost inregistrat la ITM. Stiu
sigur acest lucru, deoarece am verificat viza de pe contractul care a ramas la
societate.

In vara anului 2008, nu mai retin exact data, Trifan Florin mi-a spus
ca are nevoie de o adeverinta de salariu, pentru a contracta un credit de la
banca. Stiam ca acesta isi renova casa si din acest motiv avea nevoie de bani.

ORGAN CP          APARATOR          INVINUIT

Nu i-am cerut detalii in legatura cu acest credit. Nu stiam de la ce banca urma sa contracteze creditul.

In acest context i-am eliberat o adeverinta de venit. Precizez ca i-a fost eliberata o singura adeverinrta de venit si stiam ca va contracta un singur credit. Acest document a fost completat de catre contabila societatii numita Sima Crina.

Am verificat adeverinta de venit, in sensul ca sumele inscrise ca si salariu corespundeau cu realitatea, iar apoi am semnat acea adeverinta. Adeverinta a fost semnata doar de catre mine. Adeverinta de venit cuprindea castigurile realizate de catre Trifan, adica salariul de baza, cat si bonusurile amintite anterior. De asemenea, i-am mai dat susnumitului si o copie dupa contractul de munca. Nu i-am mai dat alte documente.

Nu stiam ce credit urma sa contracteze. Nu m-a interesat acest lucru.

Nu am avut nici o intelegere cu numitul Trifan Florin in legatura cu creditul contractat sau cu suma de bani. Nu i-am cerut parte din suma de bani contractata. Nu stiu cand a ridicat banii de la banca, cati bani a ridicat sau ce a facut cu acestia. Eu nu l-am insotit la banca niciodata pe susnumit.

Nu stiu daca a achitat ratele aferente acestui credit.

In toamna anului 2008, dupa intrarea societatii in faliment acesta a fost dat afara de la societate, din motivele aratate anterior. Din aceasta cauza cred ca numitul Trifan sustine ca as fi avut o intelegere cu el in privinta creditului, insa nu este adevarat acest lucru.

In prezent societatea este in lichidare. Numitul Jibetean este lichidator, iar numita Iulia Simbotin este contabila. Toate documentele societatii se afla la persoanele amintite. Contractele de munca ale numitilor Chirilut, Trifan si Marginean Nicolaie se afla impreunaq cu toate documentele contabile.

Nu imi explic din ce cauza numitii Trigan si Marginean Nicolaie sustin ca nu au semnat nici un contract de munca si ca semnatura de pe contractele incheiate nu le apartine. In masura in care nu erau de acord cu aceste contracte de munca, acestia nu lucrau efectiv la societatea mea.

Nu imi explic din ce cauza numitul Trifan sustine ca nu detine permis de conducere pentru nici o categorie.

Organele de politie imi prezinta contractul de munca nr. 19/01.02.2007, adeverinta de venit nr. 214/21.05.2008 si adeverinta nr. 219/26.05.2008. Semnaturile de la rubricile „director general" de pe aceste documente au fost depuse de catre mine.

Numita Poienar Ana a fost angajata la societate in calitate de coordonator transport. Nu cred ca cunostea nimic in legatura cu creditele contractate de catre cei trei.



ORGAN OP                    APARATOR                    INVINUIT

Government Exhibit 1
Page 64 of 266

13

continuare decl. invinuit Marginean Rusalin Sorin

Numitul Lascan Ioan a fost angajat la societatea mea in cursul anului 06. Nu stiu daca avea cunostinta de creditele contractate de catre numitii rilut, Marginean si Trifan. Susnumitii nu au asistat la nici o discutie pa am avut-o cu cele trei persoane care au contractat creditul, in legatura cu rdarea creditelor.

In prezent eu locuiesc cu chirie. Nu detin nici un imobil in proprietate nici un autovehicul. In momentul de fata sunt angajat ca si conducator o, cu contract de munca la SC Leo Trans SRL, societate care are sediul in lgaria si in Giurgiu. Beneficiez de un venit de aproximativ 700-800 euro ar.

Nu am nici un cont deschis la nici o banca.

Nu cunosc nici un functionar bancar de la nici o banca din Alba Iulia din Sebes.

Sunt de acord sa fiu testat cu tehnica poligraf. In acest sens ma voi ezenta la solicitarea organelor de politie pentru a fi testat.

In probatiune solicit audierea numitilor Poienar Ana, Maxim Adrian. mai solicit administrarea altor probe.

Nu ma consider vinovat de savarsirea infractiunilor care mi se retin in rcina.

Nu sufar de boli psihice.

Atat declar, sustin si semnez.

Declaratia contine patru file.

Audierea s-a terminat la ora 11.39.

ORGAN CP                APARATOR                INVINUIT

        



ORGAN CP                APARATOR                INVINUIT

14

Government Exhibit 1
Page 65 of 266



63

DECLARATIE

Subsemnatu MARGINEAN RUSALIN SORIN fiu lui RUSALIN
si al OLIMPIA nascut la data de 16.02.1972 in Cugir domici
tot in Com. Salista sat Salista Sat MRSGA jud. Alba
Declar urmatoarele

In Prezenta opozitorului ales avocat MOISE PETRU mi
s-a dus la Cunostinta Ca sint invinuit de savirsire a
infractiunilor prevazute si pedepsite de articolul 283 din
Cod Penal art. 291 din CP. articolul 25 CP. raportat
la articolul 215 alineat 1-3 din CP. Ca am dreptul
la un opozitor ales a dreptul de a nu face nici o
de Claratie tot Ce Ce de Calar pot fi folosite in
Potriva mea

Mi s-a dus la Cunostinta Ca an Caz an lipsa a mei
dainta locuinta Pe Parcursul Procesului penal in mate
Cu 3 zile sint Obligat sa anut in scris Organele
judiciar

In acesta faza a Cercetarii sint de acord sa fiu asistat
de opozitor ales avocat MOISA PETRU si sint de acord
sa fiu a declaratie in Curs an nu Cer sa vinovat de
savirse in Infractiunelor Care mi se Cetin an savicine
ata de Cer subtin si semnez

ALBA IULIA

27.04.2009







# DECLARAȚIE

64

Subsemnatu MARGINEAN RUSALIN SORIN fiu lui RUSALIN și OLIMPIA născut la data de 16.02.1972 în Cugir domiciliat în Săliște sat săliște deal NR 39 jud Alba. declar cunoscă mi so adus la cunoștința că sînt învinuit de sovîrșirea infracțiunilor prevăzute de art. 31/2 din Cod. penal raportat la articolu 205/1,2,3 din Codu penal și articolu 290/1 din Codu penal că am dreptu la un opărător ales și dreptu de nu face nici o declarație tot ceia ce declar potînd fi folosit în potriva mea.

mi so adus la cunoștința că în cazu în care îi voi schimba locuința, pe parcursu procesulu penal înoite la 3 zile sînt obligat să onunț în scris orgonele judiciare sînt de acord să fiu asistat de opărătoru ales avocat GERGE MARIN și doresc să fac o declarație.

olă deala sustin și semnez.

Alba iulia
16.02.2010







EXT-MARGINEAN-00022

31.02.2009

74
65

## DECLARAȚIE

Subsemnatul MĂRGINEAN RUSALIN SORIN fiu RUSALIN și OLIMPIA născut la data de 16.02.1972 în Cugir jud. Alba domiciliat în Sălistea sat sălistea nr. 39A jud. Alba. declar următorul.

În legătură cu plângerea numitului Grozav Tiberiu declar faptul că el Grozav pe sub numite încă nu sînt rude cu acestui numit Grozav Tiberiu este plecat de mai multă în străinătate nu a fost angajat în Codru Sec Sorg Exreu nici o dată și m-a desfășurat activitate la acest societate nu am solicitat nici o dată subnumitului să cunoaștere cu credit și să și-a în de mie bani sfinti

nu am luat nici o dată bani în plerumt de la numita Grozav nu am explica din a Cură numitei Grozav a făcut plângere în potriva mea.

nu mă consider vinovat de sarres și întrufactui atat declar susțin și semnez

Alba-iulia.

31.02.2009.





7

EXT-MARGINEAN-00023



**ROUMANIE** ROMANIA **ROMANIA**

CARTE CARTE DE IDENTITATE
D'IDENTITÉ SERIA AX NR 255039
CNP 1720216013541    I4VOC

Nume/Nom/Last name
MARGINEAN
Prenume/Prénom/First name
RUSALIN-SORIN
Prenume parinti/Noms des parents/Parent's name
RUSALIN    OLIMPIA    M
Loc nastere/Lieu de naissance/Place of birth
Ors. Cugir Jud. Alba
Domiciliu/Adresse/Address
Sat. Săliștea-Deal (Com. Săliștea) Jud. Alba
nr.39A
Emise de/Delivré par/Issued by
SPCLEP Cugir    21.03.06-16.02.2016



IDROUMARGINEAN<<RUSALIN<SORIN<<<<<<
AX255039<91327202168M160216810135411

CONFORM CU ORIGINALUL
CONFORMS TO ORIGINAL



G1

**Government Exhibit 1**
**Page 69 of 266**





CONFORM CU ORIGINALUL
CONFORMS TO ORIGINA

62

EXT-MARGINEAN-00025



2573

pentru mențiuni ale autorităților romane
for observations of Romanian authorities
aux mentions des autorités roumaines

Titularul are domiciliul in
Bearer has the domicilie in
STATELE UNITE ALE AMERICII
Scadenta la

FEB /FEB 05

N*9888366

507391

stabilit domiciliul in
ROMANIA

-03-2006

9888366

Titularul prezentului pașaport călătorește însoțit de
The Bearer of the present passport travels accompanied by
Le titulaire du présent passeport voyage accompagné de

Nr. personal/Personal No./No. personnel

Numele/Surname/Nom

Prenumele/Given names/Prénoms

Data nașterii/Date of birth/Date de naissance

Data/Date/Date

Nr. personal/Personal No./No. personnel

Numele/Surname/Nom

Prenumele/Given names/Prénoms

Data nașterii/Date of birth/Date de naissance

Data/Date/Date

CONFORM CU ORIGINALUL
CONFORMS TO ORIGINAL

DEPABD
Direcţia pentru Evidenţa Persoanelor şi Administrarea Bazelor de Date

MINISTERUL AFACERILOR INTERNE
Direcţia pentru Evidenţa Persoanelor şi Administrarea Bazelor de Date
Operator de date cu caracter personal nr. 15894-15390

Informaţii nedestinate publicităţii. Vă rugăm să asiguraţi confidenţialitatea datelor

### Fişa de evidenţă pentru CNP 1720216013541

Înapoi

#### DATE GENERALE

| CNP | 1720216013541 | Sex | Masculin |
|---|---|---|---|

**PERSOANĂ URMĂRITĂ**



| Nume | **MĂRGINEAN** | | |
|---|---|---|---|
| Prenume | **RUSALIN-SORIN** | | |
| Data naşterii | 16 Feb 1972 | Act de naştere | 68 / 1972 |
| Locul naşterii | Orş Cugir Jud.Alba | | |
| Tata | RUSALIN | Mama | OLIMPIA |
| Stare civilă | Căsătorit | Situaţia militară | fără obligaţii militare |
| Studii | studii liceale, profesionale sau complementare | Profesie | - |
| Ocupaţie | sofer | Sursa de venit | - |

#### FOTOGRAFII

| Data fotografierii | Informaţii asociate fotografiei |
|---|---|
| 20.10.2002 | atasat |
| 14.02.2003 | atasat |

#### MENTIUNI OPERATIVE

| Stare Mentiune | Obiectie | Emitent cerere | Fapta | Interdictie | Gen fapta |
|---|---|---|---|---|---|
| activ | Urmărit | 367229/02.04.2015 | Politie - Inspectoratul de politie al judetului Alba | mandat de executare a pedepsei cu inchisoarea | - | inselaciune |

#### DATE PRIVIND LEGATURA MARITALA

| CNP partener | Nume partener | Stare marital | Nr act / data | Eveniment inregistrat |
|---|---|---|---|---|
| 2751020013541 | MĂRGINEAN VIORICA | Căsătorit | 11 / 1991 lun 06 | Com.Sălistea / AB |

#### DATE PRIVIND COPIII

| CNP copil | Data | Prenume | Loc nastere |
|---|---|---|---|
| ..080140... | MĂRGINEAN | IONELA-SORINA | Orş.Cugir / AB |
| ...... | MĂRGINEAN | IONUŢ-SORIN | Orş.Cugir / AB |

#### ADRESE

| Tip | Perioada | Localitate | Adresa | Sectie |
|---|---|---|---|---|
| Activ | 16 Mar 2006 / | Sat.Sălistea-Deal (Com.Sălistea) / AB | nr.39A | Cugir |
| **Istoric** | 01 Ian 1991 / 16 Mar 2006 | Sat.Sălistea-Deal (Com.Sălistea) / AB | nr.5 | Cugir |



Government Exhibit 1
Page 72 of 266

## DOCUMENTE DE IDENTITATE

| Stare | Serie | Numar | Data emiterii | Valabil pana la | Inmanat la | Nota eliberare | Formatiunea emitenta |
|-------|-------|-------|---------------|-----------------|------------|----------------|----------------------|
| Emis | AX | 372876 | 22 Oct 2009 | 16 Feb 2019 | 26 Oct 2009 | Pierdere | SPC. Cugir |
| Emis | AX | 255039 | 21 Mar 2006 | 16 Feb 2016 | 24 Mar 2006 | Repatriat | SPC. Cugir |
| Emis | GK | 526156 | 21 Oct 1993 | 21 Oct 2003 | 21 Oct 1993 | Deteriorat/distrus/anulat | Orş. Cugir |

## DATE DE MIGRARE

| Tip migrare | Tara / data migrare | Numar / data actului emitent |
|-------------|---------------------|------------------------------|
| Repatriere | / 15 Mar 2006 | 34445 din 2006-03-15 (Serviciul paşapoarte), din () |
| Cetăţean român cu domiciliul în străinătate | S.U.A. / 08 Feb 2005 | 9888366 din 2005-02-08 (Serviciul paşapoarte), din () |
| Pierderea cetăţeniei române | / 01 Ian 1991 | FN din 1996-07-24 (A.N.C.), din () |

## DOCUMENTE DE STARE CIVILĂ

| Tip document | Serie / numar act | Data eliberarii | Institutie emitenta | Localitatea |
|--------------|-------------------|-----------------|---------------------|-------------|
| Certificat de naştere | NL / 798177 | 13 Feb 2006 | Consiliul Local | Orş.Cugir |
| Certificat de căsătorie | C8 / 527259 | 06 Iun 1991 | Consiliul Local | Com.Săliştea |
| Certificat de căsătorie | C8 / 527259 | 06 Iun 1991 | Consiliul Local | Com.Săliştea |
| Act de căsătorie | / 11 | 06 Iun 1991 | Consiliul Local | Com.Săliştea |

Utilizator : MOCE ANCA Cpas : [ ]
6 Sep 2017 , ora 12:45
Utilizator actiuni : 1 : [ ]





Government Exhibit 1
Page 73 of 266

ROMÂNIA
TRIBUNALUL ALBA
SECŢIA PENALĂ
DOSAR NR. 3420/107/2017

*12*

### Informaţii privind identitatea şi localizarea probabilă a persoanei căutate
### Mărginean Rusalin Sorin

**Mărginean Rusalin Sorin** (CNP 1720216013541), cetăţean român, fiul lui Rusalin şi Olimpia, născut la data de 16.02.1972 în Cugir, Jud. alba, cu domiciliul în com. Săliştea, sat Săliştea deal nr. 39A, jud. Alba.

Potrivit adresei comunicate de către INTERPOL, condamnatul Mărginean Rusalin Sorin şi-ar putea avea reşedinţa în S.U.A.

Anexăm fotografia persoanei condamnate



5

Government Exhibit 1
Page 74 of 266

*18*    EXT-MARGINEAN-00029





# Ataşament B

EXT-MARGINEAN-00031

48

R O M Â N I A
TRIBUNALUL ALBA
SECŢIA PENALĂ

Dosar nr. 15829/107/2012

ÎNCHEIERE
Şedinţa publică de la 22 Septembrie 2014
Completul compus din:
Preşedinte MARIA ELENA FULEA
Grefier şef NICOLAE TODEA

Parchetul de pe lângă Tribunalul Alba este reprezentat prin procuror
ADINA MALINCENCO

Pe rol se află judecarea cauzei penale  privind pe inculpaţii MĂRGINEAN RUSALIN SORIN, CHIRILUŢ CRISTIAN SABIN,  MĂRGINEAN NICOLAE, TRIFAN FLORIN,  GROZAV EUGEN TIBERIU şi POIENAR ANA, trimişi în judecată pentru săvârşirea infracţiunii de înşelăciune (art. 215 Cp) în dauna părţilor vătămate BCR S.A., ALPHA BANK SUCURSALA ALBA, ALPHA BANK AGENŢIA  SEBEŞ,  BRD  GROUPE  SOCIETE  GENERALE,  KRUK INTERNAŢIONAL SRL şi ASSET POTFOLIO SERVICING ROMÂNIA SRL.

La apelul nominal făcut în şedinţă publică se prezintă pentru inculpaţii Grozav Eugen Tiberiu şi Trifan Florin, av. Bunea Oana, apărător desemnat din oficiu, pentru inculpaţii Mărginean Rusalin Sorin şi Poienar Ana, av. Sava Raluca Maria în substituirea av. Lacrima Cristina Stan, apărător ales, pentru inculpatul Chiriluţ Cristian Sabin, av. Surpeţeanu Monica, apărător ales, şi pentru inculpatul Mărginean Nicolaie, av. Drella Carol, martora Vesi Ionuţa Elisabeta, lipsă fiind părţile şi martora Bratu Gabriela Iuliana.

Procedura de citare este legal îndeplinită.

S-a făcut referatul cauzei de către grefierul de şedinţă care învederează instanţei că înştiinţarea şi plicul conţinând citaţia emisă pe numele martorei Bratu Gabriela Iuliana la locul de muncă s-a restituit la dosar cu menţiunea că aceasta „nu lucrează la BCR".

Instanţa, în baza art. 381 rap. la art. 119-123 Cpp, procedează la audierea martorei Vesi Ionuţa Elisabeta, declaraţia acesteia fiind consemnată şi ataşată la dosarul cauzei.

În continuare, instanţa acordă cuvântul cu privire la martora Bratu Gabriela Iuliana, având în vedere menţiunile cu care s-au restituit la dosar actele de procedură întocmite pe numele acesteia.

Apărătorul inculpaţilor Mărginean Rusalin Sorin şi Poienar Ana, av. Sava Raluca Maria în substituirea av. Lacrima Cristina Stan, arată că neavând CNP-ul nu se poate emite adresă pentru aflarea domiciliului martorei, deşi se face referire la aceasta în rechizitoriu.

1

52

EXT-MARGINEAN-00032

Government Exhibit 1
Page 77 of 266

Apărătorul inculpatului Mărginean Nicolaie, av. Drella Carol, arată că în lipsa datelor nu se pot face alte demersuri, dar declarația martorei este consemnată în rechizitoriu.

Instanța, față de susținerile apărătorilor inculpaților și văzând actele și lucrările dosarului, apreciază că nu mai este necesară cauzei administrarea în cursul cercetării judecătorești a probei cu martora Bratu Gabriela Iuliana.

Totodată, instanța întreabă procurorul și apărătorii inculpaților dacă mai au de formulat cereri noi în probațiune.

Apărătorul inculpaților Grozav Eugen Tiberiu și Trifan Florin, av. Bunea Oana, arată că se impun a fi comunicate la dosar cazierele inculpaților.

Apărătorul inculpatului Chiriluț Cristian Sabin, av. Surpețeanu Monica, solicită a se dispune atașarea la dosarul cauzei a dosarului Parchetului cu nr. 74/P/2011, acela în care a fost cercetată martora Vesi Ionuța Elisabeta, pentru că clientul căruia i-a acordat creditul a fost chiar inculpatul Chiriluț. Consideră că sunt relevante și declarațiile date în fața Parchetului vis-a-vis de această situație pentru că, cu siguranță, acestea sunt mult mai amănunțite și explicațiile date sunt interesante pentru cauză. Mai solicită a se dispune și efectuarea unei adrese prin care banca să comunice la dosarul cauzei acel formular la care făcea referire martora audiată astăzi, formular care se atașa la dosarul de credit și care atesta verificarea autenticității înscrisurilor depuse și verificarea în baza de date sau la sediul firmei a susținerilor cu privire la înscrisurile care se depuneau la bancă.

Instanța pune în discuție cererea formulată.

Reprezentantul Parchetului nu se opune.

Apărătorul inculpaților Grozav Eugen Tiberiu și Trifan Florin, av. Bunea Oana, arată că susține cererea.

În deliberare, instanța respinge cererea în probațiune, având în vedere, pe de o parte, că în acest dosar a fost audiată martora Vesi Ionuța Elisabeta, care în dosarul nr. 74/P/2011 avea calitatea de învinuit, iar pe de altă parte, la dosarul de urmărire penală sunt depuse contractele de credit și, astfel cum susține martora, aceste formulare pot exista sau nu, însă la dosarul cauzei sunt depuse contractele de credit.

În continuare, instanța acordă cuvântul asupra formulării altor cereri în probațiune.

Apărătorul inculpaților Grozav Eugen Tiberiu și Trifan Florin, av. Bunea Oana, solicită acordarea unui termen scurt, de 2 săptămâni, pentru a se depune la dosar, așa cum a arătat, cazierele inculpaților și în vederea pregătirii apărării.

Instanța pune în vedere apărătorului inculpaților că urmează a acorda un termen de pronunțare de 2 săptămâni, interval în care se va solicita transmiterea la dosar a fișelor de cazier ale inculpaților și, totodată, se vor putea comunica și concluzii scrise.

Ca urmare a intrării în vigoare a noului Cod penal, instanța pune în discuție, în baza art. 386 Cpp, recorelarea articolelor de lege în temeiul cărora au fost trimiși în judecată inculpații, astfel:

1. Pentru inculpatul Mărginean Rusalin Sorin: din infr. prev. de art. 25 Cp rap. la art. 215 alin. 1-3 și 5 Cp cu aplic. art. 75 lit. a Cp și art. 41 alin. 2 Cp (7 acte



materiale) în 4 infr. prev. de art. 47 NCp rap. la art. 244 NCp deoarece sunt 4 persoane vătămate (infr. prev. de art. 47 NCp rap. rap. la art. 244 NCp – persoană vătămată Chiriluț Cristian Sabin, infr. prev. de art. 47 NCp rap. la art. 244 NCp – persoană vătămată Mărginean Nicolae, infr. prev. de art. 47 NCp rap. la art. 244 NCp cu aplic. art. 35 alin. 1 NCp – persoană vătămată Grozav Eugen Tiberiu și infr. prev. de art. 47 NCp rap. la art. 244 NCp cu aplic. art. 35 alin. 1 NCp – persoană vătămată Trifan Florin) și din infr. prev. de art. 290 Cp cu aplic. art. 41 alin. 2 Cp în infr. prev. de art. 322 NCp rap. la art. 35 alin. 1 NCp și art. 5 NCp, ambele cu aplic. art. 38 alin. 1 NCp și art. 5 NCp.

2. Pentru inculpata Poienar Ana constată că nu se impune discutarea schimbării încadrării juridice a infracțiunii pentru care a fost trimisă în judecată, respectiv art. 26 Cp rap. la art. 290 Cp în cond. art. 41 alin. 2 Cp, deoarece legea veche este legea penală mai favorabilă.

Reprezentantul Parchetului nu se opune aspectelor puse în discuție, având în vedere disp. art. 386 Cpp.

Apărătorul inculpaților Mărginean Rusalin Sorin și Poienar Ana, av. Sava Raluca Maria în substituirea av. Lacrima Cristina Stan, solicită aplicarea noului Cod penal în privința inculpatului Mărginean Rusalin Sorin și a vechiului Cod penal pentru inculpata Poienar Ana.

3. Pentru inculpatul Chiriluț Cristian Sabin: din infr. prev. de art. 215 alin. 1-3 Cp în infr. prev. de art. 244 NCp cu aplic. art. 5 NCp și din infr. prev. de art. 291 Cp în infr. prev. de art. 323 NCp cu aplic. art. 5 NCp, ambele cu aplic. art. 38 alin. 1 NCp și art. 5 NCp.

Reprezentantul Parchetului nu se opune.

Apărătorul inculpatului Chiriluț Cristian Sabin, av. Surpețeanu Monica, arată că are aceleași concluzii.

4. Pentru inculpatul Mărginean Nicolae: din infr. prev. de art. 215 alin. 1-3 Cp în infr. prev. de art. 244 NCp cu aplic. art. 5 NCp și din infr. prev. de art. 291 Cp în infr. prev. de art. 323 NCp cu aplic. art. 5 NCp, ambele cu aplic. art. 38 alin. 1 NCp și art. 5 NCp.

Reprezentantul Parchetului are aceleași concluzii.

Apărătorul inculpatului Mărginean Nicolaie, av. Drella Carol, arată că este de acord.

5. Pentru inculpatul Trifan Florin: din infr. prev. de art. 215 alin. 1-3 Cp cu aplic. art. 41 alin. 2 Cp în infr. prev. de art. 244 NCp cu aplic. art. 35 alin. 1 NCp și art. 5 NCp, din infr. prev. de art. 291 Cp cu aplic. art. 41 alin. 2 Cp în infr. prev. de art. 323 NCp cu aplic. art. 35 alin. 1 NCp și art. 5 NCp și din infr. prev. de art. 290 Cp în infr. prev. de art. 322 NCp cu aplic. art. 5 NCp, toate cu aplic. art. 38 alin. 1 NCp și art. 5 NCp.

Reprezentantul Parchetului are aceleași concluzii.

Apărătorul inculpatului Trifan Florin, av. Bunea Oana, arată că este de acord.

6. Pentru inculpatul Grozav Eugen Tiberiu: din infr. prev. de art. 215 alin. 1-3 Cp cu aplic. art. 41 alin. 2 Cp în infr. prev. de art. 244 NCp cu aplic. art. 35 alin. 1 NCp și  art. 5 NCp și din infr. prev. de art. 291 Cp cu aplic. art. 41 alin. 2 Cp în infr.

EXT-MARGINEAN-00034

prev. de art. 323 NCp cu aplic. art. 35 alin. 1 NCp și art. 5 NCp, ambele cu aplic. art. 38 alin. 1 NCp și art. 5 NCp.

Reprezentantul Parchetului are aceleași concluzii.

Apărătorul inculpatului Grozav Eugen Tiberiu, av. Bunea Oana, arată că este de acord.

Nemaifiind de dat alte explicații sau de formulat cereri noi, instanța declară terminată cercetarea judecătorească și acordă cuvântul în dezbaterea fondului cauzei.

Reprezentantul Parchetului arată că prin rechizitoriul nr. 279/P/2008 al Parchetului de pe lângă Tribunalul Alba, inculpații Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin, Grozav Eugen Tiberiu și Poienar Ana au fost trimiși în judecată pentru săvârșirea mai multor infracțiuni. În fapt, în perioada 2006-2008, inculpatul Mărginean Rusalin Sorin a deținut calitatea de administrator și asociat unic la societatea comercială Sory Expres SRL, firmă ce avea ca obiect de activitate transportul. Datorită faptului că firma inculpatului era într-o situație financiară precară, acesta a discutat cu câțiva dintre angajații săi și le-a cerut să contracteze în nume propriu diferite credite bancare, bani pe care urma să-i pună la dispoziția inculpatului, iar acesta, în schimb, să achite ratele împrumuturilor, lucru care însă nu s-a realizat. În activitatea sa infracțională, inculpatul Mărginean Rusalin Sorin a implicat-o și pe inculpata Poienar Ana, care avea calitatea de director la SC Sory Expres SRL, între cei doi existând, de altfel, și o altă relație, astfel că inculpata a completat contractele de muncă și adeverințele de salariu prin care se atesta fictiv calitatea de angajat și realizarea de venituri salariale. Aceste documente întocmite de inculpată erau semnate pentru conformitate de inculpatul Mărginean Rusalin Sorin, iar adeverințele întocmite de cei doi inculpați trebuiau semnate de numita Lupu Vasilica Crinela care conducea evidența contabilă, însă nu aceasta a fost cea care și-a pus semnătura pe documente, ci cei doi inculpați i-au falsificat semnătura. Totodată, inculpatul Mărginean Rusalin Sorin a fost cel care a confirmat telefonic funcționarilor bancari datele înscrise pe adeverințele de venit. Prin urmare, în perioada decembrie 2007 – iunie 2008 au fost contractate un număr de 7 credite bancare. Pe scurt, arată că inculpatul Chiriluț Cristian Sabin a contractat la data de 04.12.2007 un credit în cuantum de 15000 euro de la BCR SA - Agenția Cetate; la data de 04.01.2008, inculpatul Mărginean Nicolaie a contractat un credit în cuantum tot de 15000 euro de la aceeași agenție BCR; în luna mai 2008, inculpatul Trifan Florin a contractat două credite bancare în cuantum total este de 19900 euro; în luna iunie 2008, inculpatul Grozav Eugen Tiberiu a contractat 3 credite bancare în cuantum de 10000 euro, 10000 lei și 54800 lei.

Toți acești inculpați s-au folosit de documente întocmite în fals, știind că nu sunt angajați pe funcția care era trecută în adeverință și că nu aveau salariul menționat în aceasta, ci altul mult mai mic. Aceste fapte ale inculpaților, la momentul respectiv și al trimiterii în judecată, reprezentau alte infracțiuni, motiv pentru care s-a dispus schimbarea încadrării juridice dată prin rechizitoriu, astfel că se impune condamnarea inculpatului Mărginean Rusalin Sorin pentru infr. prev. de art. 47 rap. la art. 244 alin. 1, 2 NCp cu aplic. art. 77 lit. a NCp și art. 35 pct. 1 NCp, art. 322 NCp cu aplic. art. 35 pct. 1 NCp, totul cu aplic. art. 38 pct. 1 NCp, a inculpatului Chiriluț Cristian Sabin

EXT-MARGINEAN-00035

pentru infr. prev. de art. 244 alin. 1, 2 NCp, art. 323 NCp, totul cu aplic. art. 38 alin. 1 NCp, a inculpatului Mărginean Nicolaie pentru infr. prev. de art. 244 alin. 1, 2 NCp, art. 323 NCp, totul cu aplic. art. 38 alin. 1 NCp, a inculpatului Trifan Florin pentru infr. prev. de art. 244 alin. 1, 2 NCp, art. 323 NCp cu aplic. art. 35 alin. 1 NCp, art 322 NCp, totul cu aplic. art. 38 alin. 1 NCp și a inculpatului Grozav Eugen Tiberiu pentru infr. prev. de art. 244 alin. 1, 2 NCp și a aplic. art. 35 alin. 1 NCp, art. 323 NCp cu aplic. art. 35 alin. 1 NCp, ambele cu aplic. art. 38 alin. 1 NCp.

În ceea ce-o privește pe inculpata Poienar Ana se observă că vechiul Cod penal reprezintă legea penală mai favorabilă, astfel că solicită condamnarea acesteia în cond. art. 26 vechiul Cp rap. la art. 290 vechiul Cp cu aplic. art. 41 alin. 2 vechiul Cp. Referitor la individualizarea judiciară a pedepselor solicită a se aplica pedepse cu privare de libertate pentru toți inculpații. De asemenea, mai solicită ca inculpații să fie obligați la despăgubiri civile către BCR în măsura în care acestea au fost dovedite cu actele depuse la dosar în susținerea constituirii de parte civilă, precum și la plata cheltuielilor de judecată.

Apărătorul inculpaților Mărginean Rusalin Sorin și Poienar Ana, av. Sava Raluca Maria în substituirea av. Lacrima Cristina Stan, referitor la acuzația de instigare la infracțiunea de înșelăciune în ceea ce-l privește pe inculpatul Mărginean Rusalin Sorin, solicită ca în baza art. 396 alin. 5 rap. la art. 16 alin. 1 lit. c Cpp să se dispună achitarea acestuia întrucât din întreg materialul probator administrat la urmărirea penală, cât și din probele administrate în faza cercetării judecătorești, nu rezultă existența unor probe temeinice directe cum că acest inculpat ar fi determinat cu intenție pe ceilalți coinculpați la săvârșirea infracțiunii de înșelăciune, în afară de declarațiile acestora, declarații care trebuie analizate sub beneficiu de inventar, întrucât poziția lor este una interesată și conjugată în cauză, date fiind circumstanțele faptei.

Astfel, cum reiese și din cuprinsul rechizitoriului, coinculpații erau conștienți că nu îndeplinesc cerințele de solvabilitate pentru obținerea creditelor și având în vedere acest aspect sunt răspunzători pentru faptele și deciziile asumate în cunoștință de cauză. După cum s-a observat, fiecare dintre ei au avut la un moment dat raporturi de muncă în cadrul societății inculpatului Mărginean Rusalin Sorin, recunoscând că au fost plătiți pentru cursele externe ce le executau suplimentar, aspecte ce reies atât din declarațiile date în faza de urmărire penală, cât și cele din faza cercetării judecătorești.

Așadar, în afara declarațiilor coinculpaților, la dosar nu există probe din care să rezulte calitatea de participant la săvârșirea infracțiunii de instigare la înșelăciune a inculpatului Mărginean Rusalin Sorin. Tot ceea ce a făcut acest inculpat a fost să elibereze coinculpaților adeverințe de salariu ce reflectau cumulat toate sumele de bani primite ca remunerație pentru serviciile pe care le executau în calitate de șoferi pe cursele externe, și nu a intenționat nici o clipă determinarea acestora la săvârșirea de infracțiuni.

Raportat la latura civilă a cauzei, solicită respingerea cererilor formulate de Alpha Bank în care se găsesc referiri la inculpatul Mărginean Rusalin Sorin, întrucât se impune a se observa că constituirea de parte civilă nu are legătură cu fondul cauzei, respectiv cu contractele de credit la care se face referire în cuprinsul rechizitoriului. Pretențiile bănești formulate de Alpha Bank sunt în afara cadrului procesual cu care a

5

Tribunalul Alba
Pentru conf. ...
Government Exhibit 1
Page 81 of 266

fost învestită instanța prin actul de sesizare. În ceea ce privește solicitarea din rechizitoriu referitoare la măsura de siguranță a confiscării speciale prev. de art. 118 lit. c vechiul Cp, solicită a se dispune revocarea acesteia. Privitor la infracțiunea de fals în înscrisuri private reținută în privința inculpatului Marginean Rusalin Sorin, solicită ca în baza art. 396 alin. 2 Cpp să se aibă în vedere condamnarea la o pedeapsă sub forma amenzii, în principal, și, în subsidiar, dacă se va aprecia că starea de fapt reținută necesită dispunerea unei pedepse cu închisoarea, solicită ca aceasta să fie cuprinsă între limitele legale într-un cuantum cât mai redus, orientată spre minim, astfel încât să fie posibil ca modalitate de executare suspendarea sub supraveghere prev. de art. 91 Cp. La individualizarea pedepsei, solicită a se avea în vedere criteriile generale de individualizare și anume gradul de pericol social redus al faptei, vârsta inculpatului și lipsa antecedentelor penale.

În privința inculpatei Poienar Ana, solicită, având în vedere astfel cum s-a dispus, în sensul că încadrarea juridică este mai favorabilă pe vechiul Cod penal, deci și limitele de pedeapsă reținute vor fi aceleași, ca în baza art. 396 alin. 2 Cpp să se dispună condamnarea acesteia la pedeapsa unei amenzi, într-un cuantum cât mai redus pentru aceleași motive, iar la individualizare să se aibă în vedere criteriile generale prev. de art. 72 vechiul Cp și circumstanțele atenuante judiciare prev. de art. 74 lit. a și c vechiul Cp. În subsidiar, dacă se apreciază că se impune aplicarea unei pedepse cu închisoarea, având în vedere circumstanțele enumerate mai sus, solicită ca aceasta să fie într-un cuantum cât mai redus, prin efectele circumstanțelor atenuante judiciare, putând să fie coborâtă sub minimul special până la minimul general, astfel încât să poată fi dispusă suspendarea condiționată prev. de art. 81 vechiul Cp, ca modalitate de executare. Toate aceste cereri formulate au în vedere gravitatea redusă a faptei, lipsa antecedentelor penale, conduita anterioară și faptul că inculpata Poienar nu a avut reprezentarea în momentul eliberării acelor adeverințe că va comite o serie de infracțiuni de fals, câtăvreme, așa cum a relatat și inculpatul Marginean, remunerațiile oferite șoferilor reprezentau un cumul al sumelor de bani datorate acestora pentru cursele respective, astfel că tot ceea ce ea a făcut a fost să elibereze adeverințe cu sumele pe care le considera ca fiind salariul corect pe care-l primeau acești inculpați.

Apărătorul inculpaților Grozav Eugen Tiberiu și Trifan Florin, av. Bunea Oana, solicită achitarea inculpaților în baza art. 16 alin. 1 lit. b teza II Cpp și anume fapta nu a fost săvârșită cu vinovăția prevăzută de lege. Se poate observa că din întreg probatoriul administrat în cauză, atât în faza de urmărire penală, cât și în fața instanței, cei doi inculpați au fost de fapt un instrument de care s-a folosit inculpatul Marginean Rusalin Sorin. Inculpații au fost de acord să scoată bani de la diferite bănci, inculpatul Trifan luând două credite, iar inculpatul Grozav trei credite, pentru a-l ajuta pe inculpatul Marginean Rusalin Sorin, care cunoscându-i pe cei doi inculpați li s-a plâns că are probleme financiare și dacă-l pot ajuta. Cei doi inculpați au fost de acord doar în ideea de a-l ajuta pe acest inculpat; ei la nici un moment, pe tot parcursul derulării operațiunilor, nu au avut percepția că inculpatul Marginean Rusalin Sorin ar săvârși vreo infracțiune sau vreo faptă prevăzută de legea penală, nici el ca patron al SC Sory Expres SRL și nici ei prin ajutorul dat acestuia. Se impune a se avea în vedere probele administrate și mai ales declarațiile martorilor Lupu, Lăscan, Grigore, Chiriluț, Gurgui,

EXT-MARGINEAN-00037

Tribunalul Alba
Pentru conformitat:



care relatează, atât în faza de urmărire penală, cât și în fața instanței, că inculpatul Mărginean Rusalin Sorin s-a ocupat de toate actele necesare pentru a contracta aceste credite, inculpații Trifan și Grozav fiind prezenți doar la semnarea actelor. Mai mult, inculpatul Trifan spune că nu a văzut ce a semnat, ci doar i s-a dat să semneze. Atât acest inculpat, cât și inculpatul Grozav au fost asigurați că restituirea creditelor, prin plata ratelor lunare, se va face de către inculpatul Mărginean Rusalin Sorin. În momentul când a văzut inculpatul Grozav că primește acasă de la bancă sesizări pentru că nu s-au plătit ratele, a mers și a făcut autodenunțul din 24.07.2009, aflat la dosarul cauzei, prin care sesizează organele de cercetare că inculpatul Mărginean l-a determinat să contracteze un credit bancar și că acesta nu a plătit ratele de credit, așa cum s-a angajat în fața lui. În ce privește adeverințele de salariu, solicită a se observa declarațiile celor doi inculpați, care trebuie luate în considerare și din care rezultă că au fost semnate de către aceștia în alb și abia apoi s-au completat sumele pentru care erau făcute adeverințele, inculpatul motivând că procedează astfel pentru că se grăbește, urmând să li se dea o copie ulterior. Ideea este că nici un moment cei doi inculpați nu au fost conștienți de faptul că săvârșesc vreo infracțiune, pentru că inculpatul Mărginean Rusalin Sorin i-a asigurat că totul este în ordine. Mai mult, atunci când s-au deplasat la bancă, sumele de bani și graficele de rambursare au fost înmânate inculpatului Mărginean Rusalin Sorin. Astfel, acești doi inculpați nu au văzut niciodată graficele de rambursare și nu au primit nici un ban din contractarea creditelor respective. Pentru aceste motive solicită achitarea celor doi inculpați pe care îi reprezintă în cauză.

Apărătorul inculpatului Chiriluț Cristian Sabin, av. Surpețeanu Monica, pune concluzii de achitare a inculpatului, în baza art. 16 lit. b Cpp, având în vedere că fapta săvârșită de el nu a fost făcută cu vinovăția prevăzută de legea penală. Trebuie avută în vedere situația concretă în care se găsea inculpatul Chiriluț la acel moment. Inculpatul Mărginean, știind că inculpatul Chiriluț avea nevoie de niște bani, a profitat de situația în care se găsea acesta și i-a propus să-l ajute să obțină un credit bancar de 15000 euro, din care inculpatul Chiriluț urma să oprească 4000 euro, iar restul să-i rămână inculpatului Mărginean. Condiția încheierii acestei tranzacții a fost ca inculpatul Mărginean Rusalin Sorin să fie cel care achită totul la bancă. Chiar dacă în fața instanței, inculpatul Mărginean Rusalin Sorin a negat această situație, s-a făcut dovada celor susținute prin însăși contractul de împrumut depus la dosarul cauzei, act ce a fost încheiat sub semnătură privată între cei doi, Mărginean Rusalin Sorin și Chiriluț Cristian Sabin. De asemenea, expertiza grafologică întocmită în cauză, a redat faptul că inculpatul Chiriluț spune adevărul când afirmă că nu el a semnat și că nu a completat adeverința de salariu și nici unul dintre documentele depuse la dosarul de credit și, ulterior, la dosarul cauzei. Situația materială în care se găsea inculpatul Chiriluț la acel moment, l-a determinat să dea curs rugăminții adresate de șeful său, inculpatul Mărginean Rusalin Sorin, însă nici o clipă nu a avut reprezentarea faptului că ceea ce se întâmplă este o infracțiune, o faptă penală. În momentul în care, la fel ca și ceilalți doi inculpați, a început să primească acasă hârtii din partea băncii, prin care era somat să se prezinte pentru a achita ratele, s-a dus la poliție și a arătat situația, dorind o

Tribunalul Alba
Pentru conformitate

EXT-MARGINEAN-00038

Government Exhibit 1
Page 83 of 266

rezolvare în folosul lui datorită stării în care se găsea, însă din persoană care s-a dus să reclame, s-a trezit inculpat într-un dosar penal.

Solicită a se avea în vedere, în situația în care nu se va împărtăși opinia achitării, persoana inculpatului, faptul că nu a mai avut contact cu legea penală, împrejurarea că el a fost cel care s-a dus la poliție să reclame situația, precum și gradul de implicare în săvârșirea faptei, extrem de redus, pe care acesta l-a avut și, pronunțându-se, în subsidiar, o soluție de condamnare, să se dea eficiență art. fie 80, fie 83, fie 91 din Cp.

Arată că va detalia pe larg în concluziile scrise ce urmează a fi depuse la dosar.

Apărătorul inculpatului Mărginean Nicolaie, av. Drella Carol, arată că, în principiu, pune aceleași concluzii ca și pentru inculpatul Chiriluț Sabin, respectiv de achitare a inculpatului Mărginean Nicolaie întrucât faptei îi lipsește una dintre trăsăturile esențiale și anume intenția. Sub aspectul săvârșirii infracțiunii de uz de fals, aceasta nu se poate reține în sarcina inculpatului Mărginean Nicolaie, pentru că ea a fost comisă de către inculpatul Mărginean Rusalin Sorin. Singurul document pe care l-a semnat inculpatul Mărginean Nicolaie a fost cererea de credit, care a fost completată ulterior, în prezența acestuia, dar de către funcționarul bancar care a întocmit documentația de credit, creditul fiind acordat în aceeași zi, 04.01.2008. Ca atare, nu se poate susține că inculpatul Mărginean Nicolaie ar fi săvârșit o infracțiune de uz de fals, câtăvreme el nu a semnat decât o cerere de credit, iar celelalte înscrisuri folosite de inculpatul Mărginean Rusalin Sorin au fost considerate și sunt false pentru că s-au utilizat la obținerea creditelor de către acesta și nu de către inculpatul Mărginean Nicolaie.

În ceea ce privește infracțiunea de înșelăciune, nu se poate reține că inculpatul Mărginean Nicolaie ar fi fost conștient de faptul că se pune la cale o înșelare a băncii, câtăvreme cu câteva zile mai înainte aceeași bancă acordase un alt credit de nevoi personale doar cu buletinul celuilalt inculpat, Chiriluț Sabin, în aceleași condiții, respectiv pur și simplu la rugămintea patronului societății, în prezența căruia s-a completat cererea de credit, iar banii au fost virați în aceeași zi, toți ajungând în posesia inculpatului Mărginean Rusalin Sorin. Ca atare, nu se poate reține faptul că inculpatul Mărginean Nicolaie ar fi intenționat să prejudicieze banca în interesele sale sau că ar fi beneficiat de pe urma acestui credit. Inculpatul rămâne obligat pe latură civilă să restituie creditul, dar pe latură penală nu se face vinovat de săvârșirea infracțiunii de înșelăciune.

INSTANȚA

În temeiul art. 391 alin. 1 Cpp, va stabili termen pentru pronunțare la data de 06.10.2014, pentru când se vor solicita fișele de cazier judiciar actualizate ale inculpaților și se vor putea depune concluzii scrise la dosar, motiv pentru care,

ÎN NUMELE LEGII<br/>DISPUNE



Tribunalul Alba
Pentru conformitat

EXT-MARGINEAN-00039

Government Exhibit 1
Page 84 of 266



Stabileşte termen pentru pronunţare la data de 06.10.2014, pentru când se solicită fişele de cazier judiciar actualizate ale inculpaţilor şi se pot depune concluzii scrise la dosar.

Pronunţată în şedinţă publică, azi 22.09.2014.

Preşedinte,
MARIA ELENA FULEA

Grefier,
NICOLAE TODEA

N.T./2 exp./25.09.2014







9

EXT-MARGINEAN-00040

EXT-MARGINEAN-00041

53

# ROMÂNIA
## TRIBUNALUL ALBA
### SECŢIA PENALĂ

ar nr. 15829/107/2012

### ÎNCHEIERE
Şedinţa publică de la 06 Octombrie 2014
Completul compus din:
Preşedinte MARIA ELENA FULEA
Grefier şef NICOLAE TODEA

247

Parchetul de pe lângă Tribunalul Alba este reprezentat prin procuror
ADINA MALINCENCO

Pe rol se află judecarea cauzei penale  privind pe inculpaţii MĂRGINEAN RUSALIN SORIN, CHIRILUŢ CRISTIAN SABIN,  MĂRGINEAN NICOLAE, TRIFAN FLORIN,  GROZAV EUGEN TIBERIU şi POIENAR ANA, trimişi în judecată pentru săvârşirea infracţiunii de înşelăciune (art. 215 C.p.) în dauna părţilor vătămate BCR S.A., ALPHA BANK SUCURSALA ALBA, ALPHA BANK AGENŢIA SEBEŞ, BRD GROUPE SOCIETE GENERALE, KRUK INTERNAŢIONAL SRL şi ASSET POTFOLIO SERVICING ROMÂNIA SRL.

La apelul nominal făcut în şedinţă publică se constată lipsa părţilor.

Procedura de citare este legal îndeplinită.

S-a făcut referatul cauzei de către grefierul de şedinţă care învederează instanţei că, prin Serviciul registratură, Inspectoratul de poliţie al judeţului Alba/Cazier Judiciar a comunicat la dosar câte o copie de pe cazierul judiciar al fiecărui inculpat, iar inculpatul Mărginean Nicolae, prin avocat Drella Mihai, a depus concluzii scrise.

Se constată că mersul dezbaterilor şi concluziile părţilor au fost consemnate în încheierea de şedinţă din data de 22.09.2014, parte integrantă din prezenta, când instanţa a stabilit termen pentru pronunţare astăzi, 06.10.2014.

### INSTANŢA
În temeiul art. 391 alin.2 Cpp, va amâna pronunţarea la data de 13.10.2014, motiv pentru care,

### ÎN NUMELE LEGII
### DISPUNE

Amână pronunţarea la data de 13.10.2014.

Pronunţată în şedinţă publică, azi 06.10.2014.

Preşedinte,
MARIA ELENA FULEA

Grefier,
NICOLAE TODEA

57

N.T./2 exp./06.10.2014

Government Exhibit 1
Page 87 of 266

EXT-MARGINEAN-00043



R O M Â N I A
TRIBUNALUL ALBA
SECŢIA PENALĂ

Dosar nr. 15829/107/2012

SENTINŢA PENALĂ Nr. 577/2014
Şedinţa publică de la 13 Octombrie 2014
Completul compus din:
Preşedinte MARIA ELENA FULEA
Grefier şef NICOLAE TODEA



Parchetul de pe lângă Tribunalul Alba este reprezentat prin procuror
ADINA MALINCENCO

Pe rol se află judecarea cauzei penale privind pe inculpaţii MĂRGINEAN RUSALIN SORIN, CHIRILUŢ CRISTIAN SABIN, MĂRGINEAN NICOLAE, TRIFAN FLORIN, GROZAV EUGEN TIBERIU şi POIENAR ANA, trimişi în judecată pentru săvârşirea infracţiunii de înşelăciune (art. 215 C.p.) în dauna părţilor vătămate BCR S.A., ALPHA BANK SUCURSALA ALBA, ALPHA BANK AGENŢIA SEBEŞ, BRD GROUPE SOCIETE GENERALE, KRUK INTERNAŢIONAL SRL şi ASSET POTFOLIO SERVICING ROMÂNIA SRL.

La apelul nominal făcut în şedinţă publică se constată lipsa părţilor.

Procedura de citare este legal îndeplinită.

S-a făcut referatul cauzei de către grefierul de şedinţă, după care:

Se constată că mersul dezbaterilor şi concluziile părţilor au fost consemnate în încheierea de şedinţă din data de 22.09.2014, parte integrantă din prezenta, când instanţa a stabilit termen de pronunţare pentru data de 06.10.2014, şi, apoi, a amânat pronunţarea pentru astăzi, 13.10.2014.

TRIBUNALUL
Asupra cauzei de faţă,

Constată că prin rechizitoriul din data de 20.12.2012 emis în dosarul nr. 279/P/2008, Parchetului de pe lângă Tribunalul Alba a dispus trimiterea în judecată a inculpaţilor:

- **MĂRGINEAN RUSALIN SORIN** pentru săvârşirea infracţiunilor prev.de art.25 C.pen. rap. la art. 215 al.1-3 şi 5 C.pen. comb. cu art. 75 lit. a C.pen. şi 41 al.2 C.pen. (7 acte materiale); art.290 C.pen. comb. cu art.41 al.2 C.pen. (14 acte materiale),    ambele cu aplicarea art.33 lit.a C.pen.

-**CHIRILUŢ CRISTIAN SABIN** pentru săvârşirea infracţiunilor prev. de art. 215 al.1-3  pen; art. 291 C.pen. cu aplicarea art.33 lit.a C.pen.

-**MĂRGINEAN** pentru săvârşirea infracţiunilor prev. de  art. 215 al.1-3 C. pen. şi art. 291 C.pen. cu aplicarea art. 33 lit.a C.pen.

-**TRIFAN FLORIN** pentru săvârşirea infracţiunilor prev. de art. 215 al.1-3  C.pen. comb. cu art.  41 al.2 C.pen. ( 2 acte materiale); art. 291 C.pen. comb. cu art.  41   al.2 C.pen.; art. 290 C.pen. cu aplicarea art.33 lit.a C.pen.

-**GROZAV EUGEN TIBERIU** pentru săvârşirea infracţiunilor  prev. de art. 215 al.1-3 C.pen. comb. cu art. 41 al.2 C.pen. (3 acte materiale), art. 291 C.pen. comb. cu art.41 al.2 C.pen. ambele cu aplic. art.33 lit.a C.pen.

-**POIENAR ANA** pentru săvârşirea infracţiunii prev. de art. 26 C.pen. rap. la art. 290 C.pen. în cond. art. 41 alin.2 C.pen.

În motivarea actului de sesizare s-a reţinut, în esenţă că inculpatul Mărginean Rusalin Sorin acţionând în baza aceleiaşi rezoluţii infracţionale în scopul obţinerii unor venituri ilicite, în perioada decembrie  2007 – iunie 2008 a determinat un număr de patru persoane să contracteze în mod fraudulos credite bancare, sens în care le-a pus la dispoziţie documente pe care le-a falsificat împreună

EXT-MARGINEAN-00044

cu inculpata Poienar Ana, cuantumul total al creditelor contractate fiind 59.900 EUR și 68.800 lei. Același inculpat,        acționând în baza aceleiași rezoluții infracționale, în scopul obținerii unor credite în mod fraudulos, a întocmit în fals un nr. de documente 14 acte, ce au fost prezentate băncilor.

Referitor la inculpatul Chiriluț Cristian Sabin s-a reținut că la data de 04.12.2007 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S:A. Agenția Cetate, pe baza unor documente întocmite în fals, utilizând la bancă în vederea acordării creditului, documente întocmite în fals.

Cu privire la inculpatul Mărginean Nicolaie s-a arătat că la data de 04.01.2008 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S.A. Agenția Cetate, pe baza unor documente întocmite în fals, utilizând la bancă în vederea acordării creditului, documente întocmite în fals.

S-a reținut de asemenea că inculpatul Trifan Florin, în luna mai 2008, acționând în baza aceleiași rezoluții infracționale a contractat în mod fraudulos, două credite bancare în cuantum total de 19.900 EUR, prin utilizarea unor documente întocmite în fals, prezentând la bănci în vederea acordării creditelor, documente întocmite în fals.

Inculpatul, la data de 21.05.2008  a întocmit în fals un angajament de plată, în care ireal a menționat faptul că lucrează în calitate de conducător auto la S.C. SORY EXPRES S.R.L., dându-și totodată consimțământul, să i se rețină din salariu ratele de credit, în caz de neplată.

Pentru inculpatul Grozav Eugen Tiberiu, procurorul a reținut ca stare de fapt că în luna iunie 2008, acționând în baza aceleiași rezoluții infracționale a contractat în mod fraudulos, trei credite bancare în cuantum de 10.000 EUR, 10.000 lei și 54.800 lei, prin folosirea de documente întocmite în fals, prezentând la bănci în vederea acordării creditelor, documente întocmite în fals.

Referitor la inculpata Poienar Ana s-a arătat că aceasta l-a ajutat pe inculpatul Mărginean Rusalin Sorin la completarea în fals a celor 4 contracte de muncă și 10 adeverințe de venit, ce au fost folosite în vederea contractării de credite în mod fraudulos.

**Examinând actele și lucrările dosarului, Tribunalul reține următoarele:**

**În fapt:** În perioada 2006-2008, inculpatul Mărginean Rusalin Sorin a deținut calitatea de administrator și asociat unic la S.C. SORY EXPRES S.R.L. Tărtăria, firmă ce avea ca obiect principal de activitate transporturi.

Dat fiind faptul că societatea se afla într-o situație financiară precară, inculpatul, în scopul obținerii unor sume de bani necesare finanțării activității, a apelat la angajații și la zilierii care lucrau la firma sa, dar și la alte persoane care nu aveau legătură cu societatea, cerându-le să contracteze în nume propriu credite bancare, iar banii ridicați să-i pună la dispoziție, dându-le asigurări că va întocmi întreaga documentație, implicit, că va achita ratele aferente împrumuturilor; în realitate, inculpatul nu a avut niciodată intenția să restituie creditele, ca dovadă faptul că, după ce a intrat în posesia sumelor de bani, a renunțat la angajați, desfăcându-le contractul de muncă, ori a refuzat să-i mai angajeze; de asemenea, exceptând două credite, care au fost achitate anticipat prin refinanțare, în celelalte cazuri, fie s-au achitat primele 2-3 rate, fie nu s-a efectuat vreo plată.

În baza promisiunilor ce li s-au făcut și în considerarea faptului că activitățile prestate la S.C. SORY EXPRES S.R.L. le asigura singura sursă de venit - inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu au acceptat să contracteze credite de la bancă, deși, erau conștienți de faptul că nu îndeplinesc cerințele de solvabilitate, ultimii trei inculpați, nefiind nici măcar angajați.

În această activitate infracțională, a fost implicată și inculpataPoienar Ana, care lucra în calitate de director la S.C. SORY EXPRES S.R.L. și era cumnată cu inculpatul Mărginean Rusalin Sorin, între cei doi, existând și o relație extraconjugală. În concret, inculpata a  completat contractele de muncă și adeverințele de salariu, prin care se atesta fictiv calitatea de angajat și realizarea de venituri salariale, documente ce erau semnate de conformitate de către inculpatul Mărginean Rusalin Sorin, în calitatea sa de administrator. În mod distinct, s-a mai reținut că, pe adeverințele de venit cei doi inculpați au contrafăcut semnătura numitei Lupu Vasilca Crinela, persoană care conducea evidența contabilă la S.C. SORY EXPRES S.R.L.

Tribunalul Alba
Pentru conformitate

*18*

De asemenea, în vederea realizării scopului infracțional urmărit, inculpatul Mărginean Rusalin Sorin era cel care a confirmat telefonic funcționarilor bancari corectitudinea datelor înscrise pe adeverințele de venit.

Astfel, în perioada decembrie 2007- iunie 2008 au fost contractate un număr de 7(șapte) credite bancare, după cum urmează:

- Inculpatul Chiriluț Cristian Sabin a lucrat la S.C. SORY EXPRES S.R.L. în calitate de conducător auto în perioada 3.11.2007-16.04.2008, beneficiind de un salariu de 560 lei, conform contractului de muncă nr. 5/03.11.2007, înregistrat la I.T.M. Alba sub nr. 50.014423/03.12.2007. La scurt timp de la angajare, inculpatul Mărginean i-a solicitat acestuia, să contracteze un credit de 15.000 EUR de la B.C.R., iar banii să-i remită lui, sub pretextul că firma are de achitat mai multe datorii; inculpatul Chiriluț a acceptat, cu condiția ca, parte din credit, respectiv, suma de 4.000 EUR să-i revină lui.

Pentru obținerea creditului, inculpata Poienar a întocmit o copie a contractului de muncă, în care a menționat ireal că titularul desfășoară activitate în cadrul firmei din data de 03.05.2007 și are un salariu de bază brut lunar de 1.830 lei, înscris ce a fost semnat de către inculpatul Mărginean, ca fiind conform cu originalul. De asemenea, a fost întocmită și adeverința de salariu nr. 70 din 04.12.2007 ce atesta fictiv faptul că inculpatul Chiriluț Cristian Sabin a obținut venituri lunare de 3.200 lei în perioada august-octombrie 2007.

La data de 04.12.2007, inculpații Mărginean și Chiriluț s-au prezentat la B.C.R.- Agenția Cetate, iar aici inculpatul Mărginean Rusalin Sorin, având asupra sa cele două documente, le-a prezentat personal ofițerului de credite Vesi Ionuța Elisabeta, cu care se cunoștea. În aceiași zi, după aprobarea creditului, a fost întocmit contractul nr. 2007186981, pe o perioadă de 10 ani, iar în ziua următoare, inculpatul Chiriluț a ridicat din bancă suma de 15.000 EUR. Conform înțelegerii avute, i-a predat inculpatului Mărginean suma de 11.000 EUR, iar pentru a avea o garanție că acesta își va onora promisiunea de rambursare a creditului, a solicitat întocmirea unui act de împrumut, înscris ce a fost redactat de către inculpata Poienar și semnat de ambii inculpați.

În perioada anului 2008, au fost efectuate 3 plăți de rambursare a creditului, după cum urmează: în 06.02.2008 și în 26.02.2008 s-a achitat 237 EUR, respectiv, 260 EUR de către inculpata Poienar Ana, iar în data de 30.10.2008 s-a achitat de către inculpatul Chiriluț suma de 200 EUR, după care, nu s-a mai efectuat nicio plată.

Creanța datorată băncii de inculpatul Chiriluț Cristian Sabin a fost cesionată către DDM EUROPE AG, cu administrator active CREDITEXPRESS FINANCIAL SERVICES S.R.L. București, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat că nu se constituie parte civilă în cauză.

În urma expertizării grafice a documentelor prezentate la bancă, a contractului de muncă al inculpatului Chiriluț înregistrat la I.T.M. Alba sub nr. 5/03.11.2007 și a înscrisului olograf datat cu 05.12.2007- s-au formulat următoarele concluzii:

• semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 5/03.11.2007, nu a fost depusă de inculpatul Chiriluț; în schimb, semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 21/03.05.2007 (prezentat la B.C.R.) a fost probabil depusă de susnumit.

• semnăturile depuse la rubrica Angajator, pe pagina 4 a celor două contracte de muncă au fost probabil depuse de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de acest inculpat;

• scrisul depus pe cele două contracte de muncă a fost probabil executat de inculpata Poienar Ana;

• semnătura depusă pe adeverința de venit nr. 70/04.12.2007, la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Crinela; scrisul a fost depus de inculpata Poienar Ana;

• semnăturile de pe înscrisul olograf datat cu 05.12.2007 aparțin titularilor, respectiv, inculpații Mărginean Rusalin Sorin și Chiriluț Cristian Sabin, iar scrisul a fost depus de inculpata Poienar Ana.



3

TEXT-MARGINEAN-00046

*24*

Tribunalul Alba
Pentru conformitate
**Government Exhibit 1
Page 91 of 266**

- În cursul lunii ianuarie 2008, inculpatul Mărginean Rusalin Sorin, cunoscând faptul că inculpatul Mărginean Nicolaie este interesat să-și găsească un loc de muncă, i-a propus să lucreze la firma sa, S.C. SORY EXPRES S.R.L.; ulterior, la câteva zile, inculpatul invocând problemele cu care se confrunta firma sa, i-a solicitat inculpatului Mărginean Nicolaie să-l ajute financiar prin contractarea unui credit, promițându-i în schimb că va achita ratele la credit și totodată o să-l angajeze la firma sa. Pe baza asigurărilor primite, inculpatul Mărginean Nicolaie a acceptat, sens în care a predat cartea sa de identitate, cu ajutorul căreia a fost întocmită în fals, documentația pentru bancă: astfel, s-a completat în fals un contract de muncă nr. 24/02.07.2007, cu nr. de înregistrare ITM 10.196.076/03.07.2007, prin care s-a menționat ireal că inculpatul Mărginean Nicolaie este angajat al firmei în funcția de conducător auto și are un salariu de bază brut lunar de 1.200 lei; de asemenea, a fost întocmită și adeverința de salariu nr. 112/04.01.1008, prin care se atesta că inculpatul Mărginean Nicolaie a obținut venituri lunare de 3.024 lei în perioada septembrie –noiembrie 2007.

La data de 04.01.2008, inculpatul Mărginean Rusalin Sorin l-a însoțit pe inculpatul Mărginean Nicolaie la B.C.R. agenția Cetate, iar aici, a apelat din nou la funcționara Vesi Ionuța Elisabeta în vederea întocmirii contractului de credit, predându-i documentele întocmite în fals. În urma aprobării cererii de creditare pentru suma de 15.000 EUR, a fost încheiat contractul de credit nr. 20081615 pe o perioadă de 10 ani, iar inculpatului Mărginean Nicolaie i s-a eliberat suma aferentă creditului. Banii au fost predați integral inculpatului Mărginean Rusalin Sorin.

La data de 26.02.2008, inculpata Poienar a achitat suma de 300 EUR la B.C.R. reprezentând prima rată a creditului, iar ulterior nu s-a mai efectuat nicio plată. În atare situație, creditul a fost cesionat de bancă la CREDITEXPRESS FINANCIAL SERVICES S.R.L. București, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat că nu se constituie parte civilă în cauză.

Concluziile formulate în raportul de expertiză grafică cu referire la documentele prezentate la bancă în acest caz, stabilesc următoarele:
• semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 24/02.07.2007, a fost probabil depusă de inculpatul Mărginean Nicolaie; semnătura depusă la rubrica Angajator, pe pagina 4 a contractului de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de același învinuit;
• scrisul depus pe contractul de muncă a fost probabil executat de inculpata Poienar Ana;
• semnătura depusă pe adeverința de venit nr. 112/04.01.2008, la rubrica Director General, a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Crinela; scrisul a fost depus de inculpata Poienar Ana.

- În cursul lunii mai 2008, inculpatul Mărginean Rusalin Sorin a apelat și la inculpatul Trifan Florin, persoană care lucra ca zilier la firma sa, solicitându-i să-l ajute cu bani, prin aceiași modalitate, respectiv, contractarea a două credite bancare. În baza asigurărilor primite că nu va fi vreo problemă privind restituirea creditelor, inculpatul Trifan a acceptat să contracteze cele două împrumuturi, sens în care a predat cartea sa de identitate, în vederea întocmirii documentației necesare pentru bănci.

Astfel, la data de 21.05.2008, inculpatul Trifan urmând instrucțiunile date de inculpatul Mărginean, s-a prezentat la sediul sucursalei ALPHA BANK Alba Iulia, unde a prezentat funcționarului bancar, o xerocopie a contractului de muncă, nr. 19/01.02.2007 (50.015.780/02.02.2007) și 2 (două) adeverințe de venit cu nr. 214/21.05.2008 și nr. 219/26.05.2008, prin care se atesta fictiv că este angajat la S.C. SORY EXPRES S.R.L., în funcția de conducător auto, începând cu data de 01.02.2007, iar un salariu brut lunar de 1.845 lei, iar în perioada ultimelor trei luni, a realizat venituri lunare de 3.660 lei, din care, 1.320 lei reprezintă salariu, iar diferența diurnă. Ori, inculpatul nu numai că nu era angajat cu contract de muncă, dar nici măcar nu deținea permis de conducere pentru vreo categorie de autovehicule și, prin urmare, nu putea să profeseze ca șofer.

Potrivit normelor de lucru ale băncii, inculpatul Trifan Florin a completat olograf un angajament de plată, în care a menționat faptul că lucrează de 2 (doi) ani în cadrul firmei, în calitate

4



de conducător auto, dându-și totodată consimțământul, să i se rețină din salariu ratele de credit, în caz de neplată. Pe baza acestor înscrisuri a fost aprobată cererea de creditate pentru suma de 15.000 EUR și s-a întocmit contractul de credit nr. 0588299, pe o perioadă de 10 ani. Inculpatul Trifan a predat integral suma ridicată din bancă inculpatul Mărginean împreună cu graficul de rambursare a creditului.

În perioada următoare nu s-a achitat nici o rată la credit, situație în care ALPHA BANK Sucursala Alba Iulia s-a constituit parte civilă cu suma de 16.033,93 EUR.

Concluziile formulate în raportul de expertiză grafică cu referire la documentele prezentate la bancă în acest caz, stabilesc următoarele:
• semnătura existentă la rubrica Salariat, pe pagina 4 a contractului individual de muncă nr. 19/01.02.2007, nu a fost depusă de inculpatul Trifan Florin; semnătura depusă la rubrica Angajator, pe pagina 4 a contractului de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de același învinuit;
• scrisul depus pe contractul de muncă a fost probabil executat de inculpata Poienar Ana;
• semnătura depusă pe adeverința de venit nr. 214/21.05.2008, la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Crinela ; scrisul a fost depus de inculpata Poienar Ana.

- Ulterior, în data de 23.05.2008, inculpatul Trifan Florin prin același mod de operare, a contractat un nou credit de nevoi personale în cuantum de 4.900 EUR de la B.C.R. Agenția Sebeș, pe o perioadă de 10 ani, conform contractului nr. 2008398954. La obținerea creditului a fost prezentată o fotocopie a contractului de muncă nr. 19/01.02.2007 (50.015.780/02.02.2007), similară cu cea folosită anterior, semnată pe fiecare pagină de administratorul societății ca fiind conformă cu originalul, precum și 2 (două) adeverințe de venit cu nr. 215/21.05.2008 și f.n., prin care se atesta că, în perioada ianuarie-martie 2008, a obținut venituri salariale lunare de 1.980 lei și diurne de 660 lei. Și de această dată, suma încasată de la bancă cu titlu de credit, a fost predată inculpatului Mărginean Rusalin Sorin împreună cu graficul de rambursare a creditului.

În perioada următoare, nefiind achitată nici o rată, creditul a fost cesionat către ERSTE GROUP, iar subsecvent, societății SECAPITAL S.a. R.L., având ca administrator active KRUK INTERNAȚIONAL SRL București, care s-a constituit parte civilă cu suma de 25.643,92 lei, actualizată cu dobânzile și penalitățile aferente până la data efectivă a plății.

Expertiza grafică a documentelor depuse la bancă a evidențiat următoarele:
• semnăturile de conformitate cu originalul de pe xerocopia contractului de muncă nr. 50.015.780/02.02.2007 au fost depuse de inculpatul Mărginean Rusalin Sorin, iar scrisul olograf de sub mențiunea „Conform cu originalul" de pe fiecare pagină a fost executat de inculpata Poienar Ana;
• semnătura depusă pe adeverința de venit nr. 215/21.05.2008, la rubrica Director General a fost depusă probabil de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Director economic nu a fost depusă de Lupu Vasilica Crinela ; scrisul olograf a fost depus de inculpata Poienar Ana;
• semnătura depusă pe adeverința f.n., la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil nu a fost depusă de Lupu Vasilica Crinela; scrisul olograf de pe adeverința f.n. a fost depus de inculpata Poienar Ana.

- Pentru a face rost de bani prin aceiași metodă, inculpatul Mărginean Rusalin Sorin a apelat și la vărul său, inculpatul Grozav Eugen Tiberiu, plecat în Portugalia din anul 2001 și, care, în vara anului 2008 a revenit în țară pentru o scurtă perioadă de timp. Sub pretextul că dorește să-l angajeze ca șofer la societatea sa, inculpatul Mărginean i-a solicitat acestuia să contracteze un credit bancar, motivând că are nevoie de bani pentru a acoperi eventuale daune în cazul producerii unor accidente auto; de asemenea, s-a angajat să ramburseze toate ratele la credit. În acele condiții, inculpatul Grozav i-a precizat că nu posedă permis de conducere, la care, inculpatul Mărginean i-a replicat că nu-i o problemă, întrucât, totul se rezolvă. Pentru a fi credibil, inculpatul Mărginean i-a solicitat să semneze o coală în alb, care avea aplicată în partea de jos parafa firmei, motivând că, ulterior, va completa toate

EXT-MARGINEAN-00048

datele necesare contractului de muncă. Deși avea propriile suspiciuni cu privire la valabilitatea actului de angajare și era conștient de faptul că nu îndeplinește condițiile de solvabilitate pentru a angaja credite bancare - inculpatul Grozav a acceptat să dea curs acestor solicitări, contractând un număr de trei credite.

Inițial, la data de 04.06.2008, inculpatul Grozav Eugen Tiberiu a contractat un credit de 10.000 EUR de la B.C.R. Agenția Sebeș, sens în care, a prezentat actele puse la dispoziție de vărul său, respectiv, contractul de muncă nr. 29/03.05.2007 (50.014.655/04.05.2007), în fotocopie și adeverința de venit nr. 230/03.06.2008, prin care se atesta în fals că este angajat în calitate de conducător auto la SC SORY EXPRES SRL și realizează venituri nete lunare de 3.118 lei. Cu acea ocazie a fost încheiat contractul nr. 2008438664 pe o perioadă de 120 luni, iar banii ridicați din bancă, au fost predați în totalitate inculpatului Mărginean Rusalin Sorin.

- La aceiași dată, inculpatul Grozav s-a deplasat și la BRD Groupe Societe Generale-Sucursala Alba, iar aici, în baza indicațiilor date de inculpatul Mărginean a formulat cerere de acordare a unui credit de 10.000 lei, fiind depusă o fotocopie a aceluiași contract de muncă, precum și adeverința de venit nr. 232/04.06.2008, emisă de SC SORY EXPRES SRL, prin care se atesta fictiv că este angajat al acestei firme și realizează venituri lunare de 1.318 lei. În urma aprobării cererii de creditare a fost încheiat contractul nr. 1609392/05.06.2008, pe o perioadă de 48 de luni; și în acest caz, inculpatul Grozav Eugen Tiberiu a predat vărului său, integral suma ridicată din bancă.

- Tot la inițiativa inculpatului Mărginean, care a motivat că are nevoie de o sumă de bani suplimentară, la data de 25.06.2008, inculpatul Grozav a contractat un credit de refinanțare la ALPHA BANK Agenția Sebeș, în cuantum de 54.800 lei, pe o perioadă de 10 ani, pentru stingerea creditelor angajate anterior, fiind încheiat în acest sens contractul nr. 0596738. În vederea aprobării cererii de creditare, inculpatul Grozav Eugen Tiberiu a prezentat fotocopia contractului de muncă, adeverințele de venit nr. 232/19.06.2008 și nr. 233/19.06.2008 – completate și semnate de inculpații Mărginean Rusalin Sorin și Poienar Ana - prin care se atesta că este angajat în calitate de conducător auto la S.C. SORY EXPRES S.R.L. și a realizat venituri lunare de 1.818 lei în ultimele trei luni. Suma de bani rămasă după rambursarea anticipată a celor două credite a fost predată de inculpatul Grozav Eugen Tiberiu vărului său, potrivit înțelegerii avute.

În perioada următoare, inculpatul Grozav Eugen Tiberiu, fiind somat de bancă să achite ratele la credit, a efectuat unele plăți parțiale, în cuantum total de 390 lei.

În cauză, ALPHA BANK Agenția Sebeș s-a constituit parte civilă în cauză cu suma de 57.923,33 lei.

În urma expertizării grafice a documentelor depuse la ALPHA BANK Agenția Sebeș, s-au stabilit următoarele :

•    semnătura existentă la rubrica Angajator, pe xerocopia contractului individual de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de către acest inculpat; scrisul olograf din conținutul contractului și de sub mențiunea „Conform cu originalul" a fost executat de inculpata Poienar Ana;

•    semnătura depusă pe adeverința de venit nr. 232/19.06.2008, la rubrica Director General a fost executată de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil șef nu a aparține numitei Lupu Vasilica Crinela; scrisul olograf a fost depus de inculpata Poienar Ana;

•    semnătura depusă la rubrica Director General pe adeverința nr. 233/19.06.2008 aparține inculpatului Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil nu aparține numitei Lupu Vasilica Crinela; scrisul olograf din cuprinsul adeverinței a fost executat de inculpata Poienar Ana.

Starea de fapt rezultă din administrarea următoarelor mijloace de probă:

-    Procesul verbal de sesizare din oficiu întocmit de organele de poliție la data de 16.09.2008, din cuprinsul căruia rezultă că inculpatul Mărginean Rusalin Sorin, administrator la S.C. SORY EXPRES S.R.L., prin întocmirea în fals a documentației necesare accesării de credite și cu complicitatea funcționarilor bancari a reușit să obțină fraudulos sume de bani de la unitățile bancare;





6

EXT-MARGINEAN-00049



-    Autodenunțul formulat de inculpatul Grozav Eugen Tiberiu la data de 24.07.2009, în care sesizează faptul că a fost determinat de inculpatul Mărginean Rusalin Sorin să contracteze un credit bancar de 17.000 EUR, predând acestuia banii, însă ulterior, inculpatul Mărginean nu a mai achitat ratele la credit, astfel cum s-a angajat;

-    Procesul-verbal de sesizare din oficiu întocmit de organele de poliție la data de 05.04.2010, în care se reține că funcționarii bancari Bratu Gabriela Iuliana, Vesi Ionuța Elisabeta și Muntean (fostă Stanciu) Jeanina și-au încălcat atribuțiile de serviciu cu referire la creditele acordate pe baza documente fictive;

-    Ordinele de încasare numerar  cu care s-au efectuat plăți parțiale la creditele contractate de inculpații Chiriluț Cristian Sabin și  Mărginean Nicolaie;

-    Înscrisul olograf datat cu 05.12.2007 prin care se atestă că inculpatul Mărginean Rusalin Sorin a împrumutat suma de 11.000 EUR de la inculpatul Chiriluț Cristian Sabin;

-    Raportul criminalistic nr. 67208C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpatului Chiriluț Cristian Sabin. În interviul pre-test, inculpatul a arătat că, la solicitarea inculpatului Mărginean Rusalin Sorin a acceptat să contracteze creditul bancar și să i se înscrie pe adeverință un venit salarial mai mare decât cel real, deși era conștient că, în raport de veniturile ce le realiza, nu putea obține un credit de 15.000 EUR; a mai arătat că potrivit înțelegerii avute, inculpatul Mărginean Rusalin Sorin trebuia să achite ratele la bancă până la concurența sumei de 11.000 EUR, iar diferența de 4.000 EUR urma să o plătească personal. În timpul examinării propriu-zise, la întrebările relevante, ce au vizat inițiativa contractării creditului și implicarea inculpatului Mărginean Rusalin Sorin - nu au fost detectate reacții specifice comportamentului simulat;

-    Raportul criminalistic nr. 67209C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpatului Trifan Florin. În interviul pre-test, susnumitul a arătat că, după obținerea creditului de la ALPHA BANK, a fost servit cu băuturi alcoolice de inculpatul Mărginean Rusalin Sorin la barul din sat, acesta fiind singurul beneficiu obținut. De asemenea, la testarea propriu-zisă a inculpatului, nu au fost detectate reacții specifice comportamentului simulat la întrebările relevante;

-    Rapoartele de expertiză grafică nr. 54167/15.09.2009,  54174/16.09.2009 și 60617/09.03.2010, întocmite de I.P.J. Alba Serviciul Criminalistic în care au fost expertizate documentele prezentate unităților bancare în vederea obținerii de credite precum și alte documente;

-    Declarațiile martorei Lupu Vasilica Crinela (f.134), care a condus evidența contabilă la S.C. SORY EXPRES S.R.L.; martora arată că nu are nicio implicație în ceea ce privește emiterea adeverințelor de venit depuse la bănci, iar semnătura sa a fost contrafăcută pe aceste adeverințe; în acest sens, martora precizează că nu a semnat decât documentele ce le completa personal;

-    Declarația martorului Lăscan Adrian Ioan (f.146-147), care a lucrat ca șofer S.C. SORY EXPRES S.R.L.; martorul arată că la solicitarea inculpatului Mărginean Rusalin Sorin a contractat un credit bancar de 15.000 EUR, iar banii i-a remis acestuia, întrucât i-a promis că va achita ratele aferente; martorul mai declară că după ce și-a încetat activitatea în cadrul firmei, a aflat că și inculpații Chiriluț Cristian Sabin și Mărginean Nicolae au contractat credite bancare pentru patronul firmei;

-    Declarația martorului Grigore Cosmin Dănuț (f.135), fost angajat la S.C. SORY EXPRES S.R.L. care are cunoștință de faptul că inculpații Chiriluț Cristian Sabin și Mărginean Nicolaie au contractat credite bancare pentru inculpatul Mărginean Rusalin Sorin; martorul mai declară că inculpata Poienar Ana era cea care se ocupa de întocmirea documentelor în cadrul societății;

-    Declarația martorei Chiriluț Ileana (f.148), soția inculpatului Chiriluț Cristian Sabin, cu privire la împrejurările în care soțul ei a contractat creditul bancar;

-    Declarația martorului Gurgui Ioan (f.203) din care rezultă că, fiind prieten cu inculpatul Chiriluț a aflat de la acesta că a contractat un credit bancar la inițiativa patronului său „Ninuț", pe baza actelor puse la dispoziție de către acesta; martorul mai arată că și inculpatul Mărginean Nicolaie a contractat un credit bancar în aceleași condiții;

-    Declarațiile martorului Făcăleț Mircea și Făcăleț Lucia Adina, care menționează că au auzit discuții în sat în sensul că inculpații Chiriluț Cristian Sabin, Trifan Florin și Mărginean Nicolaie au scos



EX_MARGINEAN-00050

credite bancare pentru inculpatul Mărginean Rusalin Sorin, însă ulterior acesta nu a mai achitat ratele la credit, astfel cum s-a angajat;

- Carnetul de muncă seria CM 0233745 având ca titular pe inculpatul Chiriluț Cristian Sabin, din care rezultă perioada în care acesta a lucrat la S.C. SORY EXPRES S.R.L. și salariul de care a beneficiat;

- Adresa nr. 3829/02.04.2009 emisă de I.T.M. Alba la care sunt anexate fotocopii ale contractelor de muncă înregistrate de angajatorul S.C. SORY EXPRES S.R.L. la această instituție precum și fotocopii ale statelor de plată depuse pe perioada ianuarie 2007 - septembrie 2008 - din cuprinsul cărora rezultă că, exceptându-l pe inculpatul Chiriluț Cristian Sabin care, a fost angajat în perioada 03.11.2007-16.04.2008, ceilalți trei inculpați - Mărginean Nicolae, Trifan Florin și Grozav Eugen Tiberiu - nu au fost angajați în cadrul societății;

- Adresa nr. 80584/30.06.2009 emisă de Instituția Prefectului, jud. Alba - Serviciul Public Comunitar Regim Permise de Conducere și Înmatriculare a Vehiculelor prin care se atestă că inculpatul Trifan Florin nu figurează ca posesor de permis conducere;

- Carnetul de muncă seria MPS nr. 1112126 având ca titular pe Trifan Florin, din cuprinsul căruia rezultă că nu a fost angajat la S.C. SORY EXPRES S.R.L.;

- Procesul verbal încheiat de organele de poliție la data de 01.10.2008 cu ocazia verificării documentelor financiar contabile ale S.C. SORY EXPRES S.R.L. pe linia personalului angajat;

- Dosarele de credite întocmite de bănci pe numele inculpaților Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu;

- Procesele verbale întocmite cu ocazia confruntărilor efectuate între inculpați;

Cu ocazia audierilor în cursul urmăririi penale, inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu deși au avut o atitudine oscilantă, în principiu, au recunoscut săvârșirea faptelor, arătând că au acceptat să contracteze creditele bancare, bazându-se pe promisiunile făcute de inculpatul Mărginean Rusalin Sorin că va plăti ratele aferente.

În schimb, inculpatul Mărginean Rusalin Sorin și-a negat complet vinovăția, arătând că nu are nici o implicație în ceea ce privește contractarea creditelor bancare, negând faptul că sumele de bani ar fi ajuns la el; inculpatul nu a putut da însă explicații plauzibile cu privire la neconcordanța dintre documentele ce le-a emis pe numele S.C. SORY EXPRES S.R.L., prezentate băncilor, pe de o parte, și înregistrările operate în contabilitatea firmei cu referire la angajați și la salarizarea acestora, respectiv înregistrările operate la I.T.M. Alba, pe de altă parte.

În ceea ce o privește pe inculpata Poienar Ana, aceasta a recunoscut, în cursul urmăririi penale, că a completat contractele de muncă și adeverințele de venit pentru bancă, susținând că a făcut acest lucru la cererea și în baza indicațiilor date de inculpatul Mărginean Rusalin Sorin, fără însă a le confrunta cu documentele contabile ale firmei (state de plată). Justificările date de către învinuită sunt pur formale, având în vedere că pe același tip de acte, a înscris date total diferite, în condițiile în care, întocmirea acestora s-a făcut fie în aceeași zi, fie la intervale scurte de timp: astfel, în contractul individual de muncă al inculpatului Chiriluț Cristian Sabin înregistrat la I.T.M. Alba s-a trecut ca dată a începerii activității 03.11.2007 și un salariu lunar brut de 560 lei, în schimb, în contractul de muncă al aceluiași învinuit depus la bancă, inculpata Poienar, a înscris ca dată de începere a activității 03.05.2007 și un salariu lunar brut de 1830 lei; în mod similar, în cazul creditelor contractate de inculpatul Trifan Florin de la cele două bănci, inculpata a înscris sume diferite privind veniturile realizate, respectiv, suma de 2.640 lei pe adeverințele depuse la B.C.R. și 3.660 lei pe adeverințele depuse la ALPHA BANK, deși adeverințele pentru ambele bănci s-au emis la data de 21.05.2008; aceeași situație este valabilă și în cazul adeverințelor de venit utilizate de inculpatul Trifan Florin la contractarea celor trei credite și în care compar sume diferite privind veniturile realizate, în condițiile în care inculpata a emis cele trei adeverințe la interval de o zi, respectiv, de 15 zile.

În cursul judecății au fost ascultați inculpații Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie și Trifan Florin, inculpata Poienar Ana prevalându-se de dispozițiile art.70 C.penal-dreptul la tăcere.



Tribunalul Alba
Pentru conformitate

8

EXT-MARGINEAN-00051

Government Exhibit 1
Page 96 of 266

Inițial, în cursul judecății, inculpatul Mărginean Rusalin Sorin, prin declarația depusă la fila 93 a recunoscut săvârșirea faptelor reținute în actul de sesizare, solicitând ca judecata să se facă în baza dispozițiilor art.320 ind.1 C.pr.penală anterior, însă prezent în fața instanței acesta a revenit asupra declarației arătând că nu a beneficiat de banii obținuți în urma acordării creditelor celor patru inculpați, că adeverințele de salariu au fost eliberate la solicitarea angajaților și că atestau fapte reale, cei patru inculpați efectuând curse externe.

Instanța reține atitudinea oscilantă și totodată nesinceră a inculpatului în condițiile în care întregul material probator administrat în cauză și analizat mai sus infirmă cele susținute de inculpat; astfel cum arată martorii audiați și inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu, creditele au fost contractate la inițiativa inculpatului Mărginean Rusalin Sorin, pe baza promisiunilor făcute de inculpat că va plăti ratele aferente, acesta fiind cel care a și folosit banii. Martorul Lăscan Adrian, contrar celor susținute de inculpatul Mărginean Rusalin, a declarat că doar el și martorul Grigore Cosmin au efectuat curse externe, nu și ceilalți inculpați. De altfel, din adresa nr. 80584/30.06.2009 emisă de Instituția Prefectului, jud. Alba - Serviciul Public Comunitar Regim Permise de Conducere și Înmatriculare a Vehiculelor rezultă că inculpatul Trifan Florin nu figurează ca posesor de permis conducere, acesta nefiind angajat la S.C. SORY EXPRES S.R.L la fel ca inculpații Mărginean Nicolaie și Grozav Eugen Tiberiu.

De asemenea, probele menționate mai sus se coroborează  rapoartele de expertiză grafică nr. 54167/15.09.2009,   54174/16.09.2009  și  60617/09.03.2010, întocmite de I.P.J. Alba Serviciul Criminalistic în care au fost expertizate documentele prezentate unităților bancare în vederea obținerii de credite precum și Raportul criminalistic nr. 67208C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpaților Chiriluț Cristian Sabin și Trifan Florin de unde rezultă că nu au fost detectate reacții specifice comportamentului simulat, astfel că nu se poate reține, astfel cum susține avocatul inculpatului, că nu există probe din care să rezulte că inculpatul Mărginean Rusalin Sorin ar fi determinat cu intenție pe ceilalți coinculpați la săvârșirea infracțiunii de înșelăciune.

În privința inculpaților Grozav Eugen Tiberiu, Trifan Florin, Mărginean Nicolaie și Chiriluț Cristian Sabin nu se poate reține incidența dispozițiilor art. 16 alin. 1 lit. b teza II Cpp și anume fapta nu a fost săvârșită cu vinovăția prevăzută de lege. Inculpații, cu intenție, cunoscând că nu îndeplinesc condițiile cerute pentru a angaja credite bancare, au acceptat solicitarea inculpatului Mărginean Rusalin Sorin de a contracta credite bancare, sens în care s-au și deplasat la sediile unităților bancare contractante. În acest sens sunt și declarațiile inculpatului –inculpatul Grozav Eugen Tiberiu, ascultat în faza de urmărire penală (f.120-122) a arătat că la solicitarea inculpatului Mărginean Rusali Sorin s-a deplasat la BCR unde a depus o cerere pentru un credit de 10.000 euro arătând în cuprinsul ei că este angajat la SC Sory Expres SRL ca șofer și realizează un venit de 700 lei și diurnă de 1000 euro, deși în realitate inculpatul nu deținea permis de conducere și nici nu a fost angajat al acestei societăți; inculpatul Trifan Florin a declarat (f.116-117) că la solicitarea inculpatului Mărginean Rusalin Sorin s-a deplasat la Alpha Bank Alba Iulia unde a făcut o cerere de credit în care a menționat că este angajat la SC Sory Expres SRL în calitate de conducător auto, fapt ce nu corespundea realității. În fața instanței inculpatul a arătat că nu a dat nicio declarație la bancă cu privire la faptul că lucrează la SC Sory Expres SRL în calitate de conducător auto, aspect infirmat de înscrisul aflat la fila 273 intitulat „angajament de plată" completat și semnat de inculpat, însă recunoaște că nu a fost angajat și nu a lucrat nicio zi pentru Mărginean Rusalin, fiind de acord cu participarea acestuia de a contracta creditul pentru a-l câta.

Din declarațiile inculpatului Mărginean Nicolaie (f.100-103 dos.u.p., f.123) rezultă că acesta nu a semnat nici un contract de muncă, dar din discuțiile purtate de coinculpații Poienar Ana și Mărginean Rusalin anterior deplasării la bancă, a aflat că i s-a încheiat un contract de muncă pe care se menționase o sumă mai mare ca salariu decât i se cuvenea pentru a putea fi aprobat creditul; astfel nu se poate reține lipsa intenției în săvârșirea infracțiunii, întrucât cunoscând toate aceste aspecte a semnat documentele necesare obținerii creditului.

Inculpatul Chiriluț Cristian Sabin a declarat că în drum spre BCR-Agenția Cetate l-a întrebat pe inculpatul Mărginean Rusalin cum a reușit să obțină creditul de 15.000 euro având în vedere că avea



9

EXT-MARGINEAN-00052

trecut pe contractul de muncă un salariu de aproximativ 450 lei lunar, inculpatul Mărginean spunându-i că a rezolvat ca pe contractul de muncă să fie înscrisă suma de 1500-1800 lei. Cu toate acestea, inculpatul Chiriluț a acceptat să contracteze creditul.

Întrucât de la data comiterii faptelor și până la pronunțarea sentinței a intervenit o lege penală nouă, în temeiul art.7 paragraf 1 din CEDO și a Deciziei Curții Constituționale nr. 265/2014 pentru a stabili care este legea penală mai favorabilă, instanța trebuie să procedeze la o comparație globală a regimului represiv al fiecăreia dintre legile penale aplicabile în cazul acuzatului ( metoda comparației globale).

În cauză, referitor la inculpatul Mărginean Rusalin Sorin legea penală mai favorabilă este legea nouă întrucât limitele de pedeapsă pentru infracțiunea de înșelăciune prev. de art.244 alin.1, alin.2 C.penal este de la 1 an închisoare la 5 ani închisoare față de limitele de 10 ani-20 închisoare prevăzute de art.215 alin.1-3 și alin.5 C.penal din 1969. Referitor la inculpații Chiriluț Cristian Sabin, Trifan Florin, Mărginean Nicolaie și Grozav Eugen Tiberiu, legea mai favorabilă este de asemenea legea nouă care prevede pentru infracțiunea de înșelăciune prev. de art.244  alin.1 și alin.2 C.pen limite de pedeapsă de 1 an închisoare și 5 ani închisoare, pe când legea veche, art.215 alin.1 și alin.3 prevede limite de pedeapsă mai mari, respectiv de 3 ani și 15 ani închisoare.

Or instanța făcând aplicarea dispozițiilor legii noi referitoare la pedeapsa în cazul concursul de infracțiuni și a infracțiunii continuate va putea dispune în cazul inculpaților pedepse sub limitele minime de 10 ani închisoare, respectiv 3 ani închisoare prevăzute de legea veche.

Față de dispozițiile Deciziei nr.5/2014 a ICCJ potrivit cărora nu este permisă combinarea prevederilor din legi succesive în stabilirea și aplicarea legii penale mai favorabile cu privire la condițiile de existență și sancționare ale infracțiunii continuate și ale art.36 C.penal care arată că infracțiunea este continuată când o persoană săvârșește la diferite intervale de timp, dar în realizarea aceleiași rezoluții și împotriva aceluiași subiect pasiv, acțiuni sau inacțiuni care prezintă, fiecare în parte, conținutul aceleiași infracțiuni, se impune schimbarea încadrării juridice a faptelor reținute în sarcina inculpaților, astfel:

- pentru inculpatul Mărginean Rusalin Sorin, în baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de instigare la înșelăciune prev. de art.25 C.pen. din 1969 rap. la art.215 alin.1-3 și 5 C.pen. din 1969 comb. cu art.75 lit.a C.pen. din 1969 și art.41 alin2 C.pen. din 1969 (7 acte materiale) în 4 infracțiuni de instigare la înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluț Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)și din infracțiunea prev. de art.290 C.penal din 1969 comb. cu art.41 alin.2 C.penal din 1969 (14 acte materiale) în infracțiunea de fals în înscrisuri sub semnătură privată în formă continuată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal.;

- pentru inculpatul Trifan Florin, în baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.); din infracțiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal.; din infracțiunea prev. de art.290 C.penal din 1969 în infracțiunea de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art. 5 C.penal;

- pentru inculpatul  Grozav Eugen Tiberiu, în baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeș); din infracțiunea prev. de art.291 cu aplic. art.41



10

EXT/MARGINEAN-00053

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 98 of 266



alin.2 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal.

Referitor la inculpații Chiriluț Cristian și Mărginean Nicolaie, instanța raportat la cele de mai sus, stabilind că legea penală mai favorabilă în privința celor doi inculpați este legea nouă, în baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal  și din infracțiunea prev. de art.291 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal cu privire la inculpatul Chiriluț Cristian Sabin. Referitor la inculpatul Mărginean Nicolaie, în temeiul aceluiași text de lege, va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal  și din infracțiunea prev. de art.291 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal.

Pentru inculpata Poienar Ana, legea penală mai favorabilă este legea veche întrucât pedeapsa  pentru infracțiunea de infracțiunea de fals în înscrisuri sub semnătură privată prev. art. 290 C.pen.din 1969 este închisoarea de la 3 luni la 2 ani sau amendă, iar pedeapsa pentru aceeași infracțiune prev. de art.322 C.pen. este închisoarea de la 6 luni la 3 ani sau amendă.

## ÎN DREPT:

**1.** Faptele inculpatului Mărginean Rusalin Sorin care în scopul obținerii unor venituri ilicite, în perioada decembrie  2007 – iunie 2008 a determinat un număr de patru persoane să contracteze în mod fraudulos credite bancare, sens în care le-a pus la dispoziție documente pe care le-a falsificat împreună cu inculpata Poienar Ana, cuantumul total al creditelor contractate fiind  59.900 EUR și 68.800 lei – constituie 4 infracțiuni de instigare la înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluț Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)

Faptele aceluiași inculpat care, acționând în baza aceleiași rezoluții infracționale, în scopul obținerii unor credite în mod fraudulos, a întocmit în fals un nr. de documente 14 acte, ce au fost prezentate băncilor -constituie infracțiunea de fals în înscrisuri sub semnătură privată în formă continuată, prev. de art. prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal, totul cu aplicarea art.39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

**2.** Fapta inculpatului Chiriluț Cristian Sabin care la data de 04.12.2007 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S:A. Agenția Cetate, pe baza unor documente întocmite în fals - constituie infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.

Fapta aceluiași inculpat de a utiliza la bancă în vederea acordării creditului, documente întocmite în fals - constituie infracțiunea de uz de fals, prev. de art. 323 C.penal cu aplic. art.5 C.penal, totul cu aplicarea prev. art. 39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

**3.** Fapta învinuitului Mărginean Nicolaie care la data de 04.01.2008 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S.A. Agenția Cetate, pe baza unor documente întocmite în fals - constituie infracțiunea de înșelăciune prev. de art. 244 C.pen. cu aplic. art.5 C.penal.

Fapta aceluiași inculpat de a utiliza la bancă în vederea acordării creditului, documente întocmite în fals - constituie infracțiunea de uz de fals, prev. de art. 323 C.penal cu aplic. art.5 C.penal, totul cu aplicarea prev. art. 39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

**4.** Faptele inculpatului Trifan Florin care în luna mai 2008, a contractat în mod fraudulos, două credite bancare în cuantum total  de 19.900 EUR, prin utilizarea unor documente întocmite în fals - constituie două infracțiuni de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba) și infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.)



11

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 99 of 266

Faptele aceluiași inculpat de a prezenta la bănci în vederea acordării creditelor, documente întocmite în fals - constituie infracțiunea de uz de fals în formă continuată prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal;

Fapta aceluiași inculpat care la data de 21.05.2008  a întocmit în fals un angajament de plată, în care ireal a menționat faptul că lucrează în calitate de conducător auto la S.C. SORY EXPRES S.R.L., dându-și totodată consimțământul, să i se rețină din salariu ratele de credit, în caz de neplată - constituie infracțiunea de fals în înscrisuri sub semnătură privată, prev. de art.322 cu aplic. art.5 C.penal, totul cu aplicarea art. 39 lit. b C.pen. privind concursul de infracțiuni.

5. Faptele inculpatului Grozav Eugen Tiberiu care în luna iunie 2008, a contractat în mod fraudulos, trei credite bancare în cuantum de 10.000 EUR, 10.000 lei și 54.800 lei, prin folosirea de documente întocmite în fals - constituie 3 infracțiuni de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeș);

Fapta aceluiași inculpat de a prezenta la bănci în vederea acordării creditelor, documente întocmite în fals - constituie infracțiunea de uz de fals în formă continuată, prev. de art 323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal, totul cu aplicarea art. 39 lit. b C.pen. privind concursul de infracțiuni.

6. Faptele inculpatei Poienar Ana de a-l ajuta pe inculpatul Mărginean Rusalin Sorin la completarea în fals a celor 4 contracte de muncă și 10 adeverințe de venit, ce au fost folosite în vederea contractării de credite în mod fraudulos  - constituie complicitate la infracțiunea de fals în înscrisuri sub semnătură privată în formă continuată, prev. de art. 26 rap. la art. 290 C.pen. în cond. art. 41 alin. 2 C.pen.

### Individualizarea judiciară a pedepsei.

La individualizarea pedepsei, în conformitate cu prevederile art. 74 Cod penal, Tribunalul se raportează la gravitatea infracțiunii săvârșite și periculozitatea infractorului, care este evaluată după următoarele criterii: împrejurările și modul de comitere a infracțiunii, precum și mijloacele folosite; starea de pericol creată pentru valoarea ocrotită; natura și gravitatea rezultatului produs ori a altor consecințe ale infracțiunii; motivul săvârșirii infracțiunii și scopul urmărit; natura și frecvența infracțiunilor care constituie antecedente penale ale infractorului; conduita după săvârșirea infracțiunii și în cursul procesului penal; nivelul de educație, vârsta, starea de sănătate, situația familială și socială.

Raportat la criteriile deja menționate, Tribunalul apreciază că faptele inculpaților prezintă un grad relativ ridicat de pericol social având în vedere, pe de o parte, importanța valorii sociale protejate prin norma de incriminare (relațiile sociale cu caracter patrimonial care trebuie să se bazeze pe bună-credință precum și relațiile sociale referitoare la încrederea publică în înscrisurile producătoare de consecințe juridice, în veridicitatea acestor înscrisuri, în adevărul pe care trebuie să-l exprime), conduita inculpaților Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie în cursul procesului penal (de recunoaștere a săvârșirii faptelor), dar și conduita nesinceră a inculpaților Mărginean Rusalin și Poienar Ana, lipsa antecedentelor penale, faptul că inculpații Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie nu au beneficiat de banii obținuți în urma accesării creditelor, ceea ce impune orientarea spre minimul special al pedepsei.

Tribunalul mai are în vedere modul de comitere a faptelor de către inculpatul Mărginean Rusalin care profitând de starea materială precară a coinculpaților Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie, de lipsa locurilor de muncă sau condiționarea păstrării unui asemenea loc de muncă, i-a determinat pe aceștia să săvârșească infracțiuni, de faptul că banii obținuți prin săvârșirea faptelor au fost folosiți numai de către inculpatul Mărginean, astfel că va aplica acestuia o pedeapsă cu executare în regim de detenție.

Față de cele expuse, Tribunalul:

1. În baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de instigare la înșelăciune prev. de art.25 C.pen. din 1969 rap. la art.215 alin.1-3 și 5 C.pen. din 1969 comb. cu art.75 lit.a C.pen. din 1969 și 41 alin2 C.pen. din 1969 (7 acte materiale) în 4 infracțiuni de instigare la înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect



EXT-MARGINEAN-00055

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 100 of 266

*23*

pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)şi din infracţiunea prev. de art.290 C.penal din 1969 comb. cu art.41 alin.2 C.penal din 1969 (14 acte materiale) în infracţiunea de fals în înscrisuri sub semnătură privată în formă continuată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Rusalin Sorin.

Va condamna inculpatul **MĂRGINEAN RUSALIN SORIN**, la pedeapsa de:
- 1 an şi 8 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 şi art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen);
- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian)
- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune infracţiunii prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Mărginean Nicolaie)
- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic.art.35 alin.1 şi art.5 C.penal (2 acte materiale- subiect pasiv Trifan Florin)
- 1 an închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal va contopi pedepsele de mai sus în pedeapsa cea mai grea de 1 an şi 8 luni închisoare la care va adăuga sporul de 1 an şi 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **3 ani şi 6 luni închisoare.**

În baza art.112 lit.e C.penal va dispune confiscarea sumei de 26.000 euro de la inculpatul Mărginean Rusalin Sorin, suma obţinută în urma săvârşirii infracţiunii şi pentru care partea vătămată nu s-a constituit parte civilă. Astfel, creanţa datorată băncii de inculpatul Chiriluţ Cristian Sabin în cuantum de 15.000 euro din care 11.000 euro i-au fost daţi inculpatului Mărginean Rusalin şi creanţa datorată băncii de inculpat Mărginean Nicolaie în cuantum de 15.000 euro, bani folosiţi exclusiv de inc. Mărginean Rusalin a fost cesionată către DDM EUROPE AG, cu administrator active CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucureşti, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat că nu se constituie parte civilă în cauză.

**2.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal şi din infracţiunea prev. de art.291 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal cu privire la inculpatul Chiriluţ Cristian Sabin.

Va condamna inculpatul **CHIRILUŢ CRISTIAN SABIN**, la pedeapsa de:
- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.
- 6 luni închisoare pentru săvârşirea infracţiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal va contopi pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care va adăuga sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 2 luni închisoare.**

Apreciind că aplicarea pedepsei este suficientă chiar şi fără executarea acesteia în raport de persoana infractorului care nu are antecedente penale, are 3 copii minori în întreţinere, în baza art.91 C.penal va dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi va stabi un termen de supraveghere de 2 ani conform dispoziţiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul va trebui să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

13

*29*

Tribunalul Alba
Pentru conform...

Government Exhibit 1
Page 101 of 266

b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;
c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal va impune inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal va atrage atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

În baza art.112 lit.e C.penal va dispune confiscarea sumei de 4.000 euro de la inculpatul Chiriluț Cristian Sabin, suma obținută în urma săvârșirii infracțiunii și pentru care partea vătămată nu s-a constituit parte civilă, creanța datorată băncii fiind cesionată către DDM EUROPE AG, cu administrator active CREDITEXPRESS FINANCIAL SERVICES S.R.L. București, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat că nu se constituie parte civilă în cauză.

3.    În baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal și din infracțiunea prev. de art.291 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Nicolaie.

Va condamna inculpatul **MĂRGINEAN NICOLAIE** (nume anterior Mărginean Gherman), la pedeapsa de:
-    1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.
-    6 luni închisoare pentru săvârșirea infracțiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal va contopi pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care va adăuga sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an și 2 luni închisoare.**

În baza art.91 C.penal va dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și va stabili un termen de supraveghere de 2 ani conform dispozițiilor art.92 C.penal, apreciind că aplicarea pedepsei este suficientă chiar și fără executarea acesteia în raport cu persoana infractorului care nu are antecedente penale.

Pe perioada termenului de supraveghere inculpatul va trebui să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:
a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;
b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;
c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal va impune inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal va atrage atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

4.    În baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracțiunea de înșelăciune prev. de



14

art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.); din infracţiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal.; din infracţiunea prev. de art.290 C.penal din 1969 în infracţiunea de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal cu privire la inculpatul Trifan Florin.

Va condamna inculpatul **TRIFAN FLORIN**, la pedeapsa de:
- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba);
- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.);
- 6 luni închisoare pentru săvârşirea infracţiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal
- 6 luni închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal

În baza art. 39 alin.1 lit.b C.penal va contopi pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care va adăuga sporul de 8 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 8 luni închisoare.**

Apreciind că aplicarea pedepsei este suficientă chiar şi fără executarea acesteia în raport de persoana infractorului care nu are antecedente penale şi posibilităţile sale de reeducare, în baza art.91 C.penal va dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi va stabili un termen de supraveghere de 2 ani conform dispoziţiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul va trebui să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:
a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;
b) să primească vizitele consilierului de probaţiune desemnat cu supravegherea sa;
c) să anunţe, în prealabil, schimbarea locuinţei şi orice deplasare care depăşeşte 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informaţii şi documente de natură a permite controlul mijloacelor sale de existenţă;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probaţiune sau organizat în colaborare cu instituţii din comunitate.

În temeiul art.93 alin.3 C.penal va impune inculpatului obligaţia de a desfăşura pe durata termenului de supraveghere o muncă neremunerată în folosul comunităţii, pe o perioadă de 60 zile, în condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal va atrage atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

5.      În baza art.386 C.pr.pen. va schimba încadrarea juridică a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracţiunea de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeş); din infracţiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal. cu privire la inculpatul Grozav Eugen Tiberiu.

Va condamna inculpatul **GROZAV EUGEN TIBERIU** la pedeapsa de:
- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BCR SA);
- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BRD Groupe Societe Generale);



Tribunalul Alba
Pentru conformitate
Government Exhibit
Page 103 of 266

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-Alpha Bank-Sucursala Sebeș);
- 6 luni închisoare pentru săvârșirea infracțiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal

În baza art. 39 alin.1 lit.b C.penal va contopi pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care va adăuga sporul de 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an și 10 luni închisoare.**

Apreciind că aplicarea pedepsei este suficientă chiar și fără executarea acesteia în raport de persoana infractorului care nu are antecedente penale și posibilitățile sale de reeducare, în baza art.91 C.penal va dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și va stabili un termen de supraveghere de 2 ani și 6 luni conform dispozițiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul va trebui să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;

c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal va impune inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal va atrage atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

**6.**    Va condamnă inculpata **POIENAR ANA,** la pedeapsa de:
- 1 an închisoare pentru complicitatea la infracțiunea de fals în înscrisuri sub semnătură privată prev. de art.26 rap. la art.290 C.penal din 1969 în cond. art.41 alin.2 C.penl din 1969 și art.5 C.pen.

Va interzice inculpatei exercitarea, pe durata prevăzută de art.71 C.penal din 1969 a drepturilor prevăzute de art.64 lit.a teza a II-a și lit.b C.penal din 1969.

În baza art. 81 Cod penal din 1969 și art. 71 al. 5 Cod penal din 1969 va dispune suspendarea condiționată a executării pedepsei principale și a celei accesorii pe durata unui termen de încercare de 3 ani stabilit conform art. 82 Cod penal din 1969, apreciind că scopul pedepsei poate fi atins și fără executarea acesteia.

Va atrage atenția inculpatei asupra dispozițiilor art. 83 Cod penal din 1969.

În baza art.580 C.pr.pen. va dispune anularea următoarelor înscrisuri: adeverința de salariu nr.70/04.12.2007, contractul de muncă nr.21/03.05.2007, contractul de muncă nr.24/02.07.2007, adeverința de salariu nr.112/04.01.2008, contractul de muncă nr.19/01.02.2007, adeverința de salariu nr.214/21.05.2008, adeverința de salariu nr.219/26.05.2008, adeverința de venit nr.215/21.05.2008, adeverința de salariu f.n privind pe inculpatul Trifan Florin, contractul de muncă nr.29/03.05.2007, adeverința de venit nr.230/03.06.2008, adeverința de venit nr.232/04.06.2008, adeverința de venit nr.233/19.06.2008 constatate a fi false prin rapoartele de expertiză grafică întocmite în cauză.

**Latura civilă:**

Prin adresa nr. 4101/15.05.2012 emisă de ASSET PORFOLIO SERVICNG ROMÂNIA din care rezultă că nu se constituie parte civilă în cauză cu privire la creditele contractate de inculpații Chiriluț Cristian Sabin și Mărginean Nicolaie, motiv pentru care instanța a dispus confiscarea sumelor de bani.



16

EXT-MARGINEAN-00059

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 104 of 266



Prin adresa nr. 8765/21.07.2010 emisă de BRD GROUPE SOCIETE GENERALE - Sucursala Alba se arată că creditul de 10.000 lei contractat de inculpatul Grozav Eugen Tiberiu a fost achitat integral anticipat (26.06.2010) şi nu se constituie parte civilă în cauză.

Astfel, va constata că persoanele vătămate BRD GROUPE SOCIETE GENERALE cu sediul în Bucureşti, b-dul Ion Mihalache, nr.1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL cu sediul în Bucureşti, str. Matei Milo, nr.9, sector 1 nu s-au constituit părţi civile în cauză.

Alpha Bank România SA, prin înscrisul depus la fila 24 din dosar a comunicat că se constituie parte civilă cu suma 16.033,93 EUR în cazul creditului contractat de inculpatul Trifan Florin, cu suma 57.923,33 lei, în cazul creditului contractat de inculpatul Grozav Eugen Tiberiu cu sumele de 143,98 lei şi 7.362,64 lei în cazul creditelor acordate inculpatului Mărginean Rusalin Sorin.

Constatând îndeplinite prev. art.1357 C.civil potrivit cărora cel care cauzează altuia un prejudiciu printr-o faptă ilicită, săvârşită cu vinovăţie, este obligat să îl repare, Tribunalul în baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen va admite în parte acţiunea civilă formulată de partea civilă ALPHA BANK ROMÂNIA SA în consecinţă obligă inculpaţii Grozav Eugen la plata sumei de 57.345,65 lei şi Trifan Florin la plata sumei de 16.033,93 euro cu titlu despăgubiri, sume de bani reprezentând prejudiciul produs părţii civile prin săvârşirea infracţiunii de înşelăciune.

Va respinge acţiunea civilă formulată de partea civilă ALPHA BANK ROMÂNIA SA împotriva inculpatului Mărginean Rusalin Sorin, întrucât obţinerea creditelor la care face referire partea civilă nu a făcut obiectul cercetării penale din prezentul dosar, nu există vreo legătură de cauzalitate între faptele pentru care va fi condamnat inculpatul şi prejudiciul la care se face referire.

Prin adresa nr. SBCR/4/1565 din 08.06.2010, SECAPITAL S.a. R.L. Bucureşti, prin administrator active KRUK INTERNAŢIONAL SRL s-a constituit parte civilă cu suma 25.643,92 lei - din care, 20.604,99 lei debit principal restant, 3.9991,9 lei dobândă restantă şi 1.047, 03 lei penalităţi – cu referire la creditul contractat de inculpatul Trifan Florin, care a fost cesionat de B.C.R. S.A.

Constatând îndeplinite condiţiile prev. de art.1357 C.civil, în baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen va admite acţiunea civilă formulată de partea civilă KRUK INTERNAŢIONAL SRL şi în consecinţă va obliga inculpatul Trifan Florin la plata în favoarea părţii civile a sumei de 30066,87 lei (6904,94 euro) cu titlu despăgubiri.

În baza art.274 alin.1 C.pr.pen. va obliga inculpaţii Chiriluţ Cristian, Mărginean Nicolaie, Trifan Florin, Poienar Ana şi Grozav Eugen, fiecare, la plata sumei de 2100 lei şi inculpatul Mărginean Rusalin la plata sumei de 2200 lei cu titlu cheltuieli judiciare avansate de stat în cauză.

În baza art.274 alin.1 C.pr.pen. suma de 600 lei reprezentând onorariul apărătorului desemnat din oficiu pentru inculpaţii Grozav Eugen şi Trifan Florin va rămâne în sarcina statului.

PENTRU ACESTE MOTIVE
ÎN NUMELE LEGII
H O T Ă R Ă Ş T E:

**1.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de instigare la înşelăciune prev. de art.25 C.pen. din 1969 rap. la art.215 alin.1-3 şi 5 C.pen. din 1969 comb. cu art.75 lit.a C.pen. din 1969 şi 41 alin2 C.pen. din 1969 (7 acte materiale) în 4 infracţiuni de instigare la înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 şi art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)şi din infracţiunea prev. de art.290 C.penal din 1969 comb. cu art.41 alin.2 C.penal din 1969 (14 acte materiale) în infracţiunea de fals în înscrisuri sub semnătură privată în formă continuată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Rusalin Sorin.

Tribunalul Alba
Pentru conformitate

Condamnă inculpatul **MĂRGINEAN RUSALIN SORIN** - fiul lui Rusalin și Olimpia, născut la data de 16.02.1972 în Cugir, jud. Alba, CNP 1720216013541 domiciliat în comuna Săliștea, sat Săliștea Deal, nr.39A, jud. Alba, f.f.l. în com. Săliștea, sat Tărtăria, str. Florilor, nr.54, jud. Alba, cetățean român, studii: școala profesională, conducător auto, căsătorit, fără antecedente penale, la pedeapsa de:

- 1 an și 8 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen);
- 1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluț Cristian)
- 1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune infracțiunii prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Mărginean Nicolaie)
- 1 an și 6 luni închisoare pentru săvârșirea de instigare la infracțiunea de înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic.art.35 alin.1 și art.5 C.penal (2 acte materiale- subiect pasiv Trifan Florin)
- 1 an închisoare pentru săvârșirea infracțiunii de fals în înscrisuri sub semnătură privată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic.

În baza art. 39 alin.1 lit.b C.penal contopește pedepsele de mai sus în pedeapsa cea mai grea de 1 an și 8 luni închisoare la care adaugă sporul de 1 an și 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **3 ani și 6 luni închisoare.**

În baza art.112 lit.e C.penal dispune confiscarea sumei de 26.000 euro de la inculpatul Mărginean Rusalin Sorin.

**2.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal și din infracțiunea prev. de art.291 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal cu privire la inculpatul Chiriluț Cristian Sabin.

Condamnă inculpatul **CHIRILUȚ CRISTIAN SABIN** - fiul lui Sabin și Emilia, născut la data de 17.09.1974 în Cugir, jud. Alba, CNP 1740917013528 domiciliat în Cugir, str. Râul Mic, nr.106, jud. Alba, cetățean român, studii: 10 clase, conducător auto, căsătorit, 3 copii minori, fără antecedente penale, la pedeapsa de:

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.
- 6 luni închisoare pentru săvârșirea infracțiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal contopește pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care adaugă sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an și 2 luni închisoare.**

În baza art.91 C.penal dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și stabilește un termen de supraveghere de 2 ani conform dispozițiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul trebuie să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;
b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;
c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal impune inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în



18

Tribunalul Alba
Pentru conformitate

**Government Exhibit 1
Page 106 of 266**



condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal atrage atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

În baza art.112 lit.e C.penal dispune confiscarea sumei de 4.000 euro de la inculpatul Chiriluţ Cristian Sabin.

**3.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal şi din infracţiunea prev. de art.291 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Nicolaie.

Condamnă inculpatul **MĂRGINEAN NICOLAIE** (nume anterior Mărginean Gherman) - fiul lui Nicolaie şi Alionescu Dorica, născut la data de 09.07.1975 în Cugir, jud. Alba, CNP 1750709013529 domiciliat în com. Săliştea, str. Mică, nr.171, jud. Alba, cetăţean român, studii: generale, necăsătorit, fără antecedente penale, la pedeapsa de:

- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.
- 6 luni închisoare pentru săvârşirea infracţiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal contopeşte pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care adaugă sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 2 luni închisoare.**

În baza art.91 C.penal dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi stabileşte un termen de supraveghere de 2 ani conform dispoziţiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul trebuie să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probaţiune desemnat cu supravegherea sa;

c) să anunţe, în prealabil, schimbarea locuinţei şi orice deplasare care depăşeşte 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informaţii şi documente de natură a permite controlul mijloacelor sale de existenţă;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probaţiune sau organizat în colaborare cu instituţii din comunitate.

În temeiul art.93 alin.3 C.penal impune inculpatului obligaţia de a desfăşura pe durata termenului de supraveghere o muncă neremunerată în folosul comunităţii, pe o perioadă de 60 zile, în condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal atrage atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

**4.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracţiunea de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba); infracţiunea de înşelăciune prev. de art. 244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.); din infracţiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal.; din infracţiunea prev. de art.290 C.penal din 1969 în infracţiunea de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal cu privire la inculpatul Trifan Florin.

Condamnă inculpatul **TRIFAN FLORIN** - fiul lui Emil şi Ana, născut la data de 15.03.1979 în Cugir, jud. Alba, CNP 1790315011122 domiciliat în comuna Săliştea, str. Joseni, nr.459, jud. Alba, cetăţean român, studii: generale, muncitor necalificat, necăsătorit, fără antecedente penale, la pedeapsa de:



Tribunalul Alba
Pentru conformitate

19

Government Exhibit 1
Page 107 of 266

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba);
- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.);
- 6 luni închisoare pentru săvârșirea infracțiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal
- 6 luni închisoare pentru săvârșirea infracțiunii de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal

În baza art. 39 alin.1 lit.b C.penal contopește pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care adaugă sporul de 8 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an și 8 luni închisoare.**

În baza art.91 C.penal dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și stabilește un termen de supraveghere de 2 ani conform dispozițiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul trebuie să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;
b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;
c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal impune inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal atrage atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

**5.** În baza art.386 C.pr.pen. schimbă încadrarea juridică a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeș); din infracțiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal. cu privire la inculpatul Grozav Eugen Tiberiu.

Condamnă inculpatul **GROZAV EUGEN TIBERIU** - fiul lui natural și Ileana, născut la data de 10.01.1978 în Cugir, jud. Alba, CNP 1780110010017 domiciliat în comuna Săliștea, sat Săliștea Deal, nr.83, jud. Alba, cetățean român, fără ocupație, necăsătorit, fără antecedente penale, la pedeapsa de:

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BCR SA);
- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BRD Groupe Societe Generale);
- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-Alpha Bank-Sucursala Sebeș);
- 6 luni închisoare pentru săvârșirea infracțiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal



20

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 108 of 266

27

În baza art. 39 alin.1 lit.b C.penal contopeşte pedepsele de mai sus în pedeapsa cea mai grea de 1 an închisoare la care adaugă sporul de 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de 1 an şi 10 luni închisoare.

În baza art.91 C.penal dispune suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi stabileşte un termen de supraveghere de 2 ani şi 6 luni conform dispoziţiilor art.92 C.penal.

Pe perioada termenului de supraveghere inculpatul trebuie să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:
a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;
b) să primească vizitele consilierului de probaţiune desemnat cu supravegherea sa;
c) să anunţe, în prealabil, schimbarea locuinţei şi orice deplasare care depăşeşte 5 zile;
d) să comunice schimbarea locului de muncă;
e) să comunice informaţii şi documente de natură a permite controlul mijloacelor sale de existenţă;
f) să frecventeze un program de reintegrare socială derulat de către serviciul de probaţiune sau organizat în colaborare cu instituţii din comunitate.

În temeiul art.93 alin.3 C.penal impune inculpatului obligaţia de a desfăşura pe durata termenului de supraveghere o muncă neremunerată în folosul comunităţii, pe o perioadă de 60 zile, în condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal atrage atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

6/ Condamnă inculpata **POIENAR ANA** – fiica lui Busuioc şi Motrea, născută la data de 25.08.1979 în Cugir, jud. Alba, CNP 2790825013527 domiciliată în comuna Săliştea, sat Săliştea Deal, nr.39, jud. Alba, cetăţean român, studii: 10 clase, fără ocupaţie, necăsatorită, cu antecedente penale, la pedeapsa de:
- 1 an închisoare pentru complicitatea la infracţiunea de fals în înscrisuri sub semnătură privată prev. de art.26 rap. la art.290 C.penal din 1969 în cond. art.41 alin.2 C.penl din 1969 şi art.5 C.pen.

Interzice inculpatei exercitarea, pe durata prevăzută de art.71 C.penal din 1969 a drepturilor prevăzute de art.64 lit.a teza a II-a şi lit.b C.penal din 1969.

În baza art. 81 Cod penal din 1969 şi art. 71 al. 5 Cod penal din 1969 dispune suspendarea condiţionată a executării pedepsei principale şi a celei accesorii pe durata unui termen de încercare de 3 ani stabilit conform art. 82 Cod penal din 1969.

Atrage atenţia inculpatei asupra dispoziţiilor art. 83 Cod penal din 1969.

În baza art.580 C.pr.pen. dispune anularea următoarelor înscrisuri: adeverinţa de salariu nr.70/04.12.2007, contractul de muncă nr.21/03.05.2007, contractul de muncă nr.24/02.07.2007, adeverinţa de salariu nr.112/04.01.2008, contractul de muncă nr.19/01.02.2007, adeverinţa de salariu nr.214/21.05.2008, adeverinţa de salariu nr.219/26.05.2008, adeverinţa de venit nr.215/21.05 2008, adeverinţa de salariu f.n privind pe inculpatul Trifan Florin, contractul de muncă nr.29/03.05.2007, adeverinţa de venit nr.230/03.06.2008, adeverinţa de venit nr.232/04.06.2008, adeverinţa de venit nr.233/19.06.2008.

Constată că persoanele vătămate BRD GROUPE SOCIETE GENERALE cu sediu! în Bucureşti, b-dul Ion Mihalache, nr.1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL cu sediul în Bucureşti, str. Matei Milo, nr.9, sector 1 nu s-au constituit părţi civile în cauză.

În baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen admite în parte acţiunea civilă formulată de partea civilă ALPHA BANK ROMÂNIA SA cu sediul în Bucureşti, Calea Dorobanţilor, nr.237 B, sector 1 şi în consecinţă obligă inculpaţii Grozav Eugen la plata sumei de 57.345,45 lei şi Trifan Florin la plata sumei de 16.033,93 euro cu titlu despăgubiri. Respinge acţiunea civilă formulată împotriva inculpatului Mărginean Rusalin Sorin.

În baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen admite acţiunea civilă formulată de partea civilă KRUK INTERNAŢIONAL SRL cu sediul în Bucureşti, Splaiul

Tribunalul Alba
pentru conformitate

EXT-MARGINEAN-00064

Independenţei, nr.319 O.B. 152, parter, sector 6 şi în consecinţă obligă inculpatul Trifan Florin la p
în favoarea părţii civile a sumei de 30066,87 lei (6904,94 euro) cu titlu despăgubiri.

În baza art.274 alin.1 C.pr.pen. obligă inculpaţii Chiriluţ Cristian, Mărginean Nicolaie, T
Florin, Poienar Ana şi Grozav Eugen, fiecare, la plata sumei de 2100 lei şi inculpatul Mărgi
Rusalin la plata sumei de 2200 lei cu titlu cheltuieli judiciare avansate de stat în cauză.

În baza art.274 alin.1 C.pr.pen. suma de 600 lei reprezentând onorariul apărătorului dese
din oficiu pentru inculpaţii Grozav Eugen şi Trifan Florin rămâne în sarcina statului.

Cu drept de apel în termen de 10 zile de la comunicare.

Pronunţată în şedinţa publică din 13.10.2014.

Preşedinte,
Maria Elena Fulea

Grefier,
Nicolae Todea

Red. M.E.F.
Tehnored. N.T./16 exp./13.11.2014



EXT-MARGINEAN-00065

54

R O M Â N I A

CURTEA DE APEL ALBA IULIA
SECTIA PENALA SI PENTRU CAUZE CU MINORI
Dosar nr. 15829/107/2012

Î N C H E I E R E
Şedinţa publică de la 04 Martie 2015
Completul compus din:
PREŞEDINTE Gheorghe Liviu Odagiu
Judecător Alexandra Iuliana Pastiu
Grefier Cornelia Maria Neag



Ministerul Public – Parchetul de pe lângă Curtea de Apel Alba Iulia este reprezentat de procuror Adela Pleşa.

Pe rol fiind soluţionarea apelurilor declarate de partea civilă Alpha Bank România S.A. Şi de inculpaţii Mărginean Rusalin Sorin, Chiriluţ Cristian Sabin, Mărginean Nicolae Şi Poienar Ana împotriva sentinţei penale nr.577/13.10.2014, pronunţată de Tribunalul Alba,în dosarul nr.15829/107/2012.

La apelul nominal, făcut în şedinţă publică, au răspuns:

- apărătorul desemnat din oficiu pentru inculpatul apelant Chiriluţ Cristian Sabin, avocat Tomuleţiu Lavinia în substituirea domnului avocat Vârtei Sergiu;

- apărătorul ales al inculpatului apelant Mărginean Nicolae, avocat Drella Carol Mihăiţă;

- apărătorul ales al inculpaţilor apelanţi Poienar Ana şi Mărginean Rusalin Sorin, avocat Sava Raluca Maria în substituirea doamnei avocat Stan Lacrima;

- apărătorul desemnat din oficiu pentru inculpaţii intimaţi Trifan Florin şi Grozav Eugen Tiberiu, avocat Voicu Diana,

Lipsă fiind părţile.

Procedura de citare este legal îndeplinită.

S-a făcut referatul cauzei, de către grefierul de şedinţă, după care Curtea constată că nu sunt alte cereri de formulat, împrejurare faţă de care acordă cuvântul în dezbateri.

***Apărătorul ales al inculpatului apelant Mărginean Rusalin Sorin , avocat Sava Raluca Maria***, solicită, în temeiul art. 421 pct. 2 lit. a din codul de procedură penală, admiterea apelului, desfiinţarea sentinţei penale atacate pe latură penală şi civilă şi în rejudecare pronunţarea unei noi soluţii, apreciind că raportat la probele administrate hotărârea Tribunalului este nelegală.

Învederează că instanţa l-a condamnat pe inculpat pentru 4 infracţiuni de instigare la înşelăciune şi solicită, raportat la acuzaţia de instigare la înşelăciune, în temeiul art. 396 alin. 5 rap. la art. 16 alin. 1 lit. c, achitarea inculpatului, având în vedere că nu rezultă existenţa unor probe temeinice, directe, că inculpatul ar fi determinat cu intenţie coinculpaţii să săvârşească

Tribunalul Alba
Pentru conformitate
Government Exhibit 1
Page 111 of 266

58

infracțiunea de înșelăciune, în afara declarațiilor coinculpaților. Arată că, coinculpații erau conștienți că se prezintă la bancă și solicită eliberarea unui credit, iar inculpatul Mărginean nu a încercat să-i determine să încheie contracte. Precizează că acești inculpați au fost angajați ca zilieri la societatea inculpatului Mărginean și au fost plătiți, iar în momentul în care au luat decizia accesării creditelor, au solicitat societății eliberarea unor adeverințe. Precizează că la dosar nu există probe din care să rezulte calitatea de participant sub forma instigării, inculpatul doar a eliberat adeverințe în care s-a înscris cumulul veniturilor.

Cu privire la infracțiunea de fals în formă continuată solicită, în temeiul art. 396 alin. 2, să se aibă în vedere condamnarea inculpatului în principal la pedeapsa amenzii, în subsidiar solicită reducerea cuantumului pedepsei astfel încât să fie posibilă suspendarea sub supraveghere, conform art. 91 din noul cod penal, având în vedere că inculpatul a recunoscut că este posibil să fi greșit.

La individualizarea pedepsei solicită să se aibă în vedere criteriile generale de individualizare, gradul de pericol social redus al faptei.

*Apărătorul ales al inculpatei apelante Poienar Ana, avocat Sava Raluca Maria*, solicită, în temeiul art. 421 alin. 2 lit. a din codul de procedură penală, admiterea apelului și rejudecarea hotărârii, având în vedere reindividualizarea judiciară a pedepsei.

Învederează că inculpata a fost condamnată la 1 an închisoare cu suspendarea condiționată a executării pedepsei, dar raportat la poziția inculpatei, la probele administrate, la criteriile generale de individualizare a pedepsei prev. de art. 72 din codul penal, apreciază că pedeapsa aplicată este nejustificat de mare și că se impune aplicarea unei amenzi.

Arată că inculpata a recunoscut că a completat contractele de muncă și adeverințele, dar a făcut acest lucru la cererea administratorului firmei, fără a confrunta și dosarele firmei.

Apreciază că pedeapsa amenzii este suficientă pentru atingerea scopului prevăzut de lege.

Referitor la conduita inculpatei, invocă lipsa antecedentelor penale, împrejurarea că aceasta a regretat săvârșirea faptei și a recunoscut că a dat dovadă de ignoranță.

În ipoteza în care se apreciază că se impune aplicarea pedepsei închisorii, solicită aplicarea unui cuantum mai redus, orientat spre minimul general, ca urmare a reținerii dispozițiilor art. 74 din vechiul cod penal, cu suspendarea condiționată a executării pedepsei.

*Apărătorul desemnat din oficiu pentru inculpatul apelant Chiriluț Cristian Sabin, avocat Tomulețiu Lavinia*, solicită, în temeiul art. 421 alin. 2 lit. a din codul de procedură penală, admiterea apelului, desființarea sentinței penale atacate și în rejudecare, achitarea inculpatului în temeiul art. 16 lit. c din codul de procedură penală.

Arată că din materialul probator rezultă concluzia că inculpatul a avut raporturi de muncă cu societatea condusă de inculpatul Mărginean și,  deși în

2

Tribunalul Alba
Pentru conformitate



faţa instanţei de fond a avut o atitudine oscilantă, apreciază că declaraţia dată ulterior, este una adevărată, e o declaraţie sinceră şi descrie modul în care au decurs lucrurile. Precizează că se face vorbire de existenţa unui contract individual de muncă şi apreciază că la un anumit moment după angajare inculpatului i-a fost prezentat un contract individual de muncă, iar inculpatul nu a fost atent la data contractului semnat, verificând doar salariul, ce coincidea cu ce lua în mână.

În ce priveşte infracţiunea de înşelăciune, arată că nu s-a reuşit din probele administrate dovedirea elementului subiectiv al intenţiei în persoana inculpatului Chiriluţ, care a precizat că la rugăminţile inculpatului Mărginean s-a prezentat pentru angajarea unui credit care trebuia să fie folosit pentru societate, fiind încredinţat de inculpatul Mărginean că ratele vor fi plătite, astfel că nu poate fi reţinută vreo formă de intenţie din partea inculpatului Chiriluţ.

Invocă declaraţia martorului Gurgui aflată la fila 203 şi declaraţia martorului Lăscan aflată la fila 146 din dosarul de fond, care a arătat că câştiga chiar 1200 de euro, aspect ce întăreşte poziţia inculpatului Chiriluţ referitor la suma contractului, care a avut încredere că suma trecută la salariu era cea reală.

Concluzionând, solicită admiterea apelului şi achitarea inculpatului în temeiul art. 16 lit. c. În subsidiar, solicită reindividualizarea pedepsei, dându-se o mai mare eficienţă circumstanţelor personale, împrejurării că inculpatul nu are cazier iar pericolul social nu este unul sporit.

**Apărătorul ales al inculpatului apelant Mărginean Nicolae, avocat Drella Carol Mihăiţă**, solicită admiterea apelului, desfiinţarea hotărârii instanţei de fond şi în rejudecare, achitarea inculpatului în temeiul art. 16 lit. c şi d din codul de procedură penală. Apreciază că în speţă inculpatul nu se face vinovat pentru uz de fals, doar a semnat contractele de muncă şi de credit, cunoscând că creditul era pentru înmânarea lui la Mărginean Rusalin, inculpatul fiind doar o victimă a inculpatului Mărginean Rusalin.

Apreciază că în favoarea inculpatului ar fi trebuit să existe probe în dosarul de urmărire penală, învederând că în primăvara anului 2008 au sesizat în scris organele de urmărire penală cu privire la respectivele infracţiuni reţinute ulterior în sarcina lor. Arată că acele sesizări au fost intitulate plângeri, la momentul respectiv banca începuse executarea silită, dar aceste plângeri nu au fost depuse la dosarul cauzei.

Referitor la infracţiunea de înşelăciune, apreciază că nu se poate reţine intenţia de a înşela banca, inculpatul fiind conştient că acel credit va fi returnat integral.

Concluzionând, solicită admiterea apelului şi achitarea inculpatului.

Depune la dosar concluzii scrise.

**Apărătorul desemnat din oficiu pentru inculpaţii intimaţi Trifan Florin şi Grozav Eugen Tiberiu, avocat Voicu Diana**, solicită respingerea apelului declarat de inculpatul Mărginean Rusalin ca nefondat, apreciind că instanţa de fond judicios a analizat probatoriul, a avut în vedere situaţia de fapt concretă şi corect a dispus condamnarea acestuia.



Cu privire la apelurile celorlalţi inculpaţi arată că lasă soluţia la aprecierea instanţei.

Referitor la apelul părţii civile solicită respingerea lui ca nefondat.

***Apărătorul ales al inculpaţilor apelanţi Mărginean Rusalin şi Poienar Ana, avocat Sava Raluca Maria***, raportat la motivele de apel formulate de inculpatul Chiriluţ, solicită respingerea apelului declarat de acest inculpat, apreciind că susţinerile apelului contravin celor susţinute de ei. Referitor la apelul inculpatului Mărginean Nicolae, raportat la starea de fapt, de inducere în eroare a unei bănci, arată că din declaraţiile angajaţilor băncii rezultă că normele bancare au fost respectate, că inculpaţii s-au prezentat la bancă, învederând că discuţiile dintre coinculpaţi şi inculpatul Mărginean s-au circumscris în zona unor împrumuturi, acesta din urmă angajându-se să plătească ratele, achitând ratele de unde rezultă că nu se poate vorbi că nu au avut cunoştinţă de ce se va întâmpla. Învederează că inculpatul Mărginean a spus doar că le va da acele adeverinţe de salariu cu privire la sumele cumulate, nu i-a instigat. Solicită respingerea apelului părţii civile ca nemotivat.

***Apărătorul desemnat din oficiu pentru inculpatul apelant Chiriluţ Cristian Sabin, avocat Tomuleţiu Lavinia***, referitor la apelurile declarate de inculpaţii Mărginean Rusalin şi Poienar Ana solicită respingerea lor, apreciind că soluţia a fost corectă şi judicioasă.

Cu privire la apelul inculpatului Mărginean Nicolae solicită admiterea lui.

Referitor la apelul părţii civile solicită respingerea ca nefondat, nesusţinut, nemotivat.

***Apărătorul ales al inculpatului apelant Mărginean Nicolae, avocat Drella Carol Mihăiţă***, solicită respingerea apelurilor declarate de inculpaţii Mărginean Rusalin şi Poienar Ana ca nefondate şi a apelului declarat de partea civilă ca nemotivat. Solicită admiterea apelului declarat de inculpatul Chiriluţ.

***Reprezentanta Ministerului Public*** solicită respingerea ca nefondate a apelurilor declarate în cauză şi menţinerea hotărârii instanţei de fond, pe care o apreciază ca legală şi temeinică.

Cu privire la solicitarea inculpatului Mărginean Rusalin de a fi achitat arată că există probe suficiente ce dovedesc împrejurarea că a fost cel care a instigat inculpaţii să contracteze credite bancare folosind sumele de bani obţinute din aceste credite. Învederează că faptele sunt dovedite şi cu declaraţiile coinculpaţilor şi ale martorilor audiaţi în cauză, din care rezultă că inculpatul Mărginean Rusalin obişnuia să procedeze în acest mod. Invocă în acest sens declaraţiile martorilor Grigore Cosmin, Chiriluţ Ileana, Făcăleţ.

Precizează că inculpata Poienar Ana a arătat că la solicitarea inculpatului Mărginean Rusalin a eliberat adeverinţele.

Referitor la susţinerea că atât câştigau inculpaţii, arată că aceasta nu poate fi primită, în cauză existând state de plată şi că nu s-a dovedit că aceştia câştigau mai mult. Arată că există expertiza grafoscopică din care rezultă că semnăturile aparţin inculpaţilor Poienar Ana, Mărginean Rusalin şi celorlalţi coinculpaţi.

4

EXT-MARGINEAN-00069

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 114 of 266

Cu privire la infracţiunea de fals arată că a fost recunoscută de inculpatul Mărginean Rusalin, inclusiv inculpata Poienar Ana a precizat că el a solicitat întocmirea adeverinţelor în care au fost eliberate.

Învederează că inculpata Poienar a recunoscut întocmirea adeverinţelor şi apreciază că pedeapsa nu trebuie reindividualizată, precizând că aceasta mai are o condamnare pentru înşelăciune şi evaziune fiscală cu suspendarea condiţionată a executării pedepsei. Apreciază că pedeapsa a fost bine individualizată.

Referitor la ceilalţi inculpaţi arată că nici solicitările lor de achitare nu pot fi acceptate deoarece cunoşteau că nu realizau veniturile consemnate în actele folosite la bancă şi au recunoscut că au luat credite la solicitarea inculpatului Mărginean Rusalin.

Precizează că inculpatul Chiriluţ a fost supus la testul poligraf şi a declarat că cunoştea faptul că nu poate obţine credit dacă prezintă adeverinţa cu veniturile obţinute, iar la întrebările esenţiale s-a stabilit că inculpatul Chiriluţ declară adevărul, de unde rezultă că cunoştea de ce a fost eliberat creditul.

Apreciază că există probe şi nu se poate dispune achitarea inculpaţilor.

Referitor la solicitarea de reindividualizare a pedepsei aplicate inculpatului Chiriluţ învederează că pedepsele sunt în cuantum minim, iar circumstanţele atenuante nu au fost dovedite.

Cu privire la apelul părţii civile solicită respingerea lui, învederând că acesta nu a fost motivat dar crede că vizează pretenţiile care le-au fost respinse. Precizează că celelalte credite nu fac obiectul prezentei cauze, se referă la creditele contractate anterior de inculpatul Mărginean Rusalin şi nu fac obiectul prezentei cauze.

### CURTEA DE APEL

În temeiul art. 391 alin. 1 din codul de procedură penală va stabili termen de pronunţare la data de 19 martie 2015.

*Pentru aceste motive,*
*În numele legii,*
*D I S P U N E:*

Stabileşte termen de pronunţare la data de 19 martie 2015.
Pronunţată în şedinţa publică din 4 martie 2015.

*Preşedinte,*
**Gheorghe Liviu Odagiu**

*Judecător,*
**Alexandra Iuliana Paştiu**

*Grefier,*
**Cornelia Maria Neag**

Government Exhibit 1
Page 115 of 266

Dosar nr. 15829/107/2012



R O M Â N I A

CURTEA DE APEL ALBA IULIA
SECTIA PENALA SI PENTRU CAUZE CU MINORI

*DECIZIA PENALĂ Nr. 314/A/2015*
Şedinţa publică de la 19 Martie 2015
Completul compus din:
PREŞEDINTE Gheorghe Liviu Odagiu
Judecător Alexandra Iuliana Pastiu
Grefier Cornelia Maria Neag

Ministerul Public – Parchetul de pe lângă Curtea de Apel Alba Iulia este reprezentat de procuror Adela Pleşa.

Pe rol fiind pronunţarea soluţiei în cauza penală cu numărul de mai sus privind apelurile declarate de partea civilă Alpha Bank România S.A. Şi de inculpaţii Mărginean Rusalin Sorin, Chiriluţ Cristian Sabin, Mărginean Nicolae Şi Poienar Ana împotriva sentinţei penale nr.577/13.10.2014, pronunţată de Tribunalul Alba,în dosarul nr.15829/107/2012.

Mersul dezbaterilor şi susţinerile părţilor au fost consemnate în încheierea pronunţată în şedinţa publică din 4 martie 2015, când s-a stabilit termen de pronunţare la data de 19 martie 2015, încheiere care face parte integrantă din prezenta decizie.

*CURTEA DE APEL*
*Deliberând asupra apelurilor penale de faţă, constată următoarele:*



Prin sentinţa penală nr. 577 din 13.10.2014, pronunţată de Tribunalul Alba în dosarul nr. 15829/107/20142, în baza art.386 C.pr.pen. s-a dispus schimbarea încadrării juridice a faptei de instigare la înşelăciune prev. de art.25 C.pen. din 1969 rap. la art.215 alin.1-3 şi 5 C.pen. din 1969 comb. cu art.75 lit.a C.pen. din 1969 şi 41 alin2 C.pen. din 1969 (7 acte materiale) în 4 infracţiuni de instigare la înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 şi art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)şi din infracţiunea prev. de art.290 C.penal din 1969 comb. cu art.41 alin.2 C.penal din 1969 (14 acte materiale) în infracţiunea de fals în înscrisuri sub semnătură privată în formă continuată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Rusalin Sorin.

A fost condamnat inculpatul **MĂRGINEAN RUSALIN SORIN** - fiul lui Rusalin şi Olimpia, născut la data de 16.02.1972~~în~~ Cugir, jud. Alba,

1

Government Exhibit 1
Page 116 of 266

CNP 1720216013541 domiciliat în comuna Săliştea, sat Săliştea Deal, nr.39A, jud. Alba, f.f.l. în com. Săliştea, sat Tărtăria, str. Florilor, nr.54, jud. Alba, cetăţean român, studii: şcola profesională, conducător auto, căsătorit, fără antecedente penale, la:

- 1 an şi 8 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 şi art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen);

- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian)

- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune infracţiunii prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Mărginean Nicolaie)

- 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic.art.35 alin.1 şi art.5 C.penal (2 acte materiale- subiect pasiv Trifan Florin)

- 1 an închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal s-au contopit aceste pedepse în pedeapsa cea mai grea de 1 an şi 8 luni închisoare la care s-a adăugat sporul de 1 an şi 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **3 ani şi 6 luni închisoare.**

În baza art.112 lit.e C.penal s-a dispus confiscarea sumei de 26.000 euro de la inculpatul Mărginean Rusalin Sorin.

În baza art.386 C.pr.pen. s-a dispus schimbarea încadrării juridice a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal  şi din infracţiunea prev. de art.291 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal cu privire la inculpatul Chiriluţ Cristian Sabin.

A fost condamnat inculpatul **CHIRILUŢ CRISTIAN SABIN** - fiul lui Sabin şi Emilia, născut la data de 17.09.1974 în Cugir, jud. Alba, CNP 1740917013528 domiciliat în Cugir, str. Râul Mic, nr.106, jud. Alba, cetăţean român, studii: 10 clase, conducător auto, căsătorit, 3 copii minori, fără antecedente penale, la :

- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.

- 6 luni închisoare pentru săvârşirea infracţiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal au fost contopite aceste pedepse în pedeapsa cea mai grea de 1 an închisoare la care s-a adăugat sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 2 luni închisoare.**

2

Government Exhibit 1
Page 117 of 266

În baza art.91 C.penal s-a dispus suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi a fost stabilit un termen de supraveghere de 2 ani conform dispoziţiilor art.92 C.penal.

Instanţa a dispus ca, pe perioada termenului de supraveghere, inculpatul să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probaţiune desemnat cu supravegherea sa;

c) să anunţe, în prealabil, schimbarea locuinţei şi orice deplasare care depăşeşte 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informaţii şi documente de natură a permite controlul mijloacelor sale de existenţă;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probaţiune sau organizat în colaborare cu instituţii din comunitate.

În temeiul art.93 alin.3 C.penal a impus inculpatul obligaţia de a desfăşura pe durata termenului de supraveghere o muncă neremunerată în folosul comunităţii, pe o perioadă de 60 zile, în condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal s-a atras atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

În baza art.112 lit.e C.penal s-a dispus confiscarea sumei de 4.000 euro de la inculpatul Chiriluţ Cristian Sabin.

În baza art.386 C.pr.pen. s-a dispus schimbarea încadrării juridice a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 în infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal şi din infracţiunea prev. de art.291 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.5 C.penal. cu privire la inculpatul Mărginean Nicolaie.

A fost condamnat inculpatul **MĂRGINEAN NICOLAIE** (nume anterior Mărginean Gherman) - fiul lui Nicolaie şi Alionescu Dorica, născut la data de 09.07.1975 în Cugir, jud. Alba, CNP 1750709013529 domiciliat în com. Săliştea, str. Mică, nr.171, jud. Alba, cetăţean român, studii: generale, necăsătorit, fără antecedente penale, la:

- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.

- 6 luni închisoare pentru săvârşirea infracţiunii prev. de art.323 C.penal cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal au fost contopite aceste pedepse în pedeapsa cea mai grea de 1 an închisoare la care s-a adăugat sporul de 2 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 2 luni închisoare.**

Government Exhibit 1
Page 118 of 266

În baza art.91 C.penal s-a dispus suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și a fost stabilit un termen de supraveghere de 2 ani conform dispozițiilor art.92 C.penal.

Instanța a dispus ca, pe perioada termenului de supraveghere, inculpatul să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;

c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal a impus inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal s-a atras atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

În baza art.386 C.pr.pen. s-a dispus schimbarea încadrării juridice a faptei de înșelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba); infracțiunea de înșelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.); din infracțiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracțiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal.; din infracțiunea prev. de art.290 C.penal din 1969 în infracțiunea de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal cu privire la inculpatul Trifan Florin.

A fost condamnat inculpatul **TRIFAN FLORIN** - fiul lui Emil și Ana, născut la data de 15.03.1979 în Cugir, jud. Alba, CNP 1790315011122 domiciliat în comuna Săliștea, str. Joseni, nr.459, jud. Alba, cetățean român, studii: generale, muncitor necalificat, necăsătorit, fără antecedente penale, la :

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba);

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.);

- 6 luni închisoare pentru săvârșirea infracțiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal

4

Government Exhibit 1
Page 119 of 266

- 6 luni închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată prev. de art.322 cu aplic. art.5 C.penal.

În baza art. 39 alin.1 lit.b C.penal au fost contopite aceste pedepse în pedeapsa cea mai grea de 1 an închisoare la care s-a adăugat sporul de 8 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an şi 8 luni închisoare.**

În baza art.91 C.penal s-a dispus suspendarea executării pedepsei sub supravegherea Serviciului de Probaţiune de pe lângă Tribunalul Alba şi a fost stabilit un termen de supraveghere de 2 ani conform dispoziţiilor art.92 C.penal.

Instanţa a dispus ca, pe perioada termenului de supraveghere, inculpatul să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal şi art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probaţiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probaţiune desemnat cu supravegherea sa;

c) să anunţe, în prealabil, schimbarea locuinţei şi orice deplasare care depăşeşte 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informaţii şi documente de natură a permite controlul mijloacelor sale de existenţă;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probaţiune sau organizat în colaborare cu instituţii din comunitate.

În temeiul art.93 alin.3 C.penal a impus inculpatului obligaţia de a desfăşura pe durata termenului de supraveghere o muncă neremunerată în folosul comunităţii, pe o perioadă de 60 zile, în condiţiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliştea sau Primăria oraşului Cugir.

În baza art.91 alin.4 C.penal s-a atras atenţia inculpatului asupra dispoziţiilor art.96 şi art.97 C.penal.

În baza art.386 C.pr.pen. s-a dispus schimbarea încadrării juridice a faptei de înşelăciune prev. de art.215 alin.1-3 C.pen. din 1969 comb. cu art.41 alin.2 C.penal din 1969 în infracţiunea de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeş); din infracţiunea prev. de art.291 cu aplic. art.41 alin.2 C.penal din 1969 în infracţiunea de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal. cu privire la inculpatul Grozav Eugen Tiberiu.

A fost condamnat inculpatul **GROZAV EUGEN TIBERIU** - fiul lui natural şi Ileana, născut la data de 10.01.1978 în Cugir, jud. Alba, CNP 1780110010017 domiciliat în comuna Săliştea, sat Săliştea Deal, nr.83, jud. Alba, cetăţean român, fără ocupaţie, necăsătorit, fără antecedente penale, la :

- 1 an închisoare pentru săvârşirea infracţiunii de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BCR SA);

5

Government Exhibit 1
Page 120 of 266

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv- BRD Groupe Societe Generale);

- 1 an închisoare pentru săvârșirea infracțiunii de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-Alpha Bank-Sucursala Sebeș);

- 6 luni închisoare pentru săvârșirea infracțiunii de uz de fals prev. de art.323 C.penal cu aplic. art.35 alin.1 și art.5 C.penal

În baza art. 39 alin.1 lit.b C.penal au fost contopite aceste pedepse în pedeapsa cea mai grea de 1 an închisoare la care s-a adăugat sporul de 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **1 an și 10 luni închisoare.**

În baza art.91 C.penal s-a dispus suspendarea executării pedepsei sub supravegherea Serviciului de Probațiune de pe lângă Tribunalul Alba și a fost stabilit un termen de supraveghere de 2 ani conform dispozițiilor art.92 C.penal.

Instanța a dispus ca, pe perioada termenului de supraveghere, inculpatul să respecte următoarele măsuri de supraveghere prev. de art.93 alin.1 lit.a –e C.penal și art.93 alin.2 lit.b) C.penal:

a) să se prezinte la Serviciul de Probațiune de pe lângă Tribunalul Alba, la datele fixate de acesta;

b) să primească vizitele consilierului de probațiune desemnat cu supravegherea sa;

c) să anunțe, în prealabil, schimbarea locuinței și orice deplasare care depășește 5 zile;

d) să comunice schimbarea locului de muncă;

e) să comunice informații și documente de natură a permite controlul mijloacelor sale de existență;

f) să frecventeze un program de reintegrare socială derulat de către serviciul de probațiune sau organizat în colaborare cu instituții din comunitate.

În temeiul art.93 alin.3 C.penal a impus inculpatului obligația de a desfășura pe durata termenului de supraveghere o muncă neremunerată în folosul comunității, pe o perioadă de 60 zile, în condițiile art. 52 din Legea nr. 253/2013 în cadrul Primăriei comunei Săliștea sau Primăria orașului Cugir.

În baza art.91 alin.4 C.penal s-a atras atenția inculpatului asupra dispozițiilor art.96 și art.97 C.penal.

A fost condamnată inculpata **POIENAR ANA** – fiica lui Busuioc și Motrea, născută la data de 25.08.1979 în Cugir, jud. Alba, CNP 2790825013527 domiciliată în comuna Săliștea, sat Săliștea Deal, nr.39, jud. Alba, cetățean român, studii: 10 clase, fără ocupație, necăsătorită, cu antecedente penale, la pedeapsa de 1 an închisoare pentru complicitatea la infracțiunea de fals în înscrisuri sub semnătură privată prev. de art.26 rap. la art.290 C.penal din 1969 în cond. art.41 alin.2 C.penl din 1969 și art.5 C.pen.

S-a interzis inculpatei exercitarea, pe durata prevăzută de art.71 C.penal din 1969, a drepturilor prevăzute de art.64 lit.a teza a II-a și lit.b C.penal din 1969.

EXT-MARGINEAN-00076

În baza art. 81 Cod penal din 1969 şi art. 71 al. 5 Cod penal din 1969 s-a dispus suspendarea condiţionată a executării pedepsei principale şi a celei accesorii pe durata unui termen de încercare de 3 ani stabilit conform art. 82 Cod penal din 1969.

S-a atras atenţia inculpatei asupra dispoziţiilor art. 83 Cod penal din 1969.

În baza art.580 C.pr.pen. s-a dispus anularea următoarelor înscrisuri: adeverinţa de salariu nr.70/04.12.2007, contractul de muncă nr.21/03.05.2007, contractul de muncă nr.24/02.07.2007, adeverinţa de salariu nr.112/04.01.2008, contractul de muncă nr.19/01.02.2007, adeverinţa de salariu nr.214/21.05.2008, adeverinţa de salariu nr.219/26.05.2008, adeverinţa de venit nr.215/21.05.2008, adeverinţa de salariu f.n privind pe inculpatul Trifan Florin, contractul de muncă nr.29/03.05.2007, adeverinţa de venit nr.230/03.06.2008, adeverinţa de venit nr.232/04.06.2008, adeverinţa de venit nr.233/19.06.2008.

Instanţa a constatat că persoanele vătămate BRD GROUPE SOCIETE GENERALE cu sediul în Bucureşti, b-dul Ion Mihalache, nr.1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL cu sediul în Bucureşti, str. Matei Milo, nr.9, sector 1 nu s-au constituit părţi civile în cauză.

În baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen a fost admisă în parte acţiunea civilă formulată de partea civilă ALPHA BANK ROMÂNIA SA cu sediul în Bucureşti, Calea Dorobanţilor, nr.237 B, sector 1 şi în consecinţă au fost obligaţi inculpaţii Grozav Eugen la plata sumei de 57.345,65 lei şi Trifan Florin la plata sumei de 16.033,93 euro cu titlu despăgubiri. A fost respinsă acţiunea civilă formulată împotriva inculpatului Mărginean Rusalin Sorin.

În baza art.397 alin.1 C.pr.pen.rap. la art.25 alin.1 şi art.19 alin.5 C.pr.pen a fost admisă acţiunea civilă formulată de partea civilă KRUK INTERNAŢIONAL SRL cu sediul în Bucureşti, Splaiul Independenţei, nr.319 O.B. 152, parter, sector 6 şi în consecinţă a fost obligat inculpatul Trifan Florin la plata în favoarea părţii civile a sumei de 30066,87 lei (6904,94 euro) cu titlu despăgubiri.

În baza art.274 alin.1 C.pr.pen. au fost obligaţi inculpaţii Chiriluţ Cristian, Mărginean Nicolaie, Trifan Florin, Poienar Ana şi Grozav Eugen, fiecare, la plata sumei de 2100 lei şi inculpatul Mărginean Rusalin la plata sumei de 2200 lei cu titlu cheltuieli judiciare avansate de stat în cauză.

**Pentru a pronunţa această hotărâre, Tribunalul a reţinut următoarele :**

În fapt, în perioada 2006-2008, inculpatul Mărginean Rusalin Sorin a deţinut calitatea de administrator şi asociat unic la S.C. SORY EXPRES S.R.L. Tărtăria, firmă ce avea ca obiect principal de activitate transporturi.

Dat fiind faptul că societatea se afla într-o situaţie financiară precară, inculpatul, în scopul obţinerii unor sume de bani necesare finanţării activităţii, a apelat la angajaţi şi la zilierii care lucrau la firma sa, dar şi la alte persoane care nu aveau legătură cu societatea, cerându-le să contracteze în nume propriu credite bancare, iar banii ridicaţi să-i pună la dispoziţie, dându-le asigurări că va

7

întocmi întreaga documentație, implicit, că va achita ratele aferente împrumuturilor; în realitate, inculpatul nu a avut niciodată intenția să restituie creditele, ca dovadă faptul că, după ce a intrat în posesia sumelor de bani, a renunțat la angajați, desfăcându-le contractul de muncă, ori a refuzat să-i mai angajeze; de asemenea, exceptând două credite, care au fost achitate anticipat prin refinanțare, în celelalte cazuri, fie s-au achitat primele 2-3 rate, fie nu s-a efectuat vreo plată.

În baza promisiunilor ce li s-au făcut și în considerarea faptului că activitățile prestate la S.C. SORY EXPRES S.R.L. le asigurau singura sursă de venit, inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu au acceptat să contracteze credite de la bancă, deși, erau conștienți de faptul că nu îndeplinesc cerințele de solvabilitate, ultimii trei inculpați, nefiind nici măcar angajați.

În această activitate infracțională, a fost implicată și inculpataPoienar Ana, care lucra în calitate de director la S.C. SORY EXPRES S.R.L. și era cumnată cu inculpatul Mărginean Rusalin Sorin, între cei doi, existând și o relație extraconjugală. În concret, inculpata a completat contractele de muncă și adeverințele de salariu, prin care se atesta fictiv calitatea de angajat și realizarea de venituri salariale, documente ce erau semnate de conformitate de către inculpatul Mărginean Rusalin Sorin, în calitatea sa de administrator. În mod distinct, s-a mai reținut că, pe adeverințele de venit cei doi inculpați au contrafăcut semnătura numitei Lupu Vasilca Crinela, persoană care conducea evidența contabilă la S.C. SORY EXPRES S.R.L.

De asemenea, în vederea realizării scopului infracțional urmărit, inculpatul Mărginean Rusalin Sorin era cel care a confirmat telefonic funcționarilor bancari corectitudinea datelor înscrise pe adeverințele de venit.

Astfel, în perioada decembrie 2007- iunie 2008 au fost contractate un număr de 7(șapte) credite bancare, după cum urmează:

Inculpatul Chiriluț Cristian Sabin a lucrat la S.C. SORY EXPRES S.R.L. în calitate de conducător auto în perioada 3.11.2007-16.04.2008, beneficiind de un salariu de 560 lei, conform contractului de muncă nr. 5/03.11.2007, înregistrat la I.T.M. Alba sub nr. 50.014423/03.12.2007. La scurt timp de la angajare, inculpatul Mărginean i-a solicitat acestuia, să contracteze un credit de 15.000 EUR de la B.C.R., iar banii să-i remită lui, sub pretextul că firma are de achitat mai multe datorii; inculpatul Chiriluț a acceptat, cu condiția ca, parte din credit, respectiv, suma de 4.000 EUR să-i revină lui.

Pentru obținerea creditului, inculpata Poienar a întocmit o copie a contractului de muncă, în care a menționat ireal că titularul desfășoară activitate în cadrul firmei din data de 03.05.2007 și are un salariu de bază brut lunar de 1.830 lei, înscris ce a fost semnat de către inculpatul Mărginean, ca fiind conform cu originalul. De asemenea, a fost întocmită și adeverința de salariu nr. 70 din 04.12.2007 ce atesta fictiv faptul că inculpatul Chiriluț Cristian Sabin a obținut venituri lunare de 3.200 lei în perioada august-octombrie 2007.

La data de 04.12.2007, inculpații Mărginean și Chiriluț s-au prezentat la B.C.R.- Agenția Cetate, iar aici inculpatul Mărginean Rusalin Sorin, având

8



asupra sa cele două documente, le-a prezentat personal ofiţerului de credite Vesi Ionuţa Elisabeta, cu care se cunoştea. În aceiaşi zi, după aprobarea creditului, a fost întocmit contractul nr. 2007186981, pe o perioadă de 10 ani, iar în ziua următoare, inculpatul Chiriluţ a ridicat din bancă suma de 15.000 EUR. Conform înţelegerii avute, i-a predat inculpatului Mărginean suma de 11.000 EUR, iar pentru a avea o garanţie că acesta îşi va onora promisiunea de rambursare a creditului, a solicitat întocmirea unui act de împrumut, înscris ce a fost redactat de către inculpata Poienar şi semnat de ambii inculpaţi.

În perioada anului 2008, au fost efectuate 3 plăţi de rambursare a creditului, după cum urmează: în 06.02.2008 şi în 26.02.2008 s-a achitat 237 EUR, respectiv, 260 EUR  de către inculpata Poienar Ana, iar în data de 30.10.2008 s-a achitat de către inculpatul Chiriluţ suma de 200 EUR, după care, nu s-a mai efectuat nicio plată.

Creanţa datorată băncii de inculpatul Chiriluţ  Cristian Sabin a fost cesionată către DDM EUROPE AG, cu administrator active CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucureşti, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat  că nu se constituie parte civilă în cauză.

În urma expertizării grafice a documentelor prezentate la bancă, a contractului de muncă al inculpatului Chiriluţ înregistrat la I.T.M. Alba sub nr. 5/03.11.2007 şi a înscrisului olograf datat cu 05.12.2007- s-au formulat următoarele concluzii:

• semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 5/03.11.2007, nu a fost depusă de inculpatul Chiriluţ; în schimb, semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 21/03.05.2007 (prezentat la B.C.R.) a fost probabil depusă de susnumit.

• semnăturile depuse la rubrica Angajator, pe pagina 4 a celor două contracte de muncă  au fost probabil depuse de inculpatul Mărginean Rusalin Sorin,  iar semnăturile de conformitate cu originalul  au fost depuse de acest inculpat;

• scrisul depus pe cele două contracte de muncă a fost probabil executat de inculpata Poienar Ana;

• semnătura depusă pe adeverinţa de venit nr. 70/04.12.2007, la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Grinela; scrisul a fost depus de inculpata Poienar Ana;

• semnăturile de pe înscrisul olograf datat cu 05.12.2007 aparţin titularilor, respectiv, inculpaţii Mărginean Rusalin Sorin şi Chiriluţ Cristian Sabin, iar scrisul a fost depus de inculpata Poienar Ana.

În cursul lunii ianuarie 2008, inculpatul Mărginean Rusalin Sorin, cunoscând faptul că inculpatul Mărginean Nicolaie este interesat să-şi găsească un loc de muncă, i-a propus să lucreze la firma sa, S.C. SORY EXPRES S.R.L.; ulterior, la câteva zile, inculpatul invocând problemele cu care se confrunta firma sa, i-a solicitat inculpatului Mărginean Nicolaie să-l ajute financiar prin

9

Government Exhibit 1
Page 124 of 266

contractarea unui credit, promițându-i în schimb că va achita ratele la credit și totodată o să-l angajeze la firma sa. Pe baza asigurărilor primite, inculpatul Mărginean Nicolaie a acceptat, sens în care a predat cartea sa de identitate, cu ajutorul căreia a fost întocmită în fals, documentația pentru bancă: astfel, s-a completat în fals un contract de muncă nr. 24/02.07.2007, cu nr. de înregistrare ITM 10.196.076/03.07.2007, prin care s-a menționat ireal că inculpatul Mărginean Nicolaie este angajat al firmei în funcția de conducător auto și are un salariu de bază brut lunar de 1.200 lei; de asemenea, a fost întocmită și adeverința de salariu nr. 112/04.01.1008, prin care se atesta că inculpatul Mărginean Nicolaie a obținut venituri lunare de 3.024 lei în perioada septembrie –noiembrie 2007.

La data de 04.01.2008, inculpatul Mărginean Rusalin Sorin l-a însoțit pe inculpatul Mărginean Nicolaie la B.C.R. agenția Cetate, iar aici, a apelat din nou la funcționara Vesi Ionuța Elisabeta în vederea întocmirii contractului de credit, predându-i documentele întocmite în fals. În urma aprobării cererii de creditare pentru suma de 15.000 EUR, a fost încheiat contractul de credit nr. 20081615 pe o perioadă de 10 ani, iar inculpatului Mărginean Nicolaie i s-a eliberat suma aferentă creditului. Banii au fost predați integral inculpatului Mărginean Rusalin Sorin.

La data de 26.02.2008, inculpata Poienar a achitat suma de 300 EUR la B.C.R. reprezentând prima rată a creditului, iar ulterior nu s-a mai efectuat nicio plată. În atare situație, creditul a fost cesionat de bancă la CREDITEXPRESS FINANCIAL SERVICES S.R.L. București, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat că nu se constituie parte civilă în cauză.

Concluziile formulate în raportul de expertiză grafică cu referire la documentele prezentate la bancă în acest caz, stabilesc următoarele:
• semnătura existentă la rubrica Salariat de pe pagina 4 a contractului individual de muncă nr. 24/02.07.2007, a fost probabil depusă de inculpatul Mărginean Nicolaie; semnătura depusă la rubrica Angajator, pe pagina 4 a contractului de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de același învinuit;
• scrisul depus pe contractul de muncă a fost probabil executat de inculpata Poienar Ana;
• semnătura depusă pe adeverința de venit nr. 112/04.01.2008, la rubrica Director General, a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Crinela; scrisul a fost depus de inculpata Poienar Ana.

În cursul lunii mai 2008, inculpatul Mărginean Rusalin Sorin a apelat și la inculpatul Trifan Florin, persoană care lucra ca zilier la firma sa, solicitându-i să-l ajute cu bani, prin aceeași modalitate, respectiv, contractarea a două credite bancare. În baza asigurărilor primite că nu va fi vreo problemă privind restituirea creditelor, inculpatul Trifan a acceptat să contracteze cele

două împrumuturi, sens în care a predat cartea sa identitate, în vederea întocmirii documentației necesare pentru bănci.

Astfel, la data de 21.05.2008, inculpatul Trifan urmând instrucțiunile date de inculpatul Mărginean, s-a prezentat la sediul sucursalei ALPHA BANK Alba Iulia, unde a prezentat funcționarului bancar, o xerocopie a contractului de muncă, nr. 19/01.02.2007 (50.015.780/02.02.2007) și 2 (două) adeverințe de venit cu nr. 214/21.05.2008 și nr. 219/26.05.2008, prin care se atesta fictiv că este angajat la S.C. SORY EXPRES S.R.L., în funcția de conducător auto, începând cu data de 01.02.2007, cu un salariu brut lunar de 1.845 lei, iar în perioada ultimelor trei luni, a realizat venituri lunare de 3.660 lei, din care, 1.320 lei reprezintă salariu, iar diferența diurnă. Ori, inculpatul nu numai că nu era angajat cu contract de muncă, dar nici măcar nu deținea permis de conducere pentru vreo categorie de autovehicule și, prin urmare, nu putea să profeseze ca șofer.

Potrivit normelor de lucru ale băncii, inculpatul Trifan Florin a completat olograf un angajamentul de plată, în care a menționat faptul că lucrează de 2 (doi) ani în cadrul firmei, în calitate de conducător auto, dându-și totodată consimțământul, să i se rețină din salariu ratele de credit, în caz de neplată. Pe baza acestor înscrisuri a fost aprobată cererea de creditate pentru suma de 15.000 EUR și s-a întocmit contractul de credit nr. 0588299, pe o perioadă de 10 ani. Inculpatul Trifan a predat integral suma ridicată din bancă inculpatul Mărginean împreună cu graficul de rambursare a creditului.

În perioada următoare nu s-a achitat nici o rată la credit, situație în care ALPHA BANK Sucursala Alba Iulia s-a constituit parte civilă cu suma de 16.033,93 EUR.

Concluziile formulate în raportul de expertiză grafică cu referire la documentele prezentate la bancă în acest caz, stabilesc următoarele:

• semnătura existentă la rubrica Salariat, pe pagina 4 a contractului individual de muncă nr. 19/01.02.2007, nu a fost depusă de inculpatul Trifan Florin; semnătura depusă la rubrica Angajator, pe pagina 4 a contractului de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de același învinuit;

• scrisul depus pe contractul de muncă a fost probabil executat de inculpata Poienar Ana;

• semnătura depusă pe adeverința de venit nr. 214/21.05.2008, la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil a fost probabil depusă de Lupu Vasilica Crinela ; scrisul a fost depus de inculpata Poienar Ana.

Ulterior, în data de 23.05.2008, inculpatul Trifan Florin prin același mod de operare, a contractat un nou credit de nevoi personale în cuantum de 4.900 EUR de la B.C.R. Agenția Sebeș, pe o perioadă de 10 ani, conform contractului nr. 2008398954. La obținerea creditului a fost prezentată o fotocopie a contractului de muncă nr. 19/01.02.2007 (50.015.780/02.02.2007), similară cu cea folosită anterior, semnată pe fiecare pagină de administratorul societății ca fiind conformă cu originalul, precum și 2 (două) adeverințe de venit

11

Government Exhibit 1
Page 126 of 266

cu nr. 215/21.05.2008 şi f.n., prin care se atestă că, în perioada ianuarie-martie 2008, a obţinut venituri salariale lunare de 1.980 lei şi diurne de 660 lei. Şi de această dată, suma încasată de la bancă cu titlu de credit, a fost predată inculpatului Mărginean Rusalin Sorin împreună cu graficul de rambursare a creditului.

În perioada următoare, nefiind achitată nici o rată, creditul a fost cesionat către ERSTE GROUP, iar subsecvent, societăţii SECAPITAL S.a. R.L., având ca administrator active KRUK INTERNAŢIONAL SRL Bucureşti, care s-a constituit parte civilă cu suma de 25.643,92 lei, actualizată cu dobânzile şi penalităţile aferente până la data efectivă a plăţii.

Expertiza grafică a documentelor depuse la bancă a evidenţiat următoarele:

• semnăturile de conformitate cu originalul de pe xerocopia contractului de muncă nr. 50.015.780/02.02.2007 au fost depuse de inculpatul Mărginean Rusalin Sorin, iar scrisul olograf de sub menţiunea „Conform cu originalul" de pe fiecare pagină a fost executat de inculpata Poienar Ana;

• semnătura depusă pe adeverinţa de venit nr. 215/21.05.2008, la rubrica Director General a fost depusă probabil de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Director economic nu a fost depusă de Lupu Vasilica Crinela ; scrisul olograf a fost depus de inculpata Poienar Ana;

• semnătura depusă pe adeverinţa f.n., la rubrica Director General a fost depusă de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil nu a fost depusă de Lupu Vasilica Crinela; scrisul olograf de pe adeverinţa f.n. a fost depus de inculpata Poienar Ana.

Pentru a face rost de bani prin aceiaşi metodă, inculpatul Mărginean Rusalin Sorin a apelat şi la vărul său, inculpatul Grozav Eugen Tiberiu, plecat în Portugalia din anul 2001 şi, care, în vara anului 2008 a revenit în ţară pentru o scurtă perioadă de timp. Sub pretextul că doreşte să-l angajeze ca şofer la societatea sa, inculpatul Mărginean i-a solicitat acestuia să contracteze un credit bancar, motivând că are nevoie de bani pentru a acoperi eventualele daune în cazul producerii unor accidente auto; de asemenea, s-a angajat să ramburseze toate ratele la credit. În acele condiţii, inculpatul Grozav i-a precizat că nu posedă permis de conducere, la care, inculpatul Mărginean i-a replicat că nu-i o problemă, întrucât, totul se rezolvă. Pentru a fi credibil, inculpatul Mărginean i-a solicitat să semneze o coală în alb, care avea aplicată în partea de jos parafa firmei, motivând că, ulterior, va completa toate datele necesare contractului de muncă. Deşi avea propriile suspiciuni cu privire la valabilitatea actului de angajare şi era conştient de faptul că nu îndeplineşte condiţiile de solvabilitate pentru a angaja credite bancare - inculpatul Grozav a acceptat să dea curs acestor solicitări, contractând un număr de trei credite.

Iniţial, la data de 04.06.2008, inculpatul Grozav Eugen Tiberiu a contractat un credit de 10.000 EUR de la B.C.R. Agenţia Sebeş, sens în care, a prezentat actele puse la dispoziţie de vărul său, respectiv, contractul de muncă nr. 29/03.05.2007 (50.014.655/04.05.2007), în fotocopie şi adeverinţa de venit nr. 230/03.06.2008, prin care se atesta în fals că este angajat în calitate de



12

EXT-MARGINEAN-00082

conducător auto la SC SORY EXPRES SRL și realizează venituri nete lunare de 3.118 lei. Cu acea ocazie a fost încheiat contractul nr. 2008438664 pe o perioadă de 120 luni, iar banii ridicați din bancă, au fost predați în totalitate inculpatului inculpatul Mărginean Rusalin Sorin.

La aceeași dată, inculpatul Grozav s-a deplasat și la BRD Groupe Societe Generale-Sucursala Alba, iar aici, în baza indicațiilor date de inculpatul Mărginean a formulat cerere de acordare a unui credit de 10.000 lei, fiind depusă o fotocopie a aceluiași contract de muncă, precum și adeverința de venit nr. 232/04.06.2008, emisă de SC SORY EXPRES SRL, prin care se atesta fictiv că este angajat al acestei firme și realizează venituri lunare de 1.318 lei. În urma aprobării cererii de creditare a fost încheiat contractul nr. 1609392/05.06.2008, pe o perioadă de 48 de luni; și în acest caz, inculpatul Grozav Eugen Tiberiu a predat vărului său, integral suma ridicată din bancă.

Tot la inițiativa inculpatului Mărginean, care a motivat că are nevoie de o sumă de bani suplimentară, la data de 25.06.2008, inculpatul Grozav a contractat un credit de refinanțare la ALPHA BANK Agenția Sebeș, în cuantum de 54.800 lei, pe o perioadă de 10 ani, pentru stingerea creditelor angajate anterior, fiind încheiat în acest sens contractul nr. 0596738. În vederea aprobării cererii de creditare, inculpatul Grozav Eugen Tiberiu a prezentat fotocopia contractului de muncă, adeverințele de venit nr. 232/19.06.2008 și nr. 233/19.06.2008 – completate și semnate de inculpații Mărginean Rusalin Sorin și Poienar Ana - prin care se atesta că este angajat în calitate de conducător auto la S.C. SORY EXPRES S.R.L. și a realizat venituri lunare de 1.818 lei în ultimele trei luni. Suma de bani rămasă după rambursarea anticipată a celor două credite a fost predată de inculpatul Grozav Eugen Tiberiu vărului său, potrivit înțelegerii avute.

În perioada următoare, inculpatul Grozav Eugen Tiberiu, fiind somat de bancă să achite ratele la credit, a efectuat unele plăți parțiale, în cuantum total de 390 lei.

În cauză, ALPHA BANK Agenția Sebeș s-a constituit parte civilă în cauză cu suma de 57.923,33 lei.

În urma expertizării grafice a documentelor depuse la ALPHA BANK Agenția Sebeș, s-au stabilit următoarele :

• semnătura existentă la rubrica Angajator, pe xerocopia contractului individual de muncă a fost probabil depusă de inculpatul Mărginean Rusalin Sorin, iar semnăturile de conformitate cu originalul au fost depuse de către acest inculpat; scrisul olograf din conținutul contractului și de sub mențiunea „Conform cu originalul" a fost executat de inculpata Poienar Ana;

• semnătura depusă pe adeverința de venit nr. 232/19.06.2008, la rubrica Director General a fost executată de inculpatul Mărginean Rusalin Sorin, iar semnătura depusă la rubrica Contabil șef nu a aparține numitei Lupu Vasilica Crinela; scrisul olograf a fost depus de inculpata Poienar Ana;

• semnătura depusă la rubrica Director General pe adeverința nr. 233/19.06.2008 aparține inculpatului Mărginean Rusalin Sorin, iar semnătura

13

EXT-MARGINEAN-00083

depusă la rubrica Contabil nu aparține numitei Lupu Vasilica Crinela; scrisul olograf din cuprinsul adeverinței a fost executat de inculpata Poienar Ana.

Instanța a reținut că, în cursul urmăririi penale, inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu deși au avut o atitudine oscilantă, în principiu, au recunoscut săvârșirea faptelor, arătând că au acceptat să contracteze creditele bancare, bazându-se pe promisiunile făcute de inculpatul Mărginean Rusalin Sorin că va plăti ratele aferente.

În schimb, inculpatul Mărginean Rusalin Sorin și-a negat complet vinovăția, arătând că nu are nici o implicație în ceea ce privește contractarea creditelor bancare, negând faptul că sumele de bani ar fi ajuns la el; inculpatul nu a putut da însă explicații plauzibile cu privire la neconcordanța dintre documentele ce le-a emis pe numele S.C. SORY EXPRES S.R.L., prezentate băncilor, pe de o parte, și înregistrările operate în contabilitatea firmei cu referire la angajați și la salarizarea acestora, respectiv înregistrările operate la I.T.M. Alba, pe de altă parte.

În ceea ce o privește pe inculpata Poienar Ana, aceasta a recunoscut, în cursul urmăririi penale, că a completat contractele de muncă și adeverințele de venit pentru bancă, susținând că a făcut acest lucru la cererea și în baza indicațiilor date de inculpatul Mărginean Rusalin Sorin, fără însă a le confrunta cu documentele contabile ale firmei (state de plată). Justificările date de către învinuită sunt pur formale, având în vedere că pe același tip de acte, a înscris date total diferite, în condițiile în care,  întocmirea acestora s-a făcut  fie în aceeași zi, fie la intervale scurte de timp: astfel, în contractul individual de muncă al inculpatului Chiriluț Cristian Sabin  înregistrat la I.T.M. Alba s-a trecut  ca dată a începerii activității 03.11.2007 și un salariu lunar brut de 560 lei, în schimb, în contractul de muncă al aceluiași învinuit depus la bancă, inculpata Poienar, a înscris ca dată de începere a activității 03.05.2007 și un salariu lunar brut de 1830 lei; în mod similar, în cazul creditelor contractate de inculpatul Trifan Florin de la cele două bănci, inculpata a înscris sume  diferite privind veniturile realizate, respectiv, suma de 2.640 lei pe adeverințele depuse la B.C.R. și   3.660 lei pe adeverințele depuse la ALPHA BANK, deși adeverințele pentru ambele bănci s-au emis la data de 21.05.2008; aceeași situație este valabilă și în cazul adeverințelor de venit utilizate de  inculpatul Trifan Florin la contractarea celor trei credite și în care compar sume diferite privind veniturile realizate, în condițiile în care inculpata a emis cele trei adeverințe  la interval de o zi, respectiv,  de 15 zile.



În cursul judecății au fost ascultați inculpații Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie și Trifan Florin, inculpata Poienar Ana prevalându-se de dispozițiile art.70 C.penal-dreptul la tăcere.

Inițial, în cursul judecății, inculpatul Mărginean Rusalin Sorin, prin declarația depusă la fila 93 a recunoscut săvârșirea faptelor reținute în actul de sesizare, solicitând ca judecata să se facă în baza dispozițiilor art.320 ind.1 C.pr.penală anterior, însă prezent în fața instanței acesta a revenit asupra declarației arătând că nu a beneficiat de banii obținuți în urma acordării

14

Government Exhibit 1
Page 129 of 266

creditelor celor patru inculpați, că adeverințele de salariu au fost eliberate la solicitarea angajaților și că atestau fapte reale, cei patru inculpați efectuând curse externe.

Instanța a arătat că inculpatul a avut o atitudine oscilantă și totodată nesinceră, în condițiile în care întregul material probator administrat în cauză și analizat infirmă cele susținute de inculpat; astfel cum arată martorii audiați și inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu, creditele au fost contractate la inițiativa inculpatului Mărginean Rusalin Sorin, pe baza promisiunilor făcute de inculpat că va plăti ratele aferente, acesta fiind cel care a și folosit banii. Martorul Lăscan Adrian, contrar celor susținute de inculpatul Mărginean Rusalin, a declarat că doar el și martorul Grigore Cosmin au efectuat curse externe, nu și ceilalți inculpați. De altfel, din adresa nr. 80584/30.06.2009 emisă de Instituția Prefectului, jud. Alba - Serviciul Public Comunitar Regim Permise de Conducere și Înmatriculare a Vehiculelor rezultă că inculpatul Trifan Florin nu figurează ca posesor de permis conducere, acesta nefiind angajat la S.C. SORY EXPRES S.R.L la fel ca inculpații Mărginean Nicolaie și Grozav Eugen Tiberiu.

De asemenea, probele menționate mai sus se coroborează  cu rapoartele de expertiză grafică nr. 54167/15.09.2009, 54174/16.09.2009 și 60617/09.03.2010, întocmite de I.P.J. Alba Serviciul Criminalistic în care au fost expertizate documentele prezentate unităților bancare în vederea obținerii de credite precum și alte documente și Raportul criminalistic nr. 67208C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpaților Chiriluț Cristian Sabin și Trifan Florin de unde rezultă că nu au fost detectate reacții specifice comportamentului simulat, astfel că nu se poate reține, astfel cum susține avocatul inculpatului, că nu există probe din care să rezulte că inculpatul Mărginean Rusalin Sorin ar fi determinat cu intenție pe ceilalți coinculpați la săvârșirea infracțiunii de înșelăciune

S-a arătat că în privința inculpaților Grozav Eugen Tiberiu, Trifan Florin, Mărginean Nicolaie și Chiriluț Cristian Sabin nu se poate reține incidența dispozițiilor art. 16 alin. 1 lit. b teza II Cpp și anume că fapta nu a fost săvârșită cu vinovăția prevăzută de lege. Inculpații, cu intenție, cunoscând că nu îndeplinesc condițiile cerute pentru a angaja credite bancare, au acceptat solicitarea inculpatului Mărginean Rusalin Sorin de a contracta credite bancare, sens în care s-au și deplasat la sediile unităților bancare contractante. În acest sens sunt și declarațiile inculpaților –inculpatul Grozav Eugen Tiberiu, ascultat în faza de urmărire penală (f.120-122) a arătat că la solicitarea inculpatului Mărginean Rusali Sorin s-a deplasat la BCR unde a depus o cerere pentru un credit de 10.000 euro arătând în cuprinsul ei că este angajat la SC Sory Expres SRL ca șofer și realizează un venit de 700 lei și diurnă de 1000 euro, deși în realitate inculpatul nu deținea permis de conducere și nici nu a fost angajat al acestei societăți; inculpatul Trifan Florin a declarat (f.116-117) că la solicitarea inculpatului Mărginean Rusalin Sorin s-a deplasat la Alpha Bank Alba Iulia unde a făcut o cerere de credit în care a menționat că este angajat la SC Sory Expres SRL în calitate de conducător auto, fapt ce nu corespundea realității. În

15

EXT-MARGINEAN-00085

faţa instanţei inculpatul a arătat că nu a dat nicio declaraţie la bancă cu privire la faptul că lucrează la SC Sory Expres SRL în calitate de conducător auto, aspect infirmat de înscrisul aflat la fila 273 intitulat „angajament de plată" completat şi semnat de inculpat, însă recunoaşte că nu a fost angajat şi nu a lucrat nicio zi pentru Mărginean Rusalin, fiind de acord cu propunerea acestuia de a contracta creditul pentru a-l ajuta.

Din declaraţiile inculpatului Mărginean Nicolaie (f.100-103 dos.u.p., f.123) rezultă că acesta nu a semnat nici un contract de muncă, dar din discuţiile purtate de coinculpaţii Poienar Ana şi Mărginean Rusalin anterior deplasării la bancă, a aflat că i s-a încheiat un contract de muncă pe care se menţionase o sumă mai mare ca salariu decât i se cuvenea pentru a putea fi aprobat creditul; astfel nu se poate reţine lipsa intenţiei în săvârşirea infracţiunii, întrucât cunoscând toate aceste aspecte a semnat documentele necesare obţinerii creditului.

Inculpatul Chiriluţ Cristian Sabin a declarat că în drum spre BCR-Agenţia Cetate l-a întrebat pe inculpatul Mărginean Rusalin cum a reuşit să obţină creditul de 15.000 euro având în vedere că avea trecut pe contractul de muncă un salariu de aproximativ 450 lei lunar, inculpatul Mărginean spunându-i că a rezolvat ca pe contractul de muncă să fie înscrisă suma de 1500-1800 lei. Cu toate acestea, inculpatul Chiriluţ a acceptat să contracteze creditului.

S-a arătat că, întrucât de la data comiterii faptelor şi până la pronunţarea sentinţei a intervenit o lege penală nouă, în temeiul art.7 paragraf 1 din CEDO şi a Deciziei Curţii Constituţionale nr. 265/2014 pentru a stabili care este legea penală mai favorabilă, instanţa trebuie să procedeze la o comparaţie globală a regimului represiv al fiecăreia dintre legile penale aplicabile în cazul acuzatului ( metoda comparaţiei globale).

S-a apreciat că, în cauză, referitor la inculpatul Mărginean Rusalin Sorin legea penală mai favorabilă este legea nouă întrucât limitele de pedeapsă pentru infracţiunea de înşelăciune prev. de art.244 alin.1, alin.2 C.penal este de la 1 an închisoare la 5 ani închisoare faţă de limitele de 10 ani-20 închisoare prevăzute de art.215 alin.1-3 şi alin.5 C.penal din 1969. Referitor la inculpaţii Chiriluţ Cristian Sabin, Trifan Florin, Mărginean Nicolaie şi Grozav Eugen Tiberiu, legea mai favorabilă este de asemenea legea nouă care prevede pentru infracţiunea de înşelăciune prev. de art.244   alin.1 şi alin.2 C.pen limite de pedeapsă de 1 an închisoare şi 5 ani închisoare, pe când legea veche, art.215 alin.1 şi alin.3 prevede limite de pedeapsă mai mari, respectiv de 3 ani şi 15 ani închisoare.

Faţă de dispoziţiile Deciziei nr.5/2014 a ÎCCJ potrivit cărora nu este permisă combinarea prevederilor din legi succesive în stabilirea şi aplicarea legii penale mai favorabile cu privire la condiţiile de existenţă şi sancţionare ale infracţiunii continuate şi ale art.36 alin.1 C.penal care arată că infracţiunea este continuată când o persoană săvârşeşte la diferite intervale de timp, dar în realizarea aceleiaşi rezoluţii şi împotriva aceluiaşi subiect pasiv, acţiuni sau inacţiuni care prezintă, fiecare în parte, conţinutul aceleiaşi infracţiuni, s-a arătat



16

Government Exhibit 1
Page 131 of 266

că se impune schimbarea încadrării juridice a faptelor reținute în sarcina inculpaților.

Pentru inculpata Poienar Ana, s-a arătat că legea penală mai favorabilă este legea veche întrucât pedeapsa pentru infracțiunea de infracțiunea de fals în înscrisuri sub semnătură privată prevăzută de art. 290 C.pen.din 1969 este închisoarea de la 3 luni la 2 ani sau amendă, iar pedeapsa pentru aceeași infracțiune prevăzută de art.322 C.pen. este închisoarea de la 6 luni la 3 ani sau amendă.

În drept, s-a reținut că faptele inculpatului Mărginean Rusalin Sorin care în scopul obținerii unor venituri ilicite, în perioada decembrie 2007 – iunie 2008 a determinat un număr de patru persoane să contracteze în mod fraudulos credite bancare, sens în care le-a pus la dispoziție documente pe care le-a falsificat împreună cu inculpata Poienar Ana, cuantumul total al creditelor contractate fiind 59.900 EUR și 68.800 lei – constituie 4 infracțiuni de instigare la înșelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 și art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluț Cristian), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Mărginean Nicolaie), art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 art.5 C.penal ( 2 acte materiale-subiect pasiv Trifan Florin)

Faptele aceluiași inculpat care, acționând în baza aceleiași rezoluții infracționale, în scopul obținerii unor credite în mod fraudulos, a întocmit în fals un nr. de documente 14 acte, ce au fost prezentate băncilor - constituie infracțiunea de fals în înscrisuri sub semnătură privată în formă continuată, prev. de art. prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal, totul cu aplicarea art.39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

Fapta inculpatului Chiriluț Cristian Sabin care la data de 04.12.2007 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S:A. Agenția Cetate, pe baza unor documente întocmite în fals - constituie infracțiunea de înșelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal.

Fapta aceluiași inculpat de a utiliza la bancă în vederea acordării creditului, documente întocmite în fals - constituie infracțiunea de uz de fals, prev. de art. 323 C.penal cu aplic. art.5 C.penal, totul cu aplicarea prev. art. 39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

Fapta învinuitului Mărginean Nicolaie care la data de 04.01.2008 a contractat în mod fraudulos, un credit în cuantum de 15.000 EUR de la B.C.R. S.A. Agenția Cetate, pe baza unor documente întocmite în fals - constituie infracțiunea de înșelăciune prev. de art. 244 C.pen. cu aplic. art.5 C.penal.

Fapta aceluiași inculpat de a utiliza la bancă în vederea acordării creditului, documente întocmite în fals - constituie infracțiunea de uz de fals, prev. de art. 323 C.penal cu aplic. art.5 C.penal, totul cu aplicarea prev. art. 39 alin.1 lit.b C.pen. privind concursul de infracțiuni.

Faptele inculpatului Trifan Florin care în luna mai 2008, a contractat în mod fraudulos, două credite bancare în cuantum total de 19.900 EUR, prin utilizarea unor documente întocmite în fals - constituie două infracțiuni de

17

Government Exhibit 1
Page 132 of 266

înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv Alpha Bank-Sucursala Alba) şi infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv BCR S.A.)

Faptele aceluiaşi inculpat de a prezenta la bănci în vederea acordării creditelor, documente întocmite în fals - constituie infracţiunea de uz de fals în formă continuată prev. de art.323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal;

Fapta aceluiaşi inculpat care la data de 21.05.2008 a întocmit în fals un angajament de plată, în care ireal a menţionat faptul că lucrează în calitate de conducător auto la S.C. SORY EXPRES S.R.L., dându-şi totodată consimţământul, să i se reţină din salariu ratele de credit, în caz de neplată - constituie infracţiunea de fals în înscrisuri sub semnătură privată, prev. de art.322 cu aplic. art.5 C.penal, totul cu aplicarea art. 39 lit. b C.pen. privind concursul de infracţiuni.

Faptele inculpatului Grozav Eugen Tiberiu care în luna iunie 2008, a contractat în mod fraudulos, trei credite bancare în cuantum de 10.000 EUR, 10.000 lei şi 54.800 lei, prin folosirea de documente întocmite în fals - constituie 3 infracţiuni de înşelăciune prev. de art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv-BCR SA); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –BRD Groupe Societe Generale.); infracţiunea de înşelăciune prev. de art. art.244 C.pen. cu aplic. art.5 C.penal (subiect pasiv –Alpha Bank –Sucursala Sebeş);

Fapta aceluiaşi inculpat de a prezenta la bănci în vederea acordării creditelor, documente întocmite în fals - constituie infracţiunea de uz de fals în formă continuată, prev. de art 323 C.penal cu aplic. art.35 alin.1 şi art.5 C.penal, totul cu aplicarea art. 39 lit. b C.pen. privind concursul de infracţiuni.

Faptele inculpatei Poienar Ana de a-l ajuta pe inculpatul Mărginean Rusalin Sorin la completarea în fals a celor 4 contracte de muncă şi 10 adeverinţe de venit, ce au fost folosite în vederea contractării de credite în mod fraudulos - constituie complicitate la infracţiunea de fals în înscrisuri sub semnătură privată în formă continuată, prev. de art. 26 rap. la art. 290 C.pen. în cond. art. 41 alin. 2 C.pen. 

La individualizarea pedepsei, în conformitate cu prevederile art. 74 Cod penal, Tribunalul a avut în vedere gravitatea infracţiunii săvârşite şi periculozitatea infractorului, care este evaluată după următoarele criterii: împrejurările şi modul de comitere a infracţiunii, precum şi mijloacele folosite; starea de pericol creată pentru valoarea ocrotită; natura şi gravitatea rezultatului produs ori a altor consecinţe ale infracţiunii; motivul săvârşirii infracţiunii şi scopul urmărit; natura şi frecvenţa infracţiunilor care constituie antecedente penale ale infractorului; conduita după săvârşirea infracţiunii şi în cursul procesului penal; nivelul de educaţie, vârsta, starea de sănătate, situaţia familială şi socială.

Raportat la criteriile menţionate, Tribunalul a apreciat că faptele inculpaţilor prezintă un grad relativ ridicat de pericol social având în vedere, pe de o parte, importanţa valorii sociale protejate prin norma de incriminare (relaţiile sociale cu caracter patrimonial care trebuie să se bazeze pe bună-

EXT-MARGINEAN-00088

credinţă precum şi relaţiile sociale referitoare la încrederea publică în înscrisurile producătoare de consecinţe juridice, în veridicitatea acestor înscrisuri, în adevărul pe care trebuie să-l exprime), conduita inculpaţilor Chiriluţ Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie în cursul procesului penal (de recunoaştere a săvârşirii faptelor), dar şi conduita nesinceră a inculpaţilor Mărginean Rusalin şi Poienar Ana, lipsa antecedentelor penale, faptul că inculpaţii Chiriluţ Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie nu au beneficiat de banii obţinuţi în urma accesării creditelor, ceea ce a impus orientarea spre minimul special al pedepsei.

Tribunalul a mai avut în vedere modul de comitere a faptelor de către inculpatul Mărginean Rusalin care, profitând de starea materială precară a coinculpaţilor Chiriluţ Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie, de lipsa locurilor de muncă sau condiţionarea păstrării unui asemenea loc de muncă, i-a determinat pe aceştia să săvârşească infracţiuni, de faptul că banii obţinuţi prin săvârşirea faptelor au fost folosiţi numai de către inculpatul Mărginean, astfel că a aplicat acestuia o pedeapsă cu executare în regim de detenţie.

În baza art.112 lit.e C.penal s-a dispus confiscarea sumei de 26.000 euro de la inculpatul Mărginean Rusalin Sorin, suma obţinută în urma săvârşirii infracţiunii şi pentru care partea vătămată nu s-a constituit parte civilă. Astfel, creanţa datorată băncii de inculpatul Chiriluţ Cristian Sabin în cuantum de 15.000 euro din care 11.000 euro i-au fost daţi inculpatului Mărginean Rusalin şi creanţa datorată băncii de inculpatul Mărginean Nicolaie în cuantum de 15.000 euro, bani folosiţi exclusiv de inc. Mărginean Rusalin a fost cesionată către DDM EUROPE AG, cu administrator active CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucureşti, iar ulterior către ASSET PORTFOLIO SERVICING ROMÂNIA, care a comunicat  că nu se constituie parte civilă în cauză.

**Împotriva acestei sentinţe penale au declarat apel în termenul legal partea civilă Alpha Bank România S.A. şi  inculpaţii Mărginean Rusalin Sorin, Chiriluţ Cristian Sabin, Mărginean Nicolae şi Poienar Ana.**

**Partea civilă Alpha Bank România S.A.**  nu a motivat apelul declarat.

**Inculpatul Mărginean Rusalin Sorin** a solicitat, în baza art.396 alin.5 C.pr.pen. rap. la art. 16 alin.l lit. c din Codul de procedură penală, achitarea inculpatului pentru instigare la infracţiunea de înşelăciune iar în ceea ce priveşte infracţiunea de _fals în înscrisuri sub semnătură privata în forma continuată, în principal stabilirea pedepsei sub forma amenzii şi, în subsidiar, reducerea cuantumului pedepsei închisorii astfel încât să fie posibilă aplicarea ca modalitate de executare suspendarea sub supraveghere prev. de art. 91 din Codul penal. De asemenea, inculpatul a solicitat desfiinţarea măsurii confiscării sumei de 26 000 euro de la inculpat dispusă în baza art. 112 lit.e din Codul penal.

În motivarea apelului s-a arătat că nu rezultă existenţa unor probe temeinice, directe cum că inculpatul ar fi determinat cu intenţie coinculpaţii la



19

săvârşirea infracţiunilor de înşelăciune, în afara declaraţiilor acestora, declaraţii pe care instanţa trebuie sa le analizeze sub beneficiu de inventar, acestea fiind persoane interesate în cauză, poziţia acestor coinculpaţi fiind una conjugata, date fiind circumstanţele faptelor reţinute in sarcina lor.

Astfel cum reiese din cuprinsul rechizitoriului si din declaraţiile date in fata instanţei de fond coinculpaţii erau conştienţi de faptul ca nu îndeplinesc cerinţele de solvabilitate pentru obţinerea creditelor şi sunt răspunzători pentru faptele şi deciziile asumate în cunoştinţă de cauză. Inculpatul nu a încercat în niciun moment să-i determine să aplice pentru obţinerea unor astfel de credite. Astfel cum s-a observat, fiecare dintre ei s-a aflat la un moment dat şi pentru un anume interval de timp în raporturi de muncă - angajaţi sau zilieri, la societatea administrată de inculpat, recunoscând că au fost plătiţi pentru cursele externe ce le executau, suplimentar faţă de salariul de bază, motiv pentru care în momentul în care aceştia au dorit să acceseze credite în nume personal şi li s-a solicitat întocmirea dosarului, li s-au eliberat adeverinţe care atestau remuneraţia primita, sumele înscrise diferind in funcţie de cursele externe efectuate de fiecare si de salariul avut.

S-a mai arătat că, în afara declaraţiilor coinculpaţilor, la dosarul cauzei nu există probe din care să rezulte fără dubiu calitatea de participant sub forma instigării la infracţiunea de înşelăciune a inculpatului Marginean Rusalin Sorin. Tot ceea ce a făcut acest inculpat a fost sa elibereze coinculpaţilor adeverinţele de salariu solicitate, ce atestau sumele primite pentru serviciile efectuate şi nu a intenţionat nicio clipă determinarea la săvârşirea vreunei infracţiuni.

În ceea ce priveşte infracţiunea de fals în înscrisuri sub semnătură privată în forma continuată, s-a arătat că inculpatul admite ca este posibil să fi greşit consemnând în cuprinsul adeverinţelor de salariu, sume care depăşeau cuantumul remuneraţiei din contractele de munca, însă ceea ce a avut în vedere a fost să cuprindă toate sumele date angajaţilor săi. La individualizarea pedepsei s-a solicitat a se avea în vedere criteriile generale de individualizare şi anume gradul de pericol redus al faptei şi conduita inculpatului.

**Inculpatul Chiriluţ Cristian Sabin** a solicitat, achitarea sa în temeiul art. 16 lit. c din Codul de procedură penală iar, în subsidiar, reindividualizarea pedepsei, dându-se o mai mare eficienţă circumstanţelor personale, împrejurării că inculpatul nu are cazier, iar pericolul social nu este unul sporit.

În motivarea apelului s-a arătat că din materialul probator rezultă concluzia că inculpatul a avut raporturi de muncă cu societatea condusă de inculpatul Mărginean, iar deşi în faţa instanţei de fond a avut o atitudine oscilantă, declaraţia dată ulterior este una adevărată, o declaraţie sinceră şi descrie modul în care au decurs lucrurile. La un anumit moment după angajare inculpatului i-a fost prezentat un contract individual de muncă, iar inculpatul nu a fost atent la data contractului semnat, verificând doar salariul, ce coincidea cu ce lua efectiv.

În ceea ce priveşte infracţiunea de înşelăciune, s-a arătat că nu s-a reuşit prin probele administrate dovedirea elementului subiectiv al intenţiei în



20

EXT-MARGINEAN-00090

persoana inculpatului, care a precizat că la rugăminţile inculpatului Mărginean s-a prezentat pentru angajarea unui credit care trebuia să fie folosit pentru societate, fiind încredinţat de inculpatul Mărginean că ratele vor fi plătite, astfel că nu poate fi reţinută vreo formă de intenţie din partea inculpatului Chiriluţ.

Din declaraţia martorului Gurgui aflată la fila 203 şi declaraţia martorului Lăscan aflată la fila 146 din dosarul de fond, rezultă că inculpatul câştiga chiar 1200 de euro, aspect ce întăreşte poziţia inculpatului Chiriluţ referitor la suma contractului, care a avut încredere că suma trecută la salariu era cea reală.

**Inculpatul Mărginean Nicolae** a solicitat achitarea sa în temeiul art. 16 lit. c şi d din codul de procedură penală.

În motivarea apelului s-a arătat că inculpatul nu se face vinovat pentru uz de fals, doar a semnat contractele de muncă şi de credit, cunoscând că acel credit era pentru înmânarea lui la Mărginean Rusalin, inculpatul fiind doar o victimă a inculpatului Mărginean Rusalin.

S-a apreciat că în favoarea inculpatului ar fi trebuit să existe probe în dosarul de urmărire penală, în condiţiile în care în primăvara anului 2008 a sesizat în scris organele de urmărire penală cu privire la respectivele infracţiuni reţinute ulterior în sarcina sa, sesizări care au fost intitulate plângeri, la momentul respectiv banca începuse executarea silită, dar aceste plângeri nu au fost depuse la dosarul cauzei.

Referitor la infracţiunea de înşelăciune s-a susţinut că nu se poate reţine intenţia de a înşela banca, inculpatul fiind conştient că acel credit va fi returnat integral.

**Inculpata Poienar Ana** a solicitat reindividualizarea judiciară a pedepsei aplicate.

În motivarea apelului s-a arătat că inculpata a fost condamnată la 1 an închisoare cu suspendarea condiţionată a executării pedepsei, dar raportat la poziţia acesteia, la probele administrate, la criteriile generale de individualizare a pedepsei prevăzute de art. 72 din Codul penal, pedeapsa aplicată este nejustificat de mare şi se impune aplicarea unei amenzi.

Inculpata a recunoscut că a completat contractele de muncă şi adeverinţele, dar a făcut acest lucru la cererea administratorului firmei, fără a confrunta şi dosarele firmei, astfel că pedeapsa amenzii ar fi suficientă pentru atingerea scopului prevăzut de lege.

Referitor la conduita inculpatei, s-au invocat lipsa antecedentelor penale, împrejurarea că aceasta a regretat săvârşirea faptei şi a recunoscut că a dat dovadă de ignoranţă.

S-a mai solicitat că, în ipoteza în care se apreciază că se impune aplicarea pedepsei închisorii, să se dispună reducerea pedepsei la un cuantum orientat spre minimul general, ca urmare a reţinerii dispoziţiilor art. 74 din vechiul cod penal, cu suspendarea condiţionată a executării pedepsei.

**Verificând legalitatea şi temeinicia sentinţei atacate prin prisma celor expuse, precum şi din oficiu conform  art.417 din Codul de procedură**



21

Government Exhibit 1
Page 136 of 266

penală, însă în limitele prevăzute de acest text de lege, Curtea de apel constată următoarele:

Din coroborarea probelor administrate în cauză rezultă că starea de fapt reținută în hotărârea apelată este corectă, probatoriul fiind bine coroborat și interpretat.

Este dovedit în cauză că inculpatul Mărginean Rusalin Sorin, în scopul obținerii unor venituri ilicite, în perioada decembrie 2007 – iunie 2008 a determinat pe inculpații Chiriluț Cristian Sabin, Mărginean Nicolae, Trifan Florin și Grozav Eugen Tiberiu să contracteze în mod fraudulos credite bancare, sens în care le-a pus la dispoziție documente pe care le-a falsificat împreună cu inculpata Poienar Ana, cuantumul total al creditelor contractate fiind 59.900 EUR și 68.800 lei.

Același inculpat, acționând în scopul obținerii unor credite în mod fraudulos, a întocmit în fals un nr. de documente 14 acte, ce au fost prezentate băncilor.

Astfel, inculpatul Chiriluț Cristian Sabin, la data de 04.12.2007, a solicitat și obținut de la B.C.R. S:A. Agenția Cetate, un credit în sumă de 15.000 EUR, utilizând o adeverință de venit și un contract de muncă având conținut nereal, întocmite de inculpata Poienar Ana și semnate pentru conformitate de inculpatul Marginean Rusalin Sorin, în calitate de administrator al S.C. SORY EXPRES S.R.L. Tărtări.

Inculpatul Mărginean Nicolae, la data de 04.01.2008, a solicitat și obținut de la aceeași instituție bancară, un credit în cuantum de 15.000 EUR, utilizând un contract de muncă și o adeverință de venit care atestau în mod nereal că acesta ar fi fost anagajat al societății Sory Expres S.R.L. Tărtări din 2.07.2007 având un salariu de bază brut de 1200 lei.

Aceste documente au fost întocmite de inculpata Poienar Ana și semnate de inculpatul Marginean Rusalin Sorin.

În luna mai 2008 ( la datele de 21.05.2008 și 23.05.2008), inculpatul Trifan Florin a contractat în mod fraudulos două credite bancare în cuantum total de 19.900 EUR, de la Alpha Bank Alba Iulia și B.C.R. Agenția Sebeș, prin utilizarea unor documente întocmite în fals, respectiv un contract de muncă în xerocopie și câte două adeverințe de venit. De asemenea, la data de 21.05.2008, când s-a prezentat la Alpha Bank Alba Iulia a completat documentul intitulat ” angajament de plată”, în care în mod nereal a menționat faptul că lucrează în calitate de conducător auto la S.C. SORY EXPRES S.R.L., dându-și totodată consimțământul, să i se rețină din salariu ratele de credit, în caz de neplată.



În luna iunie 2008( la date le de 4.06.2008, și 25.06.2008), inculpatul Grozav Eugen Tiberiu, a solicitat și obținut de la B.C.R. Agenția Sebeș, de3 la B.R.D. FGroupe Societe Generale-Sucursala Alba și alpha Bank Agenția Sebeș trei credite bancare în cuantum de 10.000 EUR, 10.000 lei și 54.800 lei, prin folosirea de documente întocmite în fals, respectiv un contract de muncă în xerocopie și adeverințe de venit, completate și semnate de inculpații Poienar Ana și Marginean Rusalin Sorin.

22

Government Exhibit 1
Page 137 of 266

În acord cu prima instanță, Curtea de apel, în baza propriei analize a materialului probatoriu administrat în cauză, constată că din acesta rezultă că faptele există, constituie infracțiunile de fals în înscrisuri sub semnătură privată, uz de fals și înșelăciune și au fost săvârșite de inculpați în forma și modalitatea reținute în actul de sesizare a instanței.

Inculpatul Mărginean Rusalin Sorin a negat exercitarea vreunei acțiuni de determinare a coinculpaților să solicite, pentru el, obținerea creditelor prin inducerea în eroare a băncii. Deși acesta nu recunoaște că ar fi semnat pentru conformitate contractele de muncă și adeverințele de venit, susținând totodată că nu a avut nicio implicație în ceea ce privește contractarea creditelor bancare și că sumele de bani nu ar fi ajuns la el, din probatoriul administrat în cauză rezultă că acesta a fost persoana care i-a determinat pe coinculpații Chiriluț Cristian Sabin, Mărginean Nicolae, Trifan Florin și Grozav Eugen Tiberiu să se prezinte la instituțiile bancare și să folosească documente cu conținut real, inducându-i în eroare pe angajații băncilor în scopul obținerii de credite. De asemenea, probele administrate în cauză dovedesc faptul că inculpatul este cel care a semnat toate înscrisurile sub semnătură privată intitulate adeverință de venit și copiile contractelor de muncă, documente redactate de inculpata Poienar Ana.

Astfel, inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu au declarat că inculpatul Mărginean Rusalin Sorin este cel care le-a solicitat să se prezinte la unitățile bancare și să solicite acordarea de credite, arătând că au acceptat să contracteze creditele bancare, bazându-se pe promisiunile făcute de inculpatul Mărginean Rusalin Sorin că va plăti ratele aferente.

În cauză au fost întocmite rapoarte de expertiză grafică care au stabilit că semnăturile depuse pe înscrisurile menționate fie au fost executate de inculpatul Marginean Rusalin Sorin, fie probabil au fost executate de acesta, iar scrisul olograf din cuprinsul acestora i a fost executat de inculpata Poienar Ana.



De asemenea, martora Lupu Vasilica Crinela, care a condus evidența contabilă la S.C. SORY EXPRES S.R.L., a declarat că nu are nicio implicație în ceea ce privește emiterea adeverințelor de venit depuse la bănci, iar semnătura sa a fost contrafăcută pe aceste adeverințe, precizând că nu a semnat decât documentele ce le completa personal au declarat că

Martorului Lăscan Adrian Ioan), care a lucrat ca șofer S.C. SORY EXPRES S.R.La declarat că la solicitarea inculpatului Mărginean Rusalin Sorin a contractat un credit bancar de 15.000 EUR, iar banii i-a remis acestuia, întrucât i-a promis că va achita ratele aferenteA mai arătat că după ce și-a încetat activitatea în cadrul firmei, a aflat că și inculpații Chiriluț Cristian Sabin și Mărginean Nicolae au contractat credite bancare pentru patronul firmei.

Martorului Grigore Cosmin Dănuț, fost angajat la S.C. SORY EXPRES S.R.L. , a declarat că are cunoștință de faptul că inculpații Chiriluț Cristian Sabin și Mărginean Nicolaie au contractat credite bancare pentru inculpatul Mărginean Rusalin Sorin și că inculpata Poienar Ana era cea care se ocupa de întocmirea documentelor în cadrul societății.

23

Government Exhibit 1
Page 138 of 266

Martorului Gurgui Ioan, prieten cu inculpatul Chiriluț, a arătat că a aflat de la acesta că a contractat un credit bancar la inițiativa patronului său „Ninuț", pe baza actelor puse la dispoziție de către acesta și că și inculpatul Mărginean Nicolaie a contractat un credit bancar în aceleași condiții.

Raportul criminalistic nr. 67208C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpatului Chiriluț Cristian Sabin. În interviul pre-test, inculpatul a arătat că, la solicitarea inculpatului Mărginean Rusalin Sorin a acceptat să contracteze creditul bancar și să i se înscrie pe adeverință un venit salarial mai mare decât cel real, deși era conștient că, în raport cu veniturile ce le realiza, nu putea obține un credit de 15.000 EUR. A mai arătat că potrivit înțelegerii avute, inculpatul Mărginean Rusalin Sorin trebuia să achite ratele la bancă până la concurența sumei de 11.000 EUR, iar diferența de 4.000 EUR urma să o plătească personal. În timpul examinării propriu-zise, la întrebările relevante, ce au vizat inițiativa contractării creditului și implicarea inculpatului Mărginean Rusalin Sorin - nu au fost detectate reacții specifice comportamentului simulat;

Raportul criminalistic nr. 67209C din 22.05.2009 întocmit de I.P.J. Sibiu Serviciul Criminalistic cu ocazia testării poligraf a inculpatului Trifan Florin. În interviul pre-test, susnumitul a arătat că, după obținerea creditului de la ALPHA BANK, a fost servit cu băuturi alcoolice de inculpatul Mărginean Rusalin Sorin la barul din sat, acesta fiind singurul beneficiu obținut. De asemenea, la testarea propriu-zisă a inculpatului, nu au fost detectate reacții specifice comportamentului simulat la întrebările relevante;

Inculpata Poienar Ana a declarat în cursul urmăririi penale, că a completat contractele de muncă și adeverințele de venit pentru bancă, susținând că a făcut acest lucru la cererea și în baza indicațiilor date de inculpatul Mărginean Rusalin Sorin, fără însă a le confrunta cu documentele contabile ale firmei.

Coroborând concluziile rapoartelor de expertiză grafică cu declarațiile coinculpaților din prezenta cauză, toți susținând că inculpatul Marginean Rusalin Sorin este cel care i-a abordat și i-a determinat să contracteze creditele, cu declarațiile martorilor, cu rezultatele testelor cu poligraful, cu faptul că înscrisurile folosite pentru obținerea creditelor au un mod de redactare similar, instanța de apel constată că săvârșirea faptelor de către inculpat a fost dovedită dincolo de orice îndoială rezonabilă. 

În mod cert inculpatul Mărginean Rusalin Sorin a fost cel care a obținut banii acordați de bancă, în baza unor acte false prezentate instituției, acte determinante în aprecierea condițiilor necesare obținerii creditului bancar, iar infracțiunea de înșelăciune s-a consumat în momentul primirii banilor de către coinculpați , ca urmare a încheierii contractelor de credit.

Referitor la apărările inculpaților Chiriluț Cristian Sabin și Mărginean Nicolaie, Curtea de apel, în acord cu prima instanță, consideră că nu se poate reține că aceștia nu au săvârșit faptele cu vinovăția prevăzută de lege.

Astfel, faptul că aceștia au acceptat să contracteze creditele bancare, bazându-se pe promisiunile făcute de inculpatul Mărginean Rusalin Sorin că va

24

Government Exhibit 1
Page 139 of 266

plăti ratele aferente nu este de natură să înlăture vinovăția inculpaților care au avut cunoștință despre faptul că documentele prezentate instituțiilor bancare nu au un conținut real și că sunt însă necesare pentru obținerea creditelor. Aceștia cunoșteau că nu realizau veniturile consemnate în actele folosite la bancă și au recunoscut că au luat credite la solicitarea inculpatului Mărginean Rusalin.

În cazul inculpatului Chiriluț Cristian Sabin, instanța reține că acesta a reținut o parte din suma împrumutată, respectiv 4000 euro. De asemenea, deși acesta a fost angajat la societatea inculpatului în perioada 3.11.2007-16.04.2008, în   copia contractului de muncă prezentată băncii, rea menționat în mod nereal că desfășoară activitate în cadrul firmei din data de 03.05.2007.

Raportat la starea de fapt reținută și la încadrarea în drept a faptelor comise de inculpați, se constată că în mod corect prima instanța a reținut vinovăția acestora și a aplicat dispozițiile art.5 din Codul penal, constatând că legea penală mai favorabilă inculpaților  este legea în vigoare la data pronunțării hotărârii(judecării cauzei).

În ceea ce privește  încadrarea în drept a faptelor săvârșite, instanța reține că la data de 1 februarie 2014 au intrat în vigoare Legea nr. 286/2009 privind Codul penal și Legea nr.187/2012 de punere în aplicare a acesteia, dispoziții legale care  au adus modificări legislației penale existente până la această dată și care impun analiza acestora din perspectiva necesității identificării legii penale mai favorabile până la judecarea definitivă a cauzei, conform dispozițiilor art.5 alin.1 din Codul penal în vigoare.

Analizând hotărârea apelată, se constată că prima instanță a efectuat o analiză judicioasă a incidenței legii penale mai favorabile în cazul fiecărui inculpat și a analizat consecințele faptelor în legea în vigoare la data săvârșirii lor (încadrarea juridică dată în rechizitoriu și sancțiunile ce decurg din incriminare) și consecințele faptei în urma intrării în vigoare a legii noi.

La rândul său, Curtea de apel, comparând dispozițiile Codului penal din 1969 cu cele ale Noului Cod penal, având în vedere și decizia Curții Constituționale nr.265/2014 prin care s-a constatat că dispozițiile art. 5 din Codul penal sunt constituționale în măsura în care nu permit combinarea prevederilor din legi succesive în stabilirea și aplicarea legii penale mai favorabile,constată că mai favorabilă inculpaților ( cu excepția inculpatei Poienar Ana) este legea în vigoare la data judecării cauzei, atât  sub aspectul normei de incriminare, cât și al stabilirii și aplicării pedepselor.

În ceea ce privește solicitarea inculpaților de a se dispune reducerea pedepselor și stabilirea unei modalități de executare fără privare de libertate, Curtea de apel o consideră nefondată în raport cu criteriile prevăzute de art.74 din Codul penal și anume :„(1) Stabilirea duratei ori a cuantumului pedepsei se face în raport cu gravitatea infracțiunii săvârșite și cu periculozitatea infractorului, care se evaluează după următoarele criterii:

*a) împrejurările și modul de comitere a infracțiunii, precum și mijloacele folosite* – Curtea va avea în vedere numărul faptelor comise, faptul că inculpatul Mărginean Rusalin Sorin este cel care i-a abordat pe ceilalți inculpați

Government Exhibit 1
Page 140 of 266

și i-a atras să săvârșească faptele, mijloacele folosite pentru plăsmuirea actelor false

*b) starea de pericol creată pentru valoarea ocrotită* – în prezenta cauză, aceasta decurge din însăși reglementarea celor trei infracțiuni, înșelăciunea fiind o infracțiune contra patrimoniului, , iar falsul în înscrisuri sub semnătură privată și uzul de fals infracțiuni care protejează relațiile sociale referitoare la încrederea publică de care se bucură înscrisurile, toate aceste valori fiind puse în pericol

*c) natura și gravitatea rezultatului produs ori a altor consecințe ale infracțiunii* – inculpații prin acțiunile lor au cauzat pagube în patrimoniul persoanelor vătămate, cuantumul total al creditelor contractate fiind de 59.900 EUR și 68.800 lei; totodată, au pus în pericol încrederea publică de care se bucură înscrisurile

*d) motivul săvârșirii infracțiunii și scopul urmărit* – inculpatul Mărginean Rusalin Sorin  nu a menționat acest aspect, însă prin săvârșirea faptelor a obținut sumele de bani acordate cu titlu de împrumut; inculpații Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin și Grozav Eugen Tiberiu au declarat că au acceptat să contracteze creditele bancare pentru a-l ajuta pe inculpatul Mărginean Rusalin Sorin, bazându-se pe promisiunile făcute de acesta că va plăti ratele aferente.

*e) natura și frecvența infracțiunilor care constituie antecedente penale ale infractorului* –inculpații nu au antecedente penale , cu excepția inculpatei Poenar Ana

*f) conduita după săvârșirea infracțiunii și în cursul procesului penal* – inculpatul Mărginean Rusalin Sorin nu a recunoscut săvârșirea faptelor, iar ceilalți inculpați au recunoscut doar parțial acest lucru

*g) nivelul de educație, vârsta, starea de sănătate, situația familială și socială* – inculpații sunt cetățeni români,  au  studii medii, nu au invocat probleme de sănătate.

Curtea va mai avea în vedere totodată dispozițiile art. 3 din Legea nr.254/2013 potrivit cărora scopul executării pedepselor este prevenirea săvârșirii de noi infracțiuni, iar prin executarea pedepselor se urmărește formarea unei atitudini corecte față de ordinea de drept, față de regulile de conviețuire socială și față de muncă, în vederea reintegrării în societate a deținuților.

Pe cale de consecință, raportat la actele dosarului și la împrejurările anterior reținute, ținând cont de numărul și natura faptelor comise, de circumstanțele concrete ale săvârșirii acestora și de intervalul scurt de timp în care au fost comise, de urmările produse și  valorile sociale lezate, , instanța de apel  consideră că reducerea pedepselor stabilite pentru infracțiunile săvârșite de inculpați sau schimbarea naturii acesteia, cum solicită inculpata Poienar Ana, nu sunt justificate pentru atingerea scopului acestora, crearea premiselor conștientizării de către inculpați a faptelor și asumării consecințelor acestora.

Examinând din oficiu hotărârea atacată, prin prisma dispozițiilor art. 417 din Codul de procedură penală, Curtea de apel constată că  și celelalte



EXT-MARGINEAN-00096

dispoziții ale primei instanțe referitoare la aplicarea dispozițiilor privind concursul de infracțiuni, a celor privind suspendarea executării pedepsei sub supraveghere, la soluționarea acțiunii civile și luarea măsurii de siguranță a confiscării speciale, la dispunerea desființării înscrisurilor falsificate, precum și la stabilirea cheltuielilor judiciare sunt legale și temeinice.

Referitor la apelul părții civile, dealtfel nemotivat, se constată de asemenea că este nefondat, întrucât, astfel cum în mod corect a reținut prima instanță, parte din pretențiile civile formulate în cauză se referă la credite care nu a făcut obiectul cercetării penale din prezentul dosar, neexistând nicio legătură de cauzalitate între faptele care formează obiectul judecății și prejudiciul la care se face referire.

Pe cale de consecință, față de toate motivele expuse anterior Curtea de apel, în baza art.421pct.1 lit.b din Codul de procedură penală, va respinge ca nefondate apelurile declarate de partea civilă Alpha Bank România S.A. și de inculpații Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolae și Poienar Ana împotriva sentinței penale nr.577/13.10.2014, pronunțată de Tribunalul Alba, în dosarul nr.15829/107/2012.

În baza art. 275 alin. 2 din Codul de procedură penală, va obliga pe fiecare apelant să plătească suma de 320 lei cu titlu de cheltuieli judiciare avansate de stat în apel.

*Pentru aceste motive,*
*În numele legii,*
*D E C I D E:*

Respinge ca nefondate apelurile declarate de partea civilă Alpha Bank România S.A. și de inculpații Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolae și Poienar Ana împotriva sentinței penale nr.577/13.10.2014, pronunțată de Tribunalul Alba,în dosarul nr.15829/107/2012.

În baza art. 275 alin. 2 din Codul de procedură penală, obligă pe fiecare apelant să plătească suma de 320 lei cu titlu de cheltuieli judiciare avansate de stat în apel.

Onorariile acordate apărătorilor desemnați din oficiu pentru inculpați, în sumă de câte 400 lei pentru inculpații Trifan Florin și Grozav Eugen Tiberiu și de câte 100 lei pentru inculpații Mărginean Rusalin Sorin, Chiriluț Criatian Sabin, Mărginean Nicolae și Poienar Ana, vor fi avansate din fondurile Ministerului Justiției.

Definitivă.

Pronunțată în ședință publică, azi 19 martie 2015 .

*Președinte,*
*Gheorghe Lucia Odagiu*

*Judecător,*
*Alexandra Iuliana Paștiu*

*Grefier,*
*Cornelia Maria Neag*

Tribunalul Alba
Pentru conformitate

Government Exhibit 1
Page 142 of 266

Red. / tehnored. P.A.I.
2 ex./ 20.04.2015
Jud. fond M.E. Fulea

28

EXT-MARGINEAN-00098

Government Exhibit 1
Page 143 of 266

# Ataşament C

Government Exhibit 1
Page 144 of 266

16



ROMÂNIA

TRIBUNALUL ALBA
Alba Iulia, P-ţa I.Maniu, nr.24, Judet Alba,
tel. 0258/811576, fax 0258/811184,
http://portal.just.ro

SECŢIA PENALĂ
BIROUL EXECUTĂRI PENALE
DOSAR NR. 15829/107/2012 din 19.03.2015
Poz.ex.pen. 720/2014
*Operator de date cu caracter personal Nr.3823*

*Vă informăm că datele menţionate în prezentul document se înscriu în cele prevăzute de Legea Nr.677/2001, fapt ce vă conferă obligativitatea
protejării, conservării şi folosirii acestora doar în scopul prevăzut de lege*

## MANDAT DE EXECUTARE A PEDEPSEI ÎNCHISORII
### Nr. 720/2014 din 19.03.2015

În conformitate cu disp. art. 555 NCPP şi văzând sentinţa penală nr. 577/2014 din data de 13.10.2014, pronunţată de Tribunalul Alba în dosar penal nr. 15829/107/2012, nemodificată în apel şi rămasă definitivă la data de 19.03.2015 prin decizia penală nr. 314/A/2015 a Curţii de Apel Alba Iulia, prin care a fost condamnat inculpatul **MĂRGINEAN RUSALIN SORIN** - fiul lui Rusalin şi Olimpia, născut la data de 16.02.1972 în Cugir, jud. Alba, CNP 1720216013541 domiciliat în comuna Săliştea, sat Săliştea Deal, nr.39A, jud. Alba, f.f.l. în com. Săliştea, sat Tărtăria, str. Florilor, nr.54, jud. Alba, cetăţean român, studii: şcoala profesională, conducător auto, căsătorit, fără antecedente penale, la pedepsele de: 1 an şi 8 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.35 alin.1 şi art.5 C.penal (3 acte materiale - subiect pasiv Grozav Eugen); 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Chiriluţ Cristian); 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune infracţiunii prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic. art.5 C.penal ( subiect pasiv Mărginean Nicolaie); 1 an şi 6 luni închisoare pentru săvârşirea de instigare la infracţiunea de înşelăciune prev. de art. 47 C.pen. rap. la art.244 C.pen. cu aplic.art.35 alin.1 şi art.5 C.penal (2 acte materiale- subiect pasiv Trifan Florin); 1 an închisoare pentru săvârşirea infracţiunii de fals în înscrisuri sub semnătură privată prev. de art.322 rap. la art.35 alin.1 C.penal cu aplic. art.5 C.penal,

iar în baza art. 39 alin.1 lit.b C.penal au fost contopite pedepsele de mai sus în pedeapsa cea mai grea de 1 an şi 8 luni închisoare la care s-a adăugat sporul de 1 an şi 10 luni închisoare urmând ca în final inculpatul să execute pedeapsa de **3 ani şi 6 luni închisoare.**

### O R D O N Ă M :

Arestarea şi deţinerea condamnatului **MĂRGINEAN RUSALIN SORIN** în penitenciar pentru executarea pedepsei aplicate.
Din pedeapsa de executat se va deduce /
Condamnatul nu este recidivist.

**JUDECĂTOR DELEGAT,**

*Emis în 19.03.2015*
*Întocmit în trei exemplare.*
*Operat în registrul de executări penale la nr. 720/2014.*





5

**Government Exhibit 1**
**Page 145 of 266**

EXT-MARGINEAN-00100

# Attachment A

EXT-MARGINEAN-00101

ROMANIA
ALBA DISTRICT COURT
CRIMINAL DIVISION
CASE FILE NO. 3420/107/2017

**Statement of facts in relation to which we consider that the conditions necessary to request the extradition are met and a short history of the case in procedural terms:**

By the criminal court sentence no. 577/2014 delivered on the 13th of October, 2014 by Alba District Court in the case file no. 15829/107/2012, final on the 19th of May, 2015, by rejecting the appeal through the criminal court decision no. 314/A/2015 of Alba Iulia Court of Appeal, the requested person Mărginean Rusalin Sorin (personal identification number 1720216013541), Romanian citizen, son of Rusalin and Olimpia, born on the 16th of February, 1972 in Cugir, Alba County, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County, has been convicted to the resulted penalty of 3 years and 6 months of imprisonment.

The convict has been found guilty of the fact that during December 2007 - June 2008, he made four persons fraudulently contract bank loans, which is why he provided them with documents which he forged together with the defendant Poienar Ana, the total amount of contracted loans being €59,900 and LEI 68,800. To commit such facts, he has been convicted as follows:

- 1 year and 8 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts - passive subject Grozav Eugen);
- 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application article 5 of the Criminal Code (passive subject Chiriluț Cristian)
- 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 5 of the Criminal Code (passive subject Mărginean Nicolaie)
- 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (2 material acts - passive subject Trifan Florin)

The facts of the same person who, acting on the basis of the same criminal intent, to fraudulently obtain loans, falsely prepared 14 documents which were submitted to the banks is a recurrent offence of use of false deeds under a private signature referred to in article 322 related to article 35 paragraph 1 of the Criminal Code with the application of article 5 of the Criminal Code, for which he has been convicted to 1 year of imprisonment.

Government Exhibit 1
Page 147 of 266

Under article 39 paragraph 1 lett. b) of the Criminal Code, the court has imposed the convict the greatest penalty of 1 year and 8 months of imprisonment, to which it has added an increase of 1 year and 10 months of imprisonment, resulting in the final penalty of 3 years and 6 months of imprisonment.

During the criminal lawsuit, the convict Mărginean Rusalin Sorin was assisted by an appointed defender, namely lawyer Gheorghe Marin. At the same time, the convict personally appeared at the lawsuit as a result of which the sentence was passed.

Based on the final conviction, Alba District Court issued the warrant for enforcement of a custodial sentence no. 420/2014 of the 19th of March, 2015 which was not enforced because the convict was not found. For this reason, an all-ports-warning (APW) was issued against Mărginean Rusalin Sorin, issuing also a European arrest warrant.

**Judge,**

**OVIDIU TOTH**

*Illegible signature*

*Illegible stamp*

EXT-MARGINEAN-00103

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,



SWORN INTERPRETER AND TRANSLATOR ,



EXT-MARGINEAN-00104

[Translation from Romanian]

ROMANIA

ALBA DISTRICT COURT
CRIMINAL DIVISION

CASE FILE No. 3420/107/2017

### Relevant provisions of the law regulating the following:

**\*the substantial elements of the offence that extradition is requested in relationship with;**

**\*penalties applicable for the offences that extradition is requested in relationship with;**

**I. Inciting to the offence of misrepresentation as stipulated by art.47 of the Criminal Code in conjunction with art. 244 of the Criminal Code, by applying art. 35 para. 1 and art. 5 of the Criminal Code**

**\*Article 47 of the Criminal Code: Instigator**

"An instigator is a person who, with direct intent, determines another to commit an act stipulated by criminal law."

**\*Article 244 of the Criminal Code on the offence of "Misrepresentation"**

"(1) Misrepresenting false facts as being true, or of true facts as being false, in order to obtain undue material gains for oneself or for another, and if material damages have been caused, shall be punishable by no less than 6 months and no more than 3 years of imprisonment.

(2) Misrepresentation committed by using false names or capacities or other fraudulent means shall be punishable by no less than 1 and no more than 5 years of imprisonment. If the fraudulent means is in itself an offence, the rules for multiple offences shall apply.

(3) Reconciliation removes criminal liability."

**\* Art. 35 para. 1 of the Criminal Code on "Unity of a continuing offence and of a complex offence"**

"(1) An offence is deemed as continuing when a person commits, at various time intervals but for the realization of the same resolution and against the same passive subject, actions or inactions each having the content of the same offence."

**\* Art. 5 of the Criminal Code on "Use of the more favorable criminal law until final judgment in a case"**

"(1) In case one or several criminal acts have been enacted between the time the violation was committed and the final judgment in a case, the more favorable stipulation shall apply.

(2) Paragraph (1) above shall also apply to pieces of regulation or stipulations therein that are declared unconstitutional, as well as to Emergency Orders approved by Parliament, amended or supplemented, or rejected by Parliament, if while such texts were in force they included criminal stipulations that were more favourable."

**II. Forgery of deeds under a private signature in a continuing form, as stipulated by art. 322 of the Criminal Code**

"(1) The tampering with a deed under private signature in any of the ways set out in Art. 320 or Art. 321, if the perpetrator uses the false deed or entrusts it to another individual for use, in order to produce legal consequences, shall be punishable by no less than 6 months and no more than 3 years of imprisonment or by a fine.

(2) The attempt shall be also punishable."

**III. Statute of limitations for the service of penalties imposed**

ART. 161

(1) The statute of limitations removes the service of a main penalty.
(2) The statute of limitations does not remove the service of main penalties as follows:
   a) in case of genocide, offences against humanity or war offences, irrespective of the date when such offences were committed;
   b) in case of the offences provided under art. 188 and 189, as well as from the offences committed with intention, which resulted in the death of the victim.

(3) Furthermore, the statute of limitations does not remove the service of main penalties in case of the offences provided under par. (2) lettwe b) the statute of limitations term for the service of which was not reached upon the entry into force of this provisions of the law.


**ART. 162**
**The statute of limitations of the service of penalty**
(1) In case of individuals, the statute of limitations term for the service of a penalty is as follows:
   a) 20 years, when the penalty to be served is life imprisonment or a term of imprisonment exceeding 15 years;
   b) 5 years, plus the term of the penalty to be served, but no more than 15 years, for all other penalties represented by imprisonment;
   c) 3 years, if the penalty is a fine.
(2) The statute of limitations term under Art. (1) runs as of the date the conviction sentence is final.
(3) In case of withdrawal or rescission of postponement of penalty enforcement, suspension of service of a penalty under supervision or probation, the statute of limitations term runs as of the date the decision on such withdrawal or rescission is final.
(4) In case of revocation of probation, as per Art. 104 par. (1), the statute of limitations term runs as of the date the revocation decision is final and shall be computed proportional to the penalty remained to be served.
(5) In case of replacement of the fine by imprisonment, the statute of limitations term runs as of the date when the decision on such change is final and shall be computed considering the duration of the imprisonment.
(6) Ancillary penalties enforced to individuals, as well as security measures, do not have a limitation term.

EXT-MARGINEAN-00106

(7) Penalty to be served shall mean the penalty ordered by the court, considering the subsequent causes for the amending of such penalty.

## ART. 163
### Interruption of the statute of limitations term for the service of penalty
(1) The statute of limitations term for the service of a penalty is interrupted by the initiation of the service of such penalty. Absconding from the service, upon initiation of service, shall cause a new limitation term to run as of the date of the absconding.

(2) The statute of limitations term for the service shall also be interrupted by commission of a new offence.

(3) The statute of limitations term for the service of a penalty by fine shall also be interrupted by change of the obligation to pay with the obligation to perform unpaid community service.

## ART. 164
### Suspension of the statute of limitations term for the service of penalty
(1) The statute of limitations term for the service of a penalty is suspended in the cases and as provided by the Criminal procedure code.

(2) The statute of limitations term is resumed when the suspension cause ceases.

**We mention that in this case the statute of limitation term is of 8 years and 6 months and it has not been reached yet, as the conviction was rendered final on the date of 19.05.2015.**

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,



SWORN INTERPRETER AND TRANSLATOR ,



EXT-MARGINEAN-00108

MINISTRY OF THE INTERIOR AND ADMINISTRATIVE REFORM
Alba District Court
Criminal case no. 273/P/2008

Special form
Series B No. 0468090

STATEMENT of the accused/defendant
Day – 27, month – 04, year – 2009

Surname: MĂRGINEAN, forename: RUSALIN SORIN, ID document: ID card, series AX no. 255039, issued by the Cugir Police Authorities, personal identification number 1720216013541;
Previous surname and forename: ---
Alias: ----
Date of birth (day, month, year) and place of birth: 16.02.1972, Cugir
Surname and forename of the father: MĂRGINEAN RUSALIN
Surname and forename of the mother: MĂRGINEAN OLIMPIA
Citizenship: ROMANIAN
Education: VOCATIONAL SCHOOL
Military service: UNFULFILLED
Occupation: DRIVER
Employment: SC LEO TRANS SRL
Marital status: MARRIED
Residence/domicile: SĂLIŞTEA TOWNSHIP, SĂLIŞTEA DEAL VILLAGE, NO. 39A, ALBA COUNTY
Home address: ----
Criminal record: NONE
After being informed that I accused/defendant in having committed the offences of:
Forgery, use of forgery and instigation to misrepresentation
Offences provisioned by article 289 of the Criminal Code, article 291 of the Criminal Code, and article 25 of the Criminal Code in conjunction with article 215 paragraphs 1-3 of the Criminal Code.

| INVESTIGATION AUTHORITY JUDICIAL POLICE | DEFENCE ATTORNEY | ACCUSED/ DEFENDANT |
|---|---|---|
| [Signature: illegible] | [Signature: illegible] | [Signature: illegible] |

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

Consisting in the fact that in the period between 2007-2008 determined the individuals named Chirita Cristian, Trifan Florin and Mărginean Nicolaie to contract various bank loans, providing false documents, on the basis of which those respective loans were granted,

And that according to article 70 paragraphs 2 and 4 of the Code of Criminal Procedure, I have the right to a defender, the right to refrain from making any statement, being informed that everything I say may be used against me, as well as the obligation of notifying in writing, 3 days prior, any change of residence during the criminal proceedings, hereby state the following:

1

The hearing began at 10.31.

I was informed that I am charged with having committed the offences provisioned and penalised in accordance with article 289 of the Criminal Code, article 291 of the Criminal Code, and article 25 of the Criminal Code in conjunction with article 215 paragraphs 1-3 of the Criminal Code, that I have the right to a defender, the right to refrain from making any statement, and that everything I say may be used against me.

I was informed that if any change of residence occurs during the criminal proceedings, I have the obligation of notifying the judicial authorities in writing, 3 days prior to such change.

In this stage of the investigations, I agreed to be represented by the attorney-at-law Moise Petru, private attorney, in the presence of whom I agree to make this statement.

In the period of 2006-August 2008, I was the company administrator of SC Sory Expres SRL Săliștea. Since August 2008 this company does not carry out any activities, the liquidation procedure being initiated in this respect. I was the sole administrator and associate in this company. The main scope of the company was "Transports". In the period of 2007-2008, I don't recall exactly, the company I administered hired the individuals named Chiriluț Cristian, Trifan Florin and Mărginean Nicolae. I knew all three of them before I hired them in my company. All three requested me to hire them, which I did.

All three were employees of the company during the same period of time.

I remember that the individual named Chiriluț was hired from the beginning of 2007 until the fall of 2007. He was hired as a driver, and at the end of 2007 I decided to fire him because I caught him stealing diesel and because of him being undisciplined.

| INVESTIGATION AUTHORITY JUDICIAL POLICE [Signature: illegible] | DEFENCE ATTORNEY [Signature: illegible] | ACCUSED/ DEFENDANT [Signature: illegible] |
|---|---|---|

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

Chiriluț personally signed the work contract. I signed on behalf of the company. The work contract also mentioned the position of driver and a monthly salary of RON 1,700 or RON 1,800 I don't recall the exact amount. I remind you and state that the contract was drawn up by the accountant of the company at that time, namely the individual named Sima Crina, but I don't remember the exact sum written in the contract, but I believe it was the previously mentioned sum. I am mentioning that it was I who negotiated with Chiriluț the sum to be written down in his work contract.

In fact, Chiriluț, besides the basic salary mentioned in his work contract, received monthly per diem and other bonuses, depending on the trips he made. Chiriluț worked on a truck which my company purchased in leasing.

The work contract signed by Chiriluț was registered with the Local Labour Inspectorate.

In the summer of 2007, I don't recall the exact date; Chiriluț told me he needs a salary certificate to contract a loan from the bank. He told me that he had previously borrowed some money and that he wanted to pay it back. I don't know the person who lent him the money. I did not asked for details related to this bank loan. I did not know

2

EXT-MARGINEAN-00110

the bank that was to give him the loan.

In this context I gave him an income certificate. This document was filled in by the company's accountant, namely Sima Crina, about whom I did not know where she lives. She wasn't an employee of the company, but only worked on the basis of a service supply agreement and I don't have any information about her. I don't know where she lives.

I checked the income certificate, to the meaning that the sums representing the salary were corresponding to the reality, and then I signed that income certificate. I was the only one who signed this document. It comprised the income received by Chiriluț, namely the basic salary and the above-mentioned bonuses. As well, I also gave Chiriluț a copy of his work contract. I did not give him any other documents.

I did not know what type of loan he was going to get. I took no interest in this matter. No other person was present when Chiriluț told me he was going to get a loan from the bank to pay up a debt.

I had no agreement with Chiriluț in relation with his loan or the money. I did not ask for a part of the bank loan. I don't know when he cashed in the money from the bank, how much money he got or what he did with it. I never accompanied Chiriluț to the bank.

I don't know whether he actually paid the instalments related to his loan.

In the fall of 2007, he was fired by the company for the above-mentioned reasons. This is why I believe that Chiriluț claims that I allegedly had an agreement with him regarding the loan, but this is not true.

The individual named Mărginean Nicolaie was hired at the beginning of 2007 and I think since February or March until the fall of 2008. He was hired as a driver, and in the fall of 2008 I decided to fire him because I caught him stealing diesel fuel and because his lack of discipline. He also stole other items property of the company.

Mărginean Nicolaie personally signed the work contract. I signed on behalf of the company. The work contract also mentioned the position of driver and a monthly salary of RON 1,600 or RON 1,800 I don't recall the exact amount. I remind you and state that the contract was drawn up by the accountant of the company at that time, namely the individual named Sima Crina, but I don't remember the exact sum written in the contract, but I believe it was the previously mentioned sum. I am mentioning that it was I who negotiated with Mărginean Nicolaie the sum to be written down in his work contract.

In fact, Mărginean Nicolae, besides the basic salary mentioned in his work contract, received monthly per diem and other bonuses, depending on the trips he made. Mărginean Nicolaie worked on a truck which my company purchased in leasing and on a cereal harvesting combine, which was also property of the company.

The work contract signed by Mărginean Nicolaie was registered with the Local Labour Inspectorate. I know this because I checked the stamp on the contract which remained in the company.

In the summer of 2007, I don't recall the exact date; Mărginean Nicolaie told me he needs a salary certificate to contract a loan from the bank. I knew that he had bought a car and he was to pay for it. I don't know the seller of the car or its price. I did not asked for details related to this bank loan. I did not know the bank that was to give him the loan.

3

EXT-MARGINEAN-00111

In this context I gave him an income certificate. This document was filled in by the company's accountant, namely Sima Crina.

I checked the income certificate, to the meaning that the sums representing the salary were corresponding to the reality, and then I signed that income certificate. I was the only one who signed this document. It comprised the income received by Mărginean Nicolae, namely the basic salary and the above-mentioned bonuses. As well, I also gave Mărginean Nicolaie a copy of his work contract. I did not give him any other documents.

I did not know what type of loan he was going to get. I took no interest in this matter.

| INVESTIGATION AUTHORITY | DEFENCE | ACCUSED |
|---|---|---|
| JUDICIAL POLICE | ATTORNEY | |
| [Signature: illegible] | [Signature: illegible] | [Signature: illegible] |

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

I had no agreement with Mărginean Nicolaie in relation with his loan or the money. I did not ask for a part of the bank loan. I don't know when he cashed in the money from the bank, how much money he got or what he did with it. I never accompanied Chiriluț to the bank.

I don't know whether he actually paid the instalments related to his loan.

In the fall of 2008, after the company entered in bankruptcy procedure, he was fired by the company for the above-mentioned reasons. This is why I believe that Mărginean Nicolaie claims that I allegedly had an agreement with him regarding the loan, but this is not true.

The individual named Trifan Florin was hired at the beginning of 2008 and I think since February or March until the fall of 2008, until the company entered in liquidation procedure. He was hired as a driver, and in the fall of 2008 I decided to fire him because I caught him in a state inebriation while on duty and he did not perform his duties.

Trifan Florin personally signed the work contract. I signed on behalf of the company. The work contract also mentioned the position of driver and a monthly salary of RON 1,600 or RON 1,800 I don't recall the exact amount. I remind you and state that the contract was drawn up by the accountant of the company at that time, namely the individual named Sima Crina, but I don't remember the exact sum written in the contract, but I believe it was the previously mentioned sum. I am mentioning that it was I who negotiated with Trifan the sum to be written down in his work contract.

In fact, Trifan, besides the basic salary mentioned in his work contract, received monthly per diem and other bonuses, depending on the trips he made. He worked on a truck which my company purchased in leasing.

I am mentioning that I have personally seen the driving licences held by Chiriluț, Mărginean Nicolaie and Trifan Florin, and all three drove the vehicles owned by my company on the public roads.

The work contract signed by Trifan Florin was registered with the Local Labour Inspectorate. I know this because I checked the stamp on the contract which remained in the company.

4

In the summer of 2008, I don't recall the exact date; Trifan Florin told me he needs a salary certificate to contract a loan from the bank. I knew that he was renovating his house and he needed the money.

| INVESTIGATION AUTHORITY | DEFENCE | ACCUSED |
| JUDICIAL POLICE | ATTORNEY | |
| [Signature: illegible] | [Signature: illegible] | [Signature: illegible] |

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

I did not asked for details related to this bank loan. I did not know the bank that was to give him the loan.

In this context I gave him an income certificate. I am mentioning that only one income certificate was issued and I knew that he would ask for only one bank loan. This document was filled in by the company's accountant, namely Sima Crina.

I checked the income certificate, to the meaning that the sums representing the salary were corresponding to the reality, and then I signed that income certificate. I was the only one who signed this document. It comprised the income received by Trifan, namely the basic salary and the above-mentioned bonuses. As well, I also gave him a copy of his work contract. I did not give him any other documents.

I did not know what type of loan he was going to get. I took no interest in this matter.

I had no agreement with Trifan Florin in relation with his loan or the money. I did not ask for a part of the bank loan. I don't know when he cashed in the money from the bank, how much money he got or what he did with it. I never accompanied him to the bank.

I don't know whether he actually paid the instalments related to his loan.

In the fall of 2008, after the company entered in bankruptcy procedure, he was fired by the company for the above-mentioned reasons. This is why I believe that Trifan claims that I allegedly had an agreement with him regarding the loan, but this is not true.

The company is currently in liquidation. The individual named Jibetean is the liquidator, and the individual Iulia Simbotin is the accountant. All company's documents are with the above-mentioned individuals. The work contracts signed by Chiriluţ, Mărginean Nicolaie and Trifan Florin are with the other accounting documents.

I have no explanation for the reason the said Trifan and Mărginean Nicolaie claim they did not sign any work contracts and that the signature on those contracts does not belong to them. If they wouldn't have signed those contracts, they could not work for my company.

I cannot explain why Trifan claims he has no driving licence for any category.

The police authorities showed me the work contract no. 19/01.02.2007, the income certificate no. 214/21.05.2008 and the certificate no. 219/26.05.2008. The signatures appearing at the position "general manager" on these documents are mine.

The individual named Poienar Ana was hired by the company as transport coordinator. I don't believe she knew anything about the contracts signed by those three.

| INVESTIGATION AUTHORITY | DEFENCE | ACCUSED |
| JUDICIAL POLICE | ATTORNEY | |

5

EXT-MARGINEAN-00113

[Signature: illegible]                  [Signature: illegible]                [Signature: illegible]
                                                            [Stamp: Alba District Court * True copy]
                                                            [Stamp: Alba District Court * Romania]
                                                                        [Signature: illegible]

The individual named Lascan Ioan was hired by my company in 2006. I don't know if he had any information regarding the loans contracted by the individuals named Chiriluț, Mărginean Nicolaie and Trifan Florin. The above-mentioned persons weren't present for any conversations I had with the three who contracted the loans in respect of those loans.

I am currently paying rent. I own any real estate or motor vehicle. I am currently working as a driver, on the basis of a work contract in the company SC Leo Trans SRL, having its registered offices in Bulgaria and in Giurgiu. I receive a monthly income of approximately 700-800 EUR.

I don't have any bank accounts.

I don't' know any employee working in a bank from Alba Iulia or from Sebeș.

I agree to take the polygraph test. To this aim I will appear before the police authorities for testing.

As evidence, I request the hearing of the individuals Poienar Ana, Maxim Adrian. I don't request any other evidence.

I don't consider myself guilty of the charges brought against me.

I don't have any mental illness.

This is the statement I sign and uphold.

This statement has four sheets.

The hearing ended at 11.39 hrs.

| INVESTIGATION AUTHORITY | DEFENCE | ACCUSED |
|---|---|---|
| JUDICIAL POLICE | ATTORNEY | |
| [Signature: illegible] | [Signature: illegible] | [Signature: illegible] |

                                                            [Stamp: Alba District Court * True copy]
                                                            [Stamp: Alba District Court * Romania]
                                                                        [Signature: illegible]

6

EXT-MARGINEAN-00114

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

[Stamp: illegible]
[Handwritten text: Given before me on 31.08.2009]
[Signature: illegible]

## STATEMENT

I, MĂRGINEAN RUSALIN SORIN, son of RUSALIN and OLIMPIA, born on 16.02.1972 in Cugir, Alba County, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County, hereby state the following:

Referring to complaint filed against me by Grozav Tiberiu, I hereby state that I know the above-mentioned person, but he is no relative of mine. I know that the above-mentioned person, Grozav Tiberiu, has left abroad for a very long time and was not employed by the company Sory Expres and that he has never worked for this company. I have never asked the above-mentioned person to contract a loan and to give me the money obtained in such manner.

I have never borrowed money from the individual named Grozav and I have no explanation for the reason the individual named Grozav filed a complaint against me.

I don't consider myself guilty of having committed any offence.

This is my statement I sign and uphold.

[Signature: illegible]

Alba Iulia
31.08.2009

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

EXT-MARGINEAN-00116

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

[Stamp: illegible]
[Handwritten text: Given before me on 16.02.2010]
[Signature: illegible]

## STATEMENT

I, MĂRGINEAN RUSALIN SORIN, son of RUSALIN and OLIMPIA, born on 16.02.1972 in Cugir, residing in Săliștea Township, Săliștea Deal Village, no. 39, Alba County, hereby state the following:

I was informed that I am accused of having committed the offences provisioned and punishable according to article 31/2 of the Criminal Code related to article 215 paragraphs 1, 2, 3 of the Criminal Code, and article 290/1 of the Criminal Code, and that I have the right to a private attorney and the right to refrain from making any statements, and that everything I say may be used against me

I was informed that if I will change my residence during the criminal proceedings, I have to notify in writing the judicial authorities in 3 days before such change.

I agree to be assisted by the private defender, attorney-at-law George Marin and I want to make a statement.

This is my statement I sign and uphold.

[Signature: illegible]

Alba Iulia
16.02.2010
[Signature: illegible]

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]

EXT-MARGINEAN-00118

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

[Stamp: illegible]
[Handwritten text: Given before me on 27.04.2009]
[Signature: illegible]

## STATEMENT

I, MĂRGINEAN RUSALIN SORIN, son of RUSALIN and OLIMPIA, born on 16.02.1972 in Cugir, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County, hereby state the following:

In the presence of my private attorney MOISE PETRU, I was informed that I am accused of having committed the offences provisioned and punishable according to article 289 of the Criminal Code, article 281 of the Criminal Code, article 29 of the Criminal Code related to article 215 paragraphs 1-3 of the Criminal Code, and that I have the right to a private attorney and the right to refrain from making any statements, and that everything I say may be used against me.

I was informed that if I will change my residence during the criminal proceedings, I have to notify in writing the judicial authorities in 3 days before such change.

In this stage of the investigations, I agree to be assisted by the private defender MOISĂ PETRU and I agree to make a statement in this case, namely that I do not consider myself guilty for having committed the offences I was charged with.

This is my statement I sign and uphold.
Alba Iulia
27.04.2009
[Signature: illegible]

[Stamp: Alba District Court * True copy]
[Stamp: Alba District Court * Romania]
[Signature: illegible]
[Signature: illegible]

EXT-MARGINEAN-00120

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

DRPAD
Directorate for the Records of Persons and Administration of Databases
Search        Log out        Change Password  Help  About Contact
MINISTRY OF THE INTERIOR
Directorate for the Records of Persons and Administration of Databases
Data controller no. 15964, 15965
Non-public information. Please ensure the confidentiality of the data
**Record for Personal identification Number 1720216013541**

| Back |

| GENERAL DATA | | | |
|---|---|---|---|
| Personal Identification Number | 1720216013541 | Sex | **Male** |
| REQUESTED PERSON | | | |
| Name | **MĂRGINEAN** | | |
| Surname | **RUSALIN-SORIN** | | |
| Date of birth | 16 February 1972 | Birth Certificate | 68 / 1972 |
| Place of birth | Cugir City, Alba County | | |
| Father | RUSALIN | Mother | OLIMPIA |
| Marital status | Married | Military status | No military obligations |
| Education | High school, professional or complementary | Profession | - |
| Occupation | driver | Income source | - |

[Photo of the requested person]

| Passport data |
|---|
| Motor vehicle records |

| PHOTOGRAPHS | |
|---|---|
| Date of the photograph | Information associated with the photograph |
| 20-10-2009 | Show |
| 14-02-2008 | Show |

| OPERATIONAL NOTES | | | | | | |
|---|---|---|---|---|---|---|
| Status | Note | Order no. | Order issuer | Act | Ban | Other information |
| Active | Requested | 367229/02.04.2015 | Police - Police Inspectorate of Alba County | Warrant of enforcement of a custodial sentence | - | Misrepresentation |

1

EXT-MARGINEAN-00122

| DATA REGARDING THE MARITAL RELATIONSHIP | | | | |
|---|---|---|---|---|
| Partner's Personal Identification Number | Partner's name | Marital status | Document's no./date | Recorded event |
| 2751020013522 | MĂRGINEAN VIORICA | Married | 11/1991 June 06 | Săliștea Township / Alba County |

| DATA REGARDING CHILDREN | | | |
|---|---|---|---|
| Children's Personal Identification number | Name | Surname | Place of birth |
| 2910614013641 | MĂRGINEAN | IONELA-SORINA | Cugir city, Alba County |
| 1920728013654 | MĂRGINEAN | IONUȚ-SORIN | Cugir city, Alba County |

| ADDRESSES | | | | |
|---|---|---|---|---|
| Type | Period | City | Address | Public Local Community Office for Persons Records |
| Active | 16 March 2006 / | Săliștea Deal Village (Săliștea Township) / Alba County | No. 39A | Cugir |
| Past | 01 January 1991 / 16 March 2006 | Săliștea Deal Village (Săliștea Township) / Alba County | No. 5 | Cugir |

[Stamp: Alba District Court * Romania]
[Signature: illegible]

| Status | Serial | Number | Issued on | Valid until | Handed over on | Reason for issue | Issuer |
|---|---|---|---|---|---|---|---|
| Issued | AX | 372876 | 22 October 2009 | 16 February 2019 | 26 October 2009 | Loss | Public Community Office Cugir |
| Issue | AX | 25503 | 21 | 16 | 24 | Repatriated | Public |

2

EXT-MARGINEAN-00123

| d | | 9 | March 2006 | Februa ry 2016 | March 2006 | | Commun ity Office Cugir |
|---|---|---|---|---|---|---|---|
| Issue d | GK | 52615 6 | 21 Octob er 1993 | 21 Octobe r 2003 | 21 Octob er 1993 | Deteriorated/destroyed/ca ncelled | Cugir city |

| MIGRATION DATA | | |
|---|---|---|
| Migration type | Country/date of migration | Number, date of document, issuer |
| Repatriation | /15 March 2006 | 34445    on    2006-03-15 (Passport office), from () |
| Romanian national living abroad | U.S.A./08 February 2005 | 9888366    on    2005-02-08 (Passport office), from () |
| Loss of Romanian citizenship | /01 January 1991 | NA    on    1996-07-24 (National Citizenship Authority), from () |

| MARITAL STATUS DOCUMENTS | | | | |
|---|---|---|---|---|
| Document type | Serial/no. | Date of issue | Issuer | City |
| Birth certificate | NL/798177 | 13 February 2006 | Local Council | Cugir city |
| Marriage certificate | C8/527259 | 06 June 1991 | Local Council | Săliştea Township |
| Marriage certificate | C8/527259 | 06 June 1991 | Local Council | Săliştea Township |
| Marriage document | /11 | 06 June 1991 | Local Council | Săliştea Township |

User: MOCEANC/Group MJ
8 September 2017 - 12:49 hrs
Active users: 101
[Stamp: Alba District Court * Romania]
[Signature: illegible]

3

Government Exhibit 1
Page 169 of 266

I, the undersigned Gheorghiu Oana Liliana, certified English interpreter and translator, holder of licence no. 6392 issued on 12.03.2002 by the Ministry of Justice in Romania, hereby certify the accuracy of this translation from Romanian into English, and that the text presented was translated completely, without omissions, and does not distort the contents and meaning of the document.

Certified Translator

Gheorghiu Oana

ROMANIA

ALBA DISTRICT COURT

CRIMINAL DIVISION

CASE FILE NO. 3420/107/2017

### Information regarding the identity and presumptive location of the requested person Mărginean Rusalin Sorin

**Mărginean Rusalin Sorin** (personal identification number 1720216013541), Romanian citizen, son of Rusalin and Olimpia, born on the 16th of February, 1972 in Cugir, Alba County, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County.

Regarding the official letter sent by INTERPOL, the convict Mărginean Rusalin Sorin could reside in the USA.

We attach the photograph of the convicted person.

Government Exhibit 1
Page 171 of 266

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





EXT-MARGINEAN-00127

*Photograph attached*

EXT-MARGINEAN-00128

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





# Attachment B

Government Exhibit 1
Page 175 of 266

ROMANIA

ALBA DISTRICT COURT
CRIMINAL DIVISION

Case file no. 15829/107/2012

COURT SESSION REPORT

Public hearing of the 22nd of September, 2014
Chamber consisted of:
President MARIA ELENA FULEA
Chief Court Clerk NICOLAE TODEA

The Public Prosecutor's Office attached to Alba District Court is represented by the
prosecutor ADINA MALINCENCO

On the docket, the judgment of the criminal case regarding the defendants MĂRGINEAN RUSALIN SORIN, CHIRILUȚ CRISTIAN SABIN, MĂRGINEAN NICOLAE, TRIFAN FLORIN, GROZAV EUGEN TIBERIU and POIENAR ANA, indicted for the offence of misrepresentation (article 215 of the Criminal Code) to the detriment of the victims BCR S.A., ALPHA BANK - ALBA BRANCH, ALPHA BANK - SEBEȘ AGENCY, BRD GROUPE SOCIETE GENERALE, KRUK INTERNATIONAL SRL and ASSET POTFOLIO SERVICING ROMANIA SRL.

At the calling of the parties done in the public hearing, lawyer Bunea Oana, public defender, for the defendants Grozav Eugen Tiberiu and Trifan Florin, lawyer Sava Raluca Maria for the substitution of lawyer Lacrima Cristina Stan, appointed defender, for the defendants Mărginean Rusalin Sorin and Poienar Ana, lawyer, Surpețeanu Monica, appointed defender, for the defendant Chiriluț Cristian Sabin, and lawyer Drella Carol, for the defendant Mărginean Nicolaie, the witness Vesi Ionuța Elisabeta have appeared before the court, the parties and the witness Bratu Gabriela Iuliana being absent.

The summoning procedure is legally fulfilled.

The case report has been prepared by the court clerk of the hearing who informs the court that the notice and the envelope containing the summons issued in the name of the witness Bratu Gabriela Iuliana at her workplace were returned to the case file, mentioning that "she does not work for BCR".

Under article 381 related to article 119-123 of the Code of Criminal Procedure, the court has started hearing the witness Vesi Ionuța Elisabeta, her statement being recorded and attached to the case file.

The court further gives the floor regarding the witness Bratu Gabriela Iuliana, considering the mentions made when returning the procedural acts prepared in her name to the case file.

The defence lawyer of the defendants Mărginean Rusalin Sorin and Poienar Ana, lawyer Sava Raluca Maria for the substitution of lawyer Lacrima Cristina Stan, states that because they do not have the personal identification number no letter can be issued to find out the witness' domicile, although it is mentioned in the indictment.

The defence lawyer of the defendant Mărginean Nicolaie, lawyer Drella Carol, states that no other steps can be taken in the absence of data, but the witness' statement is recorded in the indictment.

As regards the allegations of the defendants' defence lawyers and analyzing the documents and papers in the case file, the court considers that the testimonial evidence of Bratu Gabriela Iuliana taken during the judicial investigation is no longer necessary for the case.

At the same time, the court asks the prosecutor and the defendants' defence lawyers if they have new applications in the evidentiary procedure.

The defence lawyer of the defendants Grozav Eugen Tiberiu and Trifan Florin, Bunea Oana, states that it is necessary to attach the criminal records of the defendants to the case file.

The defence lawyer of the defendant Chiriluț Cristian Sabin, Surpețeanu Monica, requests the court to order the attachment of the file of the Public Prosecutor's Office under the no. 74/P/2011 to the case file, file in which the witness Vesi Ionuța Elisabeta has been investigated because the client whom she granted the loan was the defendant Chiriluț. She thinks that the statements made before the Public Prosecutor's Office as regards this situation are relevant because they are certainly more detailed and the explanations are interesting for the case. She also requests the court to order the issuance of an official letter whereby the bank should attach to the case file that form mentioned by the witness who has been heard today, form which was attached to the loan file and certified the verification of authenticity of the submitted documents and the verification of the allegations regarding the documents which were submitted to the bank in the database or at the company's office.

The court disputes the application.

The representative of the Public Prosecutor's Office does not oppose.

The defence lawyer of the defendants Grozav Eugen Tiberiu and Trifan Florin, Bunea Oana, states that she supports the application.

During the deliberation, the court rejects the application in the evidentiary procedure, given, on the one hand, that the witness Vesi Ionuța Elisabeta, who was a suspect in the case file no. 74/P/2011, has been heard in this case file, and, on the other hand, the loan contracts are attached to the criminal prosecution file and, as the witness claims, such forms may exist or not, but the loan contracts are submitted to the case file.

The court further gives the floor on other applications in the evidentiary procedure.

The defence lawyer of the defendants Grozav Eugen Tiberiu and Trifan Florin, Bunea Oana, requests the court to provide a short period of 2 weeks to attach to the case file, as she has started, the criminal records of the defendants and to prepare the defence.

The court informs the defendants' defence lawyer that a 2-week period is to be granted for sentencing, period during which it shall request the attachment of the criminal records of the defendants to the case file and, at the same time, written conclusions shall also be attached.

EXT-MARGINEAN-00132

As a result of the fact that the New Criminal Code entered into force, under article 386 of the Code of Criminal Procedure, the court disputes the re-correlation of the articles under which the defendants have been indicted, as follows:

1. For the defendant Mărginean Rusalin Sorin: from the offence referred to in article 25 of the Criminal Code related to article 215 paragraph 1-3 and 5 of the Criminal Code with the application of article 75 lett. a of the Criminal Code and article 41 paragraph 2 of the Criminal Code (7 material acts) to 4 offences referred to in article 47 of the New Criminal Code related to article 244 of the New Criminal Code because there are 4 victims (offence referred to in article 47 of the New Criminal Code related to article 244 of the New Criminal Code - victim Chiriluț Cristian Sabin, offence referred to in article 47 of the New Criminal Code related to article 244 of the New Criminal Code - victim Mărginean Nicolae, offence referred to in article 47 of the New Criminal Code related to article 244 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code - victim Grozav Eugen Tiberiu and offence referred to in article 47 of the New Criminal Code related to article 244 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code - victim, Trifan Florin) and from the offence referred to in article 290 of the Criminal Code with the application of article 41 paragraph 2 of the Criminal Code to the offence referred to in article 322 of the New Criminal Code related to article 35 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code, both with the application of article 38 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code.

2. For the defendant Poienar Ana, it determines that it is not required to discuss about the change of legal classification of the offence for which she has been indicted, namely article 26 of the Criminal Code related to article 290 of the Criminal Code related to article 41 paragraph 2 of the Criminal Code, because the old law is the more favourable criminal law.

The representative of the Public Prosecutor's Office does not oppose to the disputed issues, considering article 386 of the Code of Criminal Procedure.

The defence lawyer of the defendants Mărginean Rusalin Sorin and Poienar Ana, Sava Raluca Maria for the substitution of lawyer Lacrima Cristina Stan, requests the enforcement of the New Criminal Code as regards the defendant Mărginean Rusalin Sorin and the Old Criminal Code for the defendant Poienar Ana.

3. For the defendant Chiriluț Cristian Sabin: from the offence referred to in article 215 paragraph 1-3 of the Criminal Code to the offence referred to in article 244 of the New Criminal Code with the application of article 5 of the New Criminal Code and from the offence referred to in article 291 of the Criminal Code to the offence referred to in article 323 of the New Criminal Code with the application of article 5 of the New Criminal Code, both with the application of article 38 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code.

The representative of the Public Prosecutor's Office does not oppose.

The defence lawyer of the defendant Chiriluț Cristian Sabin, Surpețeanu Monica, states that she has the same conclusions.

EXT-MARGINEAN-00133

4. For the defendant Mărginean Nicolae: from the offence referred to in article 215 paragraph 1-3 of the Criminal Code to the offence referred to in article 244 of the New Criminal Code with the application of article 5 of the New Criminal Code and from the offence referred to in article 291 of the Criminal Code to the offence referred to in article 323 of the New Criminal Code with the application of article 5 of the New Criminal Code, both with the application of article 38 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code.

The representative of the Public Prosecutor's Office has the same conclusions.

The defence lawyer of the defendant Mărginean Nicolaie, Drella Carol, states that he agrees.

5. For the defendant Trifan Florin: from the offence referred to in article 215 paragraph 1-3 of the Criminal Code with the application of article 41 paragraph 2 of the Criminal Code to the offence referred to in article 244 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code, from the offence referred to in article 291 of the Criminal Code with the application of article 41 paragraph 2 of the Criminal Code to the offence referred to in article 323 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code and from the offence referred to in article 290 of the Criminal Code to the offence referred to in article 322 of the New Criminal Code with the application of article 5 of the New Criminal Code, all with the application of article 38 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code.

The representative of the Public Prosecutor's Office has the same conclusions.

The defence lawyer of the defendant Trifan Florin, Bunea Oana, states that she agrees.

6. For the defendant Grozav Eugen Tiberiu: from the offence referred to in article 215 paragraph 1-3 of the Criminal Code with the application of article 41 paragraph 2 of the Criminal Code to the offence referred to in article 244 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code, and from the offence referred to in article 291 of the Criminal Code with the application of article 41 paragraph 2 of the Criminal Code to the offence referred to in article 323 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code, both with the application of article 38 paragraph 1 of the New Criminal Code and article 5 of the New Criminal Code.

The representative of the Public Prosecutor's Office has the same conclusions.

The defence lawyer of the defendant Grozav Eugen Tiberiu, Bunea Oana, states that she agrees.

Because there are no other explanations to be made or new applications to be filed, the court states that the judicial investigation is terminated and gives the floor in the debate of the merits of the case.

Government Exhibit 1
Page 179 of 266

The representative of the Public Prosecutor's Office states that by the indictment no. 279/P/2008 of the Public Prosecutor's Office attached to Alba District Court, the defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin, Grozav Eugen Tiberiu and Poienar Ana have been indicted for several offences. In fact, during 2006-2008, the defendant Mărginean Rusalin Sorin was the director and sole shareholder of Sory Expres SRL, company which carried out transport activities. Due to the fact that the defendant's company had a poor financial situation, he talked to several employees and asked them to contract various bank loans in their own name, money which they were to make available to the defendant, and, in exchange, he should have paid the instalments for those loans, which it did not happen. In his criminal activity, the defendant Mărginean Rusalin Sorin also involved the defendant Poienar Ana, who was a manager of SC Sory Expres SRL, between them being also another relation, so that the defendant filled in the labour agreements and income certificates fictitiously certifying the capacity of employee and the income from salary. Such documents prepared by the defendant were signed for conformity by the defendant Mărginean Rusalin Sorin, and the certificates prepared by the two defendants had to be signed by Lupu Vasilica Crinela who was conducting the accounting, but she was not the person who signed the document, but the two defendants forged her signature. At the same time, the defendant Mărginean Rusalin Sorin was the one who confirmed by phone the data in the income certificates to the bank officials. Therefore, during December 2007 - June 2008 seven bank loans were contracted. Shortly, she states that the defendant Chiriluț Cristian Sabin contracted a loan amounting to €15,000 from BCR SA - Cetate Agency on the 4th of December, 2007; on the 4th of January, 2008, the defendant Mărginean Nicolaie contracted a loan amounting to €15,000 from the same BCR agency; in May 2008, the defendant Trifan Florin contracted two bank loans amounting to €19,900; in June 2008, the defendant Grozav Eugen Tiberiu contracted three bank loans amounting to €10,000, LEI 10,000 and LEI 54,800.

All these defendants used forged documents, knowing that there were no employed in the position mentioned in the certificate and they did not have the salary mentioned in it, but a much smaller one. These acts of the defendants, at that time and at the time of indictment, were other offences, which is why the change of legal classification mentioned in the indictment was ordered, so that it is required to convict the defendant Mărginean Rusalin Sorin for the offence referred to in article 47 related to article 244 paragraph 1, 2 of the New Criminal Code with the application of article 77 lett. a of the New Criminal Code and article 35 paragraph 1 of the New Criminal Code, article 322 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code, all with the application of article 38 paragraph 1 of the New Criminal Code, the defendant Chiriluț Cristian Sabin for the offence referred to in article 244 paragraph 1, 2 of the New Criminal Code, article 323 of the New Criminal Code, all with the application of article 38 paragraph 1 of the New Criminal Code, the defendant Mărginean Nicolaie for the offence referred to in article 244 paragraph 1, 2 of the New Criminal Code, article 323 of the New Criminal Code, all with the application of article 38 paragraph 1 of the New Criminal Code, the defendant Trifan Florin for the offence referred to in article 244 paragraph 1, 2 of the New Criminal Code, article 323 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code, article 322 of the New Criminal Code, all with the application of article 38 paragraph 1 of the New Criminal Code

EXT-MARGINEAN-00135

and the defendant Grozav Eugen Tiberiu for the offence referred to in article 244 paragraph 1, 2 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code, article 323 of the New Criminal Code with the application of article 35 paragraph 1 of the New Criminal Code, both with the application of article 38 paragraph 1 of the New Criminal Code.

As regards the defendant Poienar Ana, it is noticed that the Old Criminal Code is the more favourable criminal law, so that she requests her conviction under article 26 of the Old Criminal Code related to article 290 of the Old Criminal Code with the application of article 41 paragraph 2 of the Old Criminal Code. Regarding the legal specification of custodial sentences, she requests the court to impose custodial sentences for all defendants. She also requests that the defendants shall be obliged to pay civil damages to BCR provided that they have been proven by the documents attached to the case file supporting the act of becoming a civil party, and the coverage of judicial expenses.

The defence lawyer of the defendants Mărginean Rusalin Sorin and Poienar Ana, Sava Raluca Maria for the substitution of lawyer Lacrima Cristina Stan, regarding the charge of instigation to misrepresentation as regards the defendant Mărginean Rusalin Sorin, requests the court to order his acquittal, under article 396 paragraph 5 related to article 16 paragraph 1 lett. c of the Code of Criminal Procedure, because, according to the entire evidence taken during the criminal investigation and the evidence taken during the judicial investigation, it does not result in direct solid evidence such that the defendant would have intentionally determined the other co-defendants to commit the offence of misrepresentation, besides their statements, which must be analyzed as inventory because their position is self-interested and concerted in this case, given the circumstances of the offence.

Thus, as results from the indictment, the co-defendants were aware that the solvency requirements were not met to obtain the loans and given this issue they are liable for the offences and decisions made learnedly. As noticed, at a given moment, each of them had work relations within the company of the defendant Mărginean Rusalin Sorin, admitting that they were paid for the external transports which they additionally made, issues resulting both from the statements made during the criminal investigation and the judicial investigation.

Therefore, besides the statements of co-defendants, there is no evidence in the case file resulting in the capacity of participant in committing the offence of instigation to misrepresentation of the defendant Mărginean Rusalin Sorin. All this defendant did was to issue to the co-defendants income certificates cumulatively reflecting all amounts received as payment for the services to be provided as drivers during external transports, and he did not intend to make them commit offences.

Related to the civil side of the case, she requests the court to reject the applications filed by Alpha Bank which include references to the defendant Mărginean Rusalin Sorin, because it is required to notice that the act of becoming a civil party is not related to the merits of the case, namely the loan contracts which are mentioned in the indictment. The monetary claims filed by Alpha Bank are outside the procedural framework which was granted to the court by the intimation. As regards the application in the indictment regarding the safety measure of special confiscation referred to in article 118 lett. c) of

EXT-MARGINEAN-00136

the Old Criminal Code, she requests the court to order its revocation. Regarding the offence of use of false deeds under a private signature considered as regards Mărginean Rusalin Sorin, she requests that under article 396 paragraph 2 of the Code of Criminal Procedure, it should consider the conviction to a penalty as fine, mainly, and, secondly, if it considers that the situation requires a custodial sentence, she requests that it should be between the legal limits in a small as possible amount, oriented towards the minimum, so that it is possible to use as a method of serving the sentence the suspension under supervision referred to in article 91 of the Criminal Code. In the specification of custodial sentence, she requests the court to consider the general specification criteria, namely the low degree of social danger of the offence, the age of the defendant and the lack of criminal records.

As regards the defendant Poienar Ana, she requests, as ordered, in that the legal classification is more favourable in the Old Criminal Code, so within the limits of penalty they shall be the same, that under article 396 paragraph 2 of the Code of Criminal Procedure the court shall order her conviction to a fine, in an amount as low as possible, for the same reasons, and in the specification of custodial sentence it should consider the general criteria referred to in article 72 of the Old Criminal Code and the legal mitigating circumstances referred to in article 74 lett. a and c of the Old Criminal Code. Secondly, if it requires imposing a custodial sentence, given the circumstances mentioned above, she requests to be as small as possible by the effects of legal mitigating circumstances, being reduced below the minimum special threshold up to the general minimum penalty, so as it can order the conditional suspension referred to in article 81 of the Old Criminal Code, as a way of execution. All these applications consider the low seriousness of the offence, lack of criminal records, previous behaviour and that, at the time of issuing those certificates, the defendant Poienar did not know that she would commit a number of forgeries, as long as, as the defendant Mărginean stated, the payments offered to the drivers represented a total of the amounts due to them for those transports, so that what she did was to issue certificates with the amounts which she deemed as the correct salary which these defendants received.

The defence lawyer of the defendants Grozav Eugen Tiberiu and Trifan Florin, Bunea Oana, requests the court to acquit the defendants based on article 16 paragraph 1 lett. b 2nd recital of the Code of Criminal Procedure, namely that the offence was not committed by the guilt provided by law. It can be noticed that according to the entire evidence taken in this case, both during the criminal investigation and before the court, the two defendants were actually an instrument used by the defendant Mărginean Rusalin Sorin. The defendants agreed to withdraw money from various banks, the defendant Trifan obtaining two loans, and the defendant Grozav three loans, to help the defendant Mărginean Rusalin Sorin, who, knowing the two defendants, complained that he had financial problems and if they can help him. The two defendants agreed only to help that defendant; during the operations, they did not notice at any time that the defendant Mărginean Rusalin Sorin would commit an offence or any act provided by the criminal law, neither him as the owner of SC Sory Expres SRL, nor them with the help given to him. It is necessary to consider the taken evidence and especially the statements of the witnesses Lupu, Lăscan, Grigore, Chiriluţ, Gurgui, who state, both during the criminal investigation and before the court that the defendant Mărginean Rusalin Sorin dealt with all documents required to contract those loans, the defendants Trifan and Grozav being

present only when the documents were signed. Moreover the defendant Trifan says that he did not see what he signed but he was only given to sign. Both this defendant and the defendant Grozav were ensured that the repayment of loans, through the payment of monthly instalments, would be made by the defendant Mărginean Rusalin Sorin. When the defendant Grozav saw that he received notices at home from the bank because the instalments were not paid, he went and filed a self-incriminatory report on the 24th of July, 2009, which is attached to the case file, notifying the investigation bodies that the defendant Mărginean made him contract a bank loan and he did not pay the loan instalments, as he ensured him. As regards the income certificates, she requests the court to notice the statements of the two defendants, which must be considered and from which it results that they were signed by them in blank and then they filled in the amounts for which the certificates were issued, the defendant stating that he did it because he was in a hurry, following to be subsequently given a copy. The idea is that the two defendants were not aware at any time that they committed any offence because the defendant Mărginean Rusalin Sorin ensured them that everything was fine. Moreover, when they went to the bank, the amounts and payment schedules were handed over to the defendant Mărginean Rusalin Sorin. Thus, the two defendants have never seen the payment schedules and did not receive any money from those loans. For these reasons, she requests the court to acquit the two defendants which she represents in this case.

The defence lawyer of the defendant Chiriluț Cristian Sabin, Surpețeanu Monica, makes conclusions for the acquittal of the defendant, under article 16 lett. b of the Code of Criminal Procedure, given that the act committed by him was not done by the guilt provided by law. It needs to consider the concrete situation of the defendant Chiriluț at that time. The defendant Mărginean, knowing that the defendant Chiriluț needed money, took advantage of the situation and proposed him to help him obtain a bank loan amounting to €15,000, of which the defendant Chiriluț was to retain €4,000, and the remaining was to remain to the defendant Mărginean. The condition required to conclude this transaction was that the defendant Mărginean Rusalin Sorin would be the one who had to pay everything at the bank. Even if the defendant Mărginean Rusalin Sorin denied this situation before the court, the statements were proven by the loan contract itself which is attached to the case file, document concluded under private signature by Mărginean Rusalin Sorin and Chiriluț Cristian Sabin. Also, it resulted from the graphological expertise prepared in this case that the defendant Chiriluț tells the truth when he states that he was not the one signing and filling in the income certificate and any of the documents attached to the loan file and, subsequently, to the case file. The financial situation of the defendant Chiriluț at that time made him fulfil the request of his boss, the defendant Mărginean Rusalin Sorin, but he did not know at any time that what was happening was an offence, a criminal offence. When, as the two other defendants, he started to receive papers from the bank at home, being notified to pay the instalments, he went to the police and showed the situation, wanting to solve it for his benefit due to the state in which he was, but from the person who went to make a complaint he became a defendant in a criminal file.

If the opinion of acquittal cannot be accepted she requests the court to consider the defendant, the fact that he had no contact with the criminal law, the circumstance that he was the one who went to the police to make a complaint, and the extremely low degree of involvement in committing the offence, and, secondly, delivering a sentence, to make efficient article 80 or 83 or 91 of the Criminal Code.

She states that she shall mention in details the documents to be submitted to the case file in the written conclusions.

The defence lawyer of the defendant Mărginean Nicolaie, lawyer Drella Carol, mainly makes the same conclusions as for the defendant Chiriluţ Sabin, namely for the acquittal of the defendant Mărginean Nicolaie because the act misses one of the essential features, namely the intention. In terms of the offence of forgery, it cannot be considered as regards the defendant Mărginean Nicolaie, because it was committed by the defendant Mărginean Rusalin Sorin. The only document which the defendant Mărginean Nicolaie signed was the loan application, which was subsequently filled in his presence, but by the bank official who prepared the loan documentation, the loan being granted the same day, the 4th of January, 2008. As such, it cannot be claimed that the defendant Mărginean Nicolaie would have committed the offence of forgery, as long as he signed only a loan application, and the other documents used by the defendant Mărginean Rusalin Sorin have been deemed and are false because they were used to obtain the loans by him and not by the defendant Mărginean Nicolaie.

As regards the offence of misrepresentation, it cannot be considered that the defendant Mărginean Nicolaie would have been aware of the fact that the bank was about to be deceived, as long as a few days before the same bank had granted to the other defendant Chiriluţ Sabin another loan for personal needs only based on the identity card, in the same conditions, namely at the request of the company's owner, in the presence of whom the loan application was filled in, and the money was transferred the same day, reaching the defendant Mărginean Rusalin Sorin. As such, it cannot be considered that the defendant Mărginean Nicolaie would have had the intention to prejudice the bank in his interests or he would have benefited from such loan. The defendant continues to be liable to repay the loan on the civil side, but on the criminal side he is not guilty of the offence of misrepresentation.

THE COURT

Under article 391 paragraph 1 of the Code of Criminal Procedure, shall establish a sentencing hearing for the 6th of October, 2014, when the updated criminal records of the defendants shall be requested and written conclusions can be submitted to the case file, which is why,

IN THE NAME OF LAW<br>DECIDES

The court establishes a sentencing hearing for the 6th of October, 2014, when the updated criminal records of the defendants shall be requested and written conclusions can be submitted to the case file,

Delivered in the public hearing today, the 22nd of September, 2014.

President,
MARIA ELENA FULEA

*Illegible signature*

Court clerk
NICOLAE TODEA

*Illegible signature*

N.T./2 copies/25th of September, 2014

*Stamp: Alba District Court - For compliance*
*Illegible signature*

Government Exhibit 1
Page 185 of 266

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





ROMANIA

ALBA DISTRICT COURT
CRIMINAL DIVISION

Case file no. 15829/107/2012

COURT SESSION REPORT

Public hearing of the 6th of October, 2014
Chamber consisted of:
President MARIA ELENA FULEA
Chief Court Clerk NICOLAE TODEA

The Public Prosecutor's Office attached to Alba District Court is represented by the prosecutor ADINA MALINCENCO

On the dockets, the judgment of the criminal case regarding the defendants MĂRGINEAN RUSALIN SORIN, CHIRILUȚ CRISTIAN SABIN, MĂRGINEAN NICOLAE, TRIFAN FLORIN, GROZAV EUGEN TIBERIU and POIENAR ANA, indicted for the offence of misrepresentation (article 215 of the Criminal Code) to the detriment of the victims BCR S.A., ALPHA BANK - ALBA BRANCH, ALPHA BANK - SEBEŞ AGENCY, BRD GROUPE SOCIETE GENERALE, KRUK INTERNATIONAL SRL and ASSET POTFOLIO SERVICING ROMANIA SRL.

The absence of the parties is determined at the calling of the parties done in the public hearing.

The summoning procedure is legally fulfilled.

The case report has been prepared by the court clerk of the hearing, who informs the court that, through the Registry Service, Alba County Police Inspectorate/Criminal Records attached to the case file a copy of the criminal records of each defendant and the defendant Mărginean Nicolae, through lawyer Drella Mihai, submitted written conclusions.

It is determined that the debates and conclusions of the parties were recorded in the court session report of the 22nd of September, 2014, which is an integral part thereof, when the court established a sentencing hearing today, the 6th of October, 2014.

THE COURT

Under article 391 paragraph 2 of the Code of Criminal Procedure, the court shall adjourn the sentencing for the 13th of October, 2014, which is why,

IN THE NAME OF LAW
DECIDES

The court adjourns the sentencing for the 13th of October, 2014.
Delivered in the public hearing, today, the 6th of October, 2014.

President,
MARIA ELENA FULEA
*Illegible signature*

Court clerk
NICOLAE TODEA
*Illegible signature*

N.T./2 copies/6th of October, 2014

*Illegible stamp*
*Stamp: Alba District Court - For compliance*
*Illegible signature*

EXT-MARGINEAN-00143

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





EXT-MARGINEAN-00144

ROMANIA

ALBA DISTRICT COURT

CRIMINAL SECTION

Case file no. 15829/107/2012

CRIMINAL SENTENCE No. 577/2014

Public hearing of 13 October 2014

Panel consisting in:

President MARIA ELENA FULEA

Chief Clerk NICOLAE TODEA

The Prosecutor's Office attached to Alba District Court is represented by prosecutor
ADINA MALINCENCO

On the docket is the criminal case involving defendants MĂRGINEAN RUSALIN
SORIN, CHIRILUȚ CRISTIAN SABIN, MĂRGINEAN NICOLAE, TRIFAN FLORIN,
GROZAV EUGEN TIBERIU and POIENAR ANA, on trial for having committed the offence
of fraud (article 215 of the Criminal Code) to the prejudice of the aggrieved parties BCR
S.A., ALPHA BANK ALBA BRANCH, ALPHA BANK SEBEȘ AGENCY, BRD GROUPE
SOCIETE GENERALE, KRUK INTERNAȚIONAL SRL AND ASSET PORTFOLIO
SERVICING ROMÂNIA SRL.

The roll-call performed in public hearing finds the parties not present.

The summons procedure was legally served.

The case summary was presented by the hearing clerk, following which:

It was noted that the debates and the conclusions of the parties were recorded in the
Court session report of 22.09.2014, an integral part of this document, when the Court
established a judgment date for 06.10.2014 and then postponed the judgement for today,
13.10.2014.

In this case,

The COURT

Finds that through the indictment of 20.12.2012 issued in case file no. 279/P/2008,
the Prosecutor's Office attached to Alba District Court ordered that the following
defendats should be indicted:

- **MĂRGINEAN RUSALIN SORIN** for having committed the offences provided by
article 25 of the Criminal Code in conjunction with article 215 paragraph 1-3 and article
5 of the Criminal Code combined with article 75 lett.a) of the Criminal Code and 41
paragraph 2 of the Criminal Code (7 material acts); article 290 of the Criminal Code

EXT-MARGINEAN-00145

combined with article 41 paragraph  2 of the Criminal Code (14 material acts), both by applying article 33 lett. a) of the Criminal Code.

- **CHIRILUȚ CRISTIAN SABIN** for having committed the offences provided by article 215 paragraph  1-3 of the Criminal Code; article 291 of the Criminal Code by applying article 33 lett. a) of the Criminal Code.

- **MĂRGINEAN** for having committed the offences provided by article 215 paragraph 1-3 of the Criminal Code and article 291 of the Criminal Code by applying article 33 lett. a) of the Criminal Code.

- **TRIFAN FLORIN** for having committed the offences provided by article 215 paragraph  1-3 of the Criminal Code combined with article 41 paragraph  2 of the Criminal Code (2 material acts); article 291 of the Criminal Code combined with article 41 paragraph  2 of the Criminal Code; article 290 of the Criminal Code by applying article 33 lett.a)  of the Criminal Code.

- **GROZAV EUGEN TIBERIU** for having committed the offences provided by article 215 paragraph  1-3of the Criminal Code combined with article 41 paragraph  2 of the Criminal Code (3 material acts); article 291 of the Criminal Code combined with article 41 paragraph 2 of the Criminal Code, both by applying article 33 lett.a)  of the Criminal Code.

- **POIENAR ANA** for having committed the offence provided by article 26 of the Criminal Code in conjunction with article 290 of the Criminal Code under the conditions of article 41 paragraph  2 of the Criminal Code.

In the motivation of the document instituting the proceedings it was maintained essentially that defendant Mărginean Rusalin Sorin, acting on the basis of the same criminal intent to obtain unlawful revenues, in the period of December 2007 – June 2008 determined a number of four persons to fraudulently contract bank loans, for which purpose he made available documents which he forged together with defendant Poienar Ana, while the total amount of the loans contracted is EUR 59,900 and RON 68,800. The same defendant, acting on the basis of the same criminal intent to obtain fraudulent loans, drafted a number of 14 forged documents which were presented to banks.

With regard to defendant Chiriluț Cristian Sabin, it was maintained that on 04.12.2007 he fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents, presenting the bank forged documents in order to be granted the loan.

With regard to defendant Mărginean Nicolaie, it was shown that on 04.01.2008 he fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents, presenting the bank forged documents in order to be granted the loan.

It was also retained that defendant Trifan Florin, in May 2008, acting on the basis of the same criminal intent, fraudulently contracted two bank loans in total amount of EUR 19,900, presenting the bank forged documents in order to be granted the loan.

On 21.05.2008 the defendant forged a payment commitment, where he mentioned the unreal information that he worked as a driver for S.C. SORY EXPRES S.R.L., and

EXT-MARGINEAN-00146

consented to have the loan instalments withdrawn from his salary, in case of failure to pay.

For defendant Grozav Eugen Tiberiu, the prosecutor indicated the fact that in June 2008, acting on the basis of the same criminal intent, he fraudulently contracted three bank loans in amount of EUR 10,000, RON 10,000 and RON 54,800, presenting the bank forged documents in order to be granted the loan.

With regard to defendant Poienar Ana, it was shown that she helped defendant Mărginean Rusalin Sorin to forge the 4 employment contracts and the 10 income statements which were used to contract fraudulent loans.

**Having examined the documents of the case file, the District Court maintains the following:**

**In fact:** In the period of 2006-2008, defendant Mărginean Rusalin Sorin had the capacity of administrator and sole shareholder of S.C. SORY EXPRESS S.R.L. Tărtăria, a company whose main object of activity was transport.

Given the poor financial situation of the company, the defendant asked the employees and dayworkers working for his company, as well as other persons who had no connection with the company to contract bank loans on their behalf, and make the money thus obtained available to him, in order to obtain the necessary amounts to finance the company activity, and promised he would draft all necessary documentation and, implicitly, that he would pay the loan instalments; actually, the defendant had never had any intention to repay the loans, as proven by the fact that, after having received the amounts of money, he laid off the employees, and terminated their employment contracts, or refused to employ them; also, except for two loans, which was paid in advance by roll-over, in all other cases either the first 2-3 instalments were paid or no payment was made.

Based on the promises made and given the fact that the work for S.C. SORY EXPRESS S.R.L. provided their only income source – defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu accepted to contract bank loans, although they were aware of the fact that they did not meet the solvency requirements, as the last three defendants were not even employed.

Defendant Poienar Ana was also involved in this criminal activity, in her capacity as director of S.C. SORY EXPRESS S.R.L. and sister-in-law of defendant Mărginean Rusalin Sorin, while she and the latter also had an extra-conjugal relationship. More specifically, the defendant filled in the employment contracts and the income statements fictitiously certifying the capacity of employee and the salary income, documents which were signed accordingly by defendant Mărginean Rusalin Sorin, in his capacity as administrator. Separately, it was maintained that the two defendants forged the signature of Lupu Vasilca Crinela, the person in charge with accounting records for S.C. SORY EXPRESS S.R.L., on the income statements.

EXT-MARGINEAN-00147

Also, in order to achieve the criminal purpose pursued, defendant Mărginean Rusalin Sorin was the one who confirmed the bank clerks over the phone the accuracy of the information included in the income statements.

Thus, 7 (seven) bank loans were contracted in the period of December 2007 – June 2008, as follows:

- Defendant Chiriluț Cristian Sabin worked for S.C. SORY EXPRESS S.R.L. as a driver in the period of 3.11.2007-16.04.2008, benefiting from a salary of RON 560, according to the employment contract no. 5/03.11.2007, registered with I.T.M. Alba under no. 50.014423/03.12.2007. Shortly after being employed, defendant Mărginean asked him to contract a loan in amount of EUR 15,000 from B.C.R., and give him the money, under the pretence that the company had to pay debts; defendant Chiriluț accepted, on the condition that a part of that loan, namely the amount of EUR 4,000 should be his.

In order to obtain the loan, defendant Poienar drafted a copy of the employment contract where she mentioned the unreal information that the holder undertook activities with the company starting from 03.05.2007 and had a monthly gross basic salary of RON 1,830, a document signed by defendant Mărginean as a true copy of the original. Also, income statement no. 70 of 04.12.2007 was drafted, fictitiously certifying that defendant Chiriluț Cristian Sabin obtained monthly income in amount of RON 3,200 in the period of August-October 2007.

On 04.12.2007, defendants Mărginean and Chiriluț went to B.C.R. – Cetate Agency, and here defendant Mărginean Rusalin Sorin, who had with him the two documents, presented them personally to the loan officer Vesi Ionuța Elisabeta, who was an acquaintance of his. On the same day, after the approval of the loan, contract no. 2007186981 was concluded for a 10-year period, and the next day defendant Chiriluț took the amount of EUR 15,000 from the bank. According to the agreement, he handed in the amount of EUR 11,000 to defendant Mărginean, and, in order to have a guarantee that he would honour his promise to reimburse the loan, he requested a loan document to be drafted, document which was drafted by defendant Poienar and signed by both defendants.

In 2008, 3 loan reimbursement payments were made, as follows: on 06.02.2008 and on 26.02.2008 defendant Poienar Ana paid the amounts of EUR 237 and EUR 260, respectively and on 30.10.2008, defendant Chiriluț paid the amount of EUR 200, then no payment was made.

The debt owed to the bank by defendant Chiriluț Cristian Sabin was assigned to DDM EUROPE AG, with CREDITEXPRESS FINANCIAL SERVICES S.R.L. as asset administrator, and later on to ASSET PORTFOLIO SERVICING ROMÂNIA, which communicated they would not bring civil action civil action in the case.

Following the handwriting analysis report on the documents presented by the bank, the employment contract of defendant Chiriluț registered with I.T.M. Alba under no. 5/03.11.2007 and on the handwritten document dated 05.12.2007 – the following conclusions were presented:

- The signature from the Employee field on page 4 of the individual employment contract no. 5/03.11.2007 was not written by defendant Chiriluț; instead, the signature

from the Employee field on page 4 of the individual employment contract no. 21/03.05.2007 (presented to B.C.R.) was probably written by the above-mentioned.

- The signatures from the Employer field on page 4 of the two employment contracts were probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same defendant;
- The handwriting on the two employment contracts was probably written by defendant Poienar Ana;
- The signature on the income statement no. 70/04.12.2007 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana;
- The signatures from the handwritten document dated 05.12.2007 belong to the holders, namely defendants Mărginean Rusalin Sorin and Chiriluț Cristian Sabin, and the handwriting belonged to defendant Poienar Ana.

-In January 2008, defendant Mărginean Rusalin Sorin, knowing that defendant Mărginean Nicolaie was interested in finding a job, suggested that he should work for his company, S.C. SORY EXPRESS S.R.L.; after a few days, the defendant invoked the problems his company was facing and asked defendant Mărginean Nicolaie to help him financially by contracting a loan, promising him instead to pay the loan instalments and employ him in his company. Based on these promises, defendant Mărginean Nicolaie accepted, therefore he submitted his ID card, which was used to forge the documentation for the bank; thus, the false employment contract no. 24/02.07.2007 was filled in and registered with ITM under no. 10.196.076/03.07.2007, including the false information that defendant Mărginean Nicolaie was employed by the company as a driver and had a monthly gross basic salary in amount f RON 1,200; income statement no. 112/04.01.2008 was also drafted, certifying that defendant Mărginean Nicolaie obtained monthly income in amount of RON 3,024 in the period of September-November 2007.

On 04.01.2008, defendant Mărginean Rusalin Sorin joined defendant Mărginean Nicolaie to B.C.R. Cetate Agency and here he asked again clerk Vesi Ionuța Elisabeta to draft a loan contract, handing in the forged documents. After the approval of the loan application for the amount of EUR 15,000, the loan contract no. 20081615 was concluded for a 10-year period, and defendant Mărginean Nicolaie was issued the loan amount. All money was given to defendant Mărginean Rusalin Sorin.

On 26.02.2008, defendant Poienar paid the amount of EUR 300 to B.C.R., representing the first instalment of the loan, and then no other payment was made. Therefore, the loan was assigned by the bank to CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucharest, and later on to ASSET PORTFOLIO SERVICING ROMÂNIA, which communicated they would not bring civil action in the case.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

- The signature from the Employee field on page 4 of the individual employment contract no. 24/02.07.2007 was probably written by defendant Mărginean Rusalin Sorin; the signature from the Employer field on page 4 of the employment contract

was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same accused;
- The handwriting on the employment contract was probably written by defendant Poienar Ana;
- The signature on the income statement no. 112/04.01.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana.

- In May 2008, defendant Mărginean Rusalin Sorin asked defendant Trifan Florin, who worked as dayworker for his company, to help him with money using the same means, namely to contract two bank loans. Based on the promise that there will be no problem with the loan repayment, defendant Trifan accepted to take the two loans, therefore he submitted his ID card to have the necessary documentation drafted for the banks.

Thus, on 21.05.2008, defendant Trifan followed the instructions given by defendant Mărginean, went to ALPHA BANK Alba Iulia branch, where he presented the bank officer a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007) and 2 (two) income statements no. 214/21.05.2008 and no. 219/26.05.2008, fictitiously certifying that he was employed by S.C. SORY EXPRES S.R.L. as a driver, starting with 01.02.2007, with a monthly gross salary of RON 1,845, and during the last three months he earned a monthly income of RON 3,660, of which RON 1,320 represented the salary and the rest was per diem difference. However, not only that the defendant was not employed with an employment contract, but he did not even have a driver's licence for any category of vehicle, therefore he could not have worked as a driver.

According to the bank rules, defendant Trifan handwrote a payment commitment where he mentioned that he had been working for 2 (two) years for the company, as a driver, and consented to have the loan instalments withdrawn from his salary, in case of failure to pay. The loan application for EUR 15,000 was approved based on these documents, and the loan contract no. 0588299 was concluded for a 10-year period. Defendant Trifan gave all the money taken from the bank to defendant Mărginean, together with the loan repayment schedule.

No loan instalment was paid in the forthcoming period, therefore ALPHA BANK Alba Iulia branch brought civil action for the amount of EUR 16,033.93.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

- The signature from the Employee field on page 4 of the individual employment contract no. 19/01.02.2007 was not written by defendant Trifan Florin; the signature from the Employer field on page 4 of the employment contract was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same accused;
- The handwriting on the employment contract was probably written by defendant Poienar Ana;

Government Exhibit 1
Page 195 of 266

- The signature on the income statement no. 214/21.05.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana.

- Then, on 23.05.2008, defendant Trifan Florin used the same mode of operation, he contracted a new personal loan in amount of EUR 4,900 from B.C.R. Sebeș Agency, for a 10-year period, according to the contract no. 2008398954. In order to obtain the loan he presented a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007), similar to the one used previously, signed on each page by the company administrator as a true copy of the original, and 2 (two) income statements no. 215/21.05.2008 and n.n., certifying that in the period of January-March 2008 he obtained a monthly salary income of RON 1, 980 and per diems in amount of RON 660. This amount obtained as a bank loan was also given to defendant Mărginean Rusalin Sorin, together with the loan repayment schedule.

As no payment was made in the forthcoming period, the loan was assigned to ERSTE GROUP and further to SECAPITAL S.a R.L., with KRUK INTERNAȚIONAL SRL Bucharest as asset administrator, which brought civil action for the amount of RON 25,643.92, updated according to interest rates and penalties until the payment date.

The handwriting analysis report on the documents presented to the bank indicated the following:

- The signatures confirming a true copy of the original on the employment contract no. 50.015.780/02.02.2007 were written by defendant Mărginean Rusalin Sorin, and the handwriting under the mention "True copy of the original" on each page belonged to defendant Poienar Ana;
- The signature on the income statement no. 215/21.05.2008 from the General Manager field was probably written by defendant Mărginean Rusalin Sorin, and the signature from the Economic Director field was not written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana.
- The signature on the income statement n.n. from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was not written by Lupu Vasilica Crinela; the handwriting on the income statement n.n. belonged to defendant Poienar Ana.

- In order to obtain money using the same method, defendant Mărginean Rusalin Sorin asked his cousin, defendant Grozav Eugen Tiberiu, who had left to Portugal since 2001 and who returned to Romania for a brief period of time in the summer of 2008. Under the pretext that he wanted to employ him as a driver for him company, defendant Mărginean asked him to contract a bank loan, explaining that he needed the money to cover possible damages in case of a car accident; he also promised to repay all loan instalments. Under these conditions, defendant Grozav indicated he had no driver's licence, to which defendant Mărginean answered that was not a problem, everything would be solved. To be credible, defendant Mărginean asked him to sign a blank page

with the company stamp applied at the bottom of the page and explained that he would fill in all necessary information for the employment contract. Although he had some suspicions of the validity of the employment contract and he was aware that he did not meet the solvency requirements to obtain bank loans – defendant Grozav accepted these requests and contracted three loans.

Initially, on 04.06.2008, defendant Grozav Eugen Tiberiu contracted a loan of EUR 10,000 from B.C.R. Sebeş Agency, and for this purpose he presented the documents made available by his cousin, namely a copy of the employment contract no. 29/03.05.2007 (50.014.655/04.05.2007) and the income statement no. 230/03.06.2008, falsely certifying that he was employed as a driver with SC SORY EXPRES SRL and earned a monthly net income RON 3,118. Then contract no. 2008438664 was concluded for a 120-month period, the money was taken from the bank and given to defendant Mărginean Rusalin Sorin.

- On the same date, defendant Grozav went to BRD Groupe Societe Generale – Alba branch where, based on the indications given by defendant Mărginean, he applied for a RON 10,000 loan, and submitted a copy of the same employment contract and the income statement no. 232/04.06.2008 issued by SC SORY EXPRES SRL, fictitiously certifying that he was an employee of this company and earned a monthly income of RON 1,318. After the approval of the loan application, the loan contract no. 1609392/05.06.2008 was concluded for a 48-month period; again, defendant Grozav Eugen Tiberiu gave his cousin all the money cashed-in from the bank.

- Again, on the initiative of defendant Mărginean, who motivated he needed an additional amount of money, on 25.06.2008 defendant Grozav contracted a roll-over loan with ALPHA BANK Sebeş Agency, in amount of RON 54,800 for a 10-year period, to pay the previous loans, and concluded contract no. 0596738. In order to have the loan application approved, defendant Grozav Eugen Tiberiu presented a copy of the employment contract, income statements no. 232/19.06.2008 and 233/19.06.2008 – filled in and signed by defendants Mărginean Rusalin Sorin and Poienar Ana – certifying he was employed as a driver by SC SORY EXPRES S.R.L. and had earned a monthly income of RON 1,818 in the past three months. The amount of money left after the anticipated repay of the two loans was given by defendant Grozav Eugen Tiberiu to his cousin, according to their agreement.

In the forthcoming period, as he was requested by the bank to pay the loan instalments, he made some partial payments, in total amount of RON 390.

ALPHA BANK Sebeş Agency brought civil action in the case for the amount of RON 57,923.33.

Following the handwriting analysis report on the documents submitted to ALPHA BANK Sebeş Agency, the following conclusions were presented:

• The signature from the Employer field on the copy of the individual employment contract was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same defendant; the handwritten mentions in the contract and under the mention "True copy of the original" were written by defendant Poienar Ana;

EXT-MARGINEAN-00152

- The signature on the income statement no. 232/19.06.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Chief Accountant field was not written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana;
- The signature on the income statement no. 233/19.06.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was not written by Lupu Vasilica Crinela; the handwriting on the income statement belonged to defendant Poienar Ana.

The facts resulted from administering the following evidence:

- The ex officio investigation report drafted by the police from 16.09.2008, indicating that defendant Mărginean Rusalin Sorin, administrator of SC SORY EXPRES S.R.L. managed to obtain fraudulently amounts of money from banks by forging the necessary documentation to apply for loans, with the complicity of bank officers;

- The self-incriminatory statement made by defendant Grozav Eugen Tiberiu on 24.07.2009, indicating that he was determined by defendant Mărginean Rusalin Sorin to contract a bank loan in amount of EUR 17,000 and gave him the money, but afterwards, defendant Mărginean did not pay the loan instalments, as he had promised;

- The ex officio investigation report drafted by the police from 05.04.2010, mentioning that the bank officers Bratu Gabriela Iuliana, Vesi Ionuța Elisabeta and Muntean (former Stanciu) Jeanina had breached their professional duties in relation to loans granted based on fictitious documents;

- Cash receipt orders used to make partial payments for the loans contracted by defendants Chiriluț Cristian Sabin and Mărginean Nicolaie;

- Handwritten documents dated 05.12.2007 certifying that defendant Mărginean Rusalin Sorin borrowed the amount of EUR 11,000 from defendant Chiriluț Cristian Sabin;

- Forensic report no. 67208C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendant Chiriluț Cristian Sabin. During the pre-test interview, the defendant indicated that, upon request of defendant Mărginean Rusalin Sorin, he accepted to contract the bank loan and have it mentioned on his income statement a higher salary than his real income, although he was aware that, based on his income, he could not obtain a EUR 15,000 loan; he also indicated that, according to their agreement, defendant Mărginean Rusalin Sorin had to pay the loan instalments for the amount of EUR 11,000, while he was to pay personally the difference of EUR 4,000. During the actual test no specific reactions suggesting simulated behaviour were detected for the relevant questions on the initiative of loan application and the involvement of defendant Mărginean Rusalin Sorin;

- Forensic report no. 67209C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendant Trifan Florin. During the pre-test interview, the defendant indicated that after obtaining the loan from ALPHA BANK, defendant Mărginean Rusalin Sorin offered him drinks in the village pub, and that was the only benefit he obtained. Also, during the actual test applied to the defendant, no specific reactions suggesting simulated behaviour were detected for the relevant questions;

- Handwriting analysis reports no. 54167/15.09.2009, 54174/16.09.2009 and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit analysing the documents presented to the banks in order to obtain loans and other documents;

- The statements of witness Lupu Vasilica Crinela (page 134) in charge with the accounting operations at SC SORY EXPRES S.R.L.; the witness indicates she had no involvement in the issuance of the income statements submitted to banks, and her signature was forged on those statements; to this end, the witness indicates she only signed the documents she filled in personally;

- The statement of witness Lăscan Adrian Ioan (pages 146-147) who worked as a driver for SC SORY EXPRES S.R.L.; the witness shows that, upon request of defendant Mărginean Rusalin Sorin he contracted a bank loan in amount of EUR 15,000, and he gave the latter the money, as he promised he would pay the loan instalments; the witness also states that after he ceased his activity with the company he found out that defendants Chiriluț Cristian Sabin and Mărginean Nicolae also contracted bank loans for the company owner;

- The statement of witness Grigore Cosmin Dănuț (page 135), former employee of SC SORY EXPRES S.R.L., who has knowledge of the fact that defendants Chiriluț Cristian Sabin and Mărginean Nicolaie contracted bank loans for defendant Mărginean Rusalin Sorin; the witness also states that defendant Poienar Ana was the one who drafted the documents within the company;

- The statement of witness Chiriluț Ileana (page 148), wife of defendant Chiriluț Cristian Sabin, on the circumstances in which her husband contracted the bank loan;

- The statement of witness Gurgui Ioan (page 203) indicating that, as he was a friend of defendant Chiriluț, he found out from him that he contracted a bank loan on the initiative of his employer "Ninuț", based on the documents made available by him; the witness also mentions that defendant Mărginean Nicolaie contracted a bank loan under the same conditions;

- The statements of witnesses Făcăleț Mircea and Făcăleț Adina, who mention that they heard discussions in the village that defendants Chiriluț Cristian Sabin, Trifan Florin and Mărginean Nicolaie had cashed bank loans for defendant Mărginean Rusalin Sorin, but afterwards he did not pay the loan instalments, as he had promised;

- Employment record book series CM 0233745 held by defendant Chiriluț Cristian Sabin, indicating the period when he worked for SC SORY EXPRES S.R.L. and the salary he received;

- Notification no. 3829/02.04.2009 issued by I.T.M. Alba having attached copies of the employment contracts registered by the employer SC SORY EXPRES S.R.L. with this institution as well as copies of the payroll submitted for the period of January 2007 – September 2008 – indicating that, except for defendant Chiriluț Cristian Sabin, who was employed in the period of 03.11.2007-16.04.2008, the other three defendants – Mărginean Nicolae, Trifan Florin and Grozav Eugen Tiberiu – were not employed by the company;

- Notification no. 80584 issued by the Prefect Institution, Alba County – Community Public Service Vehicle Registration and Driver's Licences certifying that defendant Trifan Florin is not registered as holder of a driver's licence;

- Employment record book series MPS no. 1112126 held by Trifan Florin, indicating he was not employed by SC SORY EXPRES S.R.L.;

- Police report of 01.10.2008 after the verification of the accounting and financial documents of SC SORY EXPRES S.R.L., employee records;

- Loan files drafted by the banks on the names of defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu;

- Reports drafted during defendants' cross-examinations;

In the hearings held during the criminal investigation, defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu, although they had an oscillating attitude, in principle, they admitted having committed the deeds, and indicated they accepted to contract the bank loans, based on the promises made by defendant Mărginean Rusalin Sorin that he would pay the loan instalments.

However, defendant Mărginean Rusalin Sorin fully denied his guilt, showing he had no involvement in contracting the bank loans and denied that he would have received the amounts of money; nevertheless, the defendant could not provide plausible explanation on the discrepancies between the documents he issued on behalf of SC SORY EXPRES S.R.L., presented to the banks, on the one hand, and the records in the company bookkeeping on the employees and their wages, and the records of I.T.M. Alba, on the other hand.

As regards defendant Poienar Ana, during the criminal investigation she admitted she had filled in the employment contracts and the income statements for the bank, and claimed she had done so upon request and based on the indications given by defendant Mărginean Rusalin Sorin, without confronting them with the accounting documents of the company (payroll). The justifications presented by the defendant are purely formal, given that she wrote completely different data on the same type of documents, which were drafted either the same day or at very short time intervals: thus, in the individual employment contract of defendant Chiriluț Cristian Sabin registered with I.T.M. Alba the start date is 03.11.2007, with a monthly salary of RON 560, while on the employment contract of the same accused, submitted to the bank, defendant Poienar wrote as start date 03.05.2007 and a monthly gross salary of Ron 1830; similarly, for the loans contracted by defendant Trifan Florin from the two banks, the defendant wrote different amounts as income, namely the amount of RON 2,640 on the statements submitted to B.C.R. and RON 3,660 on the statements submitted to APLHA BANK, although the statements for both banks were issued on 21.05.2008; we note the same situation with the income statements used by defendant Trifan Florin to contract the three loans, which indicate different amounts as income, while the defendant issued the three statements within a time interval of one day and 15 days, respectively.

Defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie and Trifan Florin were heard during the trial, while defendant Poienar Ana invoked the provisions of article 70 of the Criminal Code – the right to remain silent.

EXT-MARGINEAN-00155

Initially, during the trial, defendant Mărginean Rusalin Sorin, in his statement presented on page 93 admitted having committed the deeds mentioned in the document instituting the proceedings, and requested that he should be judged pursuant to the provisions of article 320 paragraph  1 of the previous Criminal Proceedings Code, but before the court he changed his statement and indicated that he did not benefit from the money obtained from the loans granted to the four defendants, that the income statements were issued upon request of the employees and that they indicated real facts, as the four drove abroad.

The court notes the oscillating and insincere attitude of the defendant as all the evidence administered in the case and analysed above invalidates the claims of the defendant; as indicated by the witnesses heard and by defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu, the loans were contracted on the initiative of defendant Mărginean Rusalin Sorin, based on the promises made by the defendant to pay the loan instalments, and he was the person who used the money. Witness Lăscan Adrian, as opposed to the claims of defendant Mărginean Rusalin, stated that only he and witness Grigore Cosmin drove abroad, not the other defendants. In fact, notification no. 80584/30.06.2009 issued by the Prefect Institution, Alba County – Community Public Service Vehicle Registration and Driver's Licences certifies that defendant Trifan Florin is not registered as holder of a driver's licence, and he was not employed by SC SORY EXPRES S.R.L., just like defendants Mărginean Nicolaie and Grozav Eugen Tiberiu.

Also, the evidence mentioned above corroborate with the handwriting analysis reports no. 54167/15.09.2009, 54174/16.09.2009 and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit analysing the documents presented to the banks in order to obtain loans as well as other documents and wit the Forensic report no. 67208C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendants Chiriluț Cristian Sabin and Trifan Florin indicating that no specific reactions suggesting simulated behaviour were detected, therefore the court may not find, as claimed by the defendant's lawyer, that there is no evidence indicating that defendant Mărginean Rusalin Sorin would have deliberately determined the other co-defendants to commit the offence of fraud.

As regards defendants Grozav Eugen Tiberiu, Mărginean Nicolaie and Chiriluț Cristian Sabin the court may not retain the applicability of the provisions of article 16 paragraph  1,lett. b point II) of the Criminal Proceedings Code, namely that the deed was not committed with the culpability provided by law. The defendants deliberately accepted the request of defendant Mărginean Rusalin Sorin to contract bank loans, knowing that they did not meet the requirements for being granted bank loans, and for this purpose they went to the offices of those contracting banks. The defendants' statements confirm this – defendant Grozav Eugen Tiberiu, heard during the criminal prosecution stage (pages 120-122) indicated that he went to BCR upon request of defendant Mărginean Rusalin Sorin and filed an application for a EUR 10,000 loan and he specified in his application that he was employed by SC SORY EXPRES S.R.L. as a driver and has RON 700 income and EUR 1000 per diem, although in reality the defendant did not have a driver's licence and was not the employee of this company; defendant Trifan Florin stated (pages 116-117) that, upon request of defendant Mărginean Rusalin Sorin, he went to

Government Exhibit 1
Page 201 of 266

Alpha Bank Alba Iulia where he filed a loan application in which he mentioned he was employed by SC SORY EXPRES S.R.L. as a driver, which was not real. Before the court, the defendant showed he made no statement to the bank on the fact that he worked for SC SORY EXPRES S.R.L. as a driver, which is invalidated by the document of page 273 entitled "payment commitment", filled in and signed by the defendant, but he admitted he was not employed and did not work even for one day for defendant Mărginean Rusalin, and agreed with his proposal to contract the loan to help him.

The statements of defendant Mărginean Nicolaie (pages 100-103 criminal investigation file, page 123) indicate that he did not sign any employment contract, but from discussions between co-defendants Poienar Ana and Mărginean Rusalin before going to the bank he found out that an employment contract had been concluded for him, which mentioned a higher salary than due so as the loan could be approved; therefore, the court cannot note a lack of intent to commit the offence, because he signed the necessary documents to obtain the loan, although he knew all these aspects.

Defendant Chiriluț Cristian Sabin stated that, on their way to BCR – Cetate Agency he asked defendant Mărginean Rusalin how he managed to obtain the EUR 15,000 loan, given that his employment contract indicated a monthly salary of about RON 450, and defendant Mărginean said he had arranged that the employment contract should mention the amount of RON 1500-1800. Nevertheless, defendant Chiriluț accepted to contract the loan.

Since from the date of the offences until the sentence was passed a new criminal law was adopted, pursuant to article 7 paragraph 1 of ECHR and to the Decision of the Constitutional Court no. 265/2014, in order to establish the more favourable criminal law, the court must compare the repressive regime of each of the criminal laws applicable in the case of the accused (global comparison method).

In this case, as regards defendant Mărginean Rusalin Sorin, the more favourable criminal law is the new law, as the punishment for the offence of fraud provided by article 244 paragraph 1,2 of the Criminal Code is 1 to 5 years imprisonment, compared to the 10 to 20 years imprisonment, as provided by article 215 paragraph 1-3 and 5 of the Criminal Code of 1969. As regards defendants Chiriluț Cristian Sabin, Trifan Florin, Mărginean Nicolaie and Grozav Eugen Tiberiu, the more favourable law is also the new law, which provides for the offence of fraud provided by article 244 paragraph 1 and 2 of the Criminal Code a punishment of 1 to 5 years imprisonment, while the old law, article 215 paragraph 1 and 3 provided for a more severe punishment, namely 3 years and 15 years imprisonment.

When applying the provisions of the new law for multiple offences and recurrent offences, the court will be able to rule in the case of the defendants punishments below the minimum limits of 10 years imprisonment, and 3 years imprisonment, respectively, as provided by the old law.

Having regard to the provisions of Decision no. 5/2014 of the High Court of Cassation and Justice stipulating that it is not permitted to combine provisions of successive laws in establishing and applying the more favourable criminal law with regard to the conditions establishing and punishing the recurrent offence and to the provisions of article 36 paragraph 1 of the Criminal Code stipulating that there is recurrent offence when a person

EXT-MARGINEAN-00157

commits, at different time intervals, but for in pursuit of the same intent and against the same passive subject, actions or inactions which present each the content of the same offence, the legal classification of the deeds for which the defendants are charged, as follows:

- For defendant Mărginean Rusalin Sorin, pursuant to article 386 of the Criminal Proceedings Code, the legal classification of the offence of incitement to fraud provided by article 25 of the Criminal Code of 1969 in relation to article 215 paragraph  1-3 and 5 of the Criminal Code of 1969 combined with article 75 lett.a)  of the Criminal Code of 1969 and article 41 paragraph  2 of the Criminal Code of 1969 (7 material acts) should change to 4 offences of incitement to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluț Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin), and of the offence provided by article 290 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 (14 material acts) into the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph  1 of the Criminal Code by applying article 5 of the Criminal Code.

- For defendant Trifan Florin, pursuant to article 386 of the Criminal Proceedings Code, the legal classification of the offence of fraud provided by article 215 paragraph  1-3 of the Criminal Code of 1969 combined with article 41 paragraph  2 of the Criminal Code of 1969 should change to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Alba branch); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 291 by applying article 41 paragraph  2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code; the offence provided by article 290 of the Criminal Code of 1969 into the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code.

-For defendant Grozav Eugen Tiberiu, pursuant to article 386 of the Criminal Proceedings Code, the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph  2 of the Criminal Code of 1969 should change to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject –BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Sebeș branch); the offence of fraud provided by article 291 by applying article 41 paragraph   2 of the Criminal Code of 1969 to the offence of use of forgery

provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code;

As regards defendants Chiriluț Cristian and Mărginean Nicolaie, based on the above-mentioned, having established that the more favourable criminal law for the two defendants is the new law, pursuant to article 386 of the Criminal Proceedings Code, the court shall change the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code and the legal classification of the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

For defendant Poienar Ana, the more favourable criminal law is the old law, as the punishment for use of false deeds under a private signature provided by article 290 of the Criminal Code of 1969 is imprisonment from 3 months to 2 years of a fine, while the punishment for the same offence provided by article 322 of the Criminal Code is imprisonment from 6 months to 3 years of a fine.

**BY LAW:**

1. The actions of defendant Mărginean Rusalin Sorin who, in order to obtain unlawful revenues, in the period of December 2007 – June 2008 determined a number of four persons to fraudulently contract bank loans, for which purpose he made available documents which he forged together with defendant Poienar Ana, while the total amount of the loans contracted is EUR 59,900 and RON 68,800 – constitute 4 offences of incitement to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluț Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin).

The actions of the same defendant who, acting on the basis of the same criminal intent to obtain fraudulent loans, drafted a number of 14 forged documents which were presented to banks – constitutes the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code, all by applying article 39 paragraph 1, lett. b) of the Criminal Code on multiple offences.

2. The action of defendant Chiriluț Cristian Sabin, who on 04.12.2007 fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents – constitutes the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code.

EXT-MARGINEAN-00159

The action of the same defendant of using forged documents at the bank in order to be granted the loan – constitutes the offence of use of forgery provided by article 323 of the Criminal Code by applying article article 5 of the Criminal Code, all by applying article 39 (b) of the Criminal Code on multiple offences.

3. The action of defendant Mărginean Nicolaie, who on 04.01.2008 fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents – constitutes the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code.

The action of the same defendant of using forged documents at the bank in order to be granted the loan – constitutes the offence of use of forgery provided by article 323 of the Criminal Code by applying article article 5 of the Criminal Code, all by applying article 39 (b) of the Criminal Code on multiple offences

4. The actions of defendant Trifan Florin, who in May 2008 fraudulently contracted two bank loans in total amount of EUR 19,900, by using forged documents – constitute two offences of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Sebeș branch) and the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR S.A.).

The actions of the same defendant who presented forged documents to banks in order to be granted loans constitute the offence of recurrent use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

The action of the same defendant who, on 21.05.2008 forged a payment commitment, where he mentioned the unreal information that he worked as a driver for S.C. SORY EXPRES S.R.L., and consented to have the loan instalments withdrawn from his salary, in case of failure to pay – constitutes the offence of use of false deeds under a private signature, provided by article 322 by applying article 5 of the Criminal Code, all by applying article 39 lett.b) of the Criminal Code on multiple offences.

5. The actions of defendant Grozav Eugen Tiberiu who, in June 2008, fraudulently contracted three bank loans in amount of EUR 10,000, RON 10,000 and RON 54,800, by using forged documents – constitute 3 offences of fraud as provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Sebeș branch).

The action of the same defendant to present forged documents to banks in order to be granted loans constitutes the offence of recurrent use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code, all by applying article 39 lett.b) of the Criminal Code on multiple offences.

6. The actions of defendant Poienar Ana of helping defendant Mărginean Rusalin Sorin to forge the 4 employment contracts and the 10 income statements which were used to contract fraudulent loans – constitutes the offence of aiding and abetting the

offence of recurrent use of false deeds under a private signature, provided by article 26 in conjunction with article 290 of the Criminal Code under the conditions of article 41 paragraph 2 of the Criminal Code.

**Judicial individualisation of punishment**

In the individualization of punishment, according to the provisions of article 74 of the Criminal Code, the Court takes into consideration the seriousness of the offence and the danger represented by the offender, which is evaluated against the following criteria: the circumstances of the offence and the manner in which it was committed, as well as the means used; the peril created for the value protected; the nature and the seriousness of the result generated or of any other consequences of the offence; the reason for committing the offence and the purpose pursued; the nature and the frequency of offences which represent the criminal record of the offender; the conduct after having committed the offence and during the criminal trial; the education background, the age, health condition, family and social situation.

In relation to the already mentioned criteria, the Court appreciates that the actions of the offenders have a relatively high level of social danger given, on the one hand, the importance of the social value protected by the incriminating rule (economic social relations which should be based on good faith, and the social relations related to the public trust in documents generating legal effects, in the veracity of these documents, in the truth they should express), the conduct of defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie during the criminal trial (they admitted having committed the deeds), but also the insincere conduct of defendants Mărginean Rusalin and Poienar Ana, the lack of criminal record, the fact that defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie did not benefit from the money obtained after accessing the loans, which should lead towards special minimum penalty.

The Court also considers how defendant Mărginean Rusalin committed the deeds, namely he took advantage of the poor financial situation of co-defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie, of the lack of jobs or of their desire to maintain their jobs, he determined them to commit offences, of the fact that the money obtained by committing the deeds was solely used by defendant Mărginean, so that the Court will apply a custodial sentence to him.

Having regard to the findings above:

1. Pursuant to article 386 of the Criminal Proceedings Code, the Court shall change the legal classification of the act of incitement to fraud, provided by article 25 of the Criminal Code of 1969 in conjunction with article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 75 lett.a) of the Criminal Code of 1969 and article 41 paragraph 2 of the Criminal Code of 1969 (7 material acts) in 4 offences of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluț Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the

Criminal Code by applying article 35 paragraph  1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin), and of the offence provided by article 290 of the Criminal Code of 1969 combined with article 41 paragraph  2 of the Criminal Code of 1969 (14 material acts) into the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph  1 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Rusalin Sorin.

The Court shall sentence defendant **MĂRGINEAN RUSALIN SORIN** to the punishment of:

- 1 year and 8 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen);

- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Chiriluț Cristian);

- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Mărginean Nicolaie);

- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin);

- 1 year imprisonment for committing the offence of use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph  1 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court shall merge the above mentioned penalties into the most severe penalty of 1 year and 8 months imprisonment, to which an additional penalty of 1 year and 10 months imprisonment shall be added, therefore the defendant shall serve the penalty of **3 years and 6 months imprisonment.**

Pursuant to article 112 lett.e) of the Criminal Code, the Court shall order the confiscation of the amount of EUR 26,000 from defendant Mărginean Rusalin Sorin, amount obtained by having committed the offence for which the aggrieved party did not bring civil action in the criminal proceedings. Thus, the debt owed to the bank by defendant Chiriluț Cristian Sabin in amount of EUR 15,000, of which the amount of EUR 11,000 was given to defendant Mărginean Rusalin and the debt owed to the bank by defendant Mărginean Nicolaie, in amount of EUR 15,000, money solely used by defendant Mărginean Rusalin was assigned to DDM EUROPE AG, with assets administrator CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucharest, and further to ASSET PORTFOLIO SERVICING ROMANIA, which communicated they would not bring civil action in the criminal proceedings.

2. Pursuant to article 386 of the Criminal Proceedings Code, the Court changes the legal classification of the deed of fraud provided by article 215 paragraph  1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Chiriluț Cristian Sabin.

The court shall sentence defendant **CHIRILUȚ CRISTIAN SABIN** to the punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;

- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1,lett.b) of the Criminal Code, the Court shall merge the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment.**

While appreciating that the act of sentencing is sufficient without the defendant actually serving the penalty, given that the defendant has no criminal record, has 3 minor children to support, pursuant to article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Unit attached to Alba District Court and shall order a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 39, para 1, lett. a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

- he shall appear before to the Probation Service attached to Alba District Court, at the dates established

- he shall meet with the Probation Officer designated for his supervision

- he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days

- he shall communicate any change of his current job

- he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence

- he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community

Based on art.93, paragraph 3 of the Criminal Code, the Court shall order to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Government Exhibit 1
Page 208 of 266

Based on article 91 paragraph 4 of the Criminal Code, the Court shall inform the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

Pursuant to article 112 letter e) of the Criminal Code, the Court shall order the confiscation of the amount of EUR 4,000 from the defendant Chiriluț Cristian Sabin, amount obtained by having committed the offence for which the aggrieved party did not bring civil action in the criminal proceedings, the debt owed to the bank was assigned to DDM EUROPE AG, with CREDITEXPRESS FINANCIAL SERVICES S.R.L. as asset administrator, and later on to ASSET PORTFOLIO SERVICING ROMÂNIA which communicated they would not bring civil action civil action in the case.

3. Pursuant to article 386 of the Criminal Proceedings Code, the Court shall change the legal classification of the deed of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Nicolaie.

The court shall sentence defendant **MĂRGINEAN NICOLAIE** (previous name Mărginean Gherman) to the punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;

- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, letters b) of the Criminal Code, the Court shall merge the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment.**

Pursuant to article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year probation period, according to the provisions of article 92 of the Criminal Code, while appreciating that the act of sentencing is sufficient without the defendant actually serving the penalty, given that the defendant has no criminal record.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 39, paragraph 1, letter a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

- he shall report to the Probation Service attached to Alba District Court, on the dates established;

- he shall meet with the probation officer designated for his supervision;

- he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

- he shall communicate any change of his current job;

- he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;
- he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court shall order to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court shall inform the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

4. Pursuant to article 386 of the Criminal Proceedings Code, the Court shall change the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank –Alba branch); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR S.A.); the offence of fraud provided by article 291 by applying article 41 paragraph  2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code; the offence provided by article 290 of the Criminal Code of 1969 into the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code, with regard to defendant Trifan Florin.

The court shall sentence defendant **TRIFAN FLORIN** to the punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Alpha Bank –Alba branch);
- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject BCR SA);
- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.
- 6 months imprisonment for committing the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code

Pursuant to article 39 paragraph 1, letters b) of the Criminal Code, the Court shall merge the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 8 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 8 months imprisonment.**

While appreciating that the act of sentencing is sufficient without the defendant actually serving the penalty, given that the defendant has no criminal record and his re-education

possibilities, based on article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, letters a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;
b) he shall meet with the probation officer designated for his supervision;
c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;
d) he shall communicate any change of his current job;
e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;
f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court shall order to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court shall inform the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

5. Pursuant to article 386 of the Criminal Proceedings Code, the Court shall change the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank-Sebes branch);the offence of fraud provided by article 291 by applying article 41 paragraph 2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code with regard to defendant Grozav Eugen Tiberiu

The court shall sentence defendant **GROZAV EUGEN TIBERIU** to the punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject– BCR SA);
- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject - BRD Groupe Societe Generale);

EXT-MARGINEAN-00166

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject -Alpha Bank-Sebes branch);

- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court shall merge the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 10 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 10 months imprisonment.**

While appreciating that the act of sentencing is sufficient without the defendant actually serving the penalty, given that the defendant has no criminal record and his re-education possibilities, based on article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year and 6 month probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, letters a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;

b) he shall meet with the probation officer designated for his supervision;

c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

d) he shall communicate any change of his current job;

e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court shall order to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court shall notify the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

6. The court shall sentence defendant **POIENAR ANA** to the punishment of:

- 1 year imprisonment for having committed accessory to the offence of use of false deeds under a private signature provided by article 26 in conjunction with article

Government Exhibit 1
Page 212 of 266

290 of the Criminal Code of 1969 in the condition of article 41 paragraph 2 Criminal Code of 1969 and article 5 Criminal Code of 1969

The court shall ban the defendant from exercising the rights provided by article 64 lett. a) second recital and letter b) of the 1969 Criminal Code, during the period stipulated under article 71 of the 1969 Criminal Code.

Based on article 81 of the 1969 Criminal Code and article 71 of the 1969 Criminal Code The court shall suspend the enforcement of the main penalty and the additional one under the supervision for a trial period of 3 years set out according to the provisions of article 82 of the 1969 Criminal Code, while appreciating that the act of sentencing is sufficient without the defendant actually serving the penalty

The Court shall notify the defendant regarding the provisions of article 83 the 1969 Criminal Code.

Based on article 580 of the Criminal Proceedings Code, the Court shall order the annulment of the following documents: income statement no. 70 of 04.12.2007, employment contract no. 21/03.05.2007, employment contract no. 24/02.07.2007, income statement no. 112/04.01.2008, employment contract no. 19/01.02.2007, income statement no. 214/21.05.2008, income statement no. 219/26.05.2008, income statement no. 215/21.05.2008, income statement without registration number related to defendant Trifan Florin, employment contract no. 29/03.05.2007, income statement no. 230/03.06.2008, income statement no. 232/04.06.2008, income statement no. 233/19.06.2008 declared to be false according to the handwriting analysis reports performed in this case.

**Civil side of the case:**

Through notification no. 4101/15.05.2012 issued by ASSET PORTOFOLIO SERVICING Romania, they stated that the company does not intend to bring civil proceedings in the criminal case regarding the credit contracted by defendants Chiriluț Cristian Sabin and Mărginean Nicolaie, and this is the reason why the Court ordered the confiscation of the amounts of money.

Through notification no. 8765/21.07.2010 issued by BRD GROUPE SOCIETE GENERALE – Alba branch, the bank shows that the loan of RON 10,000 contracted by the defendant Grozav Eugen Tiberiu was fully reimbursed in advance (26.06.2010) and they do not wish to bring civil proceedings in the criminal case.

Therefore, the Court notes that the aggrieved parties BRD GROUPE SOCIETE GENERALE located in Bucharest, Ion Mihalache avenue, no-1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL located in Bucharest, Matei Milo stree, no.9, district 1 would not bring civil proceedings in the case.

Alpha Bank România SA, through the document (page 24) from the case file, notified on their intention to bring civil proceedings for the amount of EUR 16,033.99 in the case of the loan contracted by  the defendant Trifan Florin, for the amount of LEI 57,923.33 in the case of the loan contracted by the defendant Grozav Eugen Tiberiu, for the amounts LEI 143.98 and LEI 7,362.64 in the case of the loans contracted by the defendant Mărginean Rusalin Sorin.

EXT-MARGINEAN-00168

Having found that the provisions of art. 1357 of the Civil Code, according to which the person who causes damages to another party through an illegal action, committed intentionally or negligently, must repair such damages, the Court based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code shall partially accept the civil proceedings brought by the civil party to the criminal trial ALPHA BANK ROMANIA and shall consequently order the defendant Grozav Eugen to pay the amount of LEI 57,345.65 and defendant Trifan Florin to pay the amount of EUR 16,033.93 as compensation for the damages brought to the civil subject by having committed the offence of misrepresentation.

The court shall reject the civil proceedings brought by the civil party ALPHA BANK ROMANIA SA against the defendant Marginean Rusalin Sorin, as the process of obtaining the credit that the civil party refers to did not represent the subject of the criminal investigation undertaken in this case file and there is no cause-effect relationship between the actions that the defendant is to be convicted for and the damages referred to.

Through notification no. SBCR/4/1565 of 08.06.2010, SECAPITAL S.a R.L. Bucuresti, through Business Administrator KRUK INTERNATIONAL SRL demanded to be accepted as a civil party for the amount of LEI 25,643.92 – with the amount of LEI 20,604.99 as principal amount owed, the amount of LEI 39991.9 as interest owed and the amount of LEI 1,047.03 as penalties – in relationship to the credit contracted out by the defendant Trifan Florin, which had been assigned by BCR SA.

Having found that the conditions stipulated by article 1357 of the Civil Code are fulfilled, based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code, the court shall accept the civil proceedings brought by the civil party to the criminal trial KRUK INTERNATIONAL SRL and shall consequently order the defendant Trifan Florin to pay infavour of this civil party an amount of LEI 30,066.87 (EUR 6,904.94) as damages.

Based on article 274 paragraph 1 of the Criminal Proceedings Code the Court shall order the defendants Chiriluț Cristian, Mărginean Nicolaie, Trifan Florin, Poienar Ana and Grozav Eugen, to pay, each separately, the amount of LEI 2,100 and the defendant Mărginean Rusalin the amount of LEI 2,200 as court expenses that had been covered by the state in advance in this case.

Based on article 274 paragraph 1 of the Criminal Proceedings Code, the amount of LEI 600 representing the fee for the publicly appointed lawyer for the defendants Eugen and Trifan Florin, shall be covered by the state.

*FOR THESE REASONS,*

IN THE NAME OF LAW
THE COURT DECIDES:

1.Pursuant to article 386 of the Criminal Proceedings Code, the Court changes the legal classification of the act of incitement to fraud, provided by article 25 of the Criminal Code

of 1969 in conjunction with article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 75 lett.a) of the Criminal Code of 1969 and article 41 paragraph 2 of the Criminal Code of 1969 (7 material acts) in 4 offences of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluţ Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin), and of the offence provided by article 290 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 (14 material acts) into the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Rusalin Sorin.

The Court convicts the defendant **MĂRGINEAN RUSALIN SORIN**- son of Rusalin and Olimpia, born on the 16th of February, 1972 in Cugir, Alba Country, personal identification no. 172021603541, residing in Săliştea Township, Săliştea Deal Village, no. 39A, Alba County, without legal documents in Săliştea Township, Tărtăria Village, 54 Florilor St., Alba County, Romanian citizen, education: vocational school, driver, married, no criminal records, to serve a punishment of:

- 1 year and 8 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen);
- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Chiriluţ Cristian);
- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Mărginean Nicolaie);
- 1 year and 6 months imprisonment for committing the offence of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin);
- 1 year imprisonment for committing the offence of use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, letter b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year and 8 months imprisonment, to which an additional penalty of 1 year and 10 months imprisonment shall

Government Exhibit 1
Page 215 of 266

be added, therefore the defendant shall serve the penalty of **3 years and 6 months imprisonment.**

Pursuant to article 112 (e) of the Criminal Code, the Court shall order the confiscation of the amount of EUR 26,000 from defendant Mărginean Rusalin Sorin.

2.Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Chiriluţ Cristian Sabin.

The court convicts the defendant **CHIRILUŢ CRISTIAN SABIN**- son of Sabin and Emilia, born on the 17.09.1974, in Cugir, Alba Country, personal identification no. 1740917013528, residing in Cugir, Râul Mic street, no. 106, Alba County, Romanian citizen, education: 10th form, driver, married, has 3 underage children, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;
- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, letter b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment.**

Pursuant to article 91 of the Criminal Code, the Court suspended the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and ordered a 2 year probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 93, para 1, letters a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

- he shall appear before to the Probation Service attached to Alba District Court, at the dates established
- he shall meet with the Probation Officer designated for his supervision
- he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days
- he shall communicate any change of his current job
- he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence
- he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community

**Government Exhibit 1**
**Page 216 of 266**

Based on art.93, paragraph 3 of the Criminal Code, the Court orders the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

Pursuant to article 112 letter e) of the Criminal Code, the Court ordered the confiscation of the amount of EUR 4,000 from the defendant Chiriluț Cristian Sabin.

3. Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the deed of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Nicolaie.

The court convicts the defendant **MĂRGINEAN NICOLAIE** (previous name Mărginean Gherman) - son of Nicolaie and Alionescu Dorica, born on the 09.07.1975, in Cugir, Alba Country, personal identification no. 1750709013529, residing in Săliștea Township, Mică street, no. 171, Alba County, Romanian citizen, general education, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;
- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, letter b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment**.

Pursuant to article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and order a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 39, paragraph 1, letters a-e of the Criminal Code and article 93 paragraph 2, lett. b) of the Criminal Code:

- he shall report to the Probation Service attached to Alba District Court, on the dates established;
- he shall meet with the probation officer designated for his supervision;
- he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;
- he shall communicate any change of his current job;
- he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

**Government Exhibit 1**
**Page 217 of 266**

- he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

4. Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank –Alba branch); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR S.A.); the offence of fraud provided by article 291 by applying article 41 paragraph  2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code; the offence provided by article 290 of the Criminal Code of 1969 into the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code, with regard to defendant Trifan Florin.

The court convicts defendant **TRIFAN FLORIN** - son of Emil and Ana, born on the 15.03.1979, in Cugir, Alba Country, personal identification no. 1790315011122, residing in Săliștea Township, Joseni street, no. 459, Alba County, Romanian citizen, general education, unqualified, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Alpha Bank –Alba branch);
- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject BCR SA);
- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.
- 6 months imprisonment for committing the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 8 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 8 months imprisonment**.

Based on article 91 of the Criminal Code, the Court ordered the suspension for the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and ordered a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, lett. a-e of the Criminal Code and article 93 paragraph 2, lett.b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;
b) he shall meet with the probation officer designated for his supervision;
c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;
d) he shall communicate any change of his current job;
e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;
f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliște town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

5. Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank-Sebes branch);the offence of fraud provided by article 291 by applying article 41 paragraph 2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code with regard to defendant Grozav Eugen Tiberiu

The court convicts the defendant **GROZAV EUGEN TIBERIU**- son of unidentified father and Ileana, born on the 10.01.1978, in Cugir, Alba Country, personal identification no.1780110010017, residing in Săliștea Township, Săliștea Deal village, no. 83, Alba County, Romanian citizen, unemployed, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject–BCR SA);
- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject - BRD Groupe Societe Generale);
- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject - Alpha Bank-Sebes branch);

EXT-MARGINEAN-00174

- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 10 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 10 months imprisonment.**

Based on article 91 of the Criminal Code, the Court shall suspend the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year and 6 month probation period, according to the provisions of article 92 of the Criminal Code.

During the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, lett, a-e of the Criminal Code and article 93 paragraph 2, lett. b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;

b) he shall meet with the probation officer designated for his supervision;

c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

d) he shall communicate any change of his current job;

e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court orders the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

6. The court convicts defendant POIENAR ANA- daughter of Busuioc and Motrea, born on the 25.08.1979, in Cugir, Alba Country, personal identification no. 2790825013527, residing in Săliștea Township, Săliștea Deal village, no. 39, Alba County, Romanian citizen, education: 10th form, unemployed, not married, with criminal records, to serve a punishment of:

- 1 year imprisonment for committing accessory to the offence of use of false deeds under a private signature provided by article 26 in conjunction with article 290 of the Criminal Code of 1969 in the condition of article 41 paragraph 2 Criminal Code of 1969 and article 5 Criminal Code of 1969

EXT-MARGINEAN-00175

The court banned the defendant from exercising the rights provided by article 64 lett. a) second recital and letter b) of the 1969 Criminal Code, during the period stipulated under article 71 of the 1969 Criminal Code.

Based on article 81 of the 1969 Criminal Code and article 71 of the 1969 Criminal Code, the court ordered the suspension of the enforcement for the main penalty and the ancillary penalty under supervision for a trial period of 3 years set out according to the provisions of article 82 of the 1969 Criminal Code.

The Court informed the defendant regarding the provisions of article 83 the 1969 Criminal Code.

Based on article 580 of the Criminal Proceedings Code, the Court ordered the annulment of the following documents: income statement no. 70 of 04.12.2007, employment contract no. 21/03.05.2007, employment contract no. 24/02.07.2007, income statement no. 112/04.01.2008, employment contract no. 19/01.02.2007, income statement no. 214/21.05.2008, income statement no. 219/26.05.2008, income statement no. 215/21.05.2008, income statement without registration number related to defendant Trifan Florin, employment contract no. 29/03.05.2007, income statement no. 230/03.06.2008, income statement no. 232/04.06.2008, income statement no. 233/19.06.2008.

The Court took note of the fact that the aggrieved parties BRD GROUPE SOCIETE GENERALE located in Bucharest, Ion Mihalache avenue, no-1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL located in Bucharest, Matei Milo stree, no.9, district 1 did not bring civil proceedings in the criminal case.

Based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code, the Court partially accepts the civil proceedings brought by the civil party ALPHA BANK ROMANIA, located in Bucharest, Calea Dorobanților, no.237 B, district 1 and consequently orders the defendant Grozav Eugen to pay the amount of LEI 57,345.65 and the defendant Trifan Florin to pay the amount of EUR 16,033.93 as damages. The Court rejects the civil proceedings brought against the defendant Mărginean Rusalin Sorin.

Based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code, the Court accepts the civil proceedings brought by the civil party KRUK INTERNATIONAL SRL, located in Bucharest, Splaiul Independenței, no.319 O.B, ground floor, district 6 and consequently orders the defendant Trifan Florin to pay in favour of this civil party to the criminal trial an amount of LEI 30,066.87 (EUR 6,904.94) as damages.

Based on article 274 paragraph 1 of the Criminal Proceedings Code the Court orders the defendants Chiriluț Cristian, Mărginean Nicolaie, Trifan Florin, Poienar Ana and Grozav Eugen, to pay, each separately, the amount of LEI 2,100 and the defendant Mărginean Rusalin the amount of LEI 2,200 as judicial expenses covered in advance by the state in this case.

Government Exhibit 1
Page 221 of 266

Based on article 274 paragraph 1 of the Criminal Proceedings Code, the amount of LEI 600 representing the fee for the publicly appointed lawyer for the defendants Grozav Eugen and Trifan Florin shall be covered by the state.

This decision may be appealed against within 10 days since it is served.

Issued in the public court session of 13.10.2014.

President,

Maria Elena Fulea

*Illegible signature*

Court clerk
NICOLAE TODEA

*Illegible signature*

Drafted. M.E.F.

Edited N.T./16 copies/13.11.2014

*Stamp: Alba District Court - For compliance*

*Illegible signature*

EXT-MARGINEAN-00177

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





EXT-MARGINEAN-00178

ROMANIA

ALBA IULIA COURT OF APPEAL

CRIMINAL DIVISION AND FOR CASES WITH MINORS

Case file no. 15829/107/2012

**COURT SESSION REPORT**

Public hearing of the 4th of March, 2015

Chamber consisted of:

PRESIDENT Gheorghe Liviu Odagiu

Judge Alexandra Iuliana Pastiu

Court clerk Cornelia Maria Neag

The Public Ministry - Public Prosecutor's Office attached to Alba Iulia Court of Appeal is represented by the prosecutor Adela Pleșa.

On the docket, the settlement of the appeals filed by the civil party Alpha Bank Romania S.A. and the defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolae and Poienar Ana against the criminal court sentence no. 577/13[th] of October, 2014, delivered by Alba District Court, in the case file no. 15829/107/2012.

At the calling of the parties done in the public hearing, the following have answered:

- the public defender of the appellant defendant Chiriluț Cristian Sabin, lawyer Tomuleţiu Lavinia for the substitution of lawyer Vârtei Sergiu;

- the appointed defender of the appellant defendant Mărginean Nicolae, lawyer Drella Carol Mihaiță;

- the appointed defender of the appellant defendants Poienar Ana and Mărginean Rusalin Sorin, lawyer Sava Raluca Maria for the substitution of lawyer Mrs. Stan Lacrima;

- the public defender of the defendants-respondents in appeal Trifan Florin and Grozav Eugen Tiberiu, lawyer Voicu Diana,

The parties are absent.

The summoning procedure is legally fulfilled.

The case report has been prepared by the court clerk of the hearing, after which the Court determines that there are no other requests to be filed, which is why it gives the floor in the debates.

***The appointed defender of the defendant-respondent in appeal Mărginean Rusalin Sorin, lawyer Sava Raluca Maria***, requests the court, under article 421 paragraph 2 lett. a of the Code of Criminal Procedure, to admit the appeal, to quash the criminal court sentence appealed on its criminal and civil side and, during the new judgment, to pass a new sentence, considering that the judgment of the Court is illegal as regards the taken evidence.

Government Exhibit 1
Page 224 of 266

She informs that the court convicted the defendant for 4 offences of instigation to misrepresentation and requests the court, related to the charge of instigation to misrepresentation, under article 396 paragraph 5 related to article 16 paragraph 1 lett. c, to acquit the defendant, considering that there is no direct solid evidence that the defendant would have intentionally made the co-defendants commit the offence of misrepresentation, besides the statements of co-defendants. She states that the co-defendants were aware that they would go to the bank and request to be granted a loan, and the defendant Mărginean did not try to make them conclude contracts. She states that those defendants were employed as day labourers in the company of the defendant Mărginean and were paid and when they decided to access loans, they requested the company to issue certificates. She states that there is no evidence attached to the case file resulting in the capacity of participant in terms of instigation, the defendant just issued certificates in which the income was mentioned.

Regarding the recurrent offence of forgery, she requests the court, under article 396 paragraph 2, to consider the conviction of the defendant mainly to pay a fine, and, secondly, requests the court to reduce the penalty so that it would be possible to suspend it under supervision, according to article 91 of the New Criminal Code, considering that the defendant has admitted that it is possible to have been made a mistake.

In the specification of custodial sentence, she requests the court to consider the general specification criteria, the low degree of social danger of the offence.

**The appointed defender of the appellant defendant Poienar Ana, lawyer Sava Raluca Maria**, requests the court, under article 421 paragraph 2 lett. a of the Code of Criminal Procedure, to admit the appeal and to retry the sentence, considering the judicial re-specification of the custodial sentence.

She informs that the defendant was sentenced to 1 year of imprisonment with the conditional suspension of the enforcement of the sentence, but, as regards the defendant's position, the taken evidence, the general specification criteria referred to in article 72 of the Criminal Code, she considers that the imposed sentence is unreasonably high and is required to impose a fine.

She states that the defendant has admitted that she filled in the labour agreements and the certificates but she did it at the request of the company's director, without confronting the company's documents, too.

She considers that the fine is enough to fulfil the purpose provided by the law.

Regarding the defendant's behaviour, she appeals to the lack of criminal records, the circumstance that she has regretted having committed the offence and admitted that she was ignorant.

In the assumption in which it is considered that the custodial sentence is required to be imposed, she requests the court to impose a lower penalty, oriented towards the minimum general penalty, as a result of the consideration of article 74 of the Old Criminal Code with the conditional suspension of the penalty.

**The public defender of the appellant defendant Chiriluț Cristian Sabin, lawyer Tomulețiu Lavinia**, requests the court, under article 421 paragraph 2 lett. a of the Code of Criminal Procedure, to admit the appeal, to quash the appealed criminal court sentence

Government Exhibit 1
Page 225 of 266

and, during the retrial, to acquit the defendant under article 16 lett. c of the Code of Criminal Procedure.

She states that the evidence concludes that the defendant had work relations with the company led by the defendant Mărginean and, although, before the court of first instance he had an oscillating attitude, she considers that the statement, which was subsequently made, is true, sincere and describes how events occurred. She mentions that it is about the existence of an individual labour agreement and considers that, at a given moment, after the employment, the defendant was shown an individual labour agreement and the defendant did not pay attention to the date of the signed contract, checking only the salary, which coincided with the money which he received.

As regards the offence of misrepresentation, she states that the taken evidence did not succeed in proving the subjective element of the intention of the defendant Chiriluț, who mentioned that at the request of the defendant Mărginean he went to obtain a loan which had to be used for the company, being assured by the defendant Mărginean that the instalments would be paid, so that it cannot consider any form of intention in case of the defendant Chiriluț.

She appeals to the statement of the witness Gurgui found in page 203 and the statement of the witness Lăscan found in page 146 of the first instance court file, mentioning that he earned even €1,200, which consolidates the position of the defendant Chiriluț regarding the amount of the contract, trusting that the amount mentioned as salary was real.

Concluding, she requests the court to admit the appeal and acquit the defendant under article 16 lett. c. Secondly, she requests a new specification of custodial sentence, making more efficient the personal circumstances, the circumstance that the defendant has no criminal record and the social danger is not high.

***The appointed defender of the appellant defendant Mărginean Nicolae, lawyer Drella Carol Mihăiță,*** requests the court to approve the appeal, to quash the decision of the first instance court and, during the retrial, to acquit the defendant under article 16 lett. c and d of the Code of Criminal Procedure. He considers that the defendant is not guilty of forgery in this case. He just signed the labour agreements and loan contracts, knowing that the loan was to be handed over to Mărginean Rusalin, the defendant being only a victim of the defendant Mărginean Rusalin.

He considers that there should have been evidence in the criminal prosecution file in favour of the defendant, informing that in spring 2008 they notified in writing the criminal prosecution bodies regarding those offences of which they have been subsequently found guilty. He states that those intimations were called complaints, at that time the bank started the forced execution, but these complaints have not been submitted to the case file.

Regarding the offence of misrepresentation, he considers that the intention to deceive the bank cannot be considered, the defendant being aware that the loan shall be fully repaid.

Concluding, he requests the court to approve the appeal and acquit the defendant.

He attaches written conclusions to the case file.

EXT-MARGINEAN-00181

**The public defender of the defendants - respondents in appeal Trifan Florin and Grozav Eugen Tiberiu, lawyer Voicu Diana**, requests the court to reject the appeal filed by the defendant Mărginean Rusalin as devoid of merit, considering that the first instance court analyzed the evidence, considered the concrete situation and correctly ordered his conviction.

Regarding the appeals of the other defendants, she states that she leaves the decision for the court.

Regarding the appeal of the civil party, she requests the court to reject it as devoid of merit.

**The appointed defender of the appellant defendants Mărginean Rusalin and Poienar Ana, lawyer Sava Raluca Maria**, related to the reasons for appeal filed by the defendant Chiriluţ, requests the court to reject the appeal filed by this defendant, considering that the allegations for appeal infringe on their statements. Regarding the appeal of the defendant Mărginean Nicolae, related to the act of deceiving a bank, she states that according to the statements of the bank employees it result that the bank norms were complied with, that the defendants went to the bank, informing that the conversations between the co-defendants and the defendant Mărginean were focused on obtaining loans, the latter undertaking to pay the instalments, paying the instalments, resulting that we cannot talk about not knowing what would happen. She informs that the defendant Mărginean only told them that he would give them those certificates regarding the cumulative amounts and he did not instigate them. She requests the court to reject the appeal of the civil party as unreasoned.

**The public defender of the appellant defendant Chiriluţ Cristian Sabin, lawyer Tomuleţiu Lavinia,** regarding the appeals filed by the defendants Mărginean Rusalin and Poienar Ana requests the court to reject them, considering that the decision was correct and judicious.

Regarding the appeal of the defendant Mărginean Nicolae, she requests the court to approve it.

Regarding the appeal of the civil party, she requests the court to rejects it as devoid of merit, unsupported, unreasoned.

**The appointed defender of the appellant defendant Mărginean Nicolae, lawyer Drella Carol Mihăiţă**, requests the court to reject the appeals filed by the defendants Mărginean Rusalin and Poienar Ana as devoid of merit and the appeal filed by the civil party as unreasoned. She requests the court to approve the appeal filed by the defendant Chiriluţ.

**The representative of the Public Ministry** requests the court to reject as devoid of merit the appeals filed in this case and maintain the decision of the first instance court which she deems as legal and ground.

Regarding the request of the defendant Mărginean Rusalin to be acquitted, she states that there is enough evidence to prove the circumstance that he was the one instigating the defendants to contract bank loans, using the money obtained from such loans. She states that the offences are also proven by the statements of the co-defendants and witnesses heard in this case, resulting that the defendant Mărginean

Rusalin used to do so. In this regard, she appeals to the statements of the witnesses Grigore Cosmin, Chiriluț Ileana, Făcăleț.

She mentions that the defendant Poienar Ana has stated that she issued the certificates at the request of the defendant Mărginean Rusalin.

Regarding the allegation that the mentioned amounts represented the earnings of the defendants, she states that it cannot be accepted, because there are payrolls in this case and it has not been proven that they earned more. She states that a graphoscopic expertise has been conducted, resulting that the signatures belong to the defendants Poienar Ana, Mărginean Rusalin and the other co-defendants.

Regarding the offence of forgery, she states that it has been admitted by the defendant Mărginean Rusalin, including the defendant Poienar Ana has stated that he asked her to prepare certificates as they were issued.

She informs that the defendant Poienar has admitted having prepared the certificates and considers that the penalty must not be specified again, mentioning that she was previously convicted for misrepresentation and tax evasion with the conditional suspension of the sentence. She considers that the sentence was well specified.

Regarding the others defendants, she states that their requests for acquittal cannot be accepted either because they knew that did not obtain the income registered in the documents used at the bank and have admitted that they obtained the loans at the request the defendant Mărginean Rusalin.

She states that the defendant Chiriluț has undergone the polygraph test and has stated the he knew that he could not obtain loans if he submitted the obtained income certificate, and, at the essential questions, it has been established that the defendant Chiriluț states the truth, resulting in that he knew why the loan was granted.

She considers that there is evidence and the defendants' acquittal cannot be ordered.

Regarding the request for re-specification of custodial sentence imposed upon the defendant Chiriluț, she informs that the penalties are minimal and the mitigating circumstances have not been proven.

Regarding the appeal of the civil party, she requests the court to reject it, informing that it has not been reasoned, but she believes that it aims at the claims which have been rejected. She mentions that the other loans are not subject to this case, refer to the loans previously contracted by the defendant Mărginean Rusalin and are not subject to this case.

### THE COURT OF APPEAL

Under article 391 paragraph 1 of the Code of Criminal Procedure, shall establish the sentencing hearing for the 19th of March, 2015.

*For these reasons,*
*In the name of law,*
*ORDERS:*

The court establishes the sentencing hearing for the 19th of March, 2015.

EXT-MARGINEAN-00183

Delivered in the public hearing of the 4th of March, 2015.

|  |  |
|---|---|
| **President,** | **Judge,** |
| **Gheorghe Liviu Odagiu** | **Alexandra Iuliana Paştiu** |
| *Illegible signature* | *Illegible signature* |

**Court Clerk,**

**Cornelia Maria Neag**

*Illegible signature*

*Illegible stamp*

*Stamp: Alba District Court - For compliance*

*Illegible signature*

*Identity card attached*

*Stamp: Copy true to the original*

*Illegible signature*

EXT-MARGINEAN-00184

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





Case file no. 15829/107/2012

ROMANIA

ALBA IULIA COURT OF APPEAL
DIVISION FOR CRIMINAL CASES AND CASES INVOLVING JUVENILES

Criminal Court Decision no.314/A/2015

Public hearing of 19th of March, 2015
Panel of judges made up from:
President Gheorghe Liviu Odagiu

Judge Alexandra Iuliana Pastiu

Court Clerk Cornelia Maria Neag

The Public Ministry Public – Prosecutor's Office attached to Alba Iulia Court of Appeal is represented by prosecutor Adela Pleșa

On the docket, there is a ruling in the criminal case with the above mentioned number as regards regarding the appeals brought by the civil party Alpha Bank Romania S.A. and the defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolae and Poienar Ana against the criminal court sentence no. 577/13th of October, 2014, delivered by Alba District Court, in the case file no. 15829/107/2012.

The debates and the verbal statements of the parties were included in the hearing report issued during the public court session on 04.03.2015, when the deadline for passing a ruling was established for 19.03.2015, and the respective report is an integral part of this decision.

**The COURT OF APPEAL**

**Having ruled on the appeals brought in the criminal case, has found the following:**

By criminal court sentence no. 577/13th of October, 2014, issued by Alba District Court, in the case file no. 15829/107/2012, based on article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the act of incitement to fraud provided by article 25 of the Criminal Code of 1969 in conjunction with article 215 paragraph  1-3 and article 5 of the Criminal Code of 1969 combined with article 75 lett.a)  of the Criminal Code of 1969 and article 41 paragraph  2 of the Criminal Code of 1969 (7 material acts) in 4 offences of inciting to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluț Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph  1 article 5 of the Criminal

Government Exhibit 1
Page 231 of 266

Code (2 material acts – passive subject Trifan Florin), and of the offence provided by article 290 of the Criminal Code of 1969 combined with article 41 paragraph  2 of the Criminal Code of 1969 (14 material acts) into the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Rusalin Sorin.

The Court convicted the defendant **MĂRGINEAN RUSALIN SORIN** - son of Rusalin and Olimpia, born on the 16th of February, 1972 in Cugir, Alba Country, personal identification no.  172021603541, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County, without legal documents in Săliștea Township, Tărtăria Village, 54 Florilor St., Alba County, Romanian citizen, education: vocational school, driver, married, no criminal records, to serve a punishment of:

- - 1 year and 8 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts - passive subject Grozav Eugen);
- - 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 5 of the Criminal Code (passive subject Chiriluţ Cristian);
- -  1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 5 of the Criminal Code (passive subject Mărginean Nicolaie);
- - 1 year and 6 months of imprisonment for the offence of instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (2 material acts - passive subject Trifan Florin);
- - 1 year of imprisonment for the offence of use of false deeds under a private signature referred to in article 322 related to article 35 paragraph 1 of the Criminal Code with the application of article 5 of the Criminal Code.

Based on article 39 paragraph 1 letter b of the Criminal Code, the aforementioned penalties were merged into the greatest penalty of 1 year and 8 months of imprisonment to which the increase of 1 year and 10 months of imprisonment has been added, the defendant finally servicing the penalty of **3 years and 6 months of imprisonment**.

Pursuant to article 112 lett.e) of the Criminal Code, the Court ordered the confiscation of the amount of EUR 26,000 from defendant Mărginean Rusalin Sorin.

Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the deed of fraud provided by article 215 paragraph  1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Chiriluţ Cristian Sabin.

The court convicted the defendant **CHIRILUŢ CRISTIAN SABIN** - son of Sabin and Emilia, born on the 17.09.1974, in Cugir, Alba Country, personal identification no. 1740917013528, residing in Cugir, Râul Mic street, no. 106, Alba County, Romanian citizen, education: 10th form, driver, married, has 3 minor children, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;
- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1,lett.b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment.**

Pursuant to article 91 of the Criminal Code, the Court suspended the enforcement of the penalty under the supervision of the Probation Unit attached to Alba District Court and ordered a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

The court ruled that during the probation period the defendant must comply with the following supervision measures stipulated under article 39, para 1, lett. a-e of the Criminal Code and article 93 paragraph 2, letter b) of the Criminal Code:

a) he shall appear before to the Probation Service attached to Alba District Court, at the dates established

b) he shall meet with the Probation Officer designated for his supervision

c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days

d) he shall communicate any change of his current job

e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence

f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

Pursuant to article 112 lett.e) of the Criminal Code, the Court ordered the confiscation of the amount of EUR 4,000 from the defendant Chiriluţ Cristian Sabin.

Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the deed of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code

by applying article 5 of the Criminal Code, and the offence provided by article 291 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code, with regard to defendant Mărginean Nicolaie.

The court convicted the defendant **MĂRGINEAN NICOLAIE** (previous name Mărginean Gherman) - son of Nicolaie and Alionescu Dorica, born on the 09.07.1975, in Cugir, Alba Country, personal identification no. 1750709013529, residing in Săliștea Township, Mică street, no. 171, Alba County, Romanian citizen, general education, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code;
- 6 months imprisonment for committing the offence provided by article 323 of the Criminal Code by applying article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, letter b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 2 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 2 months imprisonment.**

Pursuant to article 91 of the Criminal Code, the Court suspended the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

The Court ruled that during the probation period the defendant must comply with the following supervision measures stipulated under article 39, paragraph 1, lett. a-e of the Criminal Code and article 93 paragraph 2, lett. b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;

b) he shall meet with the probation officer designated for his supervision;

c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

d) he shall communicate any change of his current job;

e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

Government Exhibit 1
Page 234 of 266

Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank –Alba branch); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR S.A.); the offence of fraud provided by article 291 by applying article 41 paragraph  2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code; the offence provided by article 290 of the Criminal Code of 1969 into the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code, with regard to defendant Trifan Florin.

The court convicted the defendant **TRIFAN FLORIN** - son of Emil and Ana, born on the 15.03.1979, in Cugir, Alba Country, personal identification no. 1790315011122, residing in Săliștea Township, Joseni street, no. 459, Alba County, Romanian citizen, general education, unqualified, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Alpha Bank –Alba branch);

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject BCR SA);

- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

- 6 months imprisonment for committing the offence of recurrent use of false deeds under a private signature provided by article 322 by applying article 5 of the Criminal Code

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 8 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 8 months imprisonment.**

Based on article 91 of the Criminal Code, the Court suspended the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-year probation period, according to the provisions of article 92 of the Criminal Code.

The Court ruled that during the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, lett. a-e of the Criminal Code and article 93 paragraph 2, lett. b) of the Criminal Code:

g) he shall report to the Probation Service attached to Alba District Court, on the dates established;

h) he shall meet with the probation officer designated for his supervision;

i) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

j) he shall communicate any change of his current job;

k) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

l) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

Pursuant to article 386 of the Criminal Proceedings Code, the Court changed the legal classification of the offence of fraud provided by article 215 paragraph 1-3 of the Criminal Code of 1969 combined with article 41 paragraph 2 of the Criminal Code of 1969 to the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank-Sebes branch);the offence of fraud provided by article 291 by applying article 41 paragraph 2 of the Criminal Code of 1969 to the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph  1 and article 5 of the Criminal Code with regard to defendant Grozav Eugen Tiberiu

The court convicted the defendant **GROZAV EUGEN TIBERIU** - son of natural and Ileana, born on the 10.01.1978, in Cugir, Alba Country, personal identification no.1780110010017, residing in Săliștea Township, Săliștea Deal village, no. 83, Alba County, Romanian citizen, unemployed, not married, no criminal records, to serve a punishment of:

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject– BCR SA);

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject - BRD Groupe Societe Generale);

- 1 year imprisonment for committing the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject -Alpha Bank-Sebes branch);

- 6 months imprisonment for committing the offence of use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

Pursuant to article 39 paragraph 1, lett. b) of the Criminal Code, the Court merged the above mentioned penalties into the most severe penalty of 1 year imprisonment, to which an additional penalty of 10 months imprisonment shall be added, therefore the defendant shall serve the penalty of **1 year and 10 months imprisonment.**

Based on article 91 of the Criminal Code, the Court suspended the enforcement of the penalty under the supervision of the Probation Service attached to Alba District Court and shall order a 2-years and 6 months probation period, according to the provisions of article 92 of the Criminal Code.

The Court ruled that during the probation period the defendant shall comply with the following supervision measures stipulated under article 93, paragraph 1, lett, a-e of the Criminal Code and article 93 paragraph 2, lett. b) of the Criminal Code:

a) he shall report to the Probation Service attached to Alba District Court, on the dates established;

b) he shall meet with the probation officer designated for his supervision;

c) he shall give prior notice to the Probation Service on any change of domicile/residence and on any trip exceeding 5 days;

d) he shall communicate any change of his current job;

e) he shall communicate and provide to the Probation Service any document that will allow verification and monitoring of his means of subsistence;

f) he shall attend a social reintegration program organized by the Probation Service or in collaboration with any institutions/organizations from the community.

Based on art.93, paragraph 3 of the Criminal Code, the Court ordered to the defendant to serve, during his probation period, unpaid community work for a period of 60 days within Săliste town office or Cugir town office pursuant to art.52 of Law no. 253/2013.

Based on article 91 paragraph 4 of the Criminal Code, the Court informed the defendant regarding the provisions of article 96 and article 97 of the Criminal Code.

The court convicted the defendant **POIENAR ANA** - daughter of Busuioc and Motrea, born on the 25.08.1979, in Cugir, Alba Country, personal identification no. 2790825013527, residing in Săliștea Township, Săliștea Deal village, no. 39, Alba County, Romanian citizen, education: 10th form, unemployed, not married, with criminal records, to serve a punishment of 1 year imprisonment for committing accessory to the offence of use of false deeds under a private signature provided by article 26 in conjunction with article 290 of the Criminal Code of 1969 in the condition of article 41 paragraph 2 Criminal Code of 1969 and article 5 Criminal Code of 1969

The court banned the defendant from exercising the rights provided by article 64 lett. a) second recital and lett. b) of the 1969 Criminal Code, during the period stipulated under article 71 of the 1969 Criminal Code.

Based on article 81 of the 1969 Criminal Code and article 71 of the 1969 Criminal Code, the court suspended the enforcement of the main penalty and of the ancillary

EXT-MARGINEAN-00192

penalty under supervision for a probation period of 3 years set out according to the provisions of article 82 of the 1969 Criminal Code.

The Court informed the defendant on the provisions of article 83 the 1969 Criminal Code.

Based on article 580 of the Criminal Proceedings Code, the Court ordered the annulment of the following documents: income statement no. 70 of 04.12.2007, employment contract no. 21/03.05.2007, employment contract no. 24/02.07.2007, income statement no. 112/04.01.2008, employment contract no. 19/01.02.2007, income statement no. 214/21.05.2008, income statement no. 219/26.05.2008, income statement no. 215/21.05.2008, income statement without registration number related to defendant Trifan Florin, employment contract no. 29/03.05.2007, income statement no. 230/03.06.2008, income statement no. 232/04.06.2008, income statement no. 233/19.06.2008.

The Court took note of the fact that the aggrieved parties BRD GROUPE SOCIETE GENERALE located in Bucharest, Ion Mihalache avenue, no-1-7, ASSET PORTOFOLIO SERVICING ROMANIA SRL located in Bucharest, Matei Milo street, no.9, district 1, did not bring civil proceedings in the case.

Based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code, the Court partially accepted the civil proceedings brought by the civil party ALPHA BANK ROMANIA, located in Bucharest, Calea Dorobanților, no.237 B, district 1 and consequently ordered the defendant Grozav Eugen to pay the amount of LEI 57,345.65 and the defendant Trifan Florin to pay the amount of EUR 16,033.93 as damages. The Court rejected the civil proceedings brought against the defendant Mărginean Rusalin Sorin.

Based on article 397 paragraph 1 of the Criminal Proceedings Code in conjunction with article 25 paragraph 1 and article 19 paragraph 5 of the Criminal Proceedings Code the Court accepted the civil proceedings brought by the civil party KRUK INTERNATIONAL SRL, located in Bucharest, Splaiul Independenței, no.319 O.B, ground floor, district 6 and consequently ordered the defendant Trifan Florin to pay in favour of this civil party to the criminal trial an amount of LEI 30,066.87 (EUR 6,904.94) as damages.

Based on article 274 paragraph 1 of the Criminal Proceedings Code the Court ordered the defendants Chiriluț Cristian, Mărginean Nicolaie, Trifan Florin, Poienar Ana and Grozav Eugen, to pay, each separately, the amount of LEI 2,100 and the defendant Mărginean Rusalin the amount of LEI 2,200 as judicial expenses covered in advance by the state in this case.

In order to reach this decision, the District Court had found the following:

In fact: In the period from 2006-2008, defendant Mărginean Rusalin Sorin had the capacity of administrator and sole shareholder of S.C. SORY EXPRESS S.R.L. Tărtăria, a company whose main object of activity was transport.

Given the poor financial situation of the company, the defendant asked the employees and dayworkers working for his company, as well as other persons who had no connection with the company to contract bank loans on their behalf, and make the money thus obtained available to him, in order to obtain the necessary amounts to finance the company activity, and promised he would draft all necessary documentation and, implicitly, that he would pay the loan instalments; actually, the defendant had never had any intention to repay the loans, as proven by the fact that, after having received the amounts of money, he laid off the employees, and terminated their employment contracts, or refused to employ them; also, except for two loans, which was paid in advance by roll-over, in all other cases either the first 2-3 instalments were paid or no payment was made.

Based on the promises made and given the fact that the work for S.C. SORY EXPRESS S.R.L. provided their only income source – defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu accepted to contract bank loans, although they were aware of the fact that they did not meet the solvency requirements, as the last three defendants were not even employed.

Defendant Poienar Ana was also involved in this criminal activity, in her capacity as director of S.C. SORY EXPRESS S.R.L. and sister-in-law of defendant Mărginean Rusalin Sorin, while she and the latter also had an extra-conjugal relationship. More specifically, the defendant filled in the employment contracts and the income statements fictitiously certifying the capacity of employee and the salary income, documents which were signed accordingly by defendant Mărginean Rusalin Sorin, in his capacity as administrator. Separately, it was maintained that the two defendants forged the signature of Lupu Vasilca Crinela, the person in charge with accounting records for S.C. SORY EXPRESS S.R.L., on the income statements.

Also, in order to achieve the criminal purpose pursued, defendant Mărginean Rusalin Sorin was the one who confirmed the bank clerks over the phone the accuracy of the information included in the income statements.

Thus, 7 (seven) bank loans were contracted in the period of December 2007 – June 2008, as follows:

- Defendant Chiriluț Cristian Sabin worked for S.C. SORY EXPRESS S.R.L. as a driver in the period of 3.11.2007-16.04.2008, benefiting from a salary of RON 560, according to the employment contract no. 5/03.11.2007, registered with I.T.M. Alba under no. 50.014423/03.12.2007. Shortly after being employed, defendant Mărginean asked him to contract a loan in amount of EUR 15,000 from B.C.R., and give him the money, under the pretence that the company had to pay debts; defendant Chiriluț accepted, on the condition that a part of that loan, namely the amount of EUR 4,000 should be his.

In order to obtain the loan, defendant Poienar drafted a copy of the employment contract where she mentioned the unreal information that the holder undertook activities with the company starting from 03.05.2007 and had a monthly gross basic salary of RON 1,830, a document signed by defendant Mărginean as a true copy of the original. Also,

EXT-MARGINEAN-00194

income statement no. 70 of 04.12.2007 was drafted, fictitiously certifying that defendant Chiriluț Cristian Sabin obtained monthly income in amount of RON 3,200 in the period of August-October 2007.

On 04.12.2007, defendants Mărginean and Chiriluț went to B.C.R. – Cetate Agency, and here defendant Mărginean Rusalin Sorin, who had with him the two documents, presented them personally to the loan officer Vesi Ionuța Elisabeta, who was an acquaintance of his. On the same day, after the approval of his, contract no. 2007186981 was concluded for a 10-year period, and the next day defendant Chiriluț took the amount of EUR 15,000 from the bank. According to the agreement, he handed in the amount of EUR 11,000 to defendant Mărginean, and, in order to have a guarantee that he would honour his promise to reimburse the loan, he requested a loan document to be drafted, document which was drafted by defendant Poienar and signed by both defendants.

In 2008, 3 loan reimbursement payments were made, as follows: on 06.02.2008 and on 26.02.2008 defendant Poienar Ana paid the amounts of EUR 237 and EUR 260, respectively and on 30.10.2008, defendant Chiriluț paid the amount of EUR 200, then no payment was made.

The debt owed to the bank by defendant Chiriluț Cristian Sabin was assigned to DDM EUROPE AG, with CREDITEXPRESS FINANCIAL SERVICES S.R.L. as asset administrator, and later on to ASSET PORTFOLIO SERVICING ROMÂNIA, which communicated they would not bring civil action civil action in the case.

Following the handwriting analysis report on the documents presented by the bank, the employment contract of defendant Chiriluț registered with I.T.M. Alba under no. 5/03.11.2007 and on the handwritten document dated 05.12.2007 – the following conclusions were presented:

- The signature from the Employee field on page 4 of the individual employment contract no. 5/03.11.2007 was not written by defendant Chiriluț; instead, the signature from the Employee field on page 4 of the individual employment contract no. 21/03.05.2007 (presented to B.C.R.) was probably written by the above-mentioned.
- The signatures from the Employer field on page 4 of the two employment contracts were probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same defendant;
- The handwriting on the two employment contracts was probably written by defendant Poienar Ana;
- The signature on the income statement no. 70/04.12.2007 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana;
- The signatures from the handwritten document dated 05.12.2007 belong to the holders, namely defendants Mărginean Rusalin Sorin and Chiriluț Cristian Sabin, and the handwriting belonged to defendant Poienar Ana.

In January 2008, defendant Mărginean Rusalin Sorin, knowing that defendant Mărginean Nicolaie was interested in finding a job, suggested that he should work for his company, S.C. SORY EXPRESS S.R.L.; after a few days, the defendant invoked the problems his

company was facing and asked defendant Mărginean Nicolaie to help him financially by contracting a loan, promising him instead to pay the loan instalments and employ him in his company. Based on these promises, defendant Mărginean Nicolaie accepted, therefore he submitted his ID card, which was used to forge the documentation for the bank; thus, the false employment contract no. 24/02.07.2007 was filled in and registered with ITM under no. 10.196.076/03.07.2007, including the false information that defendant Mărginean Nicolaie was employed by the company as a driver and had a monthly gross basic salary in amount f RON 1,200; income statement no. 112/04.01.2008 was also drafted, certifying that defendant Mărginean Nicolaie obtained monthly income in amount of RON 3,024 in the period of September-November 2007.

On 04.01.2008, defendant Mărginean Rusalin Sorin joined defendant Mărginean Nicolaie to B.C.R. Cetate Agency and here he asked again clerk Vesi Ionuța Elisabeta to draft a loan contract, handing in the forged documents. After the approval of the loan application for the amount of EUR 15,000, the loan contract no. 20081615 was concluded for a 10-year period, and defendant Mărginean Nicolaie was issued the loan amount. All money was given to defendant Mărginean Rusalin Sorin.

On 26.02.2008, defendant Poienar paid the amount of EUR 300 to B.C.R., representing the first instalment of the loan, and then no other payment was made. Therefore, the loan was assigned by the bank to CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucharest, and later on to ASSET PORTFOLIO SERVICING ROMÂNIA, which communicated they would not bring civil action civil action in the case.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

- The signature from the Employee field on page 4 of the individual employment contract no. 24/02.07.2007 was probably written by defendant Mărginean Rusalin Sorin; the signature from the Employer field on page 4 of the employment contract was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same accused;
- The handwriting on the employment contract was probably written by defendant Poienar Ana;
- The signature on the income statement no. 112/04.01.2008 from the G field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana.


- In May 2008, defendant Mărginean Rusalin Sorin asked defendant Trifan Florin, who worked as dayworker for his company, to help him with money using the same means, namely to contract two bank loans. Based on the promise that there will be no problem with the loan repayment, defendant Trifan accepted to take the two loans, therefore he submitted his ID card to have the necessary documentation drafted for the banks.

Thus, on 21.05.2008, defendant Trifan followed the instructions given by defendant Mărginean, went to ALPHA BANK Alba Iulia branch, where he presented the bank officer

a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007) and 2 (two) income statements no. 214/21.05.2008 and no. 219/26.05.2008, fictitiously certifying that he was employed by S.C. SORY EXPRES S.R.L. as a driver, starting with 01.02.2007, with a monthly gross salary of RON 1,845, and during the last three months he earned a monthly income of RON 3,660, of which RON 1,320 represented the salary and the rest was per diem difference. However, not only that the defendant was not employed with an employment contract, but he did not even have a driver's licence for any category of vehicle, therefore he could not have worked as a driver.

According to the bank rules, defendant Trifan handwrote a payment commitment where he mentioned that he had been working for 2 (two) years for the company, as a driver, and consented to have the loan instalments withdrawn from his salary, in case of failure to pay. The loan application for EUR 15,000 was approved based on these documents, and the loan contract no. 0588299 was concluded for a 10-year period. Defendant Trifan gave all the money taken from the bank to defendant Mărginean, together with the loan repayment schedule.

No loan instalment was paid in the forthcoming period, therefore ALPHA BANK Alba Iulia branch brought civil action for the amount of EUR 16,033.93.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

- The signature from the Employee field on page 4 of the individual employment contract no. 19/01.02.2007 was not written by defendant Trifan Florin; the signature from the Employer field on page 4 of the employment contract was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same accused;
- The handwriting on the employment contract was probably written by defendant Poienar Ana;
- The signature on the income statement no. 214/21.05.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was probably written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana.


- Then, on 23.05.2008, defendant Trifan Florin used the same mode of operation, he contracted a new personal loan in amount of EUR 4,900 from B.C.R. Sebeș Agency, for a 10-year period, according to the contract no. 2008398954. In order to obtain the loan he presented a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007), similar to the one used previously, signed on each page by the company administrator as a true copy of the original, and 2 (two) income statements no. 215/21.05.2008 and n.n., certifying that in the period of January-March 2008 he obtained a monthly salary income of RON 1, 980 and per diems in amount of RON 660. This amount obtained as a bank loan was also given to defendant Mărginean Rusalin Sorin, together with the loan repayment schedule.

As no payment was made in the forthcoming period, the loan was assigned to ERSTE GROUP and further to SECAPITAL S.a R.L., with KRUK INTERNAȚIONAL SRL

EXT-MARGINEAN-00197

Bucharest as asset administrator, which brought civil action for the amount of RON 25,643.92, updated according to interest rates and penalties until the payment date.

The handwriting analysis report on the documents presented to the bank indicated the following:

- The signatures confirming a true copy of the original on the employment contract no. 50.015.780/02.02.2007 were written by defendant Mărginean Rusalin Sorin, and the handwriting under the mention "True copy of the original" on each page belonged to defendant Poienar Ana;
- The signature on the income statement no. 215/21.05.2008 from the General Manager field was probably written by defendant Mărginean Rusalin Sorin, and the signature from the Economic Director field was not written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana;
- The signature on the income statement n.n. from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was not written by Lupu Vasilica Crinela; the handwriting on the income statement n.n. belonged to defendant Poienar Ana.


- In order to obtain money using the same method, defendant Mărginean Rusalin Sorin asked his cousin, defendant Grozav Eugen Tiberiu, who had left to Portugal since 2001 and who returned to Romania for a brief period of time in the summer of 2008. Under the pretext that he wanted to employ him as a driver for him company, defendant Mărginean asked him to contract a bank loan, explaining that he needed the money to cover possible damages in case of a car accident; he also promised to repay all loan instalments. Under these conditions, defendant Grozav indicated he had no driver's licence, to which defendant Mărginean answered that was not a problem, everything would be solved. To be credible, defendant Mărginean asked him to sign a blank page with the company stamp applied at the bottom of the page and explained that he would fill in all necessary information for the employment contract. Although he had some suspicions of the validity of the employment contract and he was aware that he did not meet the solvency requirements to obtain bank loans – defendant Grozav accepted these requests and contracted three loans.

Initially, on 04.06.2008, defendant Grozav Eugen Tiberiu contracted a loan of EUR 10,000 from B.C.R. Sebeș Agency, and for this purpose he presented the documents made available by his cousin, namely a copy of the employment contract no. 29/03.05.2007 (50.014.655/04.05.2007) and the income statement no. 230/03.06.2008, falsely certifying that he was employed as a driver with SC SORY EXPRES SRL and earned a monthly net income RON 3,118. Then contract no. 2008438664 was concluded for a 120-month period, the money was taken from the bank and given to defendant Mărginean Rusalin Sorin.

- On the same date, defendant Grozav went to BRD Groupe Societe Generale – Alba branch where, based on the indications given by defendant Mărginean, he applied for a RON 10,000 loan, and submitted a copy of the same employment contract and the income statement no. 232/04.06.2008 issued by SC SORY EXPRES SRL, fictitiously certifying that he was an employee of this company and earned a monthly income of RON 1,318.

After the approval of the loan application, the loan contract no. 1609392/05.06.2008 was concluded for a 48-month period; again, defendant Grozav Eugen Tiberiu gave his cousin all the money cashed-in from the bank.

- Again, on the initiative of defendant Mărginean, who motivated he needed an additional amount of money, on 25.06.2008 defendant Grozav contracted a roll-over loan with ALPHA BANK Sebeş Agency, in amount of RON 54,800 for a 10-year period, to pay the previous loans, and concluded contract no. 0596738. In order to have the loan application approved, defendant Grozav Eugen Tiberiu presented a copy of the employment contract, income statements no. 232/19.06.2008 and 233/19.06.2008 – filled in and signed by defendants Mărginean Rusalin Sorin and Poienar Ana – certifying he was employed as a driver by SC SORY EXPRES S.R.L. and had earned a monthly income of RON 1,818 in the past three months. The amount of money left after the anticipated repay of the two loans was given by defendant Grozav Eugen Tiberiu to his cousin, according to their agreement.

In the forthcoming period, as he was requested by the bank to pay the loan instalments, he made some partial payments, in total amount of RON 390.

ALPHA BANK Sebeş Agency brought civil action in the case for the amount of RON 57,923.33.

Following the handwriting analysis report on the documents submitted to ALPHA BANK Sebeş Agency, the following conclusions were presented:

- The signature from the Employer field on the copy of the individual employment contract was probably written by defendant Mărginean Rusalin Sorin, and the signatures confirming the true copies of the originals were written by the same defendant; the handwritten mentions in the contract and under the mention "True copy of the original" were written by defendant Poienar Ana;
- The handwriting on the two employment contracts was probably written by defendant Poienar Ana;
- The signature on the income statement no. 232/19.06.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Chief Accountant field was not written by Lupu Vasilica Crinela; the handwriting belonged to defendant Poienar Ana;
- The signature on the income statement no. 233/19.06.2008 from the General Manager field was written by defendant Mărginean Rusalin Sorin, and the signature from the Accountant field was not written by Lupu Vasilica Crinela; the handwriting on the income statement belonged to defendant Poienar Ana.

In the hearings held during the criminal investigation, the Court took note of the fact that the defendants Chiriluţ Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu, although they had an oscillating attitude, in principle, they admitted having committed the deeds, and indicated they accepted to contract the bank loans, based on the promises made by defendant Mărginean Rusalin Sorin that he would pay the loan instalments.

However, defendant Mărginean Rusalin Sorin fully denied his guilt, showing he had no involvement in contracting the bank loans and denied that he would have received the amounts of money; nevertheless, the defendant could not provide plausible explanation on the discrepancies between the documents he issued on behalf of SC SORY EXPRES S.R.L., presented to the banks, on the one hand, and the records in the company bookkeeping on the employees and their wages, and the records of I.T.M. Alba, on the other hand.

As regards defendant Poienar Ana, during the criminal investigation she admitted she had filled in the employment contracts and the income statements for the bank, and claimed she had done so upon request and based on the indications given by defendant Mărginean Rusalin Sorin, without confronting them with the accounting documents of the company (payroll). The justifications presented by the defendant are purely formal, given that she wrote completely different data on the same type of documents, which were drafted either the same day or at very short time intervals: thus, in the individual employment contract of defendant Chiriluț Cristian Sabin registered with I.T.M. Alba the start date is 03.11.2007, with a monthly salary of RON 560, while on the employment contract of the same accused, submitted to the bank, defendant Poienar wrote as start date 03.05.2007 and a monthly gross salary of Ron 1830; similarly, for the loans contracted by defendant Trifan Florin from the two banks, the defendant wrote different amounts as income, namely the amount of RON 2,640 on the statements submitted to B.C.R. and RON 3,660 on the statements submitted to APLHA BANK, although the statements for both banks were issued on 21.05.2008; we note the same situation with the income statements used by defendant Trifan Florin to contract the three loans, which indicate different amounts as income, while the defendant issued the three statements within a time interval of one day and 15 days, respectively.

Defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolaie and Trifan Florin were heard during the trial, while defendant Poienar Ana invoked the provisions of article 70 of the Criminal Code – the right to remain silent.

Initially, during the trial, defendant Mărginean Rusalin Sorin, in his statement presented on page 93 admitted having committed the deeds mentioned in the document instituting the proceedings, and requested that he should be judged pursuant to the provisions of article 320 paragraph  1 of the previous Criminal Proceedings Code, but before the court he changed his statement and indicated that he did not benefit from the money obtained from the loans granted to the four defendants, that the income statements were issued upon request of the employees and that they indicated real facts, as the four drove abroad.

The court noticed that the defendant had an oscillating and insincere attitude, as all the evidence administered in the case and analysed above invalidates the claims of the defendant; as indicated by the witnesses heard and by defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu, the loans were contracted on the initiative of defendant Mărginean Rusalin Sorin, based on the promises made by the defendant to pay the loan instalments, and he was the person who used the money.

Witness Lăscan Adrian, as opposed to the claims of defendant Mărginean Rusalin, stated that only he and witness Grigore Cosmin drove abroad, not the other defendants. In fact, notification no. 80584/30.06.2009 issued by the Prefect Institution, Alba County – Community Public Service Vehicle Registration and Driver's Licences certifies that defendant Trifan Florin is not registered as holder of a driver's licence, and he was not employed by SC SORY EXPRES S.R.L., just like defendants Mărginean Nicolaie and Grozav Eugen Tiberiu.

Also, the evidence mentioned above corroborate with the handwriting analysis reports no. 54167/15.09.2009, 54174/16.09.2009 and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit analysing the documents presented to the banks in order to obtain loans as well as other documents and wit the Forensic report no. 67208C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendants Chiriluț Cristian Sabin and Trifan Florin indicating that no specific reactions suggesting simulated behaviour were detected, therefore the court may not find, as claimed by the defendant's lawyer, that there is no evidence indicating that defendant Mărginean Rusalin Sorin would have deliberately determined the other co-defendants to commit the offence of fraud.

As regards defendants Grozav Eugen Tiberiu, Mărginean Nicolaie and Chiriluț Cristian Sabin, it was established that the court may not retain the applicability of the provisions of article 16 (1, b point II) of the Criminal Proceedings Code, namely that the deed was not committed with the culpability provided by law. The defendants deliberately accepted the request of defendant Mărginean Rusalin Sorin to contract bank loans, knowing that they did not meet the requirements for being granted bank loans, and for this purpose they went to the offices of those contracting banks. The defendants' statements confirm this – defendant Grozav Eugen Tiberiu, heard during the criminal prosecution stage (pages 120-122) indicated that he went to BCR upon request of defendant Mărginean Rusalin Sorin and filed an application for a EUR 10,000 loan and he specified in his application that he was employed by SC SORY EXPRES S.R.L. as a driver and has RON 700 income and EUR 1000 per diem, although in reality the defendant did not have a driver's licence and was not the employee of this company; defendant Trifan Florin stated (pages 116-117) that, upon request of defendant Mărginean Rusalin Sorin, he went to Alpha Bank Alba Iulia where he filed a loan application in which he mentioned he was employed by SC SORY EXPRES S.R.L. as a driver, which was not real. Before the court, the defendant showed he made no statement to the bank on the fact that he worked for SC SORY EXPRES S.R.L. as a driver, which is invalidated by the document of page 273 entitled "payment commitment", filled in and signed by the defendant, but he admitted he was not employed and did not work even for one day for defendant Mărginean Rusalin, and agreed with his proposal to contract the loan to help him.

The statements of defendant Mărginean Nicolaie (pages 100-103 criminal investigation file, page 123) indicate that he did not sign any employment contract, but from discussions between co-defendants Poienar Ana and Mărginean Rusalin before going to the bank he found out that an employment contract had been concluded for him, which mentioned a higher salary than due so as the loan could be approved; therefore,

EXT-MARGINEAN-00201

the court cannot note a lack of intent to commit the offence, because he signed the necessary documents to obtain the loan, although he knew all these aspects.

Defendant Chiriluț Cristian Sabin stated that, on their way to BCR – Cetate Agency he asked defendant Mărginean Rusalin how he managed to obtain the EUR 15,000 loan, given that his employment contract indicated a monthly salary of about RON 450, and defendant Mărginean said he had arranged that the employment contract should mention the amount of RON 1500-1800. Nevertheless, defendant Chiriluț accepted to contract the loan.

It was established that since from the date of the offences until the sentence was passed a new criminal law was adopted, pursuant to article 7 paragraph 1 of ECHR and to the Decision of the Constitutional Court no. 265/2014, in order to establish the more favourable criminal law, the court must compare the repressive regime of each of the criminal laws applicable in the case of the accused (global comparison method).

In this case, as regards defendant Mărginean Rusalin Sorin, the Court assessed that the more favourable criminal law is the new law, as the punishment for the offence of fraud provided by article 244 paragraph 1,2 of the Criminal Code is 1 to 5 years imprisonment, compared to the 10 to 20 years imprisonment, as provided by article 215 paragraph 1-3 and 5of the Criminal Code of 1969. As regards defendants Chiriluț Cristian Sabin, Trifan Florin, Mărginean Nicolaie and Grozav Eugen Tiberiu, the more favourable law is also the new law, which provides for the offence of fraud provided by article 244 (1 and 2) of the Criminal Code a punishment of 1 to 5 years imprisonment, while the old law, article 215 (1 and 3) provided for a more severe punishment, namely 3 years and 15 years imprisonment.

Having regard to the provisions of Decision no. 5/2014 of the High Court of Cassation and Justice stipulating that it is not permitted to combine provisions of successive laws in establishing and applying the more favourable criminal law with regard to the conditions establishing and punishing the recurrent offence and to the provisions of article 36 paragraph 1 of the Criminal Code stipulating that there is recurrent offence when a person commits, at different time intervals, but for in pursuit of the same intent and against the same passive subject, actions or inactions which present each the content of the same offence, the legal classification of the deeds for which the defendants are charged.

For defendant Poienar Ana, the Court noted that the more favourable criminal law is the old law, as the punishment for use of false deeds under a private signature provided by article 290 of the Criminal Code of 1969 is imprisonment from 3 months to 2 years of a fine, while the punishment for the same offence provided by article 322 of the Criminal Code is imprisonment from 6 months to 3 years of a fine.

By law, the Court noted that the actions of defendant Mărginean Rusalin Sorin who, in order to obtain unlawful revenues, in the period of December 2007 – June 2008 determined a number of four persons to fraudulently contract bank loans, for which purpose he made available documents which he forged together with defendant Poienar Ana, while the total amount of the loans contracted is EUR 59,900 and RON 68,800 – constitute 4 offences of incitement to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1and article 5 of the Criminal Code (3 material acts – passive subject – Grozav Eugen), article

47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Chiriluț Cristian), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject Mărginean Nicolaie), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 article 5 of the Criminal Code (2 material acts – passive subject Trifan Florin).

The actions of the same defendant who, acting on the basis of the same criminal intent to obtain fraudulent loans, drafted a number of 14 forged documents which were presented to banks – constitutes the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code, all by applying article 39 paragraph 1, lett. b) of the Criminal Code on multiple offences.

The action of defendant Chiriluț Cristian Sabin, who on 04.12.2007 fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents – constitutes the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code.

The action of the same defendant of using forged documents at the bank in order to be granted the loan – constitutes the offence of use of forgery provided by article 323 of the Criminal Code by applying article article 5 of the Criminal Code, all by applying article 39 lett. b) of the Criminal Code on multiple offences.

The action of defendant Mărginean Nicolaie, who on 04.01.2008 fraudulently contracted a loan in amount of EUR 15,000 from B.C.R. S.A. Cetate Agency, based on forged documents – constitutes the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code.

The action of the same defendant of using forged documents at the bank in order to be granted the loan – constitutes the offence of use of forgery provided by article 323 of the Criminal Code by applying article article 5 of the Criminal Code, all by applying article 39 lett.b) of the Criminal Code on multiple offences

The actions of defendant Trifan Florin, who in May 2008 fraudulently contracted two bank loans in total amount of EUR 19,900, by using forged documents – constitute two offences of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Sebeș branch) and the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR S.A.).

The actions of the same defendant who presented forged documents to banks in order to be granted loans constitute the offence of recurrent use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code.

The action of the same defendant who, on 21.05.2008 forged a payment commitment, where he mentioned the unreal information that he worked as a driver for S.C. SORY EXPRES S.R.L., and consented to have the loan instalments withdrawn from his salary, in case of failure to pay – constitutes the offence of use of false deeds under a private

signature, provided by article 322 by applying article 5 of the Criminal Code, all by applying article 39 lett.b) of the Criminal Code on multiple offences.

The actions of defendant Grozav Eugen Tiberiu who, in June 2008, fraudulently contracted three bank loans in amount of EUR 10,000, RON 10,000 and RON 54,800, by using forged documents – constitute 3 offences of fraud as provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BCR SA); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – BRD Groupe Societe Generale); the offence of fraud provided by article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject – Alpha Bank – Sebeș branch).

The action of the same defendant to present forged documents to banks in order to be granted loans constitutes the offence of recurrent use of forgery provided by article 323 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code, all by applying article 39 lett.b) of the Criminal Code on multiple offences.

The actions of defendant Poienar Ana of helping defendant Mărginean Rusalin Sorin to forge the 4 employment contracts and the 10 income statements which were used to contract fraudulent loans – constitutes the offence of aiding and abetting the offence of recurrent use of false deeds under a private signature, provided by article 290 of the Criminal Code under the conditions of article 41 paragraph 2 of the Criminal Code.

In the individualization of punishment, according to the provisions of article 74 of the Criminal Code, the Court took into consideration the seriousness of the offence and the danger represented by the offender, which is evaluated against the following criteria: the circumstances of the offence and the manner in which it was committed, as well as the means used; the peril created for the value protected; the nature and the seriousness of the result generated or of any other consequences of the offence; the reason for committing the offence and the purpose pursued; the nature and the frequency of offences which represent the criminal record of the offender; the conduct after having committed the offence and during the criminal trial; the education background, the age, health condition, family and social situation.

In relation to the already mentioned criteria, the Court assessed that the actions of the offenders have a relatively high level of social danger given, on the one hand, the importance of the social value protected by the incriminating rule (economic social relations which should be based on good faith, and the social relations related to the public trust in documents generating legal effects, in the veracity of these documents, in the truth they should express), the conduct of defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie during the criminal trial (they admitted having committed the deeds), but also the insincere conduct of defendants Mărginean Rusalin and Poienar Ana, the lack of criminal record, the fact that defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie did not benefit from the money obtained after accessing the loans, which lead towards special minimum penalty.

The Court also considered how defendant Mărginean Rusalin committed the deeds, namely he took advantage of the poor financial situation of co-defendants Chiriluț Cristian Sabin, Trifan Florin, Grozav Eugen, Mărginean Nicolaie, of the lack of jobs or of their desire to maintain their jobs, he determined them to commit offences, of the fact that the

money obtained by committing the deeds was solely used by defendant Mărginean, so that the Court applied a custodial sentence to him.

Pursuant to art. 112 (e) of the Criminal Code, the Court ordered the confiscation of the amount of EUR 26,000 from defendant Mărginean Rusalin Sorin, amount obtained by having committed the offence for which the aggrieved party did not bring civil action in the criminal proceedings. Thus, the debt owed to the bank by defendant Chiriluț Cristian Sabin in amount of EUR 15,000, of which the amount of EUR 11,000 was given to defendant Mărginean Rusalin and the debt owed to the bank by defendant Mărginean Nicolaie, in amount of EUR 15,000, money solely used by defendant Mărginean Rusalin was assigned to DDM EUROPE AG, with assets administrator CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucharest, and further to ASSET PORTFOLIO SERVICING ROMANIA, which communicated they would not bring civil action in the criminal proceedings.

**The civil party Alpha Bank Romania S.A. and the defendants Mărginean Rusalin Sorin, Chiriluț Cristian Sabin, Mărginean Nicolae and Poienar Ana have filed an appeal against this criminal court sentence.**

**The civil party Alpha Bank Romania S.A.** has not reasoned the filed appeal.

Under article 396 paragraph 5 of the Code of Criminal Procedure related to article 16 paragraph 1 lett. c of the Code of Criminal Procedure, **the defendant Mărginean Rusalin Sorin** has requested the court to acquit the defendant for instigation to misrepresentation and, as regards the recurrent offence of use of false deeds under a private signature, mainly to impose the penalty as a fine and, secondly, to reduce the custodial sentence so that it would be possible to impose the suspension under supervision as enforcement method referred to in article 91 of the Criminal Code. The defendant has also requested the court to quash the confiscation of €26,000 from the defendant which is imposed according to article 112 letter e of the Criminal Code.

In the reasoning of the appeal, it has been proven that there is no direct solid proof such that the defendant would have intentionally determined the co-defendants to commit the offences of misrepresentation, besides their statements, statements which must be analysed by the court as inventory because they are interested persons in this case, the co-defendants' position being concerted, given the circumstances of the offences of which they have been found guilty.

Thus, as results from the indictment and the statements made before the first instance court, the co-defendants were aware that the solvency requirements were not met to obtain the loans and are liable for the offences and decisions made learnedly. The defendant did not attempt at any time to make them request such loans. As noticed, at a given moment, each of them had work relations within the company of the defendant Mărginean Rusalin Sorin, admitting that they were paid for the external transports which

they additionally made, issues resulting both from the statements made during the criminal investigation and the judicial investigation. As noticed, at a given moment and for a certain period, each of them had work relationships - employees or day labourers, within the company managed by the defendant, admitting that they were paid for the external transports which they made in addition to the basic salary, which is why when they wanted to obtain loans in their own name and they were requested to prepare the file, they were issued certificates which confirmed the received salary, the registered amounts being different depending on the external transports made by each of them and the salary.

Besides the statements of co-defendants, it has also been stated that there is no evidence in the case file resulting, without any doubt, in the capacity of participant in committing the offence of instigation to misrepresentation of the defendant Mărginean Rusalin Sorin. All this defendant did was to issue to the co-defendants the requested income certificates, confirming all amounts received for the services and he did not intend at any moment to make them commit offences.

Regarding the recurrent offence of use of false deeds under a private signature, it has been stated that the defendant admits that it is possible to have been wrong when he specified in the income certificates amounts exceeding the salary mentioned in the labour agreements, but what he considered was to include all amounts offered to his employees. In the specification of custodial sentence, the court has been requested to consider the general specification criteria, namely the low degree of social danger of the offence and the defendant's behaviour.

**The defendant Chiriluţ Cristian Sabin** has requested the court to acquit him, under article 16 lett. c of the Code of Criminal Procedure and, secondly, to re-specify the custodial sentence, making more efficient the personal circumstances, the circumstance that the defendant has no criminal record and the social danger is not high.

In the reasoning of the appeal, it has been stated that the evidence concludes that the defendant had work relationships with the company managed by the defendant Mărginean and, although, before the first instance court he had an oscillating attitude, the statement, which has been subsequently made, is true, sincere and describes how events occurred. At a given moment after the employment, the defendant was shown an individual labour agreement and the defendant did not pay attention to the date of the signed agreement, checking only the salary, which coincided with the money which he received.

As regards the offence of misrepresentation, it has been stated that the taken evidence did not succeed in proving the subjective element of the intention of the defendant, who mentioned that, at the request of the defendant Mărginean, he went to obtain a loan which had to be used for the company, being assured by the defendant

Government Exhibit 1
Page 251 of 266

Mărginean that the instalments would be paid, so that it cannot consider any form of intention in case of the defendant Chiriluţ.

According to the statement of the witness Gurgui found in page 203 and the statement of the witness Lăscan found in page 146 of the first instance court file, it results that the defendant earned even €1,200, which consolidates the position of the defendant Chiriluţ regarding the amount of the agreement, trusting that the amount mentioned as salary was real.

**The defendant Mărginean Nicolae** has requested the court to acquit him under article 16 lett. c and d of the Code of Criminal Procedure.

In the reasoning of the appeal, it has been stated that the defendant is not guilty of forgery, he just signed the labour agreements and loan contracts, knowing that the loan was to be handed over to Mărginean Rusalin, the defendant being only a victim of the defendant Mărginean Rusalin.

It has been considered that there should have been evidence in the criminal investigation file in favour of the defendant, provided that in spring 2008 he notified in writing the criminal investigation bodies regarding those offences of which he has been subsequently found guilty, intimations which were subsequently called complaints, at that time the bank started the forced execution, but these complaints have not been attached to the case file.

Regarding the offence of misrepresentation, it has been claimed that the intention to deceive the bank cannot be considered, the defendant being aware that the loan shall be fully repaid.

**The defendant Poienar Ana** has requested the court to re-specify the imposed custodial sentence.

In the reasoning of the appeal, it has been stated that the defendant was sentenced to 1 year of imprisonment with the conditional suspension of the enforcement of the sentence, but, as regards the defendant's position, the taken evidence, the general specification criteria referred to in article 72 of the Criminal Code, the imposed sentence is unreasonably high and is required to impose a fine.

The defendant has admitted that she filled in the labour agreements and the certificates but she did it at the request of the company's director, without confronting the company's documents, so that the fine would be enough to fulfil the purpose provided by law.

EXT-MARGINEAN-00207

Regarding the defendant's behaviour, it has been appealed to the lack of criminal records, the circumstance that she has regretted having committed the offence and admitted that she was ignorant.

It has also been requested that, in the assumption in which it is considered that the custodial sentence is required to be imposed, the court should impose a lower penalty, oriented towards the minimum general penalty, as a result of the consideration of article 74 of the Old Criminal Code with the conditional suspension of the penalty.

**Checking the legality and soundness of the appealed sentence in terms of the statements, and, ex officio, according to article 417 of the Code of Criminal Procedure, but within the limits provided by this law, the Court of Appeal determines the following:**

From the corroboration of the evidence taken in this case, it results that the situation as considered in the appealed sentence is correct, the evidence being well corroborated and interpreted.

In this case, it is proven that the defendant Mărginean Rusalin Sorin, in order to obtain illegal income, during December 2007 - June 2008, made the defendants Chiriluț Cristian Sabin, Mărginean Nicolae, Trifan Florin and Grozav Eugen Tiberiu fraudulently contract bank loans, which is why he provided them with documents which he forged together with the defendant Poienar Ana, the total amount of contracted loans being €59,900 and LEI 68,800.

The same defendant, acting to obtain fraudulent loans, falsely prepared 14 documents which were submitted to the banks.

Thus, the defendant Chiriluț Cristian Sabin applied for and obtained a loan amounting to €15,000 from BCR SA - Cetate Agency on the 4th of December, 2007, using an income certificate and a labour agreement with unreal content, prepared by the defendant Poienar Ana and signed for compliance by the defendant Mărginean Rusalin Sorin, as director of S.C. SORY EXPRES S.R.L. Tărtări.

On the 4th of January, 2008, the defendant Mărginean Nicolaie applied for and obtained a loan amounting to €15,000 from the same bank, using a labour agreement and an income certificate unrealistically certifying that he would have been an employee of the company Sory Expres S.R.L. Tărtări since the 2nd the July, 2007, having a gross basic salary of LEI 1,200.

These documents were drawn up by the defendant Poienar Ana and signed by the defendant Mărginean Rusalin Sorin.

**Government Exhibit 1**
**Page 253 of 266**

In May 2008 (on the 21st of May, 2008 and 23rd of May, 2008), the defendant Trifan Florin fraudulently contracted two bank loans amounting to €19,900 from Alba Iulia Alpha Bank and B.C.R. - Sebeş Agency, using forged documents, namely a copy of a labour agreement and two income certificates. On the 21st of May, 2008, when he went to Alba Iulia Alpha Bank, he also filled in the document called "payment commitment" where, contrary to the reality, he specified that he worked as a driver for S.C. SORY EXPRES S.R.L., and also consented to have the loan instalments withdrawn from his salary, in case of failure to pay.

In June 2008 (on the 4th of June, 2008 and 25th of June, 2008), the defendant Grozav Eugen Tiberiu applied for and obtained from B.C.R. -  Sebeş Agency, B.R.D. Group Societe Generale - Alba Branch and Alpha Bank - Sebeş Agency three bank loans in amount of €10,000, RON 10,000 and RON 54,800, using forged documents, namely a copy of the labour agreement and income certificates, filled in and signed by the defendants Poienar Ana and Mărginean Rusalin Sorin.

In agreement with the first instance, the Court of Appeal, based on its own analysis of the evidence taken in this case, determines that the facts exist, are offences of use of false deeds under a private signature, forgery and misrepresentation and were committed by the defendants in the way and using the method considered in the intimation.

The defendant Mărginean Rusalin Sorin denied that he would have exercised any action to make the co-defendants apply, in his name, for loans by deceiving the bank. Although he does not admit having signed the labour agreements and income certificates for compliance, at the same time claiming that he had no involvement in the bank loan contracting and that he would not have received the money, according to the evidence taken in this case it results that he was the one who made the co-defendants Chiriluţ Cristian Sabin, Mărginean Nicolae, Trifan Florin and Grozav Eugen Tiberiu go to the bank institutions and use documents containing real information, deceiving the bank officials in order to obtain loans. Also, the evidence taken in this case prove that the defendant was the one who signed all documents under a private signature called income certificates and the copies of the labour agreements, documents drawn up by the defendant Poienar Ana.

Thus, the defendants Chiriluţ Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu have stated that the defendant Mărginean Rusalin Sorin asked them to go to the bank and apply for a loan, stating that they agreed to contract the bank loans, relying on the promises of the defendant Mărginean Rusalin Sorin that he would pay the related instalments.

Handwriting analysis reports have been drawn up in this case, establishing that the signatures affixed on the mentioned documents belonged either to the defendant

EXT-MARGINEAN-00209

Mărginean Rusalin Sorin, or they probably belonged to him, and the handwriting belonged to the defendant Poienar Ana.

Also, the witness Lupu Vasilica Crinela, who prepared the accounting records for S.C. SORY EXPRES S.R.L., has stated that she has no involvement in the issuance of the income certificates submitted to the banks and her signature affixed on such certificates was forged, mentioning that she only had signed the documents that she had personally filled in.

The witness Lăscan Adrian Ion who worked as a driver for SC SORY EXPRES S.R.L. stated that, at the request of the defendant Mărginean Rusalin Sorin he contracted a bank loan in amount of €15,000, and he gave the latter the money, as he promised he would pay the loan instalments. He has also stated that after he ceased his activity with the company he found out that the defendants Chiriluț Cristian Sabin and Mărginean Nicolae also contracted bank loans for the company owner.

The witness Grigore Cosmin Dănuț, former employee of S.C. SORY EXPRES S.R.L., has stated that he has knowledge of the fact that defendants Chiriluț Cristian Sabin and Mărginean Nicolaie contracted bank loans for the defendant Mărginean Rusalin Sorin and the defendant Poienar Ana was the one who drafted the documents within the company.

The witness Gurgui Ioan, a friend of defendant Chiriluț, has stated that he found out from him that he contracted a bank loan on the initiative of his employer "Ninuț", based on the documents made available by him and that the defendant Mărginean Nicolaie contracted a bank loan under the same conditions.

Forensic report no. 67208C of the 22nd of May, 2009 drafted by Sibiu County Police Inspectorate - Forensics Unit after the polygraph test administered to defendant Chiriluț Cristian Sabin. During the pre-test interview, the defendant stated that, at the request of defendant Mărginean Rusalin Sorin, he accepted to contract the bank loan and have it mentioned on his income certificate a higher salary than his real income, although he was aware that, based on his income, he could not obtain a €15,000 loan. He has also stated that, according to their agreement, the defendant Mărginean Rusalin Sorin had to pay the loan instalments for the amount of €11,000, while he was to pay personally the difference of €4,000. During the actual test, no specific reactions suggesting simulated behaviour were detected for the relevant questions on the initiative of loan application and the involvement of the defendant Mărginean Rusalin Sorin;

Forensic report no. 67209C of the 22nd of May, 2009 drafted by Sibiu County Police Inspectorate - Forensics Unit after the polygraph test administered to defendant Trifan Florin. During the pre-test interview, the defendant stated that after obtaining the loan from ALPHA BANK, the defendant Mărginean Rusalin Sorin offered him drinks in the

village pub, and that was the only benefit he obtained. Also, during the actual test administered to the defendant, no specific reactions suggesting simulated behaviour were detected for the relevant questions;

The defendant Poienar Ana has stated, during the criminal investigation, that she had filled in the labour agreements and the income certificates for the bank, and claimed she had done so at request and based on the indications given by the defendant Mărginean Rusalin Sorin, without confronting them with the accounting documents of the company.

Confirming the conclusions of the handwriting analysis reports by the statements of the co-defendants in this case, who claim that the defendant Mărginean Rusalin Sorin is the one who approached and made them contract loans, the witnesses' statements, the results of the polygraph test, the fact that the documents used to obtain loans were drafted in a similar manner, the court of appeal determined that it has been proven beyond any reasonable doubt that the defendant committed the offences.

The defendant Mărginean Rusalin Sorin was definitely the one who obtained the money granted by the bank, based on false documents submitted to the bank, documents which were determinant in considering the conditions required for the bank loan, and the offence of misrepresentation was committed when the co-defendants received the money, as a result of the fact that the bank contracts were concluded.

Regarding the defences of the defendants Chiriluţ Cristian Sabin and Mărginean Nicolaie, the Court of Appeal, in agreement with the first instance court, deems that it cannot be considered that they did not commit the offences by the guilt provided in the law.

Thus, because they accepted to contract bank loans,

relying on the promises of the defendant Mărginean Rusalin Sorin that he would pay the related instalments it is not likely to remove the guilt of the defendants who knew that the documents submitted to the bank institutions did not contain real information and that they were still necessary to obtain the loans. They knew that they did not obtain the income mentioned in the documents used for the bank and admitted that they contracted loans at the request of the defendant Mărginean Rusalin.

For the defendant Chiriluţ Cristian Sabin, the court considers that he kept a part of the borrowed amount, namely €4,000. Also, although he worked for the defendant's company in the period 3rd of November, 2007-16th of April, 2008, the copy of the labour agreement submitted to the bank mentioned unreal information, according to which he carried out the activity within the company since the 3rd of May, 2007.

Government Exhibit 1
Page 256 of 266

Related to the considered situation and the judicial classification of the offences committed by the defendants, it is determined that the first instance court has correctly considered his guilt and applied art. 5 of the Criminal Code, determining that the more favourable criminal law for the defendants is the law applicable at the time of sentencing (judgment).

As regards the judicial classification of the committed offences, the court considers that on the 1st of February, 2014 Law no. 286/2009 on the Criminal Code and Law no. 187/2012 on its enforcement entered into force, legal provisions which changed the criminal laws in force at that date and required their analysis in terms of the need to identity more favourable criminal laws until the final judgement of the case, according to art. 5 paragraph 1 of the applicable Criminal Code.

Analyzing the appealed sentence, it is determined that the first instance court made a judicious analysis of the applicability of the more favourable criminal law for each defendant and analyzed the consequences of the offences in the applicable law at the time of their commission (the judicial classification mentioned in the indictment and the sanctions arising from the accusation) and the consequences of the offence as a result of implementing the new law.

In its turn, the Court of Appeal, comparing the provisions of the Criminal Code of 1969 to the ones of the New Criminal Code, considering the decision of the Constitutional Court no. 256/2014 determining that the provisions of art. 5 of the Criminal Code are constitutional as far as they do not allow the combination of successive laws for the establishment and application of the more favourable criminal law, determines that the law applicable at the time of judgment is more favourable for the defendants (except the defendant Poienar Ana) both in terms of the incriminating norm and the establishment and enforcement of sentences.

As regards the application of the defendants who request the court to order the reduction of sentences and establish a method of enforcement without being detained, the Court of Appeal considers it devoid of merit in relation to the criteria referred to in art. 74 of the Criminal Code, namely: "(1) The establishment of the sentence duration shall be done in relation to the seriousness of the offence and the degree of danger of the defendant, which are assessed according to the following criteria:

a) *the circumstances of the offence and the manner in which it was committed, as well as the means used* - The court shall consider the number of committed offences, the fact that the defendant Mărginean Rusalin Sorin approached the other defendants and made them commit the offences, the means used to draw up the false documents

b) *the peril created for the value protected* - in this case, it arises from the regulation of the three offences, the misrepresentation being an offence against property, and the

EXT-MARGINEAN-00212

use of false deeds under a private signature and forgery, offences protecting the social relations related to public trust from which the documents benefit, all these values being endangered.

*c) the nature and the seriousness of the result generated or of any other consequences of the offence* - by the defendant's actions they caused damage to the victims' property, the total amount of contracted loans being €59.900 and LEI 68,800; at the same time, they endangered the public trust from the documents benefit

*d) the reason for committing the offence and the purpose pursued* - the defendant Mărginean Rusalin Sorin did not mention it, but by committing the offences he obtained the money granted as loan; the defendants Chiriluț Cristian Sabin, Mărginean Nicolaie, Trifan Florin and Grozav Eugen Tiberiu stated that they accepted to contract the bank loans to help the defendant Mărginean Rusalin Sorin, relying on his promises that he would pay the related instalments.

*e) the nature and the frequency of offences which represent the criminal record of the offender* - the defendants have no criminal record, except the defendant Poenar Ana

*f) the conduct after having committed the offence and during the criminal trial* - the defendant Mărginean Rusalin Sorin did not admit that he committed the offences and the other defendants admitted it only partially

*g) the education background, the age, health condition, family and social situation* - the defendants are Romanian citizens, graduated a high school, did not mention any health problem.

At the same time, the court shall consider the provisions of art. 3 of Law no. 254/2013 according to which the purpose of sentences is to prevent new offences and, by serving the sentences, it aims at creating a correct attitude to the law order, to the rules of social life and labour, with a view to reintegration of prisoners into the society.

Therefore, in relation to the documents of the case file and to the previously considered facts, taking into account the number and nature of the committed offences, the actual circumstances of their perpetration and the short period of time during which they were committed, the consequences and the affected social values, the court of appeal considers that the reduction of the sentences established for the offences committed by the defendants or the change of their nature, as requested by the defendant Poienar Ana, are not justified to achieve their purpose, to create the premises of awareness of the facts by the defendants and to assume their consequences.

Examining ex officio the appealed sentence, in terms of art. 417 of the Code of Criminal Procedure, the Court of Appeal determines that the other provisions of the first

instance court regarding the application of the provisions on concurrence of offences, those on the suspension of the penalty under supervision, the settlement of the civil action and the safety measure of special confiscation, the annulment of forged documents and the establishment of the judicial expenses are legal and sound.

Regarding the appeal of the civil party, which is unjustified, it is also determined that it is devoid of merit, because, as correctly recalled by the first instance court, part of the civil claims filed in this case refers to the loans which were not included in the criminal investigation of this case file, there being no causal link between the facts subject to the judgment and the damage to which it refers.

Therefore, regarding all reasons mentioned above, under art. 421 para. 1 lett. b of the Code of Criminal Procedure, the Court of Appeal shall dismiss as devoid of merit the appeals filed by the civil party Alpha Bank Romania S.A. and the defendants Mărginean Rusalin Sorin, Chiriţut Cristian Sabin, Mărginean Nicolae and Poienar Ana against the criminal court sentence no.577/13th of October, 2014, delivered by Alba District Court, in the case file no.15829/107/2012.

Under art. 275 para. 2 of the Code of Criminal Procedure, it shall oblige each appellant to pay LEI 320 as judicial expenses paid by the state during the appeal.

***For these reasons,***
***In the name of law,***
***DECIDES:***

The court dismisses, as devoid of merit, the appeals filed by the civil party Alpha Bank Romania S.A. and the defendants Mărginean Rusalin Sorin, Chiriluţ Cristian Sabin, Mărginean Nicolae and Poienar Ana against the criminal court sentence no. 577/13th of October, 2014, delivered by Alba District Court, in the case file no. 15829/107/2012.

Under art. 275 para. 2 of the Code of Criminal Procedure, it shall oblige each appellant to pay LEI 320 as judicial expenses paid by the state during the appeal.

The fees paid to the public defenders of the defendants amounting to LEI 400 for the defendants Trifan Florin and Grozav Eugen Tiberiu,

and LEI 100 each for the defendants Mărginean Rusalin Sorin, Chiriluţ Cristian Sabin, Mărginean Nicolae and Poienar Ana, shall be paid from the funds of the Ministry of Justice.

Final.

Delivered in the public hearing today, the 19th of March, 2015.

**President**
**Gheorghe Liviu Odagiu**
*Illegible signature*

**Judge,**
**Alexandra Iuliana Paștiu**
*Illegible signature*

**Court clerk**

**Cornelia Maria Neag**

*Illegible signature*

*Stamp: Alba District Court - For compliance*

*Illegible signature*

Drawn up/typed P.A.I.

2 copies/ 20th of April, 2015

 Judge within the first instance court M.E. Fulea

*Illegible 21st of January, 2015*

*Illegible signature*

**Government Exhibit 1**
**Page 260 of 266**

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizaţiei nr. 10507/2003, eliberată de Ministerul Justiţiei, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, şi că, prin traducere, înscrisului nu i-a fost denaturat conţinutul şi sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ŞI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,





EXT-MARGINEAN-00216

# Attachment C

EXT-MARGINEAN-00217

ROMANIA

*(Romanian Coat of Arms)*

ALBA DISTRICT COURT

Alba Iulia, 24 I. Maniu Square, Alba County

Phone: 0258/811576, Fax 0258/811184

http://portal.just.ro

CRIMINAL DIVISION

DEPARTMENT FOR ENFORCEMENT OF SENTENCES

CASE FILE NO. 15829/107/2012 of the 19th of March, 2015

Position of Department for Enforcement of Sentences 720/2014

*Personal data operator no. 3823*

---

*We inform you that the data mentioned in this document are included in Law no. 67/2001, which confers the obligation to protect, preserve and use them only as provided by the law.*

### WARRANT FOR ENFORCEMENT OF A CUSTODIAL SENTENCE

No. 720/2014 of the 19th of March, 2015

According to article 555 of the New Code of Criminal Procedure and analysing the criminal court sentence no. 577/2014 of the 13th of October, 2014, delivered by Alba District Court in the case file no. 15829/107/2012, not amended in the appeal and final on the 19th of March, 2015 by the criminal court decision no. 314/A/2015 of Alba Court of Appeal, whereby it convicted the defendant **MĂRGINEAN RUSALIN SORIN** - son of Rusalin and Olimpia, born on the 16th of February, 1972 in Cugir, Alba Country, personal identification no. 172021603541, residing in Săliștea Township, Săliștea Deal Village, no. 39A, Alba County, without legal documents in Săliștea Township, Tărtăria Village, 54 Florilor St., Alba County, Romanian citizen, education: vocational school, driver, married, no criminal records, to: 1 year and 8 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts - passive subject Grozav Eugen); 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 5 of the Criminal Code (passive subject Chiriluț Cristian); 1 year and 6 months of imprisonment for instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 5 of the Criminal Code (passive subject Mărginean Nicolaie); 1 year and 6 months of imprisonment for the offence of instigation to misrepresentation referred to in article 47 of the Criminal Code related to article 244 of the Criminal Code with the application of article 35 paragraph 1 and article 5 of the Criminal Code (2 material acts - passive subject Trifan Florin); 1 year

EXT-MARGINEAN-00218

<u>of imprisonment</u> for the offence of use of false deeds under a private signature referred to in article 322 related to article 35 paragraph 1 of the Criminal Code with the application of article 5 of the Criminal Code.

Under article 39 paragraph 1 letter b of the Criminal Code, the aforementioned penalties have been merged into the greatest penalty of 1 year and 8 months of imprisonment to which the increase of 1 year and 10 months of imprisonment has been added, the defendant finally servicing the penalty of **3 years and 6 months of imprisonment**.

## WE ORDER:

The arrest and detention of the convict **MĂRGINEAN RUSALIN SORIN** in the penitentiary for serving the imposed sentence.

It shall deduct from the sentence to be served –

The convict is not a reoffender.

## DELEGATED JUDGE,

*Illegible signature*

*Stamp: Romania – Alba District Court*

*Issued on the 19th of March, 2015*

*Prepared in 3 copies*

*Recorded in the register for enforcement of sentences no. 720/2014*

EXT-MARGINEAN-00219

Subsemnatul Iordăchescu Tudor Gheorghe, interpret si traducător autorizat pentru limba engleza, în temeiul autorizației nr. 10507/2003, eliberată de Ministerul Justiției, certifica exactitatea prezentei traduceri efectuate din limba română, că textul prezentat a fost tradus complet, fără omisiuni, și că, prin traducere, înscrisului nu i-a fost denaturat conținutul și sensul.

I the undersigned, Iordăchescu Tudor Gheorghe, a sworn interpreter and translator for the English language by virtue of License No. 10507/2003, issued by the Romanian Ministry of Justice, do hereby certify the accuracy of the foregoing translation from Romanian into English, that the text submitted to me has been translated entirely, without omissions and that the document thus translated suffered no alteration in meaning and content.

INTERPRET ȘI TRADUCĂTOR AUTORIZAT,

SWORN INTERPRETER AND TRANSLATOR ,









44260/2017 /07.05.2018

**U.S. DEPARTMENT OF JUSTICE**
Criminal Division
Office of International Affairs
1301 New York Avenue, N.W.
Suite 800
Washington DC 20005

In attention to : Deborah GAYNUS,
Senior Trial Attorney

In reference to your ellectronic message dated 3 May 2018, concerning the additional information needed in regard to the extradition request against MĂRGINEAN RUSALIN SORIN, we communicate you, bellow, as requested, the text of articles 320 and 321 from our Criminal Code:

ART. 320
**Tampering with official documents**
(1) The act of tampering with an official document by counterfeiting the writing or the signatures or by altering it in any manner, likely to have legal consequences, shall be punishable by no less than 6 months and no more than 3 years of imprisonment.
(2) The action described in par. (1), committed by a public servant during the exercise of their office duties, shall be punishable by no less than 1 and no more than 5 years of imprisonment and a ban on the exercise of certain rights.
(3) Tickets or any other printed documents producing legal consequences are assimilated to official documents.
(4) The attempt shall be also punishable.

ART. 321
**Creating false documents**
(1) The act of tampering with an official document when it is drawn up, committed by a public servant during the exercise of office duties, by certifying untrue facts or circumstances or by knowingly omitting to insert certain data or circumstances, shall be punishable by no less than 1 and no more than 5 years of imprisonment.
(2) The attempt shall be also punishable.

Respectfully yours,

Viviana Onaca,
Director
Directorate for International Law and Judicial Cooperation



Str. Apolodor nr. 17, sector 5, 050741 București, România
Tel. +4 037 204 1082
www.just.ro

Pagina 1 din 1

COD: FS-01-03-ver.3

Government Exhibit 1
Page 266 of 266