IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF RUSALIN SORIN MĂRGINEAN | Case No. 3:21-mc-01260-SB |
| | **OPINION AND CERTIFICATE OF EXTRADITABILITY** |

**BECKERMAN, U.S. Magistrate Judge.**

The United States, on behalf of the Government of Romania ("Romania" and together with the United States, the "Government"), seeks the extradition of Rusalin Sorin Mărginean ("Mărginean") pursuant to the Extradition Treaty between the United States and Romania, signed in Bucharest on September 10, 2007 and entered into force on May 8, 2009 (the "Extradition Treaty"). For the reasons explained below, the Court certifies that Mărginean is eligible for extradition to Romania.

## BACKGROUND

In October 2014, the Alba District Court in Alba County, Romania (the "Romanian Trial Court"), convicted Mărginean of four counts of instigation to misrepresentation and one count of use of a false deed under private signature and sentenced him to three years and six months in prison. (ECF Nos. 43-1 at 207; 43-3 at 22-37.) Mărginean appealed his conviction, and the Alba

PAGE 1 – OPINION AND CERTIFICATE OF EXTRADITABILITY

Iulia Court of Appeal (the "Romanian Court of Appeal") dismissed his appeal as "devoid of merit" in March 2015. (ECF No. 43-1 at 259.) On the same date, the Romanian Trial Court issued a warrant for Mărginean's arrest. (*Id.* at 263-64.) Mărginean—now a United States citizen—was arrested in the District of Oregon in November 2021. (ECF Nos. 6, 9, 19.)

Article 8 of the Extradition Treaty requires that the requesting country submit extradition requests through the diplomatic channel. (*See* Extradition Treaty, ECF No. 43-1 at 6-44.) Romania formally requested Mărginean's extradition from the United States on November 15, 2017. (ECF No. 43-1 at 4.) The Department of State referred the extradition request to the United States Department of Justice in January 2020 (*id.* at 1-3), and the Government filed a complaint seeking Mărginean's arrest in furtherance of his extradition in November 2021. (ECF No. 1.)

Following his arrest and initial appearance in the District of Oregon on November 23, 2021, the Court released Mărginean to the supervision of U.S. Pretrial Services, including location monitoring and home detention (ECF No. 7), and to date Mărginean has not violated any conditions of his release. The parties litigated several issues prior to the extradition hearing, including the Government's motion to terminate release (ECF No. 12), Mărginean's motion to compel discovery (ECF No. 22), and Mărginean's motion for reconsideration of his motion to compel discovery (ECF No. 27).

At the parties' request, the Court also evaluated prior to the extradition hearing whether the Romanian Trial Court convicted Mărginean *in absentia*. (*See* ECF Nos. 46-47.) Article 8, paragraph 4(d) of the Extradition Treaty requires the requesting country to produce "in the case of a person who has been found guilty or convicted *in absentia*, . . . information regarding the circumstances under which the person was absent from the proceedings." (*Id.* at 30.) The Court found that the Romanian Trial Court convicted Mărginean *in absentia* because "it is undisputed

that there were at least three days of Mărginean's criminal trial at which neither he nor his counsel appeared" and therefore "Mărginean was not personally present and was unrepresented during a critical phase of his criminal trial, and did not have the opportunity to cross examine two trial witnesses nor object to their testimony." *Matter of Extradition of Mărginean*, No. 3:21-mc-01260-SB, 2023 WL 8069641, at *3 (D. Or. Nov. 21, 2023)*. Accordingly, the Court found that "Romania must comply with Section 8, paragraph 4(d) of the Extradition Treaty, and the Court must make an independent finding of probable cause to certify Mărginean's extradition to Romania." *Id.*

The Court held the extradition hearing on February 7, 2024 (ECF No. 56), and took the Government's request for extradition under advisement.

## DISCUSSION

## I. LEGAL STANDARDS

### A. Extradition Requirements

Extradition is a diplomatic process governed by the federal extradition statute, 18 U.S.C. § 3181 *et seq*., and the relevant treaty—in this case, the Extradition Treaty. (*See* ECF No. 43-1 at 6-44.) Section 3184 governs international extradition procedures in the United States:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State[.]

18 U.S.C. § 3184 ("Section 3184"); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997) ("Extradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." (citing *In re Metzger*, 46 U.S. 176, 188 (1847))); *see also Factor v. Laubenheimer*, 290 U.S. 276, 294 (1933) (instructing that extradition treaties "should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them").

A requesting country must satisfy five requirements for the Court to certify extradition:

1.  the court has jurisdiction to conduct the extradition proceeding;

2.  the court has jurisdiction over the [extraditee];

3.  there is an extradition treaty in full force and effect;

4.  the crimes charged by the requesting nation fall within the terms of the treaty; and

5.  competent legal evidence to support a finding of extraditability.

*In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1304 (D. Or. 2013) (citations omitted). "If the court concludes that each of the above elements are met, it has no discretion and must certify the extradition to the Secretary of State." *Id.* (first citing 18 U.S.C. § 3190; and then citing *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008)); *see also Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (finding that "[f]oreign states requesting extradition are not required to litigate their criminal cases in American courts" and therefore, "the scope of the extradition court's review 'is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered'") (citation omitted).

"The court's task in [extradition] proceedings is to determine: (1) whether the fugitive is accused of an extraditable crime and (2) whether there is probable cause to believe the fugitive committed the crime he is charged with." *Matter of Extradition of Ameen*, No. 2:18-mj-00152-

EFB, 2021 WL 1564520, at *9 (E.D. Cal. Apr. 21, 2021) (citing *Santos*, 830 F.3d at 991); *see also Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) ("[T]he judicial officer conducts a hearing to determine whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' . . . in other words, whether there is probable cause." (quoting 18 U.S.C. § 3184)); *see also Santos*, 830 F.3d at 1006 (finding that although the role of an extradition judge "is indeed a limited one, . . . this is not to say that a judge in an extradition proceeding is expected to wield a rubber stamp") (simplified).

### B.    Probable Cause

"In assessing probable cause, [courts] ask whether, under the totality of the circumstances, a reasonable and prudent person would think that there is a 'fair probability' that the accused person committed the crime for which extradition is sought." *Gomez v. United States*, No. 23-35139, 2024 WL 2874372, at *1 (9th Cir. June 7, 2024) (first quoting *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005); then citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); and then citing *Mainero v. Gregg*, 164 F.3d 1199, 1205 (9th Cir. 1999)); *In re Extradition of Mathison*, 974 F. Supp. 2d at 1313 (noting that probable cause is established "when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested" (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007))); *see also Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913) (comparing an extradition hearing to a grand jury investigation); *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1121 (E.D. Cal. 2003) ("The judge in an extradition proceeding applies a standard similar to that of a preliminary hearing, determining whether the evidence justifies holding the accused for trial, not whether the evidence may justify a conviction." (citing *In re Extradition of Powell*, 4 F. Supp. 2d 945 (S.D. Cal. 1998))).

"The government bears the burden of establishing extraditability, so the government must show, among other things, that there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense." *Matter of Extradition of Santos*, 228 F. Supp. 3d 1034, 1036 (C.D. Cal. 2017) (first citing 18 U.S.C. §§ 3184 and 3190; then citing *Manta*, 518 F.3d at 1140; and then citing *In re Extradition of Santos*, 795 F. Supp. 2d 966, 969-70 (C.D. Cal. 2011)). "It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate [judge]'s probable cause hearing." *Santos*, 830 F.3d at 991 (quoting *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981)). Rather, "[t]he function of the committing magistrate [judge] is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Id.* at 991-92 (quoting *Collins v. Loisel*, 259 U.S. 309, 316 (1922)). "Thus, courts have emphasized that '[t]he person charged is not to be tried in this country for crimes he is alleged to have committed in the requesting country" because "[t]hat is the task of the . . . courts of the other country." *Id.* at 992 (quoting *Eain*, 641 F.2d at 508). "If the judicial officer determines that there is probable cause, [s]he is required to certify the individual as extraditable to the Secretary of State." *Vo*, 447 F.3d at 1237 (quoting *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003)) (simplified).

"[A] conviction is ordinarily conclusive proof of probable cause." *In Matter of Extradition of Ernst*, 97 CRIM.MISC.1 PG.22, 1998 WL 395267, at *6 (S.D.N.Y. July 14, 1998) (citations omitted); *see also In re Extradition of Camelo-Grillo*, No. 2:16-cv-09026 JVS (SS), 2017 WL 2945715, at *7 (C.D. Cal. July 10, 2017) ("Where, as here, the fugitive has already been convicted, the conviction is often considered dispositive of the existence of probable cause."). "However, where . . . the conviction is the result of a trial *in absentia*, the conviction is

regarded merely as a charge, requiring independent proof of probable cause." *In Matter of Extradition of Ernst*, 1998 WL 395267, at *7 (collecting cases and concluding that the extraditee's "conviction *in absentia* must be regarded as only a charge and the government is required to make an independent showing of probable cause to believe that [the extraditee] committed the offenses with which he is charged"); *Gbessay v. Dunne*, No. 1:13-cv-06571 (MKB), 2020 WL 9816006, at *6 (E.D.N.Y. May 4, 2020) ("[W]here an extradition request involves a conviction resulting from an *in absentia* trial, the inquiry for a reviewing court is whether there is probable cause that the individual committed the offenses he has been convicted of in the requesting country.") (citation omitted).

### C. Competent Evidence

"International extradition proceedings are not governed by the Federal Rules of Evidence[] [or] the hearsay prohibitions[.]" *Strunk*, 293 F. Supp. 2d at 1122 (citing, *inter alia*, FED. R. EVID. 1101(d)(3); *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986); and 18 U.S.C. § 3172(2)); *Blasko v. Boyden*, No. 22-15830, 2023 WL 5198775, at *2 (9th Cir. Aug. 14, 2023) (noting that the Ninth Circuit has "consistently held that hearsay statements, including unsworn hearsay statements that are summarized by a foreign court, can constitute 'competent evidence' in extradition proceedings" (first citing *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984); and then citing *Manta*, 518 F.3d at 1147)), *cert. denied*, 144 S. Ct. 2548 (2024); *Emami v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings.") (citation omitted); *see also In re Mazur*, No. 1:06-mc-00295, 2007 WL 839982, at *5 (N.D. Ill. Mar. 15, 2007) ("To be sure, an extradition proceeding is a strange bird: it is not a criminal proceeding, though it involves criminal conduct; and,

although it is a federal court hearing, neither the federal rules of criminal procedure, nor the federal rules of evidence applies.").

At the extradition hearing, an extraditee may present "explanatory" evidence but may not offer "contradictory" evidence: "[E]xplanatory evidence is evidence that explains away or completely obliterates probable cause, whereas contradictory evidence is that which merely controverts the existence of probable cause, or raises a defense." *Santos*, 830 F.3d at 992 (simplified); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("[The extraditee] is not permitted to introduce evidence on the issue of guilt or innocence but can only offer evidence that tends to explain the government's case of probable cause."). Thus, an extraditee may not present evidence that contradicts the Government's evidence, but may present evidence that "'explain[s] ambiguities or doubtful elements' in the government's case." *Santos*, 830 F.3d at 993 (citation omitted).

## II.     ANALYSIS

The Court finds that the Government has satisfied the requirements of the Extradition Treaty and Section 3184 to certify Mărginean's extradition to Romania.

### A.     Subject Matter Jurisdiction

Section 3184 provides that this Court has subject matter jurisdiction to conduct extradition proceedings, which Mărginean does not dispute. *See* 18 U.S.C. § 3184 ("Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such

justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, [the judge] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty . . . , he shall certify the same . . . .").[1]

### B.    Personal Jurisdiction

The Court has personal jurisdiction over Mărginean because he was arrested in the District of Oregon, which Mărginean does not dispute. *See In re Extradition of Camelo-Grillo*, 2017 WL 2945715, at *5 ("A district court has jurisdiction over a fugitive found within its jurisdictional boundaries.").

### C.    Valid Extradition Treaty

The Extradition Treaty between the United States and Romania has been in full force and effect at all relevant times, which Mărginean does not dispute. (*See* Decl. Michael N. Jacobsohn ¶ 2, ECF No. 43-1 at 1, "The relevant and applicable treaty provisions in full force and effect between the United States and Romania are found in the Extradition Treaty between the United States of America and Romania, signed on September 10, 2007."; *see also id.* at 6-44, attaching the Extradition Treaty).

### D.    Dual Criminality

The Extradition Treaty provides for the return of individuals charged with, found guilty of, or convicted of an "extraditable offense," and defines offenses as extraditable if they are felonies in both jurisdictions (i.e., "punishable under the laws in both Parties by deprivation of

---

[1] Section 3184 provides that United States Magistrate Judges may hear and evaluate extradition matters when "authorized so to do by a court of the United States." 18 U.S.C. § 3184. In the District of Oregon, magistrate judges are "authorized to perform all of the duties and functions prescribed and authorized by 28 U.S.C. § 636 and any other statutes or Federal Rules of Procedure which authorize a Magistrate Judge to perform judicial duties or functions." Standing Order 07-MC-9207 (D. Or. Sept. 7, 2007).

liberty for a period of more than one year or by a more severe penalty"). (Extradition Treaty, ECF No. 43-1 at 26; *see also id.*, providing that where the individual has been convicted of an extraditable offense, he must have yet to serve a custodial sentence "of at least four months").

The parties appear to agree that Mărginean's offenses of conviction (i.e., instigation to misrepresentation and use of a false deed under private signature) are akin to a conspiracy to commit (or aiding and abetting) bank or loan fraud and use of forged signatures, which are felonies under United States law.[2] *See, e.g.*, 18 U.S.C. § 1014 (establishing a prison sentence of "not more than 30 years" for "[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of [a financial institution] upon any application . . . or loan"); 18 U.S.C. § 1344 (establishing a prison sentence of "not more than 30 years" for "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution"); 18 U.S.C. § 1349 (establishing the same penalties for "[a]ny person who attempts or conspires to commit" a violation of § 1344). The Court finds that the Romanian Trial Court convicted Mărginean of extraditable offenses.

###    E.    Probable Cause

Mărginean primarily challenges extradition on the ground that Romania has not provided competent evidence to support a finding of probable cause that he committed the offenses of conviction. (Reply Gov't's Mem. Supp. Extradition ("Resp.") at 4-16, ECF No. 55.) The Court finds that the Government has presented competent legal evidence to meet its burden of demonstrating probable cause that Mărginean committed the offenses of conviction.

///

---

[2] It is also undisputed that the Romanian Trial Court imposed a sentence of greater than four months, which Mărginean has not yet served.

### 1.    The Alleged Offenses

The indictment alleged that Mărginean caused four men to pose as drivers from Mărginean's transport company, S.C. Sory Express S.R.L. Tartaria ("Sory Express"), and obtain seven bank loans in their own names for Mărginean's benefit. (ECF No. 43-3 at 22-23.) The indictment alleged that Mărginean conspired with his sister-in-law and Sory Express's director, Ana Poienar ("Poienar"), to create false employment contracts and payroll documents to support the straw borrowers' false claims about their income and employment status. (*Id.*) The indictment further alleged that Mărginean offered the straw borrowers cash payment or future employment to apply for the loans, and he agreed to pay the loans back in full, but did not. (*Id.*) The indictment alleged that Mărginean received most of the proceeds from the seven fraudulent loans, totaling approximately $66,750. (*Id.*)

### 2.    The Government's Evidence

The Romanian Trial Court held a twenty-hearing trial on the indictment from February 4, 2013, through October 13, 2014. (*See* ECF Nos. 43-1 at 190-222, 43-2 at 3-72.) On October 13, 2014, the Romanian Trial Court announced Mărginean's conviction on "[four] offences of incitement to fraud" and one count of "recurrent use of false deeds under a private signature." (ECF No. 43-1 at 204.) The Romanian Trial Court sentenced Mărginean to a total of three years and six months imprisonment. (*Id.* at 207.) Mărginean appealed his conviction (ECF No. 43-2 at 122, 136-37), and the Romanian Court of Appeal dismissed his appeal as "devoid of merit" on March 19, 2015. (ECF No. 43-1 at 259.)

In its extradition complaint, the Government summarized the trial evidence against Mărginean:

   a.    At all relevant times, Mărginean was the administrator and sole owner of the transportation company, [Sory Express or the "Company"]. In or around 2007, Sory Express fell into financial trouble. Mărginean

established a scheme whereby he encouraged his employees and a relative to obtain loans in their names using forged documents that exaggerated their monthly income and employment. The money from the loans went directly to Mărginean and, in return, Mărginean promised that he would draft all necessary documentation and, implicitly, that he would repay the loans.

b.      In or around November 2007, Mărginean asked new employee Chirilut Sabin ("Chirilut") to take out a loan for EUR 15,000 to help Mărginean pay off his Company's debts. [Chirilut] agreed with the understanding that he would keep EUR 4,000 for himself and Mărginean would pay off the loan. In fact, [Chirilut] requested a separate document memorializing this agreement, which both [Chirilut] and Mărginean signed. Mărginean accompanied [Chirilut] to the bank and personally presented false documents that inflated [Chirilut]'s salary and income to the loan officer. A handwriting analysis confirmed that Mărginean signed the income statement. The handwriting analysis concluded that Mărginean likely signed the employee contract, which exaggerated [Chirilut]'s term of employment and income. The loan was approved, and [Chirilut] handed EUR 11,000 to Mărginean. Only three loan payments were made on this loan.

c.      In early January 2008, Mărginean offered Mărginean Nicolaie ("N. Mărginean") a job. A few days later, Mărginean told him about the Company's financial problems and asked him to help by taking out a loan. Mărginean promised to repay the loan. Mărginean accompanied [N. Mărginean] when he sought the loan, and Mărginean personally provided fraudulent documents to the loan officer. The fraudulent documents verified [N. Mărginean]'s employment and inflated his income. [N. Mărginean] was not employed by the Company. A EUR 15,000 loan was approved by the same loan officer, who handed over the money to Mărginean, not [N. Mărginean]. The first installment on the loan was paid, but no other installments were paid. A handwriting analysis confirmed that Mărginean signed the false income statement and likely signed the false employee contract.

d.      A few months later, in May 2008, Mărginean asked a dayworker Trifan Florin ("Trifan") to take out a loan because Mărginean needed additional money. Mărginean promised to repay the loan, and [Trifan] agreed. On Mărginean's instructions, [Trifan] provided false documents to a loan officer to obtain a EUR 15,000 loan. The documents exaggerated [Trifan]'s income and falsely stated that he was a driver at Sory Express, when in truth [Trifan] did not even have a driver's license and was not employed by the Company. A handwriting analysis found that Mărginean signed the false income statement and likely signed the false employment contract. The loan was approved and [Trifan] turned

over the money to Mărginean. No installments on this loan were ever paid.

e.    A few days later, [Trifan] went to a different bank with similar fraudulent documents and obtained another personal loan for EUR 4,900. The money from this loan was also given to Mărginean, as was the loan repayment schedule. Mărginean failed to make a single installment payment towards this loan.

f.    In June 2008, Mărginean asked his cousin Grozav Eugen Tiberiu ["Grozav"] to work for his Company as a driver. Mărginean explained that [Grozav] would need to take out a loan, which would be used to cover any car accidents. Mărginean promised that he would make all the installment payments on the loan. [Grozav] noted that he did not have a driver's license, but Mărginean said this would not be a problem. Mărginean asked [Grozav] to sign several blank pages that bore the Company's stamp at the bottom of each page.

g.    On June 4, 2008, [Grozav] used fraudulent documents created with the help of Mărginean to obtain loans from two separate banks. [Grozav] contracted a loan for EUR 10,000 from one bank and a loan for RON 10,000 from another bank. The money from both loans was given to Mărginean. A few weeks later, on the urging of Mărginean, [Grozav] obtained a "roll over" loan, which covered the two prior loans and provided an additional loan amount. [Grozav] used the same fraudulent employment contract and new income statements, and the surplus money not used to pay off the prior loans was given to Mărginean. Only a few partial payments were made on this roll over loan.

h.    A handwriting analysis found that Mărginean signed the income statements and likely signed the false employment contract for [Grozav]. [Grozav] was not employed by the Company.

i.    An investigation by Romanian authorities found that Mărginean was assisted in obtaining these loans by his sister-in-law (who also worked at the Company) and complicit loan officers.

j.    Mărginean maintained his innocence, but the trial court noted that Mărginean was unable to explain the discrepancies between the documents he issued on behalf of Sory Express for the purpose of obtaining these loans and the internal bookkeeping maintained by his Company.

(Compl. ¶ 5) (simplified).

///

PAGE 13 – OPINION AND CERTIFICATE OF EXTRADITABILITY

Following Mărginean's motion to compel the Government to produce additional evidence in support of the extradition request, Romania voluntarily produced supplemental materials from the Romanian Trial Court's file in December 2022. (*See* ECF No. 43.) Together, the original and supplemental evidence the Government produced included the Romanian Trial Court's summary of evidence; Mărginean's testimony; the statements of his codefendants, including alleged straw borrowers Chirilut, Trifan, N. Mărginean, and Grozav; the testimony of Sory Express accountant Vasilica Crinela Lupu ("Lupu"); the testimony of former Sory Express driver Adrian Ioan Lascan ("Lascan"); the loan files from the victim lenders documenting the subject loans; and employment and driver records establishing the alleged falsity of the straw borrowers' representations about their employment status. (Memo. Law Supp. Extradition ("Gov't's Memo") at 4-5, ECF No. 52.)

In its memorandum in support of extradition, the Government highlighted the relevant trial evidence supporting a finding of probable cause:

1.  Mărginean's first statement to investigators, on April 27, 2009 (ECF No. 43-1 at 154), in which he admitted he was the manager of Sory Express at all relevant times, claimed he had hired codefendants Chirilut, Trifan, and [N. Mărginean] as drivers for the company, and acknowledged reviewing and signing income statements that had been issued to those drivers to use in procuring loans for their own purposes. He claimed they were falsely accusing him of participating in the loans because he had fired them. He further claimed the income statements and work contracts for these drivers were filled out by "the company's accountant, namely Sima Crina"— about whom he had "no information" because she was not an employee of the company—and that he was the only person who signed the income statements. (*Id.* at 155-57.) Mărginean further claimed not to believe Poienar "knew anything" about those drivers' contracts. (*Id.* at 158.)

2.  Mărginean's second statement about the allegations on August 31, 2009, in response to a civil claim by codefendant Grozav, in which he admitted he knew Grozav and asserted Grozav had "never worked" for Sory Express. (*Id.* at 161.)

PAGE 14 – OPINION AND CERTIFICATE OF EXTRADITABILITY

3.      Mărginean's third statement, submitted while the trial was underway on May 13, 2013, in which he unreservedly "admit[ted] having committed the offences [he had been] charged with in the document instituting the proceedings in court." (ECF No. 43-2 at 106.)

4.      Mărginean's fourth statement, made in open court during the trial on October 28, 2013, in which he admitted to having issued income statements for Chirilut, [N. Mărginean], Trifan, and Grozav as charged in the indictment. Mărginean claimed for the first time that Grozav worked as a driver for Sory Transport just like the other three borrowers. Mărginean admitted taking €11,000 from Chirilut after the latter had obtained a loan with the income certificate Mărginean had issued. Mărginean also admitted that [Lupu]—not Poienar—kept Sory Express's accounts but did not fill out the income certificates for the codefendant borrowers. Mărginean admitted that Poienar did so at his own request. (ECF No. 43-2 at 107-08.)

5.      Statements by straw-borrower codefendants Chirilut, Trifan, [N. Mărginean], and Grozav, indicating that Mărginean directed them to apply for their loans and then took the proceeds. (ECF No. 43-1 at 198, 201-02.)

6.      The testimony of Sory Express accountant [Lupu] who testified that her signatures on the disputed payroll documents were forgeries. (*Id.* at 199.)

7.      The handwriting analysis report numbers 54167/15.09.2009, 54174/16.09.2009, and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit, which confirmed Mărginean's and Poienar's handwriting and signatures on the bogus employment and income documents but concluded that Lupu's signatures on the income statements supporting Trifan's second (May 23, 2008) loan application and Grozav's loan applications to Societe Generale and Alpha Bank were forgeries. (ECF No. 43-1 at 243-44.)

8.      The testimony of former Sory Express driver [Lascan], who indicated he too had obtained a €15,000 loan at Mărginean's direction and then given Mărginean the proceeds—and later heard that Chirilut and [N. Mărginean] had done the same thing. (*Id.*)

9.      Employment records indicating that none of the straw borrowers (except Chirilut) had ever worked for Sory Express at all—much less as well-paid truck drivers. (*Id.* at 199.)

10.     Drivers' license records confirming that at least one of the straw borrowers, Trifan, was not even licensed to drive. (*Id.* at 200.)

11. The victim-lenders' loan files, documenting the fraudulent representations about the straw borrowers' employment and income. (*Id.*)

(Gov't's Memo at 12-15.)

### 3.    The Romanian Courts' Opinions

On October 13, 2014, the Romanian Trial Court entered detailed findings of fact and conclusions of law in support of Mărginean's convictions and sentence. (ECF No. 43-1 at 190-222.) The Romanian Trial Court concluded that the trial evidence established that Mărginean was guilty of the alleged offenses:

> In the period of 2006-2008, defendant [Mărginean] had the capacity of administrator and sole shareholder of [Sory Express], a company whose main object of activity was transport.
>
> Given the poor financial situation of the company, [Mărginean] asked the employees and dayworkers working for his company, as well as other persons who had no connection with the company to contract bank loans on their behalf, and make the money thus obtained available to him, in order to obtain the necessary amounts to finance the company activity, and promised he would draft all necessary documentation and, implicitly, that he would pay the loan instalments; actually, the defendant had never had any intention to repay the loans, as proven by the fact that, after having received the amounts of money, he laid off the employees, and terminated their employment contracts, or refused to employ them; also, except for two loans, which was paid in advance by rollover, in all other cases either the first 2-3 instalments were paid or no payment was made.
>
> Based on the promises made and given the fact that the work for [Sory Express] provided their only income source - defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav] accepted to contract bank loans, although they were aware of the fact that they did not meet the solvency requirements, as the last three defendants were not even employed.
>
> Defendant [Poienar] was also involved in this criminal activity, in her capacity as director of [Sory Express] and sister-in-law of [Mărginean], while she and the latter also had an extra-conjugal relationship. More specifically, the defendant filled in the employment contracts and the income statements fictitiously certifying the capacity of employee and the salary income, documents which were signed accordingly by defendant [Mărginean], in his capacity as administrator. Separately, it was maintained that the two defendants forged the signature of [Lupu], the person in charge with accounting records for [Sory Express], on the income statements.

PAGE 16 – OPINION AND CERTIFICATE OF EXTRADITABILITY

Also, in order to achieve the criminal purpose pursued, defendant [Mărginean] was the one who confirmed the bank clerks over the phone the accuracy of the information included in the income statements.

Thus, 7 (seven) bank loans were contracted in the period of December 2007 – June 2008, as follows:

- Defendant [Chirilut] worked for [Sory Express] as a driver in the period of 3.11.2007-16.04.2008, benefiting from a salary of RON 560, according to the employment contract no. 5/03.11.2007, registered with I.T.M. Alba under no. 50.014423/03.12.2007. Shortly after being employed, defendant Mărginean asked him to contract a loan in amount of EUR 15,000 from B.C.R., and give him the money, under the pretence that the company had to pay debts; defendant Chirilut accepted, on the condition that a part of that loan, namely the amount of EUR 4,000 should be his.

In order to obtain the loan, defendant Poienar drafted a copy of the employment contract where she mentioned the unreal information that the holder undertook activities with the company starting from 03.05.2007 and had a monthly gross basic salary of RON 1,830, a document signed by defendant Mărginean as a true copy of the original. Also, income statement no. 70 of 04.12.2007 was drafted, fictitiously certifying that defendant [Chirilut] obtained monthly income in amount of RON 3,200 in the period of August-October 2007.

On 04.12.2007, defendants Mărginean and Chirilut went to B.C.R. - Cetate Agency, and here defendant [Mărginean], who had with him the two documents, presented them personally to the loan officer . . . , who was an acquaintance of his. On the same day, after the approval of the loan, contract no. 2007186981 was concluded for a 10-year period, and the next day defendant Chirilut took the amount of EUR 15,000 from the bank. According to the agreement, he handed in the amount of EUR 11,000 to defendant Mărginean, and, in order to have a guarantee that he would honour his promise to reimburse the loan, he requested a loan document to be drafted, document which was drafted by defendant Poienar and signed by both defendants.

In 2008, 3 loan reimbursement payments were made, as follows: on 06.02.2008 and on 26.02.2008 defendant [Poienar] paid the amounts of EUR 237 and EUR 260, respectively and on 30.10.2008, defendant Chirilut paid the amount of EUR 200, then no payment was made.

The debt owed to the bank by defendant [Chirilut] was assigned to DOM EUROPE AG, with CREDITEXPRESS FINANCIAL SERVICES S.R.L. as asset administrator, and later on to ASSET PORTFOLIO SERVICING ROMANIA, which communicated they would not bring civil action civil action in the case.

PAGE 17 – OPINION AND CERTIFICATE OF EXTRADITABILITY

Following the handwriting analysis report on the documents presented by the bank, the employment contract of defendant Chirilut registered with 1.T.M. Alba under no. 5/03.11.2007 and on the handwritten document dated 05.12.2007 - the following conclusions were presented:

•  The signature from the Employee field on page 4 of the individual employment contract no. 5/03.11.2007 was not written by defendant Chirilut; instead, the signature from the Employee field on page 4 of the individual employment contract no. 21/03.05.2007 (presented to B.C.R.) was probably written by the above-mentioned.

•  The signatures from the Employer field on page 4 of the two employment contracts were probably written by defendant [Mărginean], and the signatures confirming the true copies of the originals were written by the same defendant;

•  The handwriting on the two employment contracts was probably written by defendant [Poienar];

•  The signature on the income statement no. 70/04.12.2007 from the General Manager field was written by defendant [Mărginean], and the signature from the Accountant field was probably written by [Lupu]; the handwriting belonged to defendant [Poienar];

•  The signatures from the handwritten document dated 05.12.2007 belong to the holders, namely defendants [Mărginean] and [Chirilut], and the handwriting belonged to defendant [Poienar].

- In January 2008, defendant [Mărginean], knowing that defendant [N. Mărginean] was interested in finding a job, suggested that he should work for his company, [Sory Express]; after a few days, the defendant invoked the problems his company was facing and asked defendant [N. Mărginean] to help him financially by contracting a loan, promising him instead to pay the loan instalments and employ him in his company. Based on these promises, defendant [N. Mărginean] accepted, therefore he submitted his ID card, which was used to forge the documentation for the bank; thus, the false employment contract no. 24/02.07.2007 was filled in and registered with ITM under no. 10.196.076/03.07.2007, including the false information that defendant [N. Mărginean] was employed by the company as a driver and had a monthly gross basic salary in amount of RON 1,200; income statement no. 112/04.01.2008 was also drafted, certifying that defendant [N. Mărginean] obtained monthly income in amount of RON 3,024 in the period of September-November 2007.

On 04.01.2008, defendant [Mărginean] joined defendant [N. Mărginean] to B.C.R. Cetate Agency and here he asked again [a] clerk . . . to draft a loan contract, handing in the forged documents. After the approval of the loan

application for the amount of EUR 15,000, the loan contract no. 20081615 was concluded for a 10-year period, and defendant [N. Mărginean] was issued the loan amount. All money was given to defendant [Mărginean].

On 26.02.2008, defendant Poienar paid the amount of EUR 300 to B.C.R., representing the first instalment of the loan, and then no other payment was made. Therefore, the loan was assigned by the bank to CREDITEXPRESS FINANCIAL SERVICES S.R.L. Bucharest, and later on to ASSET PORTFOLIO SERVICING ROMANIA, which communicated they would not bring civil action in the case.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

•    The signature from the Employee field on page 4 of the individual employment contract no. 24/02.07.2007 was probably written by defendant [Mărginean]; the signature from the Employer field on page 4 of the employment contract was probably written by defendant [Mărginean], and the signatures confirming the true copies of the originals were written by the same accused;

•    The handwriting on the employment contract was probably written by defendant [Poienar];

•    The signature on the income statement no. 112/04.01.2008 from the General Manager field was written by defendant [Mărginean], and the signature from the Accountant field was probably written by [Lupu]; the handwriting belonged to defendant [Poienar].

- In May 2008, defendant [Mărginean] asked defendant [Trifan], who worked as dayworker for his company, to help him with money using the same means, namely to contract two bank loans. Based on the promise that there will be no problem with the loan repayment, defendant Trifan accepted to take the two loans, therefore he submitted his ID card to have the necessary documentation drafted for the banks.

Thus, on 21.05.2008, defendant Trifan followed the instructions given by defendant Mărginean, went to ALPHA BANK Alba Iulia branch, where he presented the bank officer a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007) and 2 (two) income statements no. 214/21.05.2008 and no. 219/26.05.2008, fictitiously certifying that he was employed by [Sory Express] as a driver, starting with 01.02.2007, with a monthly gross salary of RON 1,845, and during the last three months he earned a monthly income of RON 3,660, of which RON 1,320 represented the salary and the rest was per diem difference. However, not only that the defendant was not employed with an employment contract, but he did not even have a driver's licence for any category of vehicle, therefore he could not have worked as a driver.

PAGE 19 – OPINION AND CERTIFICATE OF EXTRADITABILITY

According to the bank rules, defendant Trifan handwrote a payment commitment where he mentioned that he had been working for 2 (two) years for the company, as a driver, and consented to have the loan instalments withdrawn from his salary, in case of failure to pay. The loan application for EUR 15,000 was approved based on these documents, and the loan contract no. 0588299 was concluded for a 10-year period. Defendant Trifan gave all the money taken from the bank to defendant Mărginean, together with the loan repayment schedule.

No loan instalment was paid in the forthcoming period, therefore ALPHA BANK AlbaIulia branch brought civil action for the amount of EUR 16,033.93.

The conclusions of the handwriting analysis report on the documents presented to the bank in this case establish the following:

• The signature from the Employee field on page 4 of the individual employment contract no. 19/01.02.2007 was not written by defendant [Trifan]; the signature from the Employer field on page 4 of the employment contract was probably written by defendant [Mărginean], and the signatures confirming the true copies of the originals were written by the same accused;

• The handwriting on the employment contract was probably written by defendant [Poienar];

• The signature on the income statement no. 214/21.05.2008 from the General Manager field was written by defendant [Mărginean], and the signature from the Accountant field was probably written by [Lupu]; the handwriting belonged to defendant [Poienar].

- Then, on 23.05.2008, defendant [Trifan] used the same mode of operation, he contracted a new personal loan in amount of EUR 4,900 from B.C.R. Sebe~Agency, for a 10-year period, according to the contract no. 2008398954. In order to obtain the loan he presented a copy of the employment contract no. 19/01.02.2007 (50.015.780/02.02.2007), similar to the one used previously, signed on each page by the company administrator as a true copy of the original, and 2 (two) income statements no. 215/21.05.2008 and n.n., certifying that in the period of January-March 2008 he obtained a monthly salary income of RON 1,980 and per diems in amount of RON 660. This amount obtained as a bank loan was also given to defendant [Mărginean], together with the loan repayment schedule.

As no payment was made in the forthcoming period, the loan was assigned to ERSTE GROUP and further to SECAPITAL S.a R.L., with KRUK INTERNATIONAL SRL Bucharest as asset administrator, which brought civil

action for the amount of RON 25,643.92, updated according to interest rates and penalties until the payment date.

The handwriting analysis report on the documents presented to the bank indicated the following:

• The signatures confirming a true copy of the original on the employment contract no. 50.015.780/02.02.2007 were written by defendant [Mărginean], and the handwriting under the mention "True copy of the original" on each page belonged to defendant [Poienar];

• The signature on the income statement no. 215/21.05.2008 from the General Manager field was probably written by defendant [Mărginean], and the signature from the Economic Director field was not written by [Lupu]; the handwriting belonged to defendant [Poienar].

• The signature on the income statement n.n. from the General Manager field was written by defendant [Mărginean], and the signature from the Accountant field was not written by [Lupu]; the handwriting on the income statement n.n. belonged to defendant [Poienar].

- In order to obtain money using the same method, defendant [Mărginean] asked his cousin, defendant [Grozav], who had left to Portugal since 2001 and who returned to Romania for a brief period of time in the summer of 2008. Under the pretext that he wanted to employ him as a driver for him company, defendant Mărginean asked him to contract a bank loan, explaining that he needed the money to cover possible damages in case of a car accident; he also promised to repay all loan instalments. Under these conditions, defendant Grozav indicated he had no driver's licence, to which defendant Mărginean answered that was not a problem, everything would be solved. To be credible, defendant Mărginean asked him to sign a blank page with the company stamp applied at the bottom of the page and explained that he would fill in all necessary information for the employment contract. Although he had some suspicions of the validity of the employment contract and he was aware that he did not meet the solvency requirements to obtain bank loans - defendant Grozav accepted these requests and contracted three loans.

Initially, on 04.06.2008, defendant [Grozav] contracted a loan of EUR 10,000 from B.C.R. Sebe~Agency, and for this purpose he presented the documents made available by his cousin, namely a copy of the employment contract no. 29/03.05.2007 (50.014.655/04.05.2007) and the income statement no. 230/03.06.2008, falsely certifying that he was employed as a driver with [Sory Express] and earned a monthly net income RON 3,118. Then contract no. 2008438664 was concluded for a 120-month period, the money was taken from the bank and given to defendant [Mărginean].

- On the same date, defendant Grozav went to BRD Groupe Societe Generale – Alba branch where, based on the indications given by defendant Mărginean, he applied for a RON 10,000 loan, and submitted a copy of the same employment contract and the income statement no. 232/04.06.2008 issued by [Sory Express], fictitiously certifying that he was an employee of this company and earned a monthly income of RON 1,318. After the approval of the loan application, the loan contract no. 1609392/05.06.2008 was concluded for a 48-month period; again, defendant [Grozav] gave his cousin all the money cashed-in from the bank.

- Again, on the initiative of defendant Mărginean, who motivated he needed an additional amount of money, on 25.06.2008 defendant Grozav contracted a roll-over loan with ALPHA BANK Sebe~Agency, in amount of RON 54,800 for a 10-year period, to pay the previous loans, and concluded contract no. 0596738. In order to have the loan application approved, defendant [Grozav] presented a copy of the employment contract, income statements no. 232/19.06.2008 and 233/19.06.2008 – filled in and signed by defendants [Mărginean] and [Poienar] - certifying he was employed as a driver by [Sory Express] and had earned a monthly income of RON 1,818 in the past three months. The amount of money left after the anticipated repay of the two loans was given by defendant [Grozav] to his cousin, according to their agreement.

In the forthcoming period, as he was requested by the bank to pay the loan instalments, he made some partial payments, in total amount of RON 390.

ALPHA BANK Sebe~Agency brought civil action in the case for the amount of RON 57,923.33.

Following the handwriting analysis report on the documents submitted to ALPHA BANK Sebe~Agency, the following conclusions were presented:

•    The signature from the Employer field on the copy of the individual employment contract was probably written by defendant [Mărginean], and the signatures confirming the true copies of the originals were written by the same defendant; the handwritten mentions in the contract and under the mention "True copy of the original" were written by defendant [Poienar];

•    The signature on the income statement no. 232/19.06.2008 from the General Manager field was written by defendant [Mărginean], and the signature from the Chief Accountant field was not written by [Lupu]; the handwriting belonged to defendant [Poienar];

•    The signature on the income statement no. 233/19.06.2008 from the General Manager field was written by defendant [Mărginean], and the

signature from the Accountant field was not written by [Lupu]; the handwriting on the income statement belonged to defendant [Poienar].

The facts resulted from administering the following evidence:

- The ex officio investigation report drafted by the police from 16.09.2008, indicating that defendant [Mărginean], administrator of [Sory Express] managed to obtain fraudulently amounts of money from banks by forging the necessary documentation to apply for loans, with the complicity of bank officers;

- The self-incriminatory statement made by defendant [Grozav] on 24.07.2009, indicating that he was determined by defendant [Mărginean] to contract a bank loan in amount of EUR 17,000 and gave him the money, but afterwards, defendant Mărginean did not pay the loan instalments, as he had promised;

- The ex officio investigation report drafted by the police from 05.04.2010, mentioning that the bank officers . . . had breached their professional duties in relation to loans granted based on fictitious documents;

- Cash receipt orders used to make partial payments for the loans contracted by defendants [Chirilut] and [N. Mărginean];

- Handwritten documents dated 05.12.2007 certifying that defendant [Mărginean] borrowed the amount of EUR 11,000 from defendant [Chirilut];

- Forensic report no. 67208C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendant [Chirilut]. During the pre-test interview, the defendant indicated that, upon request of defendant [Mărginean], he accepted to contract the bank loan and have it mentioned on his income statement a higher salary than his real income, although he was aware that, based on his income, he could not obtain a EUR 15,000 loan; he also indicated that, according to their agreement, defendant [Mărginean] had to pay the loan instalments for the amount of EUR 11,000, while he was to pay personally the difference of EUR 4,000.

During the actual test no specific reactions suggesting simulated behaviour were detected for the relevant questions on the initiative of loan application and the involvement of defendant [Mărginean];

- Forensic report no. 67209C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendant [Trifan]. During the pre-test interview, the defendant indicated that after obtaining the loan from ALPHA BANK, defendant [Mărginean] offered him drinks in the village pub, and that was the only benefit he obtained. Also, during the actual test applied to the

defendant, no specific reactions suggesting simulated behaviour were detected for the relevant questions;

- Handwriting analysis reports no. 54167/15.09.2009, 54174/16.09.2009 and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit analysing the documents presented to the banks in order to obtain loans and other documents;

- The statements of witness [Lupu] (page 134) in charge with the accounting operations at [Sory Express]; the witness indicates she had no involvement in the issuance of the income statements submitted to banks, and her signature was forged on those statements; to this end, the witness indicates she only signed the documents she filled in personally;

- The statement of witness Lascan Adrian Ioan (pages 146-147) who worked as a driver for [Sory Express]; the witness shows that, upon request of defendant [Mărginean] he contracted a bank loan in amount of EUR 15,000, and he gave the latter the money, as he promised he would pay the loan instalments; the witness also states that after he ceased his activity with the company he found out that defendants [Chirilut] and [N. Mărginean] also contracted bank loans for the company owner;

- The statement of witness Grigore Cosmin Danut (page 135), former employee of [Sory Express], who has knowledge of the fact that defendants [Chirilut] and [N. Mărginean] contracted bank loans for defendant [Mărginean]; the witness also states that defendant [Poienar] was the one who drafted the documents within the company;

- The statement of witness Chirilut Ileana (page 148), wife of defendant [Chirilut], on the circumstances in which her husband contracted the bank loan;

- The statement of witness Gurgui Ioan (page 203) indicating that, as he was a friend of defendant Chirilut, he found out from him that he contracted a bank loan on the initiative of his employer "Ninuf", based on the documents made available by him; the witness also mentions that defendant [N. Mărginean] contracted a bank loan under the same conditions;

- The statements of witnesses Facalet Mircea and Facalet Adina, who mention that they heard discussions in the village that defendants [Chirilut], [Trifan] and [N. Mărginean] had cashed bank loans for defendant [Mărginean], but afterwards he did not pay the loan instalments, as he had promised;

- Employment record book series CM 0233745 held by defendant [Chirilut], indicating the period when he worked for [Sory Express] and the salary he received;

- Notification no. 3829/02.04.2009 issued by I.T.M. Alba having attached copies of the employment contracts registered by the employer [Sory Express] with this institution as well as copies of the payroll submitted for the period of January 2007 - September 2008 - indicating that, except for defendant [Chirilut], who was employed in the period of 03.11.2007-16.04.2008, the other three defendants - [N. Mărginean], [Trifan] and [Grozav] - were not employed by the company;

- Notification no. 80584 issued by the Prefect Institution, Alba County – Community Public Service Vehicle Registration and Driver's Licences certifying that defendant [Trifan] is not registered as holder of a driver's licence;

- Employment record book series MPS no. 1112126 held by [Trifan], indicating he was not employed by [Sory Express];

- Police report of 01.10.2008 after the verification of the accounting and financial documents of [Sory Express], employee records;

- Loan files drafted by the banks on the names of defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav];

- Reports drafted during defendants' cross-examinations;

In the hearings held during the criminal investigation, defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav], although they had an oscillating attitude, in principle, they admitted having committed the deeds, and indicated they accepted to contract the bank loans, based on the promises made by defendant [Mărginean] that he would pay the loan instalments.

However, defendant [Mărginean] fully denied his guilt, showing he had no involvement in contracting the bank loans and denied that he would have received the amounts of money; nevertheless, the defendant could not provide plausible explanation on the discrepancies between the documents he issued on behalf of [Sory Express], presented to the banks, on the one hand, and the records in the company bookkeeping on the employees and their wages, and the records of I.T.M. Alba, on the other hand.

As regards defendant [Poienar], during the criminal investigation she admitted she had filled in the employment contracts and the income statements for the bank, and claimed she had done so upon request and based on the indications given by defendant [Mărginean], without confronting them with the accounting documents of the company (payroll). The justifications presented by the defendant are purely formal, given that she wrote completely different data on the same type of documents, which were drafted either the same day or at very short time intervals: thus, in the individual employment contract of defendant [Chirilut] registered with I.T.M. Alba the start date is 03.11.2007, with a monthly salary of

RON 560, while on the employment contract of the same accused, submitted to the bank, defendant Poienar wrote as start date 03.05.2007 and a monthly gross salary of Ron 1830; similarly, for the loans contracted by defendant [Trifan] from the two banks, the defendant wrote different amounts as income, namely the amount of RON 2,640 on the statements submitted to B.C.R. and RON 3,660 on the statements submitted to APLHA BANK, although the statements for both banks were issued on 21.05.2008; we note the same situation with the income statements used by defendant [Trifan] to contract the three loans, which indicate different amounts as income, while the defendant issued the three statements within a time interval of one day and 15 days, respectively.

Defendants [Mărginean], [Chirilut], [N. Mărginean] and [Trifan] were heard during the trial, while defendant [Poienar] invoked the provisions of article 70 of the Criminal Code - the right to remain silent.

Initially, during the trial, defendant [Mărginean], in his statement presented on page 93 admitted having committed the deeds mentioned in the document instituting the proceedings, and requested that he should be judged pursuant to the provisions of article 320 paragraph 1 of the previous Criminal Proceedings Code, but before the court he changed his statement and indicated that he did not benefit from the money obtained from the loans granted to the four defendants, that the income statements were issued upon request of the employees and that they indicated real facts, as the four drove abroad.

The court notes the oscillating and insincere attitude of the defendant as all the evidence administered in the case and analysed above invalidates the claims of the defendant; as indicated by the witnesses heard and by defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav], the loans were contracted on the initiative of defendant [Mărginean], based on the promises made by the defendant to pay the loan instalments, and he was the person who used the money.

Witness Lascan Adrian, as opposed to the claims of defendant [Mărginean], stated that only he and witness Grigore Cosmin drove abroad, not the other defendants. In fact, notification no. 80584/30.06.2009 issued by the Prefect Institution, Alba County - Community Public Service Vehicle Registration and Driver's Licences certifies that defendant [Trifan] is not registered as holder of a driver's licence, and he was not employed by [Sory Express], just like defendants [N. Mărginean] and [Grozav].

Also, the evidence mentioned above corroborate with the handwriting analysis reports no. 54167/15.09.2009, 54174/16.09.2009 and 60617/09.03.2010, drafted by I.P.J. Alba Forensics Unit analysing the documents presented to the banks in order to obtain loans as well as other documents and with the Forensic report no. 67208C of 22.05.2009 drafted by I.P.J. Sibiu Forensics Unit after the polygraph test administered to defendants [Chirilut] and [Trifan] indicating that no specific reactions suggesting simulated behaviour were detected, therefore the

court may not find, as claimed by the defendant's lawyer, that there is no evidence indicating that defendant [Mărginean] would have deliberately determined the other co-defendants to commit the offence of fraud.

As regards defendants [Grozav], [N. Mărginean] and [Chirilut] the court may not retain the applicability of the provisions of article 16 paragraph 1, lett. b point II) of the Criminal Proceedings Code, namely that the deed was not committed with the culpability provided by law. The defendants deliberately accepted the request of defendant [Mărginean] to contract bank loans, knowing that they did not meet the requirements for being granted bank loans, and for this purpose they went to the offices of those contracting banks. The defendants' statements confirm this - defendant [Grozav], heard during the criminal prosecution stage (pages 120-122) indicated that he went to BCR upon request of defendant [Mărginean] and filed an application for a EUR 10,000 loan and he specified in his application that he was employed by [Sory Express] as a driver and has RON 700 income and EUR 1000 per diem, although in reality the defendant did not have a driver's licence and was not the employee of this company; defendant [Trifan] stated (pages 116-117) that, upon request of defendant [Mărginean], he went to Alpha Bank Alba Iulia where he filed a loan application in which he mentioned he was employed by [Sory Express] as a driver, which was not real. Before the court, the defendant showed he made no statement to the bank on the fact that he worked for [Sory Express] as a driver, which is invalidated by the document of page 273 entitled "payment commitment", filled in and signed by the defendant, but he admitted he was not employed and did not work even for one day for defendant [Mărginean], and agreed with his proposal to contract the loan to help him.

The statements of defendant [N. Mărginean] (pages 100-103 criminal investigation file, page 123) indicate that he did not sign any employment contract, but from discussions between co-defendants [Poienar] and [Mărginean] before going to the bank he found out that an employment contract had been concluded for him, which mentioned a higher salary than due so as the loan could be approved; therefore, the court cannot note a lack of intent to commit the offence, because he signed the necessary documents to obtain the loan, although he knew all these aspects.

Defendant [Chirilut] stated that, on their way to BCR - Cetate Agency he asked defendant [Mărginean] how he managed to obtain the EUR 15,000 loan, given that his employment contract indicated a monthly salary of about RON 450, and defendant Mărginean said he had arranged that the employment contract should mention the amount of RON 1500-1800. Nevertheless, defendant Chirilut accepted to contract the loan.

(ECF No. 43-1 at 192-202.)

///

Based on these and other findings of fact, the Romanian Trial Court entered the following conclusions of law:

> The actions of defendant [Mărginean] who, in order to obtain unlawful revenues, in the period of December 2007 - June 2008 determined a number of four persons to fraudulently contract bank loans, for which purpose he made available documents which he forged together with defendant [Poienar], while the total amount of the loans contracted is EUR 59,900 and RON 68,800 - constitute 4 offences of incitement to fraud provided by article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 and article 5 of the Criminal Code (3 material acts - passive subject-[Grozav]), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject [Chirilut]), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 5 of the Criminal Code (passive subject [N. Mărginean]), article 47 of the Criminal Code in conjunction with article 244 of the Criminal Code by applying article 35 paragraph 1 article 5 of the Criminal Code (2 material acts - passive subject [Trifan]).

> The actions of the same defendant who, acting on the basis of the same criminal intent to obtain fraudulent loans, drafted a number of 14 forged documents which were presented to banks - constitutes the offence of recurrent use of false deeds under a private signature provided by article 322 in conjunction with article 35 paragraph 1 of the Criminal Code by applying article 5 of the Criminal Code, all by applying article 39 paragraph 1, lett. b) of the Criminal Code on multiple offences.

(*Id.* at 204.)

Mărginean, represented by counsel, appealed his convictions, arguing that "there is no direct solid proof" that he intentionally caused his co-defendants to misrepresent their salaries other than his co-defendants' statements, and the same co-defendants admitted they "were aware that the solvency requirements were not met to obtain the loans[.]" (*Id.* at 250.) Mărginean argued that he "did not attempt at any time to make them request such loans" and that each borrower worked for Sory Express as either employees or day laborers and were paid for external transports in addition to their basic salaries. (*Id.*) Mărginean further argued there is no evidence that he intended to commit the offenses, as all he did was issue the requested income

certificates. (*Id.* at 251.) Mărginean acknowledged that "it is possible to have been wrong when he specified in the income certificates amounts exceeding the salary mentioned in the labour agreements, but what he considered was to include all amounts offered to his employees." (*Id.*)

The Romanian Court of Appeal reviewed the Romanian Trial Court's opinion and evidence evaluated therein, and affirmed Mărginean's convictions on January 21, 2015, finding his appeal "devoid of merit." (*Id.* at 259.) In so finding, the Romanian Court of Appeal presented a detailed summary of the "corroborated" trial evidence implicating Mărginean:

> From the corroboration of the evidence taken in this case, it results that the situation as considered in the appealed sentence is correct, the evidence being well, corroborated and interpreted.
>
> In this case, it is proven that [Mărginean], in order to obtain illegal income, during December 2007 - June 2008, made the defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav] fraudulently contract bank loans, which is why he provided them with documents which he forged together with the defendant [Poienar], the total amount of contracted loans being €59,900 and LEI 68,800.
>
> The same defendant, acting to obtain fraudulent loans, falsely prepared 14 documents which were submitted to the banks.
>
> Thus, the defendant [Chirilut] applied for and obtained a loan amounting to €15,000 from BCR SA - Cetate Agency on the 4th of December, 2007, using an income certificate and a labour agreement with unreal content, prepared by the defendant [Poienar] and signed for compliance by [Mărginean], as director of [Sory Express].
>
> On the 4th of January, 2008, the defendant [N. Mărginean] applied for and obtained a loan amounting to €15,000 from the same bank, using a labour agreement and an income certificate unrealistically certifying that he would have been an employee of the company [Sory Express] since the 2nd the July, 2007, having a gross basic salary of LEI 1,200. These documents were drawn up by the defendant [Poienar] and signed by [Mărginean].
>
> In May 2008 (on the 21st of May, 2008 and 23rd of May, 2008), the defendant [Trifan] fraudulently contracted two bank loans amounting to €19,900 from Alba Iulia Alpha Bank and B.C.R. - Sebe~Agency, using forged documents, namely a copy of a labour agreement and two income certificates. On the 21st of May, 2008, when he went to Alba Iulia Alpha Bank, he also filled in the document

PAGE 29 – OPINION AND CERTIFICATE OF EXTRADITABILITY

called "payment commitment" where, contrary to the reality, he specified that he worked as a driver for [Sory Express], and also consented to have the loan instalments withdrawn from his salary, in case of failure to pay.

In June 2008 (on the 4th of June, 2008 and 25th of June, 2008), the defendant [Grozav] applied for and obtained from B.C.R. - Sebe~Agency, B.R.D. Group Societe Generale - Alba Branch and Alpha Bank - Sebe~Agency three bank loans in amount of €10,000, RON 10,000 and RON 54,800, using forged documents, namely a copy of the labour agreement and income certificates, filled in and signed by the defendants [Poienar] and [Mărginean].

In agreement with the first instance, the Court of Appeal, based on its own analysis of the evidence taken in this case, determines that the facts exist, are offences of use of false deeds under a private signature, forgery and misrepresentation and were committed by the defendants in the way and using the method considered in the intimation. [Mărginean] denied that he would have exercised any action to make the co-defendants apply, in his name, for loans by deceiving the bank. Although he does not admit having signed the labour agreements and income certificates for compliance, at the same time claiming that he had no involvement in the bank loan contracting and that he would not have received the money, according to the evidence taken in this case it results that he was the one who made the co-defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav] go to the bank institutions and use documents containing real information, deceiving the bank officials in order to obtain loans. Also, the evidence taken in this case prove that the defendant was the one who signed all documents under a private signature called income certificates and the copies of the labour agreements, documents drawn up by the defendant [Poienar].

Thus, the defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav] have stated that [Mărginean] asked them to go to the bank and apply for a loan, stating that they agreed to contract the bank loans, relying on the promises of [Mărginean] that he would pay the related instalments.

Handwriting analysis reports have been drawn up in this case, establishing that the signatures affixed on the mentioned documents belonged either to [Mărginean], or they probably belonged to him, and the handwriting belonged to the defendant [Poienar].

Also, the witness [Lupu], who prepared the accounting records for [Sory Express], has stated that she has no involvement in the issuance of the income certificates submitted to the banks and her signature affixed on such certificates was forged, mentioning that she only had signed the documents that she had personally filled in.

The witness Lascan Adrian Ion who worked as a driver for [Sory Express] stated that, at the request of [Mărginean] he contracted a bank loan in amount of

€15,000, and he gave the latter the money, as he promised he would pay the loan instalments. He has also stated that after he ceased his activity with the company he found out that the defendants [Chirilut] and [N. Mărginean] also contracted bank loans for the company owner.

The witness Grigore Cosmin Danut, former employee of [Sory Express], has stated that he has knowledge of the fact that defendants [Chirilut] and [N. Mărginean] contracted bank loans for [Mărginean] and the defendant [Poienar] was the one who drafted the documents within the company.

The witness Gurgui Ioan, a friend of defendant Chirilut, has stated that he found out from him that he contracted a bank loan on the initiative of his employer "Ninut", based on the documents made available by him and that the defendant [N. Mărginean] contracted a bank loan under the same conditions.

Forensic report no. 67208C of the 22nd of May, 2009 drafted by Sibiu County Police Inspectorate - Forensics Unit after the polygraph test administered to defendant [Chirilul]. During the pre-test interview, the defendant stated that, at the request of [Mărginean], he accepted to contract the bank loan and have it mentioned on his income certificate a higher salary than his real income, although he was aware that, based on his income, he could not obtain a €15,000 loan. He has also stated that, according to their agreement, [Mărginean] had to pay the loan instalments for the amount of €11,000, while he was to pay personally the difference of €4,000. During the actual test, no specific reactions suggesting simulated behaviour +were detected for the relevant questions on the initiative of loan application and the involvement of [Mărginean.]

Forensic report no. 67209C of the 22nd of May, 2009 drafted by Sibiu County Police Inspectorate - Forensics Unit after the polygraph test administered to defendant [Trifan]. During the pre-test interview, the defendant stated that after obtaining the loan from ALPHA BANK, [Mărginean] offered him drinks in the village pub, and that was the only benefit he obtained. Also, during the actual test administered to the defendant, no specific reactions suggesting simulated behaviour were detected for the relevant questions[.]

The defendant [Poienar] has stated, during the criminal investigation, that she had filled in the labour agreements and the income certificates for the bank, and claimed she had done so at request and based on the indications given by [Mărginean], without confronting them with the accounting documents of the company.

Confirming the conclusions of the handwriting analysis reports by the statements of the co-defendants in this case, who claim that [Mărginean] is the one who approached and made them contract loans, the witnesses' statements, the results of the polygraph test, the fact that the documents used to obtain loans were

drafted in a similar manner, the court of appeal determined that it has been proven beyond any reasonable doubt that the defendant committed the offences.

[Mărginean] was definitely the one who obtained the money granted by the bank, based on false documents submitted to the bank, documents which were determinant in considering the conditions required for the bank loan, and the offence of misrepresentation was committed when the co-defendants received the money, as a result of the fact that the bank contracts were concluded.

(*Id.* at 253-56.)

### 4.    Disposition

Mărginean argues that the Government has not presented competent evidence to establish probable cause that he committed the offenses of conviction. (*See* Resp. at 1.) Specifically, Mărginean argues that the Government did not provide any evidence explaining Sory Express's accounting practices or any evidence to demonstrate the completeness of the payroll records at issue. (*Id.*) He argues that there is no evidence that the income certificates were false, or that Mărginean knew they were false. (*Id.* at 5.) He explains that the drivers at issue were not salaried or hourly employees, but were paid based on the routes they completed, and the trial evidence reflected that the income certifications at issue appeared to be consistent with what the drivers actually earned. (*Id.* at 5-13.)

The Court finds that the Government has met its burden of demonstrating probable cause, based on the detailed opinions of the Romanian Trial Court and the Romanian Court of Appeal, as well as the Court's independent evaluation of the evidence.

As discussed, in light of Mărginean's *in absentia* conviction, the Court cannot rely on the fact of his conviction alone to support a probable cause finding. However, courts have consistently held that a detailed judgment summarizing the relevant evidence—i.e., something more than just the fact of conviction—is sufficient to establish probable cause in the event of an

*in absentia* conviction. The district court's opinion in *Matter of Extradition of Blasko*, No. 1:17-mc-00067-DAD-SAB, 2018 WL 6044921, at *9 (E.D. Cal. Nov. 19, 2018), is instructive.

In the *Matter of Extradition of Blasko*, Slovakia sought the extradition of Blasko following his *in absentia* conviction. Blasko argued that because he was convicted *in absentia*, the government must "present independent proof of probable cause" and "the declaration of the trial judge, the judgment in the case, the appellate decision, and the international arrest warrant are insufficient to meet the obligations under the treaty." *Id.* at *7 (noting that Blasko further argued that the court cannot rely on the trial court's opinion where "statements of the eyewitnesses have not been provided and there is nothing to indicate that these individuals gave statements under oath or penalty of perjury" and "there is not sufficient indicia of reliability [of hearsay statements] to establish probable cause"). The government argued that the authenticated copy of the judgment was sufficient to establish probable cause. *See id.*

Acknowledging that in the past, courts have "have denied extradition where the requesting country's submissions are merely conclusory, unsupported by underlying documentation, or were otherwise unreliable," the district court found that "the requesting nation has provided more than the mere fact of conviction and the sentence that was imposed." *Id.* at *9. In *Blasko*, "[t]he judgment itself [wa]s an extensive recitation of the evidence that was considered and contain[ed] the testimony and statements of twenty witnesses and other documentary evidence that was considered during the trial of the matter." *Id.* (citations omitted). As a result, the district court found "no merit to the argument that the judgment itself is insufficient to establish probable cause."[3] *Id.*; *see also Haxhiaj v. Hackman*, 528 F.3d 282, 288-

---

[3] Following the certification of extradition, Blasko filed a habeas petition, the district court denied the habeas petition, and the Ninth Circuit affirmed the denial. *See Blasko*, 2023 WL 5198775, at *2 (affirming denial of habeas petition and finding that the evidence

90 (4th Cir. 2008) (disagreeing that the extradition treaty at issue required the requesting nation

to submit the underlying evidence in support of an *in absentia* conviction, and holding that "[t]he

certified copy of the appellate opinion satisfied the required showing and afforded a reasonable

basis upon which to find probable cause"); *United States v. Perilla Umbarila*, 562 F. Supp. 3d

729, 743 (C.D. Cal. 2022) ("This Court relies on the Superior Tribunal's judgment as sufficient

evidence that [the extraditee] committed the crimes for which his extradition is sought. Thus, the

Court holds that this judgment alone supports a finding of probable cause. The Court further

holds that 'an independent assessment of the facts surrounding [the] offenses' supports a finding

of probable cause." (quoting *Haxhiaj*, 528 F.3d at 290)); *In the Matter of Extradition of Manea*,

No. 3:15-mj-00157 (JGM), 2018 WL 1110252, at *14 (D. Conn. Mar. 1, 2018) ("In this case,

[the extraditee] contends that Article 8 of the Extradition Treaty . . . explicitly requires separate

evidence supporting probable cause when a defendant has been tried *in absentia*, and thus under

the terms of the Treaty, Romania must provide evidence of 'something other than the charging

document, arrest warrant, and conviction and sentencing documents.' The Court agrees that more

than conclusory evidence is required; however, the evidence submitted by Romania suffices.")

(simplified).

Similarly here, the Romanian Trial Court's decision contains a detailed summary of the

evidence presented at trial, and a thorough analysis evaluating the prosecutor's evidence and

---

summarized by the extradition court "overwhelmingly substantiated" probable cause that
Blasko committed the charged offense), *cert. denied*, 144 S. Ct. 2548 (2024). With respect to
relying on the evidence summarized in the Slovakian court's decision, the Ninth Circuit noted
that it has "consistently held that hearsay statements, including unsworn hearsay statements that
are summarized by a foreign court, can constitute 'competent evidence' in extradition
proceedings." *Id.* (first citing *Zanazanian*, 729 F.2d at 627; and then citing *Manta*, 518 F.3d at
1147).

Mărginean's and his co-defendants' proffered defenses. (ECF No. 43-1 at 192-202.) The Romanian Trial Court, in a position to evaluate all of the evidence and each witness's credibility—including Mărginean's—convicted Mărginean of the charged offenses. Having carefully reviewed the Romanian Trial Court's opinion and in light of the above authorities, the Court concludes that the evidence summarized in the judgment of conviction satisfies the probable cause standard here. *See In the Matter of Extradition of Manea*, 2018 WL 1110252, at *14 (relying on a Romanian trial court's decision to satisfy the probable cause requirement and stating that "it is inconceivable that the signatory parties would intend that judicial findings sufficient in themselves in either country would somehow not be sufficient to warrant extradition from one to the other") (citation omitted); *see also Blasko*, 2023 WL 5198775, at *2 ("Moreover, while American criminal courts do not conduct *in absentia* proceedings, it is for the executive branch and the Senate, not the judiciary, to examine the procedural fairness of foreign court systems and determine whether they are adequate for extradition purposes. Here, the governing Treaty does not require that we discount evidence from *in absentia* convictions, or that we seek individual sworn declarations from witnesses to extradite a fugitive. Considering the extensive evidence against Blasko detailed in the Slovakian court decision, we affirm that competent evidence supports the extradition court's probable cause finding.").

Further, Mărginean appealed his convictions, appeared via counsel before the Romanian Court of Appeal, and the appellate court affirmed the convictions. The Romanian Court of Appeal also carefully summarized the trial evidence, presented a thorough analysis of the evidence and Mărginean's and his co-defendants' proffered defenses, and concluded "beyond any reasonable doubt" that Mărginean committed the offenses of conviction. (*Id.* at 256.) Standing alone, the Romanian Trial Court's opinion is enough to satisfy the probable cause

standard, but when evaluated together with the Romanian Court of Appeal's opinion, there is no reasonable dispute that the opinions together satisfy the probable cause standard.

Although one or both of these opinions are sufficient to demonstrate probable cause, the Court alternatively finds that the Government has met its burden of demonstrating probable cause based on the Court's independent assessment of the facts. Notably, as summarized above, several witnesses implicated Mărginean and established his role in (i) recruiting the straw borrowers to apply for loans because Mărginean needed money, (ii) providing the false income statements the straw borrowers presented in support of their loan applications, (iii) forging documents, (iv) receiving the proceeds of the loans, and (v) failing to repay the loans. *See Manrique v. Kolc*, 65 F.4th 1037, 1044 (9th Cir. 2023) ("Self-incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing.") (citation omitted). Further, documentary evidence, expert handwriting analysis, and forensic test results corroborated the co-defendants' testimony. *See Blasko*, 2023 WL 5198775, at *2 (holding that detailed witness statements, documentary evidence, and an expert medical opinion summary "overwhelmingly substantiated" probable cause to believe that the extraditee committed the charged offense).

With respect to Mărginean's current argument that the Government has not presented sufficient evidence to demonstrate each borrower's actual earnings or that Mărginean knew the loan applications inflated each borrower's earnings, the Romanian Trial Court rejected the same defense theory at trial. (*See* ECF No. 43-2 at 107-08, Mărginean testified that he issued the income certificates to the borrowers to allow them to obtain loans and that the earnings data in the income certificates was true, and suggesting that any discrepancy was the result of paying the borrowers in Euros and paying for the number of transports each month in addition to a base

salary; ECF No. 43-1 at 201, finding that "defendant [Mărginean] fully denied his guilt, showing he had no involvement in contracting the bank loans and denied that he would have received the amounts of money; nevertheless, the defendant could not provide plausible explanation on the discrepancies between the documents he issued on behalf of [Sory Express] presented to the banks, on the one hand, and the records in the company bookkeeping on the employees and their wages, and the records of I.T.M. Alba, [i.e., Romania's labor agency,] on the other hand"; *id.* at 202, "The court notes the oscillating and insincere attitude of the defendant as all the evidence administered in the case and analysed above invalidates the claims of the defendant; as indicated by the witnesses heard and by defendants [Chirilut], [N. Mărginean], [Trifan] and [Grozav], the loans were contracted on the initiative of defendant [Mărginean], based on the promises made by the defendant to pay the loan instalments, and he was the person who used the money."). Further, Mărginean raised these same arguments on appeal (*see* ECF No. 43-1 at 250), but the Romanian Court of Appeal nevertheless affirmed his convictions. (*See id.* at 253-56.) Mărginean's attempts now to establish that the income certificates accurately reflected each of the borrower's earnings, without any explanatory evidence, is not persuasive.[4]

On this record, the Court agrees with the Government that "there is ample support for a finding of probable cause to believe that Mărginean conspired with Chirilut, Trifan, [N.

---

[4] Notably, none of the straw borrowers appear to have testified that the income certificates accurately reflected their earnings (if any) at Sory Express, and at least one borrower acknowledged in a forensic interview that the income certificate Mărginean created overstated his actual earnings. (*See, e.g.,* ECF No. 43-1 at 198, summarizing results of a forensic test administered to Chirilut, during which he "indicated that, upon request of defendant [Mărginean], he accepted to contract the bank loan and have it mentioned on his income statement a higher salary than his real income, although he was aware that, based on his income, he could not obtain a EUR 15,000 loan").

Mărginean], and Grozav to obtain loans from banks under false pretenses and using forged documents that misrepresented the amounts the borrowers earned as 'drivers' for Sory Express." (Gov't's Memo at 15.)

### F.    Other Challenges

#### 1.    Documentation of *In Absentia* Conviction

Mărginean also argues that Romania did not produce the information that the Extradition Treaty requires for *in absentia* convictions. Mărginean acknowledges that Romania has now "provided court records for many (or perhaps all) of the trial level hearings in Mr. Mărginean's case." (Resp. at 17.) However, Mărginean argues that the record fails to demonstrate why hearings occurred without Mărginean's presence or why the court called two of the five witnesses on a date when neither Mărginean nor his counsel were present. (*Id.*) Mărginean notes that Romania did not conduct a "nationwide search" for him, and made no attempt to serve him notice of proceedings in the United States. (*Id.* at 18.)

The Court finds that Romania has satisfied all of the requirements of Article 8 of the Extradition Treaty. As relevant here, Article 8(4) requires that in the case of an *in absentia* conviction, the requesting state shall provide "information regarding the circumstances under which the person was absent from the proceedings." (ECF No. 43-1 at 30.) Romania's original request for extradition did not include sufficient information for the Court to determine if the Romanian Court convicted Mărginean *in absentia* because the available records were internally inconsistent with respect to whether Mărginean or his counsel were present during the trial proceedings. However, the Government supplemented its original request with additional Romanian Trial Court records documenting each trial hearing and the attendance or absence of Mărginean and his counsel on each day. Notably, the Romanian Trial Court's records established that both Mărginean and his counsel were absent from three days of trial, including one trial date

PAGE 38 – OPINION AND CERTIFICATE OF EXTRADITABILITY

on which two of the five trial witnesses testified. Based on these trial records, the Court

concluded that the Romanian Court convicted Mărginean *in absentia*, such that the Court must

consider his conviction only as a charge and require independent proof of probable cause. *See*

*Matter of Extradition of Mărginean*, 2023 WL 8069641, at *3 ("In light of Mărginean's in

absentia conviction, the Court finds that Romania must comply with Section 8, paragraph 4(d) of

the Extradition Treaty, and the Court must make an independent finding of probable cause to

certify Mărginean's extradition to Romania.").

      The Romanian Trial Court's records also included information regarding its service of

notice of the various hearing dates on Mărginean or his counsel as required by Romanian law.

(*See, e.g.*, ECF No. 43-2 at 97, proof of service records.) The Court does not reach the question

of whether, in the event of an *in absentia* conviction, the requesting country is required to

provide proof that it served notice on the extraditee for each day of trial or whether the proof of

service complied with the requesting country's law. Here there is no dispute that Mărginean was

aware of his trial because he appeared for portions of it, he was represented by counsel

throughout the trial, and he voluntarily left Romania to live in the United States during the

relevant time period. In light of those undisputed facts, the record supports the conclusion that

Mărginean was aware of but voluntarily waived his right to be present at the entirety of his trial.

*Cf. Haxhiaj*, 528 F.3d at 291 ("Underlying the disparate treatment of a conviction rendered *in

absentia* is the notion that 'a trial in absentia is not likely to be a fair trial,' affording the accused

'no opportunity to confront the prosecution witnesses or to present a defense' and providing no

real 'assistance in ascertaining the probable guilt of the accused.'") (citation omitted). As such,

the Court finds that Romania was not required to provide information about its efforts to serve

Mărginean with notice of each hearing date in order to satisfy the Extradition Treaty's

PAGE 39 – OPINION AND CERTIFICATE OF EXTRADITABILITY

requirement that the requesting state provide "information regarding the circumstances under which the person was absent from the proceedings." (ECF No. 43-1 at 30.) Rather, Romania satisfied the Extradition Treaty's requirement by providing information regarding which days Mărginean and his counsel were present and absent from the trial, because that information allowed the Court to determine whether Mărginean was convicted *in absentia* and to apply the appropriate standard. *See Matter of Extradition of Mărginean*, 2023 WL 8069641, at *3.

### 2.    Human Rights Violations

Mărginean also opposes extradition because a United Kingdom court previously denied his extradition to Romania on the ground that extradition would be incompatible with international standards of human rights. (*See* Resp. at 18.) However, Ninth Circuit precedent requires this Court to allow the Secretary of State to resolve any objections to extradition on human rights or humanitarian grounds.

The Ninth Circuit has "long adhered to the rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state." *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (first citing *Blaxland*, 323 F.3d at 1208; and then citing *Barapind v. Reno*, 225 F.3d 1100, 1105-06 (9th Cir. 2000)); *Blaxland*, 323 F.3d at 1208 (noting that "judges generally 'refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely'" (quoting *Lopez-Smith*, 121 F.3d at 1327)); *Barapind*, 225 F.3d at 1105-06 (recognizing that "[m]any courts, including ours, have adhered to the general rule that it is not the role of the courts, but rather the Secretary of State, to determine whether extradition should be denied on humanitarian grounds"). "The rule of non-inquiry is based on the principle that the Secretary of State's exercise of discretion

regarding whether to extradite an individual may be based not only on 'considerations individual to the person facing extradition' but 'may be based on foreign policy considerations instead.'" *Prasoprat*, 421 F.3d at 1016 (citing *Lopez-Smith*, 121 F.3d at 1326).

Thus, the law is clear that this Court "lacks discretion to inquire into the conditions that might await a fugitive upon return to the requesting country." *Prasoprat*, 421 F.3d at 1016 ("Once the magistrate judge determines that the crime is extraditable and there is probable cause to sustain the charge, 'it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive.'" (quoting *Blaxland*, 323 F.3d at 1208)); *Parsons v. Feather*, No. 3:13-cv-01905-JO, 2014 WL 2123983, at *5 (D. Or. May 19, 2014) ("The magistrate judge determined that the allegations against [the extraditee] fell within the terms of the Extradition Treaty and that the evidence supported probable cause. Having made that judicial determination, he had no authority to refuse to issue a certificate for extradition on the basis of [the extraditee]'s allegation that he may be treated inhumanely. [The extraditee] must direct his arguments based on the [Convention Against Torture] to the Secretary of State.").

Accordingly, even if the Court has concerns that the United States is supporting Mărginean's extradition after a European court has already determined that his extradition would violate international human rights law, the Court must leave it to the Secretary of State to evaluate the current state of Romania's prison system.[5] *See* U.S. Department of State, Country Reports on Human Rights Practices for 2023, Romania, available at https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/romania,

---

[5] Mărginean has preserved his arguments that extradition to Romania would violate his international human rights, and that delegating the evaluation of international human rights to the Department of State violates the separation of powers doctrine and Article III, Section 2 of the U.S. Constitution. (*See* Resp. at 18-20.)

[https://perma.cc/5HBV-YS69] (recently finding that "[p]rison conditions [in Romania] were harsh and overcrowded[,]" "[a]buse of prisoners by authorities and other prisoners occurred[,]" "[p]risoners had very limited access to hot water[,]" "[i]ndependent observers noted . . . [m]attresses and bedding were often worn out and infested with bed bugs and cockroaches[,]" "[p]risoners had insufficient in-cell heating in winter[,]" "[p]risons reportedly provided insufficient medical care[,]" "[p]rison authorities in some facilities kept prisoners confined to their cells for long periods without opportunity for movement or exercise[,]" and "[p]risoners regularly assaulted and abused fellow inmates with impunity").

## CERTIFICATE OF EXTRADITABILITY

Having heard and considered the evidence and arguments in this matter, and based on the findings and conclusions set forth above, the Court CERTIFIES to the Secretary of State of the United States of America that:

1.  This Court has subject matter jurisdiction over extradition proceedings.

2.  This Court has personal jurisdiction over Mărginean.

3.  A valid Extradition Treaty exists between the United States and Romania.

4.  The Extradition Treaty between the United States and Romania is, and at all relevant times has been, in full force and effect.

5.  Romania charged and convicted Mărginean of criminal offenses within its jurisdiction.

6.  The offenses with which Mărginean has been charged and convicted are extraditable offenses under the Extradition Treaty between the United States and Romania.

7.      The person before the Court is the same person who is sought in the request for

extradition.

8.      The request for extradition contains competent evidence establishing probable

cause to believe that Mărginean committed the charged offenses of instigation to

misrepresentation and use of a false deed under private signature.

9.      The documents required have been presented in accordance with the laws of the

United States of America and the Extradition Treaty, and have been translated and

duly authenticated.

The parties shall confer regarding an appropriate surrender date, and provide the Court

with a status report by February 7, 2025.

**IT IS SO ORDERED.**

DATED this 24th day of January, 2025.

HON. STACIE F. BECKERMAN
United States Magistrate Judge